

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0159-12

### GREGG CARL BAIRD, Appellant

### v.

### THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE TENTH COURT OF APPEALS
### BRAZOS COUNTY

PRICE, J., delivered the opinion of the Court in which WOMACK, KEASLER, HERVEY, COCHRAN, and ALCALA, JJ., joined. KELLER, P.J., filed a concurring opinion. MEYERS, J., filed a dissenting opinion. JOHNSON, J., concurred in the result.

### O P I N I O N

The appellant hired Dawn Killian to stay at his home and care for his dog while he was away on vacation. During her stay, Killian used the appellant's computer in his master bedroom and found child pornography. At a pre-trial motion to suppress hearing, the appellant claimed that Killian's access to his bedroom and computer was illegal; therefore, the State could not use the evidence against him at his trial, under Article 38.23(a) of the

Baird — 2

Texas Code of Criminal Procedure.[1]  The trial court denied the motion to suppress, and the

Tenth Court of Appeals affirmed.[2]  We granted the appellant's petition for discretionary

review to examine this holding.  We now affirm.

## FACTS AND PROCEDURAL HISTORY

### In the Trial Court

The appellant was indicted for thirteen counts of child pornography.[3]  Prior to trial,

the appellant filed a motion to suppress the files seized from his computer, claiming that they

should be excluded under Article 38.23(a) of the Code of Criminal Procedure.  Specifically,

the appellant alleged that Dawn Killian recovered the computer files while violating the

Texas Penal Code provisions that prohibit criminal trespass and breach of computer security.[4]

At the suppression hearing, Killian testified to the events that led up to her finding child

pornography on the appellant's computer.

Killian came to know the appellant through a mutual friend, and the appellant

arranged for her to pet sit for his dog while he was out of town.  In preparation for the job,

---

[1]

*See* TEX. CODE CRIM. PROC. art. 38.23(a) (evidence obtained in violation of the laws or constitutions of Texas or the United States may not be used as evidence in a criminal case).

[2]

*Baird v. State*, 379 S.W.3d 353, 358 (Tex. App.—Waco 2012).

[3]

TEX. PENAL CODE § 43.26(a).

[4]

*See* TEX PENAL CODE § 30.05(a)(1) and § 33.02(a).  At the suppression hearing, the appellant also alleged that Killian violated other penal provisions, but he did not press those claims on appeal or in his petition for discretionary review, and so we have no occasion to address them.

Killian visited the appellant's home twice, once to meet the dog and a second time on the day that the appellant planned to leave so he could show her around the home.  This tour of the appellant's home, Killian maintained, included a walk through the master bedroom and bathroom as well as the guest bedroom and bathroom, where she was to stay.  The appellant also pointed out his roommate's bedroom and office and "kind of indicat[ed] that those were probably places that neither I [n]or the dog would be going."  In the kitchen, the appellant "open[ed] cabinets and cupboards" specifically to show Killian where the dog's leash could be found and to "kind of show[] [her] where things were at."  While they were in the kitchen, the appellant told Killian, "Help yourself to anything."  According to Killian, this statement was repeated at least once during the tour of the home.  At one point, Killian quotes the appellant as going so far as to tell her that she could "[h]elp [her]self to *everything*."  As part of the tour, the appellant demonstrated how to use the various remote controls to his "very large TV" and DVD player.  The appellant instructed Killian to keep the master bedroom door closed "because he didn't want the dog sleeping in his bed[.]"  However, the appellant never specifically instructed Killian that she was not permitted to enter the master bedroom or that she was not allowed to access his computer in the master bedroom.

Killian then explained how she came to use the appellant's computer.  In an attempt to copy songs from one of the appellant's compact disks onto her phone, Killian entered the master bedroom and activated the computer from its sleep mode by simply moving the mouse.  The computer was powered on and was not password protected.  She inserted a

Baird — 4

compact disk into the computer to begin the copying process. After realizing that the process would be more complicated than she originally believed, Killian decided to abandon her idea to transfer the songs. However, by this time she had already loaded the music onto the computer. In an attempt to "clean up what [she] had done," she went into the "recent documents" folder. There she saw titles that suggested the appellant had child pornography on his computer.[5] Killian also opened the "recycle bin . . . [t]o take the second step of deleting the music." There she discovered thumbnail images of what she thought was child pornography. When playing a video ultimately confirmed her suspicion, Killian contacted the College Station Police Department.

