# 10-10-00297-CR

# CLERK'S RECORD

VOLUME 2 OF 2
Trial Court Cause No. 09-02494-CRF-272
In the 272ND DISTRICT COURT
of BRAZOS County, Texas-
Honorable TRAVIS BRYAN III, Presiding Judge

THE STATE OF TEXAS
VS.
Gregg Carl Baird

FILED
TENTH COURT OF APPEALS

Appealed to the 10TH Court of Appeals
for the 272ND DISTRICT COURT
of Bryan, Texas.

OCT 15 2010

SHARRI ROESSLER, CLERK

Attorney for Appellant(s):
RICHARD E. WETZEL
1411 West Avenue
Austin, Tx 78701
PHONE NO:512-469-7943
FAX NO:512-474-5594
SBOT #: 21236300

Attorney for Appellee:
Danny Smith (Asst. D.A.)
300 E. 26TH ST STE. 310
BRYAN, TEXAS 77803
PHONE NO:(979) 361-4320
FAX NO. (979) 361-4368
SBOT #: 24046867

Delivered to the 10TH Court of Appeals for
the 272ND DISTRICT COURT at ___BRYAN___, Texas on
the __11th__ day of_ October , 2010 .

Marc Hamlin,
Brazos County District Clerk

*Andria Chavarria*

DEPUTY CLERK

Appellate Court Cause No. _____

Filed in the Court of Appeals for the 10TH District of
Texas, at Houston, Texas on this ____ day of
_____, 2010.

_____, Clerk          By: _____, Deputy

RECEIVED
OCT 14 2010
COURT OF APPEALS
WACO, TEXAS

No. 09-02494-CRF-272

FILED

At [illegible] o'clock ___ M

AUG 2 3 2010

MARC HAMLIN, DIST CLERK
Brazos County, Texas
_____ Deputy

| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | OF BRAZOS COUNTY |
| | § | |
| GREGG BAIRD | § | 272nd JUDICIAL DISTRICT |

## DEFENDANT'S OBJECTIONS TO STATE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DENIED MOTION TO SUPPRESS EVIDENCE

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now, Gregg Baird, Defendant in the above styled and numbered cause and files these objections to the State's proposed findings of fact and conclusions of law on the motion to suppress evidence which was denied by the Court on February 26, 2010. The State's proposed findings and conclusions were filed on May 27, 2010. Defendant offers the following objections to those findings and conclusions.

### Findings of Fact

**1. The defendant, Gregg Baird, is currently charged with 100 counts of Possession of Child Pornography under section 43.26 of the Texas Penal Code.**

Defendant objects to this finding because it misstates the procedural posture of the case. Defendant was convicted on his plea of guilty to ten counts of possession of child pornography in the above styled and numbered cause.

**2. All findings of fact made herein are based upon the credibility of the witnesses.**

**Page 150**

Defendant has no objection to findings based on credibility determinations by the Court, but challenges those findings noted below which are contrary to or not supported by the record before the Court.

**3.   Dawn Killian provided credible testimony regarding the circumstances of her access to Gregg Baird's home, bedroom, computer, and information on that computer.**

Defendant has no objection to findings based on credibility determinations by the Court, but challenges those findings noted below which are contrary to or not supported by the record before the Court.

**4.   Detective Johse of the College Station Police Department provided credible testimony regarding his investigation.**

Defendant has no objection to this finding.

**5.   Bill Odem provided credible testimony as to his forensic assessment of Gregg Baird's computer.**

Defendant has no objection to this finding and simply notes that both computer forensic experts, Odom[1] and Hubbard, testified that Killien's[2] description of her initial use of the computer was not supported by "footprints" left on the computer (1 RR 67, 3 RR 8)[3].

**6.   Dawn Killian was invited by defendant Gregg Baird into his home for the purpose of pet-sitting.**

Defendant has no objection to this finding.

---

[1]   Throughout the proposed findings, the State spells Odom's name as Odem. Defendant uses the spelling given by the witness at the suppression hearing (1 RR 51).

[2]   Throughout the proposed findings, the State spells Killien's name as Killian. Defendant uses the spelling given by the witness at the suppression hearing (1 RR 3).

[3]   "RR" refers to the reporter's record from the suppression hearing. Certified copies have been filed with the District Clerk's Office of Brazos County. "1 RR" refers to the reporter's record of the suppression hearing on February 23, 2010 and "3 RR" refers to the reporter's record of the suppression hearing on February 26, 2010.

7.    Dawn Killian was invited by defendant Gregg Baird to reside at his home for approximately ten (10) days while he was away on vacation.

Defendant has no objection to this finding.

8.    Gregg Baird placed no limits or restrictions on Dawn Killian access to his home.

Defendant objects to this finding because it does not comport with and is contrary to the evidence presented on the motion to suppress.  Killian testified Baird told her to keep the door to his bedroom closed (1 RR 32-33). Baird testified he told Killien to keep the door to his bedroom closed (3 RR 57).  Killien testified that while in the kitchen with Baird, he opened various cabinets showing Killien the location of various food items and told Killien to help herself to anything (1 RR 10-11).  Both Killien and Baird testified she was not told she could use the computer in Baird's bedroom (1 RR 37, 3 RR 57).  Killien understood she was not to enter the roommate's bedroom or office (1 RR 10).

9.    Specifically, Gregg Baird placed no limitations or restrictions on Dawn Killian's access to his bedroom.

Defendant objects to this finding because it does not comport with and is contrary to the evidence presented on the motion to suppress.  Killien testified Baird told her to keep the door to his bedroom closed (1 RR 32-33). Baird testified he told Killien to keep the door to his bedroom closed (3 RR 57).

10.    Gregg Baird placed no limitations or restrictions on Dawn Killian's access to his computer.

Defendant objects to this finding because it does not comport with and is contrary to the evidence presented on the motion to suppress.  Killien testified Baird told her to keep the door to his bedroom closed (1 RR 32-33). Baird testified he told Killien to keep the door to his bedroom closed (3 RR 57).  The computer accessed by Killien was located in Baird's bedroom (1 RR 12).  Both Killien and Baird testified Killien was not told she could use the computer in his bedroom (1 RR 37, 3 RR 57).

**11. Gregg Baird took no steps to limit or restrict access to his bedroom or computer, and took no steps to protect the information on his computer through the use of passwords, encryptions, or other such methods.**

Defendant objects to this finding because it does not comport with and is contrary to the evidence presented on the motion to suppress.  Killien testified Baird told her to keep the door to his bedroom closed (1 RR 32-33). Baird testified he told Killien to keep the door to his bedroom closed (3 RR 57).  The computer accessed by Killien was located in Baird's bedroom (1 RR 12).  Both Killien and Baird testified Killien was not told she could use the computer in his bedroom (1 RR 37, 3 RR 57).

**12.    Prior to his leaving his home, Gregg Baird showed Dawn Killian around his home, including his bedroom and bathroom.**

Defendant has no objection to this finding.

**13.    Gregg Baird told Dawn Killian to "help herself to anything" or words to that effect.**

Defendant objects to this finding because it does not comport with and is contrary to the evidence presented on the motion to suppress and could be construed that defendant gave Killien free rein in his home.  While in the kitchen opening cabinets and showing Killien the location of various food items, Baird told Killien to help herself to anything (1 RR 10-11).

**14. Dawn Killian accessed Gregg Baird's computer by moving the computer's mouse and awakening the computer from sleep mode.**

Defendant has no objection to this finding.

**15.    Dawn Killian's access to the bedroom and the computer was reasonably foreseeable to Gregg Baird.**

Defendant objects to this finding because it does not comport with and is contrary to the evidence presented on the motion to suppress.  In view of the instructions to keep the bedroom door closed, it was not reasonably foreseeable that Killien would disobey those instructions, open the bedroom

door, enter the bedroom and proceed to access the computer located in Baird's bedroom.

**16.    Dawn Killian's access to Gregg Baird's computer was superficial and the files she accessed were accessed from the desktop of the computer requiring not more than two (2) mouse clicks to access and view.**

Defendant objects to this finding because it is meaningless in relation to the controversy at hand.  Killien knowingly accessed Baird's computer without Baird's effective consent.  Her actions constituted the offense of breach of computer security under Tex. Pen. Code § 33.02(a).  Such an offense does not require the access to be more than superficial.

Further, Defendant objects to this finding because it does not comport with and is contrary to the evidence presented on the motion to suppress.  Killien's testimony reflects an extensive use of the computer beyond superficial and two mouse clicks.  She initially moved the mouse to awaken the computer, opened the start menu on the computer, inserted one of Baird's compact disks, accessed music software on the computer to copy two music files, attempted to dock her telephone to the computer, attempted to delete the two music files from the desk top, opened the recent documents folder and attempted to delete the music files, opened the recycle bin and attempted to delete the music files, changed the view mode of the recycle bin to include thumbnails, and accessed a video stored on the computer depicting child pornography.  (Killien 1 RR 12-18; Odom 1 RR 58-59, 69, 3 RR 35; Hubbard 3 RR 12-24).

**17.    Dawn Killian had no intent to invade the privacy of Gregg Baird.**

Defendant objects to this finding because it is meaningless in relation to the controversy at hand.  Killien knowingly accessed Baird's computer without Baird's effective consent.  Her actions constituted the offense of breach of computer security under Tex. Pen. Code § 33.02(a).  Such an offense does not require an intent to invade the privacy of the computer owner.

**18.    Dawn Killian is a private citizen, was not acting for or under the direction of law enforcement, and did not anonymously report Gregg Baird's suspected possession of child pornography to law enforcement.**

5

Defendant has no objection to this finding.

**19.    Any finding of fact that is a conclusion of law shall be deemed a conclusion of law, and any conclusion of law that is a finding of fact shall be deemed a finding of fact.**

Defendant has no objection to this finding.

## Conclusions of Law

**1.    Dawn Killian committed no criminal offense which led to discovery of evidence against the defendant, Gregg Baird.**

Defendant objects to this conclusion because it ignores the evidence presented during the hearing on the motion to suppress and the statute establishing the offense of breach of computer security. Killien admitted she was told to keep the door to Baird's bedroom closed (1 RR 32-33). Killien was not told she could use the computer located within that bedroom (1 RR 37). Despite having been told to keep the door shut, she opened the door and entered Baird's bedroom (1 RR 12). Killian admitted she knowingly accessed the computer in Baird's bedroom (1 RR 12).

Killien knowingly accessed Baird's computer without Baird's effective consent. Her actions constituted the offense of breach of computer security under Tex. Pen. Code § 33.02(a). After unlawfully accessing defendant's computer, Killien discovered evidence leading to the instant prosecution.