To corroborate Killian's testimony, the State called William Odom, a forensic computer expert, who studied a "forensic copy" of Killian's activity on the appellant's computer.[6] Odom's testimony largely substantiated Killian's story, except that he did not find any evidence that songs were transferred onto or deleted from the computer.

The appellant testified, contesting Killian's testimony in a few key aspects. He denied having taken Killian into the master bedroom or bathroom. He confirmed that he told Killian to keep the door to the master bedroom closed. His intention was not only to keep his dog out, but to keep Killian out as well. However, it is unclear from his testimony whether he

---

[5]

    While Killian could not remember the title of the files at the hearing, she agreed that it was something to the effect of "younger boy sucks older man."

[6]

    The record does not clearly reveal exactly what a "forensic copy" is. Whatever it is, it seems to have provided Odom with specific information about Killian's access to the computer.

Baird — 5

ever communicated either of these specific intentions to Killian.[7]  He did acknowledge that

_____

[7]

    On cross-examination, the prosecutor asked the appellant about his instruction to keep the door closed and his motivation behind that instruction:

> Q  Now, you indicated you told her the bedroom door should remain shut.  You never told her she could not go into the bedroom. Is that correct?
>
> A  Correct.
>
> Q  The idea of keeping the bedroom door shut really had to do about keeping the dog out while she was not there; is that right?
>
> A  True.
>
> ***
>
> Q  So no question you never told Dawn, "Do not go into my bedroom?"
>
> A  I never stated - - - I told Dawn to keep the bedroom door shut.
>
> Q  And that was in connection with keeping the dog out of there when she wasn't in there? Yes or no?
>
> A  Correct.
>
> ***
>
> Q  But your recollection now is that you specifically told her, "I don't want [the dog] in my bedroom?"
>
> A  Correct.
>
> ***
>
> A  The only statement I recall telling her was to please keep my bedroom door shut.
>
> Q  In connection with [the dog], right?
>
> A  I don't know if those two statements were made concurrently at the same time.

In response to a question on redirect examination, the appellant indicated that the reason he wanted the door closed was to keep both the dog and Killian out of the bedroom.  He was never

Baird — 6

he never expressly *told* Killian not to enter his master bedroom.  With respect to his statement

to Killian that she should "[h]elp [her]self to anything," the appellant claimed that he made

this offer in the kitchen and that it pertained specifically and exclusively to food.  He

explained that he actually told Killian, "You can help yourself to any food you find," while

gesturing to the refrigerator.  As evidence of this limited intention, he told the trial court that

he had stocked his kitchen with Killian's preferred beer and food.  He admitted that he

showed Killian how to use both his television and his stereo.  Finally, while he maintained

that Killian did not have his consent to access his computer, the appellant acknowledged that

he allowed his roommate to use it.

The defense next called Rose Hubbard, a computer forensic examiner.  She agreed

with Odom that there was no indication that music had been loaded onto or deleted from the

computer.  Unlike Odom, Hubbard testified that she did not find evidence consistent with

Killian inserting a compact disk into the computer.  Instead, Hubbard explained, the evidence

simply showed that "a file was accessed."[8]

---

asked, however, and never offered whether he expressed this motivation to Killian during the tour.

[8]   It is unclear from Hubbard's testimony exactly what kind of file she believed was accessed.
Hubbard refers to the file in question as an "AOL CAT file," a "CAB file," a "M.C.S.C. CAT" file,
or a file consistent with "the computer being asleep and updating itself."  It is also unclear from her
testimony whether she believed that the computer was still in sleep mode during this time.  The
defense attorney inquired about the state of the computer during the time Killian claims she input
a compact disk:

Q  So your testimony is that this just happened while the computer was asleep?