**2.    Specifically, Dawn Killian did not commit the offenses of Burglary of a Habitation (30.02 Texas Penal Code), Criminal Trespass (30.05 Texas Penal Code), or Breach of Computer Security (33.02 Texas Penal Code).**

Defendant objects to this conclusion of law and relies on his objection to conclusion of law number one above. Defendant does not waive his continued assertion Killien's conduct also violated the burglary and trespass statutes.

**3.    Dawn Killian had Gregg Baird's effective consent to access his bedroom and computer.**

Defendant objects to this conclusion because it ignores the evidence presented during the suppression hearing and does not comport with the law. The State failed to sustain its burden of proving by clear and convincing evidence Baird consented to Killien's access of his computer. The State failed to demonstrate Baird clearly and unequivocally consented to Killien's access to his computer. In view of the instructions to keep the bedroom door closed, Baird did not give Killien consent to open the bedroom door, enter the bedroom, and proceed to access the computer located in the bedroom.

**4.  Gregg Baird had no reasonable expectation of privacy in the contents of his computer.**

Defendant objects to this conclusion because it ignores the evidence presented during the suppression hearing and does not comport with the law. In view of the instructions to keep the bedroom door closed, Baird's expectation of privacy in his bedroom and computer was reasonable and violated when Killien disobeyed those instructions, opened the bedroom door, entered the bedroom and proceeded to access the computer located in the bedroom.

**5.  Article 38.23 of the Texas Code of Criminal Procedure does not apply to the facts of this case because no criminal offense was committed by Dawn Killian in accessing Gregg Baird's bedroom or computer.**

Defendant objects to this conclusion. Here, despite explicit instructions to keep the door to the bedroom closed, Killien opened the door, entered the bedroom, and knowingly accessed Baird's computer. That unlawful access led to her viewing of child pornography on Baird's computer. Her actions constituted the offense of breach of computer security under Tex. Pen. Code § 33.02(a).

Killien's observations during her unlawful access to Baird's computer formed the basis for the search warrant affidavit. The warrant was executed on Baird's computer and led to the recovery of evidence upon which the prosecution was based. Pursuant to Tex. Crim. Proc. Code, art. 38.23(a), the evidence was obtained in violation of the law and was not admissible at trial.

6.     The affidavit in support of the search warrant at issue in this case presented sufficient probable cause to search Gregg Baird's residence and computer located in his bedroom.

Defendant has no objection to this conclusion, but notes there are no statements in the affidavit independent of the tainted observations by Killien which would support a finding of probable cause.

7.     The information provided in the affidavit for the search warrant at issue was sufficient for a neutral and detached magistrate to conclude that Dawn Killian was credible and that the information she provided to the College Station Police Department was credible and reliable.

Defendant has no objection to this conclusion, but notes there are no statements in the affidavit independent of the tainted observations by Killien which would support a finding of probable cause.

WHEREFORE, PREMISES CONSIDERED, defendant prays the Court will sustain the above objections, reconsider its previous ruling denying the motion to suppress, and grant the motion to suppress based on the unlawful actions of Dawn Renee Killien.

Respectfully submitted,

Richard E. Wetzel
State Bar No. 21236300

1411 West Ave., Suite 100
Austin, Texas 78701

(512) 469-7943 - telephone
(512) 474-5594 – facsimile

Attorney for Appellant
Gregg Baird

**Page 157**

## CERTIFICATE OF SERVICE

This is to certify a true and correct copy of this pleading was hand delivered to Counsel for the State of Texas, Shane Phelps, Assistant District Attorney, 300 E. 26th Street, Ste. 310, Bryan, Texas, 77803, on this the 23rd day of August, 2010.

Richard E. Wetzel

1

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME
TRIAL COURT CAUSE NOS. 09-02492-CRF-272,
09-02493-CRF-272, 09-02494-CRF-272,
09-02495-CRF-272, 09-02496-CRF-272,
09-02496-CRF-272, 09-02497-CRF-272,
09-02498-CRF-272

FILED
DC
At 12:07 o'clock __ M
AUG 2 3 2010
MARC HAMLIN, DIST-CLERK
Brazos County, Texas
_____, Deputy

STATE OF TEXAS        )    IN THE DISTRICT COURT OF

VS.                   )    BRAZOS COUNTY, TEXAS

GREGG CARL BAIRD      )    272ND JUDICIAL DISTRICT


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EXCERPT OF TESTIMONY

MOTION TO SUPPRESS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


On the 23rd day of February, 2010, the

following proceedings came on to be heard in the

above-entitled and numbered cause before the Honorable

Judge Travis Bryan, Judge presiding, held in Bryan,

Brazos County, Texas:

Proceedings reported by computerized

machine shorthand transcription.