A  Possibly.

Baird — 7

The trial court denied the appellant's motion to suppress the images taken from his computer, crediting Killian's testimony over the appellant's.[9]  Specifically, the trial court found that the appellant did not explicitly exclude Killian from his bedroom or from his computer; that he walked her through the master bedroom and bathroom; and that he told her

---

Q  Possibly?

A  Yes.

[9]

The suppression hearing concluded on February 26, 2010.  The State filed proposed findings of fact and conclusion of law on May 27, 2010.  On August 3, 2010, the appellant requested findings. *See State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006).  The trial court subsequently adopted the State's proposed findings and conclusions, which included the following:

3.  Dawn Killian provided credible testimony regarding the circumstances of her access to [the appellant's] home, bedroom, computer, and information on that computer.

* * *

8. [The appellant] placed no limits or restrictions on Dawn Killian's access to his home.

9.  Specifically, [the appellant] placed no limitations or restrictions on Dawn Killian's access to his bedroom.

10. [The appellant] placed no limitations or restrictions on Dawn Killian's access to his computer.

11. [The appellant] . . . took no steps to protect the information on his computer[.]

12. Prior to leaving his home, [the appellant] showed Dawn Killian around his home, including his bedroom and bathroom.

13. [The appellant] told Dawn Killian to "help yourself to anything" or words of that effect.

to "[h]elp [her]self to anything."  Based on these fact findings, the trial court determined that Killian did not violate the Penal Code because she had the appellant's effective consent to enter the bedroom and use the computer, and it held that, without establishing that Killian violated the law, the appellant could not invoke Article 38.23 to exclude the material.[10]

After the trial court denied his motion to suppress,[11] the appellant pled guilty to ten counts of child pornography, and the trial court sentenced him to ten years' incarceration on nine of the counts and five years' incarceration on the remaining count.  The judge ordered the five year sentence and one of the ten year sentences to run consecutively to the eight other ten year sentences.  On appeal, the appellant challenged the pre-trial suppression ruling.

### In the Court of Appeals

The court of appeals affirmed the trial court's ruling.[12]  The court of appeals

---

[10]

    Under either provision, Killian violated the Penal Code only if she did not have effective consent.  *See* TEX. PENAL CODE § 30.05(a) ("A person commits an offense if the person enters or remains on or in property of another, including residential land, agricultural land, a recreational vehicle park, a building, or an aircraft or other vehicle without effective consent and the person: (1) had notice that the entry was forbidden; or (2) received notice to depart but failed to do so."); TEX. PENAL CODE § 33.02(a) ("A person commits an offense if the person knowingly accesses a computer, computer network, or computer system without effective consent of the owner.").

[11]

    At the conclusion of presentation of evidence at the suppression hearing, counsel for the appellant made his closing argument first, followed by the prosecutor.  Without awaiting rebuttal argument from the appellant, the trial court orally denied the motion to suppress.  Counsel for the appellant complained that he had not been permitted to rebut, but ultimately yielded with the observation that, "I'm not going to do a useless thing."  The trial court apologized for encroaching, observing that "I thought you were through."  Trial counsel concluded, "That's fine, Judge."

[12]

    *Baird, supra*, at 358.

Baird — 9

concluded that the trial court's resolution of the factual dispute was supported by the evidence elicited at the suppression hearing and that the trial court correctly denied the motion to suppress under Article 38.23 based upon the facts as thus resolved.[13]  According to the court of appeals, Killian did not violate either section of the Penal Code because she had the appellant's apparent consent to access his master bedroom and use his computer. That is to say that, while she did not have the appellant's express assent in fact, she did have his apparent assent in fact.[14]  We granted review of the appellant's petition for discretionary review to scrutinize this holding.[15]

## APPELLATE STANDARD

An appellate court reviews a trial court's pre-trial suppression ruling under a bifurcated standard.[16]  Almost total deference is afforded to the trial court's determination of fact.[17]  Determinations of fact include "who did what, when, where, how, or why" and

---

[13]

*Id.* at 357-58.