ORIGINAL



```
1                          APPEARANCES

2
   SHANE PHELPS
3       Assistant District Attorney
        SBOT No. 15707530
4       300 East 26th Street, Suite 310
        Bryan, Texas 77803
5       Phone:  (979) 361-4320
                    FOR THE STATE
6
   JIM JAMES
7       SBOT No. 10554250
        Law Offices of Jim James
8       1716 Briarcrest, Suite 505
        Bryan, Texas 77802
9       Phone:  (979) 846-1934
                    FOR THE DEFENDANT
10

11                          * * * * * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 160**

1          THE COURT:  Raise your right hand, please

2  ma'am.

3              DAWN RENEE KILLIEN,

4  Having been duly sworn, testified as follows.

5          THE COURT:  You can have a seat.

6              DIRECT EXAMINATION

7  BY MR. PHELPS:

8      Q.    Ma'am, would you state your name for the

9  record, please?

10     A.    My name is Dawn Renee Killien.

11     Q.    How do you spell your last name?

12     A.    Killien.

13     Q.    And I know that sometimes people spell Renee

14  differently.  How do you spell Renee?

15     A.    R-e-n-e-e.

16     Q.    And Dawn is D-a-w-n?

17     A.    Yes, sir.

18     Q.    Dawn, would you tell the Judge just a little

19  bit about yourself, where do you work, where you live?

20  We don't need addresses or anything.

21     A.    I'm an employee in G.I.S. for the City of

22  College Station, and I currently live in College Station

23  near Half Price Books.

24     Q.    You mentioned G.I.S.  What does that mean?

25     A.    I did G.I.S., which is Geographic Information

1  Systems.   It's a spacial software data in mapping.

2       Q.    And do you work for the City of College

3  Station?

4       A.    Yes, sir.

5       Q.    From time to time you do work with the police

6  department?

7       A.    There are times when I may be involved in

8  their data, but it's not -- it's not looking at their

9  data so much as making their data spatially aware within

10  the system.

11       Q.    But you're not a -- you're not a police

12  officer?

13       A.    No, sir.

14       Q.    You're not an employee of the police

15  department?

16       A.    No.

17       Q.    You don't do any investigative work or

18  anything like that?

19       A.    No.

20       Q.    Okay.   And I'm going to try to make this as

21  brief as I can, because we've narrowed the scope of this

22  hearing pretty significantly.   So I just want to go

23  through details to see -- excuse me -- very briefly.

24  First of all, can you briefly tell the Court how you

25  know Greg Baird?

1    A.    Greg Baird is a very -- an acquaintance that
2  I've met twice; and after the second meeting, he
3  arranged for me to pet sit for him through a mutual
4  friend.

5             THE COURT:  He arranged for what to you?
6  I didn't understand.

7             THE WITNESS:  Pet sitting, sir.

8             THE COURT:  Say it again.

9             THE WITNESS:  Pet sitting.

10            THE COURT:  Pet sitting.  Okay.  Go
11 ahead.

12    Q.    (By Mr. Phelps)  Like house sitting but there
13 is an animal involved.  Why don't you bring that
14 microphone over to you?  Okay.  Try and keep your voice
15 up.

16    A.    Okay.

17    Q.    The first time that you mentioned meeting him,
18 just briefly, what was the context of meeting Mr. Baird?

19    A.    The first time I met Greg was, I believe, two
20 or three years ago, very briefly, at a bike ride that
21 was organized by a friend.  He was practicing to be a
22 ride marshal, and it was a commuter ride through town, I
23 think, like 14 miles or something, a day ride.

24    Q.    And did you ever subsequent to that, after
25 that, did you ever meet with him or see him?

**Page 163**

1   generally speaking; it's much better for animals to

2   reside at its own residence rather than be in a kennel

3   in a cage.

4       Q.    Okay.  So did you at some point meet with him

5   about familiarity with the house and -- and duties as

6   pet sitter, what was expected?

7       A.    Yes.  The first time we just met was really

8   just kind of meeting with the dog.  And, you know, of

9   course, then I knew where the house was.  The day that

10  he was leaving, we walked through the house and -- and

11  went over the layout of the house and the -- the TV and

12  "just help yourself to everything, here is the guest

13  room, here is the -- the spare shower," that type of

14  thing.

15      Q.    Okay.  Well, was it your understanding when

16  you entered into this agreement with Mr. Baird that you

17  would be staying at his house and access to his house?

18      A.    I don't think I knew that initially.  I

19  thought maybe I would be coming by and letting the dog

20  out a couple of times a day; but when I arrived, it was

21  I was going to be staying at the house.  That wasn't a

22  problem for me at that point in time.

23      Q.    Well, is this there any question when you

24  arrived at the house to have this meeting about what you

25  would be doing, that it was expected that you would be

**Page 164**

1  staying at his house?

2      A.   I don't remember that.

3      Q.   Did he show you where you would be sleeping?

4      A.   Not -- not the first time we met; but when he

5  was leaving, yes, he --

6      Q.   Let's talk about that time, when he was

7  leaving.

8      A.   Okay.

9      Q.   Did he show you through the house?

10     A.   He did the time he was leaving.

11     Q.   Okay.  Let's talk about that time.  Did he

12  show you through the house at that time?

13     A.   Yes.

14     Q.   Did he show you the master bedroom, the master

15  bathroom?

16     A.   Yes.

17     Q.   Did he actually take you physically in there?

18     A.   We -- we kind of walked through everywhere,

19  yes.

20     Q.   Okay.  But specifically did he walk you

21  through the master bedroom and the master bathroom?

22     A.   Yes.

23     Q.   Okay.  Did he show you the guest bathroom or

24  bedroom?

25     A.   Yes.

**Page 165**

1      Q.    Did he indicate to you that that was where you

2  would be sleeping?

3      A.    Yes.

4      Q.    Did he indicate to you that -- where -- what

5  bathroom you would be using?

6      A.    Yes.

7      Q.    During the course of this meeting, did you

8  have an understanding from him kind of the dog's habits

9  and where the dog liked to be in house?

10     A.    Yes.

11     Q.    Okay.  And where was that?

12     A.    That -- either his bed or if he wasn't there

13  at home, there was blankets over the furniture for the

14  dog to have access everywhere.

15     Q.    Okay.  And you indicated that he, also, showed

16  you something about the remotes.  Tell the Judge just

17  briefly about that.

18     A.    Yes, he had four or five TV remotes with a

19  very large TV and tried to show me how to use those

20  items and a DVD with a photo slide show on it.  And I

21  asked if he could write it down because there were so

22  many remotes, and I don't actually use a TV at home.

23  So --

24     Q.    During the time that you stayed there, were

25  you ever actually able to use that?

**Page 166**

1    A.    No, actually when he left, he left the TV on;
2  and the volume was really loud.  So it took me awhile.
3  I got the screen turned off, but I couldn't get the
4  volume turned off.  I finally got it turned off and
5  never knew how to turn it back on.
6    Q.    By the way, did Mr. Baird know what you did
7  for a living?
8    A.    Well, yes, he knew that I worked with -- with
9  Greg.  So he at least knew where I worked.
10   Q.    Okay.  And after you went through the house
11 with Mr. Baird on this particular occasion, just before
12 he left, did he indicate to you that anything was off
13 limits?
14   A.    He did point out that the spare -- there was a
15 roommate and this was the roommate's bedroom and that
16 this was the roommate's office.  You know, kind of
17 indicating that those were probably places that neither
18 I or the dog would be going.  But, no, he said help
19 yourself to everything.
20   Q.    Okay.  And I know you indicated to the police
21 at the time that you reported this, that Mr. Baird told
22 to you help yourself to anything or some words to that
23 effect.
24   A.    Yes.
25   Q.    Do you recall that?

**Page 167**

1    A.   Yes.

2    Q.   And did he say that?

3    A.   Yes, you know, he -- in the kitchen he was

4  opening cabinets and cupboards to show that the dog

5  lease was underneath the stove and just kind of showing

6  me where things were at.

7    Q.   Okay.  Did he indicate to you at any time that

8  -- other than the roommate's -- Well, let me ask this

9  first.  With respect to the roommate's room and his

10 bathroom or his study, I guess, did he specifically tell

11 you not to go in there or just --

12   A.   No, but I would just assume, you know, that

13 they're roommates.

14   Q.   Sure.  Okay.  With respect to any part of the

15 house, did he give you any specific instructions about

16 where you could and could not go?

17   A.   No.

18   Q.   Did he ever specifically instruct you not to

19 go in the master bedroom?

20   A.   No.

21             MR. JAMES:  Objection.  Leading, your

22 Honor.

23             THE COURT:  Overruled.

24   Q.   (By Mr. Phelps)  Did he ever specifically tell

25 that you that you could not access his computer?

**Page 168**

1      A.    No.

2      Q.    Okay.  At some point while you were there, did

3   you, in fact, access his computer?

4      A.    Yes.

5      Q.    When you being accessed his computer -- First

6   of all, where was it located?

7      A.    It was located in the master bedroom.

8      Q.    All right.  And what was the purpose for

9   accessing the computers, just briefly?

10      A.    I wanted to listen to some music.

11      Q.    Okay.  And when you say "listen to music," can

12   you elaborate on that just a little?

13      A.    There were a collection of CDs in the informal

14   dining area and at that point I had gotten the TV off

15   and there was no way I could get it back on without

16   possibly messing it all up.  So I knew how to put a CD

17   into the computer and listen to music.

18      Q.    Okay.  Did you have an intention to -- to

19   record some of that music or put it on your phone or

20   anything like that?

21      A.    Yes, I did.  I was kind of new to my iPhone,

22   and my thought process was to pull some of that music

23   off and put it onto the phone.  At that point in time, I

24   recalled that my old phone was a very simple process of

25   doing such a thing, and on the new phone it would

**Page 169**

1  involve going through iTunes.  At that point I realized

2  I should just not do that.

3      Q.    Okay.  When you first accessed the computer,

4  exactly how did you do it?

5      A.    Quite simply, I walked over to it and shook

6  the mouse.

7      Q.    Okay.  You a know a little bit about

8  computers.  Was the computer on at the time?

9      A.    It was on, and it was in sleep mode.

10     Q.    Okay.  And you just shook the mouse?  Did it

11 wake the computer up?

12     A.    Yes, it did.

13     Q.    What was the first thing you saw when you woke

14 the computer up with the mouse?

15     A.    It sat on the desktop view, and there was just

16 a bunch of icons on the desktop.

17     Q.    Was there anything on -- on the desktop or on

18 the computer by way of a password that was required to

19 access the computer?

20     A.    No.

21     Q.    Once you kind of woke up the computer, were

22 you able to -- to just click on things and do what you

23 wanted to do?

24     A.    Yes.

25     Q.    Okay.  At some point did you access the Recent

1    Documents file?

2        A.    Yes.

3        Q.    And what was the purpose of getting into the

4    Recent Documents file?

5        A.    At the point that I realized that I would have

6    had to log into iTunes, I decided that I would just

7    delete the songs from the folder that I put them in and

8    clean up what I had done.

9        Q.    Was the -- was the purpose of -- of putting

10   the songs in a folder to transfer them to your phone?

11       A.    Yes, my old phone would have just been drag

12   and drop.

13       Q.    Okay.  So when you got into the documents

14   folder, did you see anything that -- that kind of

15   surprised or alarmed you?

16       A.    Yes.

17       Q.    What did you see?

18       A.    I saw some document titles that were

19   suggestive of indiscretion.  I -- I don't know what the

20   right term is there.  I saw document titles that were

21   suggestive of child porn.

22       Q.    Okay.  Did you specifically see a document

23   that was entitled, something to the effect of "younger

24   boy sucks older man," or something to that effect?

25       A.    Something to that effect, yes.

1    Q.    And at that point -- Let me ask this:  At some

2    point did you access the recycle bin?

3    A.    Yes.

4    Q.    And what was the purpose of accessing the

5    recycle bin?

6    A.    To take the second step of deleting the music

7    that I was --

8    Q.    When you accessed the recycle bin, did you see

9    anything that caused you alarm?

10    A.    Yes.

11    Q.    What did you see?

12    A.    There were thumbnail images that were, I

13    guess, place holders for documents within the recycle

14    bin.

15    Q.    Okay.  Now, when you spoke to the police, you

16    described some -- I think, you described specifically

17    four documents that you saw in the recycle bin on

18    Mr. Baird's computer?  Do you recall that?

19    A.    Yes.

20    Q.    Now, specifically when you entered the Recent

21    Documents folder or the recycle bin, were there any kind

22    of protections in place to prevent you from doing that?

23    A.    I did not have to bypass any type of system,

24    no, I just clicked.

25    Q.    Okay.  Are you familiar with passwords on

**Page 172**

1  computers?

2       A.    Yes.

3       Q.    Is it possible to put passwords in place to

4  keep people from going certain places on a computer?

5       A.    It could be.

6       Q.    Okay.  And you didn't see anything like that?

7       A.    No.

8                  MR. PHELPS:  Your Honor, may I approach?

9                  THE COURT:  Yes.

10      Q.    (By Mr. Phelps) You described these -- these

11  images that you saw to the -- to the detective.  And I

12  want to show you what's been marked as State's Exhibits

13  2, 3, 4, and 5 and ask you if those appear to be the

14  documents or at least blowups of the thumbnail that you

15  saw that you described to the detective?

16      A.    Yes, they do.

17      Q.    Okay.  And I've shown you these, also, briefly

18  earlier today, did I not?

19      A.    Correct.

20                 MR. PHELPS:  Your Honor, at this time

21  I'll offer State's Exhibits 2, 3, 4, and 5 for the

22  purposes of this hearing.

23                 MR. JAMES:  Judge, I don't think that

24  it's -- you've got to judge the -- the warrant on the --

25  on the four corners.  So I don't really see that -- that

**Page 173**

1   it's relevant.  Other than that, it's the Court; and I

2   don't have any huge objection it to.  But the Court

3   can't look at these and say:  Well, this takes care of

4   -- if the description was lacking or something like

5   that.

6            But I don't have any -- any other

7   objection, your Honor.  Have I made that clear about --

8   I mean, the Court, obviously, has to judge the warrant

9   on the four corners.  It can't bootstrap itself and say:

10  Well, the description wasn't that good; but these

11  pictures make it good.

12            THE COURT:  I understand.

13            MR. PHELPS:  I agree with that.

14            THE COURT:  Understanding that, State's 2

15  through 5 are admitted.

16            (State's Exhibit Nos. 2, 3, 4, and 5

17  admitted into the record.)

18       Q.   (By Mr. Phelps)  After you saw those images,

19  did you believe at that point that you were looking at

20  child pornography?

21       A.   I strongly suspected it, yes.

22       Q.   At some point after that, did you access a

23  video, I think, of the -- on his computer to confirm

24  your suspicions that it was child pornography?

25       A.   Yes, I did.

**Page 174**

1      Q.     And did that confirm your suspicions that it

2   was child pornography?

3      A.     Yes.

4      Q.     Is there any question in your mind that what

5   you were looking at involved sexual acts with underage

6   boys?

7      A.     My only question was whether or not the child

8   was under 18 or not, which led me to the police.

9      Q.     And did you believe that that was the case?

10      A.     I believed that it was.

11      Q.     Okay.  Now, at -- at some point I understand

12   you, also, accessed a website chat forum?

13      A.     Yes, I did.

14      Q.     Did you post information consistent with what

15   you said today on that website for the purposes of

16   seeking advice?

17      A.     Yes, I did.

18      Q.     And did you receive advice?

19      A.     I did.

20      Q.     Okay.  After -- Let me ask this:  This

21   activity on the computer, did you -- did you do this on

22   a particular date, like -- Let me ask it this way:  When

23   was Mr. Baird supposed to be out of town and you were

24   supposed to be pet sitting and living in his house?

25      A.     I believe that he left on a Thursday and was

**Page 175**

1   coming back about ten days later.  However, there were

2   times when the roommate was going to be in town and I

3   was not going to be staying at the house.  So it was not

4   a consistent or contiguous timeline that I was there

5   every single night.

6        Q.    Were you there May 7th and May 8th?

7        A.    Yes.

8        Q.    And was -- was your access, as we've described

9   it, on May 8th, the evening hours of May 8th?

10       A.    Was May 8th a Friday?

11       Q.    I believe so.

12       A.    Yes.

13       Q.    Okay.  After you observed these -- these

14  images and formed the opinion that you were looking at

15  child pornography, did you -- did you determine at that

16  point that you were going to report it to the police?

17       A.    At that point I determined that I need more

18  information and I used the -- the social forum that I

19  wrote a note into and I, also -- I think that I looked

20  up some information on the internet to determine what I

21  needed to do next.

22       Q.    Okay.  At what point did you actually report

23  this to the police?

24       A.    I spoke off record to the crime analyst for

25  College Station P.D. and -- to ask her about reporting

**Page 176**

1  anonymously.

2      Q.    Why did you want to report anonymously?

3      A.    I wanted to report anonymously because this is

4  a very small town and the information could be not only

5  devastating to the person I was reporting on but to

6  myself as well.

7      Q.    How -- how so?

8      A.    My director informed me that I could lose my

9  job.

10      Q.    Okay.  Is that what you were worried about at

11  that point?

12      A.    At that point I was just worried about the

13  size of the town.

14      Q.    Ultimately, you did report it to the police?

15      A.    Yes.

16      Q.    You made a formal report and it was not

17  anonymous?

18      A.    No.

19      Q.    They knew your name?

20      A.    Correct.

21      Q.    Okay.  From the point -- Let me ask this:

22  When was your first contact with anybody from the police

23  department?

24      A.    I don't remember the exact date.  I spoke with

25  Detective Michael Jose.  After speaking with Kabrina

1  (phonetic) Scott, I spoke with Michael Jose by phone;

2  and then I believe that there was a weekend intervening

3  there.  I then made a sworn statement to Detective

4  Falwell.

5       Q.    Okay.  Let me -- let me ask a very important

6  question.  At any time that you had any access to

7  Mr. Baird's computer, did you do so at the request of

8  any police authority?

9       A.    No.

10      Q.    From the point that you contacted the police,

11  did you ever go back and access his computer?

12      A.    No.

13      Q.    Were you ever asked by police to make any

14  copies or go back into the computer at all?

15      A.    No.

16            MR. PHELPS:  I think that's all with

17  respect to the issues at hand.  So I'll pass the

18  witness, your Honor.

19            THE COURT:  Yes, sir.

20            CROSS-EXAMINATION

21  BY MR. JAMES:

22      Q.    Ms. Killien, what's your birthday?

23      A.    My birthday?

24      Q.    Uh-huh.

25      A.    It's June 23.

**Page 178**