[14]

*Id.*

[15]

TEX. R. APP. P. 66.3(b).  One consideration informing this Court's decision on whether to grant a petition for discretionary review is "whether a court of appeals has decided an important question  of state or federal law that has not been, but should be, settled by the Court of Criminal Appeals."

[16]

*Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010).

[17]

*Id.*

"credibility determinations."[18] Because "[t]rial judges . . . are uniquely situated to 'observe[]

first hand the demeanor and appearance of a witness[,]'" this Court has long recognized that

they are the sole arbiter of questions of fact and of the weight and credibility to give

testimony.[19]   In that capacity, a trial judge is free to believe or disbelieve any part of the

testimony as he sees fit.[20]   When a trial judge makes written findings of fact, as he did in the

instant case, a reviewing court must examine the record in the light most favorable to the

ruling and uphold those fact findings so long as they are supported by the record.[21]   The

reviewing court then proceeds to a *de novo* determination of the legal significance of the

facts as found by the trial court.[22]   That *de novo* determination sometimes involves

construction of statutory language.[23]

## ANALYSIS

### The Trial Court's Resolution of Factual Discrepancies

The appellant objects to the trial court's findings that he placed no limits on Killian's

---

[18]

*State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008).

[19]

*Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007) (quoting *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)).

[20]

*Ross, supra*, at 855.

[21]

*Valtierra, supra*, at 447.

[22]

*Derichsweiler v. State,* 348 S.W.3d 906, 913 (Tex. Crim. App. 2011).

[23]

*Williams v. State*, 253 S.W.3d 673, 677 (Tex. Crim. App. 2008).

access to either his bedroom or his computer.[24]   We do not disagree that the appellant's own testimony would support his contention that he never assented in fact to her entering his bedroom and accessing his computer.  But we review the record in the light most favorable to the trial court's resolution of disputed facts and conclude that the evidence— specifically Killian's testimony—adequately supports the trial court's contrary fact findings.  Killian testified, and the appellant confirmed, that he never explicitly excluded her from his master bedroom or from his computer.  She also testified that he told her to "[h]elp [her]self to anything" and "everything"; he walked her through the master bedroom, where the computer was kept; and he told her to keep the bedroom door closed only for the express purpose of keeping the dog out.  With regard to the specific finding that appellant placed no limits on Killian's access to his computer, the appellant acknowledged that he regularly allowed his roommate to use it.  He also conceded that he had showed Killian how to use other electronic devices such as his television and stereo.  Killian's testimony that the appellant had left the computer powered on and did not put a password on it also supports this finding.

The appellant particularly contests the trial court's implicit finding that the appellant told Killian to "[h]elp [her]self to anything" in the house.[25]   Again, he points to his own

---

[24]
    *See* note 9 *ante*, Finding of Fact #8.

[25]
    *See* note 9, *ante*, Finding of Fact #13.  While this finding of fact, when viewed alone, is somewhat ambiguous as to whether the statement applied to a particular area of the house or the home as a whole, when viewed in the context of the trial court's other findings, it is reasonable to conclude that the trial court found that the statement applied to the entire house.  The trial court deemed Killian's testimony to be credible.  Killian testified that the statement applied to the entire

Baird — 12

testimony that this comment was only made in the kitchen, and specifically in reference to

food. However, the appellant does not acknowledge that Killian testified that the appellant

repeated this statement at least once during the tour of the home and told her also to "[h]elp

herself to everything."[26]   We conclude that the trial court's resolution of this

---

house. She even quotes the appellant at one time saying she could "[h]elp [her]self to everything."
Killian's testimony, combined with the trial court's finding that the appellant placed no limits on
Killian's access to his home, support the inference that the trial court implicitly found that the
statement applied to the entire home.