```
 1        Q.    Of what year?

 2        A.    1969.

 3        Q.    Okay.  And what's your -- what's your

 4   educational background?

 5        A.    My educational background --

 6        Q.    Uh-huh.

 7        A.    -- involves junior college and Texas A&M.

 8        Q.    Okay.  You say involves junior college,

 9   involves Texas A&M.  Did you graduate from junior

10   college?

11        A.    Yes.

12        Q.    Okay.  And did you graduate Texas A&M?

13        A.    No.

14        Q.    And what about your work issue?  How long have

15   you been with College Station Police Department?

16        A.    I'm not --

17        Q.    I'm sorry.  I miss spoke.  How long have you

18   been with the City of College Station?

19        A.    I've been with the City of College Station

20   slightly over two years.

21        Q.    Okay.  And would it be fair to say that your

22   dealings with the police department are somewhat

23   tangential?

24        A.    Definitely.

25        Q.    Okay.  You certainly haven't acquired any kind
```

**Page 179**

1   of reputation in law enforcement or statewide reputation

2   of any sort as far as what you do or with law

3   enforcement, have you?

4       A.    I don't quite understand what you're asking

5   here.

6       Q.    You haven't acquired any kind of statewide

7   representation as far as your work with law enforcement

8   or the kind of work you do, have you?

9       A.    I have acquired a reputation with G.I.S.

10      Q.    With what?

11      A.    G.I.S.

12      Q.    Now, let's try to get our dates down.  In May

13  of last year, you said that he was -- that Greg was

14  going to take a trip, right?  Do you remember if it was

15  Costa Rica or Belize with his parents?  Does that sound

16  familiar?

17      A.    I believe he told me he was going to Panama

18  with his parents.

19      Q.    Panama.  Okay.  And that you were going to dog

20  sit, and do you remember the name of the dog?

21      A.    Not at this time.

22      Q.    Okay.  And when -- when you came to the -- the

23  house, probably -- Have you ever been convicted of a

24  felony or misdemeanor of moral turpitude?

25      A.    No, sir.

**Page 180**

1 Q. Okay.  Now, when did you attend M.I.T.?

2 A. I took an on-line class through their open

3 courseware.  It's not actually attending M.I.T.  It's a

4 program that they have instated to reduce education

5 barriers.

6 Q. And what courses did you take?

7 A. An entry level philosophy class.

8 Q. Okay.  When was that?

9 A. Last year, I guess.

10 Q. Just roughly, I'm not asking for -- Okay.  And

11 so you work a lot with computers, don't you?

12 A. I work on computers.  I don't work with

13 computers.

14 Q. You don't do any kind of IT work or anything

15 like that?

16 A. I am housed within the department of IT.  I'm

17 not considered an IT person.

18 Q. Okay.  Well, when you have a computer does

19 something -- does it -- does it leave a footprint?

20 A. That's beyond my scope to answer.

21 Q. You don't know if when you access something,

22 it -- it leaves what's called a footprint?  You've never

23 heard of that before?

24 A. It's not something I have to deal with in

25 G.I.S.

**Page 181**

1       Q.     Well, are you familiar -- you're familiar with

2   computers?

3       A.     It's possible that it could, and it's also

4   possible it could not be.

5       Q.     Why would it not be?

6       A.     I don't know.

7       Q.     Okay.  And so you don't know if a computer

8   leaves a footprint as to where it is directed to go?

9       A.     I believe that it can.

10      Q.     Okay.  And if I tell a computer to go to

11  iTunes, that would leave a footprint, wouldn't it?

12      A.     Yes, it would possibly.

13      Q.     And if I tell it to go to the internet, it

14  leaves a footprint, doesn't it?

15      A.     Quite possibly.

16      Q.     And if I tell it to go to Recent Folders, it

17  leaves a footprint, doesn't it?

18      A.     It could.

19      Q.     Okay.  And if I tell it to go to the Deleted

20  Items, it would leave a footprint, wouldn't it?

21      A.     It could.

22      Q.     And you're aware that we've had our experts

23  look for the footprints on this computer from the time

24  you -- May the 8th, when you accessed the computer?

25  You're aware of this, aren't you?

**Page 182**

1     A.   Yes, I was told this.

2     Q.   And you understand that all anybody wants here

3 today is for you to tell the truth?

4     A.   Yes.

5     Q.   Okay.  That's all Mr. Phelps wants.  That's

6 all I want.  That's all Judge Bryan wants, is to tell

7 the truth?

8     A.   Yes.

9     Q.   Now, would you have any explanation as to why

10 that computer would show that the first place that you

11 went on May 8th and after you woke it up would be to the

12 Recent Files?  Do you have any idea why it would show

13 that was the first place you went?

14     A.   No.

15     Q.   Well, is it going to show -- is the computer

16 -- and we're all talking about is the computer in Greg

17 Baird's bedroom, right?

18     A.   Yes.

19     Q.   Is it going to show that you accessed iTunes?

20     MR. PHELPS:  Judge, I'm going to object.

21 This is -- She's already tried to say, "I don't know

22 these things.  I'm not -- it's beyond my --"  She said

23 it was beyond her ability to answer that question.

24 She's having to speculate at this point.

25     Mr. James has his expert here who can say

**Page 183**

1  these things.  I've got my expert here he can cross.  I
2  don't quite understand the point of this, if this issue
3  -- or the issues -- we're only talking about the issue
4  about whether she was an agent of law enforcement and
5  whether the search warrant -- that doesn't have anything
6  to do with her shield.
7           MR. JAMES:  Well, it's not just a shield.
8  38.23 prohibits an illegal search by an individual,
9  Judge, if her story is not truthful, the story she told
10 and the story that's been relayed.  And that is the crux
11 of our argument.
12          MR. PHELPS:  But how can it be an illegal
13 search?  It's not illegal under the Fourth Amendment
14 because she's a private citizen.  My understanding, if
15 you're going to a 38.23, which is not my understanding
16 of what you are claiming, other than the subject is
17 you've got to violate some law, that you violated --
18          MR. JAMES:  That's right.
19          MR. PHELPS:  What law are you claiming
20 that she violated?
21          MR. JAMES:  The law would be 30.02,
22 accessing the computer without permission, burglary,
23 30.02, and criminal trespass, 30.05.
24          MR. PHELPS:  Now, that doesn't have
25 anything to do with whether the search was illegal.

**Page 184**

1    What -- what I think you have to be able to persuade the

2    Court is that she committed a crime in doing any of

3    those three things and that led to the discovery of this

4    evidence and that was placed into the warrant and then

5    the warrant becomes --

6                      If that's what you're arguing, this whole

7    idea, that there is this global idea that it's an

8    illegal search, I don't think it's access.

9                      MR. JAMES:  Those are the areas why it is

10   illegal.

11                     MR. PHELPS:  Do we agree that in order to

12   claim 38.23, you have to point to a particular law that

13   she violated?

14                     MR. JAMES:  Yes, and we are going to do

15   so, 33.02 -- 30.02, 30.05.

16                     THE COURT:  That's Penal Code?

17                     MR. JAMES:  Yes, sir.

18                     THE COURT:  30.02.

19                     MR. PHELPS:  I'm not sure that's

20   completely clear from your -- from your motion but --

21                     MR. JAMES:  It's an illegal search.  I

22   mean --

23                     MR. PHELPS:  Again, I think it's a

24   different thing to say just globally it's an illegal

25   search by a private citizen, which we know doesn't

**Page 185**

1   violate -- Article 38.23 says a specific statute.  It

2   says:  Show me the law that she violated if she

3   committed a crime that resulted in discovery of the

4   evidence.  And those are different issues.  So --

5              MR. JAMES:  I'm sorry.  Mr. Phelps is

6   mistaken.  We are claiming it was an illegal search.  It

7   was illegal because she violated those provisions.

8              MR. PHELPS:  I understand 30.02 sets

9   forth a law that says an offense -- if a person

10  knowingly accesses a computer without the effective

11  consent of the owner.  So you're trying to set up a

12  proof that she went into his computer without his

13  consent?

14             MR. JAMES:  Yes, sir.

15             MR. PHELPS:  Therefore violated the penal

16  law and therefore 38.23 is triggered by that?

17             MR. JAMES:  Sure.

18             MR. PHELPS:  And I guess burglary --

19  although I don't know how you show she didn't have

20  consent to the house and criminal trespass -- criminal

21  trespass to the house or to that room?

22             MR. JAMES:  To that room.  Only burglary

23  can be completed if you go into a place where you're not

24  supposed to be.  That's what my client is going to

25  testify.

**Page 186**

 1           MR. PHELPS:   The genesis of my objection

 2 initially was:  He's asking her questions about whether

 3 a computer leaves footprints and should it show this,

 4 should it show that?  It's beyond her ability to say

 5 that.  She said that.  And I don't think she should

 6 answer question further about what the --

 7           MR. JAMES:   Well, Judge, these are

 8 different questions.  I'm not asking the same question.

 9 These are not the same questions.

10           MR. PHELPS:   I mean, I think you can ask:

11 Did you access I.T.?  And if he thinks that the evidence

12 shows she did, he puts on his witness that says she did

13 not.  But to ask her:  Should it show this?

14           She said it could; but she also at the

15 very beginning said:  That's beyond my ability to say

16 that.  She's not an I.T. person, as she said.  To the

17 extent he's asking her questions that are based upon her

18 knowledge of what computers might do --

19           THE COURT:   Tell me the question you're

20 seeking to ask her, Mr. James, that you have not been

21 able to establish.

22           MR. JAMES:   Judge, I think I was asking

23 her:  Did you access iTunes?

24           MR. PHELPS:   My objection was:  He's

25 asking her:  Is there some reason the computer wouldn't

**Page 187**

1  show she accessed it?  And that's different than asking:

2  Did you access I.T.?  Then we're talking about her

3  knowledge, which she's stated she doesn't know.

4              MR. JAMES:  If she says:  Yes, there is a

5  reason, because I deleted that or something like that.

6  If she doesn't know, she can say she doesn't know.

7              THE COURT:  Let's start with a new

8  question and let me take these objections as they come.

9      Q.    (By Mr. James)  Did you access iTunes?

10      A.    No, I did not.

11      Q.    Did you plug in your iPhone?

12      A.    No, I did not.