[26]

     The record presents ample reason for the trial court to find Killian's account more credible,
including her testimony that the appellant's invitation to "help herself" was extended more than once
and was not limited to the contents of the kitchen. Immediately after accessing the appellant's
computer and finding what looked to her like child pornography, Killian took part in a lengthy
Internet "chat room" conversation, which was accessed by the State's computer expert, downloaded,
printed out, and admitted into evidence at the suppression hearing. In it, Killian described the tour
that the appellant had given her of the house, which "included directions to the 5 remotes to the tv,
the stereo, the security, etc[.] and a general 'help yourself to anything' statement."

> Killian then described how she
>
> decided to copy 2 songs from a cd to my phone and 'woke' the computer from sleep
> mode, installed the music disc, completed the transfer, then opened the start
> menu/my recent documents to right click and remove the 2 songs from the list then
> delete them from the trash. Both the trash and the my recent documents list are full
> of video download titles such as 'emo boyslave,' '3 boys of fun, 'my 10 yr old
> boyfriend' (this would be when I throw up).

Killian admitted to a certain paranoia, such as whether she might be accused of downloading the
pornography, and wondered whether she should tell her boss, who is a friend of appellant, what she
had seen. Then she worried that her boss, who also had a key to appellant's house, might be accused
of downloading the videos. She explained that the situation was

> horribly serious. On one hand I have no desire to falsely accuse anyone of
> downloading childporn (I have seen what being labeled a sex offender can do to
> persons that you and I wouldn't consider dangerous) . . . nor deal with all the drama
> this revelation could initiate (its possible my boss could dislike me for "telling" on
> his friend). On the other hand, my boss has a boy child, this neighborhood is full of
> children and this man has had years of access as Big Brother/Eagle/adventure

factual/credibility dispute between the parties—that the appellant's invitation was not limited to food—is supported by the record.

## Apparent Consent

The appellant also challenges the court of appeals's ruling with respect to the legal significance of the facts even as the trial court found them.[27] The court of appeals held that Killian had the effective consent to enter the appellant's bedroom and use his computer because he gave her his "apparent" assent in fact to do so.[28] The court of appeals did not elaborate on what it meant by "apparent," and the Penal Code does not define it.

Whether Killian committed either trespass or breach of computer security depends upon whether she had the appellant's "effective consent."[29] The issue is not whether any consent that the appellant may have given was "effective" as that term is defined in the Penal

---

Scout[.]

Numerous "chat room" people respond with advice, virtually all of it recommending that she notify the authorities.  Killian bemoaned the situation in which she found herself:

> Why did I want to dog sit for money . . . (is fling money for my san diego trip worth this??)  I wish I had never wanted to put that music on my phone.

Killian and the chat room participants decided that she must report what she had seen.  Killian signed off, saying, "meanwhile I am taking the dog and going to my house[.] [T]his fancy place is creeping me out now. [T]omorrow is going to be a busy tough day."  This chat room conversation is entirely consistent with Killian's testimony at the suppression hearing.

[27]    Appellant's Brief at 17.

[28]    *Baird, supra,* at 357-58.

[29]    *See* note 10, *ante.*

Baird — 14

Code,[30] but whether he gave any consent at all.  "Consent" is statutorily defined as "assent in fact, whether express or apparent."[31]  There is no contention here that the appellant *expressly* assented in fact to Killian entering his bedroom and accessing his computer.  The issue therefore boils down to whether, as the court of appeals held, the appellant gave his "apparent" assent in fact to her doing so.  Whether Killian's description of her encounter with the appellant fits the statutory criteria for apparent assent in fact turns on what we construe "apparent" to mean in the context of the statutory language in which it appears.

So what does Section 1.07(11) of the Penal Code mean by "assent in fact" that is "apparent" as opposed to "express"?  The cardinal principle of statutory construction is to implement the will of the Legislature.[32]  In construing statutory language, we always begin with the literal text, reading it in context and construing it according to the rules of grammar and common usage.[33]  We assume that every word was meant to serve a discrete purpose that should be given effect.[34]  And we may also consult standard dictionaries to determine the common usage of a word where that word does not have a technical meaning or is not

---

[30]
    TEX. PENAL CODE § 1.07(19).