13      Q.    Did you plug in a U.S.B. cord?

14      A.    No, I did not.

15      Q.    What CDs did you record?

16      A.    I did not actually -- well, I did not record

17  a CD.

18      Q.    What -- I want to watch my language.  What CD

19  did you transfer to the -- the desktop?

20      A.    I did not transfer an entire CD to the

21  desktop.

22      Q.    What song did you transfer to the desktop?

23      A.    I removed two U2 songs from a CD and put it on

24  the desktop.

25              THE COURT:  I didn't understand.

**Page 188**

1          THE WITNESS:  I never moved the two U2

2   songs from a CD and put those on the desktop.

3      Q.    (By Mr. James)  Okay.  And -- and just so

4   we're all together on the time, you had gone over to

5   Greg's house on May 7th, correct?

6      A.    If that was a Thursday, then yes.

7              MR. JAMES:  We stipulate that was a --

8              MR. PHELPS:  I'm pretty sure that was a

9   Thursday.

10             MR. JAMES:  That was Thursday.  I'm

11  pretty sure we can stipulate.

12             THE COURT:  All right.

13     Q.    (By Mr. James)  Now, you didn't access the

14  computer at all that Thursday, did you?

15     A.    Not that I'm aware of, no.

16     Q.    And the next day would have been May 8th; and

17  sometime in the evening you burned the -- you woke it

18  from its sleep mode; is that correct?

19     A.    Yes.

20     Q.    Okay.  Now, you were sleeping in the -- in the

21  guest room; is that right?

22     A.    Correct.

23     Q.    Did Greg ever tell you that you were to keep

24  the bedroom door closed because he didn't want the dog

25  sleeping on his bed?

**Page 189**

1    A.    He did state that.

2    Q.    Okay.  And did you -- did the dog, in fact,

3 sleep with you?

4    A.    It did.

5    Q.    And he inferred when you said -- when you

6 talked to the police -- and Mr. Phelps was kind enough

7 to give us a copy of the CD -- you talked to them and

8 you said he said something like:  Go anywhere in the

9 house or help yourself to anything.  Do you remember

10 saying that?

11    A.    Yes, I do.

12    Q.    Have you listened to that CD in the last week,

13 ten days?

14    A.    Yes.

15    Q.    Okay.  And you, in fact, weren't real sure

16 exactly what was said, were you?

17    A.    I did not have the exact wording.

18    Q.    And certainly if you had seen a -- a hundred

19 dollar bill in the house, you would not have thought

20 that you could take that hundred dollar bill and spend

21 it, would you?

22    A.    I don't understand the question.

23    Q.    That's okay.  If you had seen a one hundred

24 dollar bill laying there, you would not have thought you

25 could help yourself to that, would you?

1    A.    I believe this is -- I don't understand this
2 question, but the answer is no.
3    Q.    Okay.  Isn't it true that what Greg actually
4 told you was that you could help yourself to anything to
5 eat?
6    A.    Not directly, no.
7    Q.    Well, that was -- that was the implication.
8 He was looking in refrigerator and said, "You can help
9 yourself to anything," while y'all are looking in the
10 refrigerator?
11    A.    That's not the only time he said that.
12    Q.    Well, he certainly did say that when looking
13 in the refrigerator, didn't he?
14    A.    I don't recall him looking in the
15 refrigerator.
16    Q.    Now, this is very important.  You never have
17 told -- you never told the police anything about having
18 him show you his bedroom, did you?
19    A.    He gave me a tour of his entire house,
20 including his bedroom.
21    Q.    Okay.  He gave you a tour of the house; but he
22 told to you keep the door closed, is that right --
23    A.    He said to --
24    Q.    -- to his bedroom?
25    A.    Closed when he wasn't there -- when I wasn't

**Page 191**

1  there.

2      Q.    Did he add that, "when you were there"?

3      A.    He added that.  It was part of the statement,

4  I believe.

5      Q.    Now, you can't download -- or what kind of

6  phone did you have when you downloaded things directly

7  from the -- from the CD to the -- excuse me -- from a

8  desktop to a phone without going through iTunes or

9  anything?

10     A.    I had a Sony Ericsson, and it had drag and

11 drop file protocol with an eight gig memory stick in it.

12     Q.    That day did you, in fact, burn the CD, the U2

13 CD, onto the desktop?

14     A.    I drug two songs over.  That's not exactly

15 called burning.

16     Q.    Okay.  You drug them?

17     A.    Yes.

18     Q.    Onto the desktop?

19     A.    Yes.

20     Q.    And then you couldn't transfer those to your

21 iPhone; is that right?

22     A.    Then I realized, yes, that I had to go through

23 iTunes and didn't want to take that extra step.

24     Q.    And so it was at that point that you went to

25 Recent Documents to open the recently opened files?

**Page 192**

1      A.    Yes.

2      Q.    Now, you didn't have to do anything to delete

3  those, did you, or you could have left them on his

4  computer?

5      A.    I could have.

6      Q.    But then he would have known that you had been

7  messing with his computer, wouldn't he?

8      A.    He would have known anyway.  I would have told

9  him.

10     Q.    Did you in any of your correspondence, and

11 y'all e-mailed back and forth, mention that you were on

12 his computer?

13     A.    No.

14     Q.    Did you tell his roommate you had been on his

15 computer?

16     A.    No.

17     Q.    So you wanted to delete off of his computer

18 these two songs; is that right?

19     A.    Yes.

20     Q.    And you opened his recent -- his file that

21 showed where he had recently been; is that correct?

22     A.    It's called "My Recent Documents," yes.

23     Q.    And those are user created, because it depends

24 on what they've done, correct?  It's not like the

25 internet?

**Page 193**

1      A.    It's -- it's -- no, it's not user created.

2      Q.    It's not?

3      A.    It's machine created.

4      Q.    I understand.  It's machine created; but it's

5  created after you go somewhere, right?

6      A.    It's created by whoever is using that machine

7  at that time.  So it's created to the machine specific,

8  not to a user specific.

9      Q.    Greg never told you, "You can use the

10  computer," did he?

11      A.    No.

12      Q.    Now, he never told you could -- you could drag

13  his CDs and put them on your phone, did he?

14      A.    No.

15      Q.    Did you ever tell the police officer that you

16  were going to put it on your phone to see if you like it

17  and then you would buy it?

18      A.    Yes.

19      Q.    Why would you buy it if you had it on your

20  phone already?

21      A.    Because, as I told you, I was only doing two

22  songs.

23      Q.    You told -- you told the chat -- when you were

24  on the chat room that night or -- excuse me -- on the

25  11th, that your employer's legal department is

**Page 194**

1  researching a list of attorneys for you to review.  Was

2  that true?

3      A.  Yes.

4      Q.  Okay.  All right.  Your employer was doing

5  that for you?

6      A.  At that point in time, I don't know the exact

7  person I spoke to, my I.T. director; and he advised a

8  lawyer to me who I actually saw rather than waiting for

9  I.T. -- the Human Resource Department to get back to me.

10     Q.  What lawyer was that?

11     A.  I don't recall his name.

12     Q.  Where was his office?

13     A.  It was in Bryan.

14     Q.  Where in Bryan?

15     A.  They have his name.  I don't remember his

16  name.

17     Q.  Okay.

18         MR. THOMAS:  Kyle Hawthorne.

19     Q.  (By Mr. James)  And just so I understand, did

20  you do anything at the request of the police on the

21  computer?

22     A.  No, I did not.

23     Q.  Okay.  Now, when you saw these thumbnails, how

24  did you see the thumbnails?

25     A.  They were on the computer.

**Page 195**

1     Q.    I understand, but where did you go to get
2   those thumbnails?
3     A.    I didn't go anywhere to get those thumbnails.
4     Q.    What did you access so that the thumbnails
5   appeared?
6     A.    I accessed the recycle bin icon.
7     Q.    Now, did they automatically appear; or did you
8   see words that you then clicked on to access the photos?
9     A.    I think -- I don't -- I don't remember
10  exactly.  I don't want to speculate.
11    Q.    In fact, when you were in that folder in the
12  recycle bin, you saw words and you accessed something
13  that caught your attention?  You accessed that and saw
14  the thumbnails, didn't you?
15    A.    I don't know.
16          MR. JAMES:  May I have one moment, your
17  Honor?
18          THE COURT:  Yes, sir.
19          (Brief pause in the proceedings.)
20    Q.    (By Mr. James)  Did you access any kind of
21  video player on the computer?
22    A.    Yes, I did.
23    Q.    Okay.  What did you access?
24    A.    I accessed a -- a video that was in My Recent
25  Documents.

**Page 196**

1    Q.    Okay.  Did you have to separately access the

2  video player, or did you just click on a video and it

3  started automatically?

4    A.    It started automatically.

5    Q.    Just so I understand what you're telling us,

6  you're saying that you had dragged two songs off the CD

7  onto the -- onto the desktop.  You wanted to erase any

8  evidence of those CDs; and you went to -- you were going

9  to go to your Recent Documents; is that right?

10    A.    That was not my exact plan, no.

11    Q.    What was your exact plan?

12    A.    My plan was to put those songs on my iPhone.

13    Q.    Okay.

14    A.    And when that did not work, I stopped the

15  process.

16    Q.    Well, did you try to plug your iPhone in?

17    A.    No, I did not.

18    Q.    Did you tell the police that you created a

19  folder for the music?

20    A.    I don't remember exactly.

21    Q.    Well, what you're describing would not have a

22  folder, would it?

23    A.    It could.

24    Q.    Okay.  Do you remember telling the police that

25  you created a folder specifically for that music?

**Page 197**

1      A.    I don't remember exactly.

2      Q.    So after going -- you didn't have any clue

3  that there was anything improper on that computer until

4  you went to the recycle bin and saw a -- a title that

5  you thought suspicious, correct?

6      A.    Incorrect.

7      Q.    Okay.  What -- excuse me.  Until you went to

8  Recent Documents and saw a title that you thought was

9  questionable?

10     A.    Correct.

11     Q.    And then you clicked on that title, correct?

12     A.    Not right then, I don't think.

13     Q.    You didn't?

14     A.    Not that exact moment -- or actually, yes, I

15 did.

16     Q.    And that was to see what was stored on Greg

17 Baird's computer, correct?

18     A.    No, that was to see that exact document.

19     Q.    Well, it was to find out what he had been

20 looking at, correct?

21     A.    No, it was to see that exact document.

22     Q.    Well, you knew that was a recently opened

23 document, correct?

24     A.    I didn't know he was the most recent person on

25 that computer.