[31]
    TEX. PENAL CODE § 1.07(11).

[32]
    *Ivey v. State*, 277 S.W.3d 43, 52 n.51 (Tex. Crim. App. 2009).

[33]
    *Tapps v. State*, 294 S.W.3d 175, 177 (Tex. Crim. App. 2009).

[34]
    *Id.*

particularly defined by the Legislature in the statute itself.[35]  If, having implemented these basic canons of statutory construction, we find that the statutory language is plain on its face, we are ordinarily constrained to adhere to the plain import of that statutory language, regarding it as the definitive indicium of the legislative intent.[36]  We may not resort to extra-textual factors to construe statutory language otherwise than by its plain import—unless implementation of the plain language would lead to absurd consequences that the Legislature could not possibly have intended.

The word "apparent" has two dictionary definitions that could plausibly apply in the context of Section 1.07(11) of the Penal Code.  The oldest sense of the word is "clear or manifest to the understanding."[37]  But the word may also mean, in some contexts, "manifest to the sense or mind as real or true on the basis of evidence that may or may not be factually valid."[38]  A statute is ambiguous when the language it employs is reasonably susceptible to

---

[35]  *Cornet v. State*, 359 S.W.3d 217, 222 (Tex. Crim. App. 2012) (plurality opinion); *Ex parte Rieck*, 144 S.W.3d 510, 512 (Tex. Crim. App. 2004).

[36]  *Tapps, supra.*

[37]  Merriam Webster's Collegiate Dictionary 56 (10th ed. 1996).

[38]  *Id.*  Other dictionaries we have consulted manifest a similar duality of meaning for the word "apparent."  *See* Black's Law Dictionary 112 (9th ed. 2009) ("**1.** Visible; manifest; obvious. **2.** Ostensibly; seeming."); Webster's Third New International Dictionary Unabridged 102 (2002) ("**1:** capable of easy perception: as **a:** readily perceptible to the senses, esp. sight **:** open to ready observation or full view **:** unobstructed and unconcealed . . . **b:** capable of being readily perceived by the sensibilities or understanding as certainly existent or present . . . **2:** readily manifest to senses or mind as real or true and supported by credible evidence of genuine existence but possibly distinct from or contrary to reality or truth").

more than one understanding.[39]   But before we declare a word that has more than one

plausibly applicable definition sufficient to render a statute ambiguous, and therefore subject

to interpretation by extra-textual factors, we must broaden our examination to the setting in

which the word appears, in order to determine whether context makes clear which definition

the Legislature intended.[40]  Reading "apparent" in context, and invoking the canon that every

word is presumed to have a discretely effective purpose, we think it plain which of the

common-usage definitions the Legislature intended.[41]

  Only the first definition of "apparent" set out above gives the "assent in fact" clause

in Section 1.07(11) its full meaning and purpose.  To assent, is "to agree to something

esp[ecially] after thoughtful consideration."[42]  "In fact" has been defined as "actual or real."[43]

For "assent" "in fact" to occur, therefore, there must be an actual or real agreement after

thoughtful consideration.  In the context of Section 1.07(11)'s definition of consent, to give

the word "apparent" the second definition above—something that *seems* real enough but

which is not necessarily so—would strip the "assent in fact" clause of its plain and literal

---

[39]
 *E.g.*, *Mahaffey v. State*, 364 S.W.3d 908, 913 (Tex. Crim. App. 2012).

[40]
 *Cornet, supra* at 222.

[41]
 *Id.*

[42]
 WEBSTER'S, *supra*, at 69.