```
 1      Q.    Well, you -- you went to see what was on that
 2  computer, right?
 3      A.    No, I went to that computer to down load music
 4  on my phone.
 5      Q.    No, I mean at that point when you clicked on
 6  the words --
 7      A.    Yes, to look at that document.
 8      Q.    -- you wanted to see what was in that
 9  document?
10      A.    Yes.
11      Q.    And then later you clicked on the delete or
12  Deleted Items and you clicked on several of those.  Then
13  you got words; and you clicked on those to see the
14  images, correct?
15      A.    I don't remember exact process.
16            MR. JAMES:  I'll pass the witness.
17                  REDIRECT EXAMINATION
18  BY MR. PHELPS:
19      Q.    I just have a couple more questions for you.
20  First of all, would you explain to the Judge why you
21  wanted to go see the lawyer?  What were you concerned
22  about?
23      A.    I was concerned because it's a small town.  I
24  -- I knew that if I was involved in anything that --
25  We're told where I work, we go through a background
```

**Page 199**

1  check, that if we're involved with anything to do with

2  seeing the police or a crime, then we have to report

3  that to our I.T. director or whoever your director is.

4          And so I -- I made the decision to speak

5  with my director, without revealing any names, of what

6  my situation was at that point in time and to ask him:

7  Did I have access to a list of attorneys recommended by

8  the city or could he himself recommend an attorney to

9  me?  Did I need an attorney; and my concern, how could

10 this impact my job, because I -- I need my job or a job.

11         And he let me know that if there was

12 negative impact, it could negatively impact my job and I

13 could, in fact, lose my job, is what my I.T. director

14 said to me.  He called Human Resources for me and spoke

15 with them about, you know -- you know, seeing if we had

16 a list or recommendation for attorneys.

17         And then he said to me himself that he has

18 used the lawyer that they stated I saw and that perhaps

19 I should call him and go see him, which I immediately

20 did, because I was concerned with losing my job or

21 somehow creating, you know, not knowing could it be

22 since the computer had been open and available, were

23 they files that the roommate had placed there?

24         So when I -- when I filed the report, I

25 made sure to state the house's address and that there

**Page 200**

1  were two men living there.  That's why I saw a lawyer,

2  to find out did I need a lawyer, not that I could afford

3  one, but did I need one to go forward with this process

4  if I was unable to file anonymously, which I learned to

5  my dismay that neither the F.B.I. or our local police

6  department allowed this type of crime to be filed

7  anonymously.

8      Q.    When you met with the lawyer, was that on

9  Monday, May 11th?

10     A.    I believe so.

11     Q.    Okay.  Was that after you had seen the things

12 you saw on Mr. Baird's computer?

13     A.    Yes.

14     Q.    In fact, any of the discussions that you had

15 with -- with Kabrina or with your supervisor or anybody,

16 was that after you saw the things that you saw?

17     A.    Yes, they were.

18     Q.    The -- as I understand it, you accessed at

19 some point the Recent Documents file; is that correct?

20     A.    Correct.

21     Q.    And that's where you saw -- something, I think

22 you told the police was bad names?

23     A.    Yes.

24     Q.    And at some point you accessed the recycle bin

25 where you saw 24 to 60 thumbnail images that appeared to

**Page 201**

1  be child pornography?

2       A.    Correct.

3       Q.    And as I understand it, also, at some point

4  during your chat session, you accessed a particular

5  video and opened it and looked at it; is that right?

6       A.    That's true.

7       Q.    And that was to help you confirm to yourself

8  it was, in fact, child pornography?

9       A.    Yes.

10      Q.    Did all of those events happen in the first --

11  either leading up to or during that first chat session?

12      A.    Yes.

13      Q.    Okay.  Did any of them happen that next Sunday

14  or that next Monday?

15      A.    No.

16      Q.    Okay.  And so the Court is crystal clear on

17  this, anybody from the city, anybody from the police

18  department, ever tell you, "Go into his computer."?

19      A.    No.

20      Q.    Did they ever ask you to copy anything?

21      A.    No.

22      Q.    When you went on Mr. Baird's computer to begin

23  with, was it your intention to look into his files?

24      A.    No.

25      Q.    If you had seen pass word protection or

1   anything indicating that you should not look at those

2   files, would you have not looked at them?

3       A.    Yes, I would not have looked.  I would have

4   said, well, it's pass word protected, and not listen to

5   music.

6       Q.    Okay.  And that Recent Documents tab, is that

7   -- do you get to that by just pushing the start button

8   and that's one of the things that pops up?

9       A.    Yes.

10      Q.    Pretty easy to get to?

11              MR. JAMES:  Objection.  Continued

12  leading, your Honor.

13              THE COURT:  I'll sustain.

14      Q.    (By Mr. Phelps)  Was it hard for you to get to

15  it?

16      A.    No.

17      Q.    How about the recycle bin?

18      A.    It was easily accessible by it's icon.

19      Q.    And was that -- was that icon on the desktop?

20      A.    I believe it was either on the desktop or

21  within the start menu.

22      Q.    Okay.  And you indicated that -- that you had

23  accessed that chat website.  What was the purpose of

24  getting on that website?  What were you grappling with?

25      A.    I was dealing with a lot of different

**Page 203**

1  thoughts, and I was trying to weigh the questions out

2  so that not only could I see what I was concerned with,

3  but I could acquire other people's responses or answers

4  to those questions and they would be people that are not

5  local and wouldn't have any possibility of knowing

6  anyone involved.

7      Q.   Okay.

8           MR. PHELPS:  May I approach, your Honor?

9           THE COURT:  Yes, sir.

10     Q.   (By Mr. Phelps)  Let me show you State's

11 Exhibit Pretrial 7 and 7A.  Have you seen these before?

12     A.   Yes, I have.

13     Q.   And looking at this, does this appear to be a

14 fair and accurate representation of that chat that you

15 participated in that night and then subsequent to then?

16     A.   Yes, it does.

17     Q.   Okay.

18           MR. PHELPS:  Your Honor, at this time

19 we'll offer 7 and 7A for the purposes of this hearing.

20           MR. JAMES:  Judge, I'm not sure the --

21 the relevance of the text of her chat.

22           MR. PHELPS:  Well, he's attempted to

23 attack her credibility.  This shows --

24           THE COURT:  Well, I mean, you brought it

25 up, didn't you; and he's entitled to --

**Page 204**

1          MR. JAMES:  That's fine.

2          MR. PHELPS:  Plus, I don't think the

3    rules of evidence apply here.  So, I mean, it's not

4    hearsay evidence.

5          THE COURT:  State's 7 and 7A are

6    admitted.

7          (State's Exhibit Nos. 7 and 7A

8    admitted into the record.)

9          MR. PHELPS:  May I approach, your Honor?

10   Q.   (By Mr. Phelps)  So that the Judge knows what

11   he's looking at, did you start this particular thread on

12   this chat forum?

13   A.   Yes, I did.

14   Q.   Are you Sublime Serenity?

15   A.   Yes.

16   Q.   And on the first and second and it looks like

17   third pages, is that a recitation of what you did?

18   A.   That was my entry, "Here's the questions I'm

19   dealing with.  Please let me know what you're thinking."

20   Q.   Okay.  There were actually two chat sessions,

21   right?

22   A.   I believe that I accessed it two different

23   times.

24   Q.   Okay.  And Mr. --

25   A.   It continues.  It's not actually chat so much

1   as a conversation thread.

2       Q.    Thread?

3       A.    Yeah.

4       Q.    You post something, somebody literally a week

5   later can look at it, post something, and that continues

6   the thread?

7       A.    Correct.

8       Q.    Okay.  Mr. James indicated specifically about

9   you seeing -- getting a list of attorneys.  But that

10  doesn't appear until it looks like 7:00 to 11:00 p.m. on

11  Sunday, May 11th; is that right, where you begin, "I

12  will be filing tomorrow with no anonymity," etcetera,

13  "My employer's legal department is researching a list of

14  attorneys for me to review."

15      A.    And what they said was -- yes, that's true.

16      Q.    But that's Monday, right?

17      A.    Yes.

18      Q.    And there are -- I mean, you get on -- back on

19  and respond to some of these folks who were -- who were

20  talking to you; is that right?

21      A.    Correct.

22      Q.    So where it says "Sublime Serenity," that's

23  you talking?

24      A.    Correct.

25      Q.    Okay.  And at some point that evening, do

**Page 206**

1   these events occur, what I just recited, the access to

2   the Recent Documents folder, the access to the recycle

3   bin, the viewing of that video, the looking at those

4   thumbnails that we've offered, that all occurred that

5   first night, is that right, May 8th?

6         A.    Yes.

7         Q.    Okay.  And at some point during that evening,

8   did you put a CD into the computer --

9         A.    Yes.

10         Q.    -- as you've testified?  Okay.  Thank you,

11   Dawn.

12                   MR. PHELPS:  Your Honor, we pass the

13   witness.

14                   MR. JAMES:  I'll pass the witness, Judge.

15                   THE COURT:  You can step down, ma'am.

16                   THE WITNESS:  Thank you, sir.

17                   (The witness', Detective Jose,

18   testimony was not requested as an excerpt to this

19   transcript.)

20                   WILLIAM ODOM,

21   Having been duly sworn, testified as follows.

22                   THE COURT:

23                   DIRECT EXAMINATION

24   BY MR. PHELPS:

25         Q.    Sir, would you state your first and last name

**Page 207**

1   and spell your last name, please?

2       A.    O-d-o-m.

3       Q.    How are you employed, sir?

4       A.    I am a computer forensic expert, and I have my

5   own company.

6       Q.    Would you tell the Judge a little bit about

7   your training and experience as a computer forensic

8   expert?

9       A.    Yes, my initial entry into computer forensics

10  was in 1997.  I -- at the time I was a special agent

11  with the Federal Bureau of Investigation in the New York

12  office.  During my tenure with the F.B.I. from '97 until

13  I left in 2001, I was a computer forensic experts with

14  the F.B.I.  All of my training during that time was

15  received through the F.B.I.

16              I was certified as a computer forensics

17  examiner; and I took, I think, somewhere in the

18  neighborhood of seven or eight courses that allowed me

19  to become a computer forensics expert and, again,

20  through certification through the F.B.I. allowed me to

21  practice that with the F.B.I.

22              During that time I did several hundred

23  computer forensic examinations as an F.B.I. agent.  All

24  in federal courts and testified probably about four

25  times in federal court, both in New York and then in

1   Houston, when I transferred to Houston in 1999.   After

2   2001, I went into private practice with a company,

3   Deloitte Touche, continuing with my computer forensics,

4   primarily on civil matters as opposed to criminal.

5               During that time and since 2001, I've been

6   in private practice as a consultant, again, going

7   through hundreds, into thousands, of computer forensic

8   examinations on thousands of pieces of evidence.   And

9   all those have either been civil or criminal and in one

10  case administrative courts, either in Texas or in

11  federal cases throughout the country.

12       Q.    Okay.   At the -- at the State's request, did

13  you examine a computer hard drive in this case?

14       A.    Yes, I did.

15       Q.    It will tell the Judge, if you would, just

16  briefly what you do when you examine these hard drives?

17       A.    The -- the basic principle is to perform the

18  forensic examination, which is to perform analysis on a

19  forensic copy of the original evidence.   So in other

20  words, I don't actually look at the original computer;

21  but I look at a forensic copy of that computer.

22               And the analysis, obviously, can vary from

23  the -- the request for the type of work that's involved;

24  but in this specific case I was -- reviewed evidence of

25  access to the computer, specifically to the computer and

**Page 209**

1  information related to access dates and times and the

2  types of files that would have been accessed during a

3  particular time period.

4      Q.    Now, were you made aware of certain facts in

5  this case with respect to what Dawn Killien said she did

6  on the computer?

7      A.    Yes, I was.

8      Q.    And during the course of your examination, did

9  you recover chat that was -- chat thread that Dawn

10 Killien started?

11     A.    That's correct, I did.

12     Q.    And have you reviewed her statements on that?

13     A.    I -- the --

14     Q.    Did you read through what she said she did,

15 the transcription?

16     A.    The transcript of what I recovered, yes.

17     Q.    Yes, sir.