[43]
 BLACK'S, *supra*, at 846.

significance.   After all, consent cannot be both an "actual or real" agreement "after thoughtful consideration" and at the same time only a seeming agreement that "may or may not be factually valid."  We therefore conclude that, read in context, the word "apparent" as it appears in Section 1.07(11) embraces the first dictionary definition of "apparent"—assent in fact that, while not communicated expressly, is no less "clear and manifest to the understanding" for not having been explicitly verbalized.[44]  Because we deem the statutory

---

[44]    Our construction of "apparent" for purposes of determining the meaning of consent as defined by Section 1.07(11) obviously differs from the meaning of "apparent" in the context of third-party authority to consent to a search for Fourth Amendment purposes.  When a police officer obtains consent to conduct a warrantless search from a third party, we refer to that third-party's seeming authority to consent, though ultimately found invalid, as "apparent" authority to consent. *Limon v. State*, 340 S.W.3d 753, 756-57 (Tex. Crim. App. 2011);  *Hubert v. State*, 312 S.W.3d 554, 560-62 (Tex. Crim. App. 2010).  If the officer reasonably, though mistakenly, believes that the third party was authorized to give consent, then that "apparent" (that is to say, seeming) authority renders the search reasonable for Fourth Amendment purposes.  *Id.*  The Fourth Amendment does not demand that police assessment of the situation be invariably accurate—only that it be reasonable. *Illinois v Rodriguez*, 497 U.S. 177, 184 (1990).  For Fourth Amendment purposes, then, it is enough that authority to give consent is reasonably "apparent" under the circumstances, in the sense that there is every indication that such authority exists even if, in reality, it does not.  But, for reasons we explain in the text, we do not think the Legislature meant for the word "apparent" in Section 1.07(11) to denote "seeming" for purposes of defining criminal offenses in the Penal Code.

    By letter brief following submission of the case, the appellant has called our attention to language from the very recent opinion in *Florida v. Jardines*, 133 S.Ct. 1409 (2013).  There, the United States Supreme Court remarked that "[t]he scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose."  *Id.* at *5.  Nothing that we say today conflicts with this proposition. The Supreme Court's remark in *Jardines* came in the context of resolving a question, not of the proper scope of an express or implied consent to search for Fourth Amendment purposes, but of what kind of official conduct constitutes a "search" to begin with. Specifically, the Court was called upon to determine the point at which police deviation from "customary" or "traditional" recognition of public access to the curtilage of a home is sufficient to trigger the reasonableness requirement of the Fourth Amendment.  Here, we are not concerned with the scope of "customary" or "traditional" consent to enter a premises, but with the scope of the permission that was conveyed, expressly or impliedly, by the appellant's particular language and conduct under the circumstances of this particular case.  What is the scope of the "particular areas"

Baird — 18

language to be plain, we have no occasion to resort to extratextual factors to determine the meaning of "apparent" consent.[45]

## Apparent Consent

Under this construction of the term, the evidence supports a finding that the appellant gave Killian his apparent consent. The appellant invited Killian to help herself to "anything" and "everything," and this invitation was not limited to the refrigerator and pantry, but was repeated during the course of the tour of the house, which included his master bedroom. Whatever he may have intended, the appellant *told* Killian only that he required her to keep the bedroom door closed in order to keep the dog out. He did not expressly banish her from the bedroom, nor did he forbid her to use his computer. He showed her how to operate the television and stereo. He did not power the computer down or password-protect it, and he admitted that he allowed his roommate to use it regularly. Given this convergence of facts, the trial court was justified in concluding that Killian had the appellant's apparent consent—that is to say, it is clear and manifest to the understanding that she had his assent in fact—to enter his bedroom and use his computer.

---

of his home, and of the "specific purpose" for which she could access those areas, that the appellant communicated, if only implicitly, during his interactions with Killian? *Jardines* does not speak to this question. In any event, as we have observed in the immediately preceding paragraph, we are here concerned with the extent to which the appellant's language and conduct communicated consent, not as it has been understood for Fourth Amendment purposes, but as it is properly to be understood as a function of Section 1.07(11) of the Penal Code.

[45]

*Ivey, supra*, at 52 n.51.

## CONCLUSION

Accordingly, we affirm the judgment of the court of appeals.


DELIVERED:       May 8, 2013
PUBLISH