18     A.    Yes, I did review that and read that.

19     Q.    So was -- was the purpose of your examination

20 partly to determine whether what you found on the

21 computer was consistent with what she said she did?

22     A.    Yes, that's correct.

23     Q.    Okay.  Well, let me ask you a few questions

24 about that first of all.  The date that we're talking is

25 May 8th, actually May 7th and May 8th is when she stayed

**Page 210**

1   the night.   From your examination did you determine when

2   the first time that Dawn Killien accessed the computer,

3   approximately?

4         A.   Yes.   That was -- approximate time, yes, I was

5   able to determine approximately 6:00 p.m. on May 8th,

6   she accessed the computer.

7         Q.   When you examined the computer, were you able

8   to determine or make any kind of conclusion about

9   whether the computer was on or off when Dawn Killien

10  accessed it?

11        A.   It was in -- it was consistent with it being

12  in a sleep mode.   In other words, the computer was not

13  turned off.   It was on, but in a -- a mode to reserve

14  power and -- and the act of moving a mouse or pushing a

15  key would wake the computer up effectively.

16        Q.   So is -- is what you found on Greg Baird's

17  computer consistent with it being woke up with a

18  movement of a mouse?

19        A.   Yes, it is.

20        Q.   Did you see or were you able to determine when

21  the last time that computer was accessed before that?

22        A.   Yes, I was.

23        Q.   And when was that?

24        A.   That was May 7th, I believe, at 5- --

25  5:21 p.m.

**Page 211**

1    Q.    Okay.  So that would have been the day before?

2    A.    That's correct.

3    Q.    And was there anything that indicated to you

4  or that showed you that the computer was on before Dawn

5  Killien accessed it on Friday May 8th?

6    A.    Between the time that the computer was last

7  accessed at 5:21 and -- and 6:00 p.m. on May 8th, the

8  next day, there was an activity that's consistent with

9  Windows system updates.  Basically, the -- the computer

10  is being updated automatically by windows and that's

11  fairly common and that occurred later in the evening.  I

12  don't specifically recall the time, but it occurred

13  later in the evening of May 7th.

14    Q.    If a computer is in sleep mode, is it still

15  capable of searching for updates on the internet and

16  downloading those?

17    A.    Well, if it's in sleep mode, no.  So it would

18  have gone to sleep at some point after that point, yes.

19    Q.    Now, I -- I just want to get a couple of

20  basics out of the way about recent -- My Recent

21  Documents files and recycle bins and that sort of thing.

22  First of all, where is My Recent Folders -- My Recent

23  Documents file located?

24    A.    The folder is physically located in -- on the

25  hard drive in a place called "Recent."  That's the name

**Page 212**

1  of the folder, and there are a number of files that are

2  stored in that folder that are created -- they're what's

3  called shortcuts.  They are effectively files used to

4  reference Recent Documents.

5           The way that it's viewed, however, is

6  different that someone doesn't actually access that

7  folder directly.  That's simply viewed by going to the

8  start button on the Windows menu, and one of the many

9  options that pops you up is the Recent Documents.  And a

10  list is populated that the user sees, and that list is

11  generated from the Recent Folder.

12      Q.   Okay.  So if I -- if I, as I do from time to

13  time, take work home with me on a flash drive and I put

14  it into my computer at home and I access a document

15  there from that flash drive?

16      A.   Yes.

17      Q.   Will that pop up on my Recent Documents?

18      A.   It -- it would populate that folder; and at

19  some point after that, that's right.

20      Q.   Okay.  And you indicated that -- that it was

21  in the start menu.  Can you just explain -- first of

22  all, we are talking about Windows?

23      A.   The Windows operating system.

24      Q.   Is there a start button at the bottom left

25  hand corner?

**Page 213**

1    A.    There is.

2    Q.    And if you click that one time, will you see

3 among other files my Recent Documents?

4    A.    Yes.

5    Q.    So do you have to go very deep into the

6 computer at all or access any files, go to My Computer,

7 or do any of that stuff in order to find that My Recent

8 Document -- My Recent Document file or folder?

9    A.    No.

10    Q.    In your examination of a computer with respect

11 to what Dawn Killien did, is it your opinion that what

12 we're talking about is a -- was it a superficial --

13             MR. JAMES:  I'm sorry.

14    Q.    (By Mr. Phelps)  Was it a superficial access

15 to the computer or was there deep access like look into

16 files and things like that?  Do you understand what I'm

17 asking?

18    A.    Not exactly.  I'm sorry, no.

19    Q.    I guess what I'm trying to figure out is:

20 With respect to Dawn Killien's access, when we're

21 talking about My Recent Documents file and trash bins,

22 is that something difficult at all for somebody to do?

23    A.    No, it's fairly straight forward.

24    Q.    Okay.  Do those -- the recycle bin, is that an

25 icon on the desktop?

**Page 214**

1      A.    It's represented by an icon on the desktop.

2      Q.    Okay.  If you hit that start button, will you

3 also see the recycle bin?

4      A.    You can, yes.

5      Q.    Okay.  With respect to Dawn Killien's access,

6 you said the first access, you said the first access was

7 about 6:00 o'clock on Friday, May 8th.  Did you see any

8 indication that Dawn Killien or somebody at about that

9 time put a CD in the computer?

10     A.    The -- What I located at 6:00 o'clock was

11 access to a system file that was being used, being

12 called, that was -- it's necessary for the media center

13 for music or other media that's been inserted into the

14 CD.  So that's consistent -- the access of that is

15 consistent to a CD being put into a computer and being

16 accessed.

17     Q.    So if you put a -- a music CD in there to

18 listen to it or anything else with it, would that show

19 up that way?

20     A.    Yes.

21     Q.    And is that what you found?

22     A.    That is what I found, yes, sir.

23     Q.    Is that consistent with what your

24 understanding of what Dawn Killien said?

25     A.    Yes, it is.

**Page 215**

1    Q.    Now, did you find evidence that Dawn Killien

2 accessed the My Recent Documents folder or file?

3    A.    I found evidence that she accessed a specific

4 file in the Recent Documents folder.

5    Q.    And in your examination did you find in that

6 Recent Documents folder, a file with the name, something

7 to the effect of "boy sucks older men" or "older men

8 sucks boy," or something to that effect?

9    A.    Something, a name to that effect, yes.

10    Q.    And would that have been obvious or visible to

11 somebody that had opened up that Recent Documents file?

12    A.    Yes.

13    Q.    Okay.  Again, that would have been with just

14 one click of the start menu and then to my Recent

15 Documents?

16    A.    Correct.

17    Q.    Okay.  Do you -- did you in your examination

18 find evidence that she accessed the recycle bin?

19    A.    Yes, I did.

20    Q.    Now, if you would, explain to the Judge

21 exactly what a recycle bin is?

22    A.    Okay.  A recycle bin is a term that's, and

23 specifically in this case, deals with a Windows

24 operating system.  The act of deleting a file is a user

25 initiated act.  And when I, as a user, chooses to delete

**Page 216**

1  a file, Windows allows me the ability to store it in a

2  temporary place called a recycle bin.

3        The reason for that is in case I need to

4  recover that file for whatever reason, I can.  So it

5  acts as temporary storage facility.  The only way that

6  files are emptied out of the recycle bin is if I need

7  the recycle bin to be emptied by, again, user

8  interaction.  So all of that requires user interaction.

9        The recycle bin, also, acts as -- again,

10 it's -- it's a way to recover files that may have been

11 inadvertently deleted by the user; but it's, also,

12 representative of files not only on the computer but,

13 also, additional hard drives or other drives, external

14 drives, that may be attached to the computer.

15        So, in -- in other words, if -- if I have

16 a computer plugged in an external drive, a recycle bin

17 -- the recycle bin will not only show me which files I

18 delete off of my hard drive on the computer but anything

19 that I delete off of the external drive as well with the

20 same -- And if I didn't mean to delete that, then I can

21 restore that back to the external drive that I

22 originally deleted it from.

23 Q.   So if I want to delete something, I would

24 delete it and I would have to go into -- actually delete

25 it from the computer and go into the recycle bin and

1  delete it from there?

2     A.   That's correct, or empty the recycle bin is

3  the term that is used.

4     Q.   Okay.  And on Mr. Baird's computer, as it was

5  on that particular night May 8th, did you discover that

6  there were thumbnails of child pornography on that -- in

7  that recycle bin?

8     A.   Yes, there is indication that there was a

9  thumbnail that was representative of files on the

10  recycle bin.

11                MR. PHELPS:  Your Honor, may I approach?

12                THE COURT:  Yes, sir.

13                MR. PHELPS:  Those four images, your

14  Honor.

15     Q.   (By Mr. Phelps)  Let me show you State's

16  Exhibits 2, 3, 4, and 5.  Did you recover these from

17  that recycle bin?

18     A.   Yes.

19     Q.   Okay.  And were those from the computer hard

20  drive or from the external hard drive?

21     A.   They were from the -- the external hard drive

22  that was attached to the computer.

23     Q.   Okay.  And have you reviewed what Dawn Killien

24  told the police about those four pictures?

25     A.   I only reviewed her statement that was in the

1  police report.

2      Q.    Okay.  Do you -- do you recall whether her

3  description of those four documents was consistent --

4      A.    Yes.

5      Q.    -- with -- with what we discovered on the file

6  of the external drive?

7      A.    Yes, they are consistent with her statement.

8      Q.    During your examination did you discover

9  whether there were any attempts at protecting any of

10  this information?

11      A.    There was no incription or any passwords that

12  were either through Windows or otherwise that I was able

13  to locate that limited access to them, any of the files.

14      Q.    Is it possible in that operating system if --

15  to require that when a computer goes to sleep, that when

16  it comes back there up, there would be a password to go

17  any further?

18      A.    Yes.

19      Q.    And was that done in this case?

20      A.    No.

21      Q.    Is it possible with respect to any particular

22  file, to password protect a file?

23      A.    Generally speaking, yes.

24      Q.    And -- and did you see any of that with

25  respect to these images?

**Page 219**

1    A.    No.

2    Q.    Or anything on the Recent Documents file?

3    A.    No.

4    Q.    By the way, did you also -- Ms. Killien made

5 reference to clicking on a video to determine whether it

6 was, in fact, child pornography from the recent

7 documents file?  Did you observe any evidence of that?

8    A.    Yes, I did.

9    Q.    Can you tell the Judge what you observed?

10   A.    I observed two pieces.  The -- the first piece

11 of evidence was on the computer itself.  It was a

12 shortcut in the Recent Documents folder, which acts --

13 I'm sorry -- pointed to the video.  Again, it was

14 something to the effect of "man sucks boy" or "boy sucks

15 man."  I don't recall specifically.

16          That was on the computer, and then it was

17 accessing the video that was actually on an external

18 drive that was attached to the computer.  And then I was

19 able to locate the video on the external drive and

20 review that as well.

21          MR. PHELPS:  Your Honor, may I approach?

22          THE COURT:  Yes, sir.

23   Q.    (By Mr. Phelps)  Looking at -- is this a

24 document that you generated regarding that particular

25 access to that video?

**Page 220**

1        A.    Yes, it is.

2        Q.    Okay.  And does it indicate the time that it

3   was accessed, or do you recall based on that?

4        A.    It was accessed on February (sic) 8th, 2009 at

5   9:15 p.m.

6        Q.    And in the chat that we have offered into

7   evidence, is there a -- kind of a commensurate entry

8   from her indicating she's now looked that video?

9        A.    Yes.

10             MR. JAMES:  Judge, just for -- I think he

11  said February.  Just so the record --

12             MR. PHELPS:  May 8th is the date.

13             MR. JAMES:  May 8th, yeah.  Did you

14  intend to say -- did you intend to say May 8th?

15             THE WITNESS:  Yes, I did.

16       Q.    (By Mr. Phelps)  In this State's Pretrial

17  Exhibit No. 6, is that -- that video clip put onto this

18  CD?

19       A.    Yes, it is.

20       Q.    Was that recovered by you from Mr. Baird's

21  computer?

22       A.    Yes, from the external hard drive.

23       Q.    From the external hard drive.

24             MR. PHELPS:  Your Honor, at this time we

25  offer State's Exhibit No. -- Pretrial No. 6.

```
 1                    (Discussion held off the record.)
 2              MR. JAMES:  We don't have any --
 3              THE COURT:  That's 6?
 4              MR PHELPS:  Yes, sir.
 5              THE COURT:  State's 6 is admitted.
 6                    (State's Exhibit No. 6 admitted
 7  into the record.)
 8      Q.   (By Mr. Phelps)  And have you taken a look at
 9  that video?
10      A.   Yes, I did.
11      Q.   What's the name of that video?
12      A.   I'm sorry.  I don't recall again.  It's called
13  "Boy Scout David," comma, "Part 2-3."
14      Q.   And have you looked at the video?
15      A.   Yes.
16      Q.   Is it child pornography?
17      A.   Yes.
18      Q.   You've seen child pornography before --
19      A.   Yes, I have.
20      Q.   -- in your previous experience?
21      A.   Yes.
22      Q.   Was the access to the Recent Documents folder,
23  the recycle bin, and the video that we just talked
24  about, did that occur on May 8th of 2009?
25      A.   Yes, it did.
```

**Page 222**

1    Q.    Other than that access to the computer, did

2 Dawn Killien from your examination do anything else with

3 the computer of any significance?

4    A.    Her activity was limited to accessing the web

5 and specifically accessing the forum where she was

6 posting and reviewing that information.  My examination,

7 that was the significant portion of her activity, was

8 internet access.

9    Q.    After she accessed that video at about 9:15,

10 do you see any further activity on her part in which she

11 is examining files of the Defendant?

12    A.    No.

13    Q.    Other than the access to the Recent Document

14 folder, the recycle bin, and that video, do you see her

15 examining any other folders?

16    A.    No.

17           MR. PHELPS:  Thank you.  We pass the

18 witness.

19           MR. JAMES:  Can we have one moment, your

20 Honor?

21           THE COURT:  Yes.

22              (Brief pause in the proceedings.)

23              CROSS-EXAMINATION

24 BY MR. JAMES:

25    Q.    Mr. Odom, let me ask a couple of questions

**Page 223**

1   here.   Was that -- You don't know what happened as far

2   as whether Greg told her to keep the bedroom door closed

3   or not, do you?

4        A.   No, sir, I do not.

5        Q.   You don't know whether or not he told her she

6   could use the computer, do you?

7        A.   No, sir.

8        Q.   You don't know whether or not she used that

9   computer without his permission, do you?

10       A.   No, sir.

11       Q.   Okay.   So those are all the things that you --

12   you don't know.   Let's talk about the things that you

13   were able to discern.   Okay?

14       A.   Okay.

15       Q.   Were you able to find any evidence that songs

16   had been moved from the CD onto the computer?

17       A.   Specifically, no.

18       Q.   Now, you heard -- you heard Ms. Killien say

19   that she dragged songs on -- from the CD onto the

20   computer.   You never found any evidence of that, did

21   you?

22       A.   I didn't see the songs on there, no, sir.

23       Q.   And you didn't see that they had ever been

24   deleted; did you?

25       A.   No, sir.

**Page 224**

1    Q.    And if they had been dragged on there, there
2  would be a fingerprint -- a footprint or if they had
3  been deleted there would have been a footprint, wouldn't
4  there?

5    A.    If they were deleted on that computer, that's
6  correct.

7    Q.    And you didn't see that, did you?

8    A.    Not on that computer.

9    Q.    And, in fact, at 9- -- Did you make a timeline
10  or something?  Do you have any notes that you made about
11  your -- your findings?

12    A.    I have just some printouts that were part of
13  my examination that are related.

14                MR. JAMES:  May I?

15                THE COURT:  Yes, sir.

16    Q.    (By Mr. James)  The problem is, Mr. Odem, I
17  don't always know what I'm looking at.

18                MR. JAMES:  Your Honor, could I have
19  Ms. Hubbard, who is my expert, look at these, because
20  this is essentially Greek to me.  And this also -- these
21  are --

22    Q.    (By Mr. James)  What are these, sir?

23    A.    That is a listing of the files in the recycle
24  bin from the external hard drive.

25                MR. JAMES:  May I have her -- I can

**Page 225**

1    continue my cross of him, Judge.

2                    THE COURT:   Okay.

3        Q.    (By Mr. James)   Now, you said at -- at 6:00

4    p.m. it was action consistent with somebody listening to

5    music, right?

6        A.    That's correct, yes.

7        Q.    And then it's three hours -- The computer goes

8    back to sleep, doesn't it?

9        A.    I don't believe it did.   It's possible it

10   could have, but I --

11       Q.    Well, at -- the next thing that happens after

12   somebody is listening to music, you don't see any

13   evidence of anything being dragged onto the computer,

14   you don't see anything else until 9:15; is that right?

15       A.    That sounds about right.   I'm not sure of the

16   specific times, but --

17       Q.    And then at that time somebody accesses the

18   Recent Folder, correct?

19       A.    Well, there is access to a file on the Recent

20   Folder.

21       Q.    Well -- but they get to it through going to

22   the recent -- Recent Folder, right?

23       A.    That's correct.

24       Q.    And you don't see any sign that anybody is

25   deleting music or trying to add music or anything else

**Page 226**