1  on the computer, but we go straight to Recent Folders

2  and it's got a -- a list with names on it, right?

3       A.   Yes, sir.

4       Q.   And then somebody clicks "Boy Scout David,

5  Part 2-3;" is that right?

6       A.   That's the name of the file, yes.

7       Q.   Okay.   And somebody plays that and the video

8  comes on.   So we're getting that played, right?

9       A.   Yes.

10      Q.   And then somebody later clicks on the

11 deletion.   And before those pop up -- those thumbnails

12 come up -- they don't just come up when you pop on them

13 or when you click on that.   What you get is a -- a

14 wording, a description, and you click on that

15 description; and that's what gives you the thumbnails,

16 right?

17      A.   I would not say that's an accurate

18 characterization of how that works.   In fact, with

19 Windows and certainly with Windows Vista, it has the

20 ability to store thumbnails to allow for any folder

21 containing any sort of photograph to have a thumbnail

22 version of that photograph for the purposes of seeing

23 that.

24      Q.   Well, what is the case in this -- on this

25 instance on this computer?

**Page 227**

1      A.     Well, by my accounts there's thumbnail

2   versions of that.

3      Q.     Okay.  But did you have to click on something

4   to get those thumbnails?

5      A.     You would have to access the folder in which

6   the thumbnails reside in -- in which the pictures reside

7   in.  Sorry.

8      Q.     Okay.  Just for demonstrative purposes, you

9   click on the recycle bin, right?

10     A.     Okay.

11     Q.     And what the recycle bin is going to give is

12  descriptions of files.  It may be holiday vacation, or

13  it may be anything.  It may be something horribly

14  suggestive, but it's going to give you those words.  And

15  then you click on this (Indicating); and then up will

16  pop what's there, correct?

17     A.     I'm not sure I follow your question.  Are you

18  saying that "holiday vacation" is a folder that has

19  pictures within that folder?

20     Q.     Yes, sir.  Yes, sir.

21     A.     Certainly, that's one way that they could be

22  viewed.  In some instance the thumbnail will actually

23  put thumbnails of the photos on a folder -- on this

24  folder so that you would see the thumbnails from the

25  folder view as well.

**Page 228**

1       Q.    But that's not what the situation is here, is

2  it?  In here we've got words, some word that was

3  suggestive, "Boy sucks man" or whatever it was.  That

4  was clicked on, because there has been testimony.  It

5  said this "boy sucks man" or whatever and then you click

6  on that and that's when you get the -- the thumbnails,

7  correct?

8       A.    No, sir, that's not my testimony actually.

9  The -- the video in question that we're discussing is

10 actually an active file stored on the external hard

11 drive.  That's not the name of any of the files and

12 certainly not the name of files that were here.  In

13 fact, the name of the files here are not suggestive at

14 all.  They're simply numerical.  So it would not be a

15 suggestive name at all.  It's only a number that would

16 show up.

17              And, again, to answer question, I mean,

18 that -- those are two different places, that's two

19 different files.  The pictures that are being -- that

20 are viewed that were representative of the pictures of

21 the thumbnail, are simply that they're pictures that

22 would be represented in a smaller version so that a user

23 would be able to see those in what's known as a

24 thumbnail size version.

25              And those files were in the recycle bin.

**Page 229**

1   That's separate from the video that's stored in an

2   active file on the -- on the hard drive -- or the

3   external drive.  Sorry.

4       Q.    There is no doubt that somebody -- it appears

5   nobody other than Ms. Killien went in and accessed both

6   the recent files to see what had been put on there

7   recently as well as the recycle bin.  That's true, isn't

8   it?

9       A.    She accessed one file in the recent files.

10      Q.    Yes.

11      A.    One specifically.

12      Q.    And, also, accessed the recycle bin, correct?

13      A.    Yes.

14              MR. JAMES:  I'll pass the witness.

15                  DIRECT EXAMINATION

16  BY MR. PHELPS:

17      Q.    When you opened up that recycle bin on the

18  external drive, would you see thumbnails?

19      A.    Yes, sir.

20      Q.    And is that what happened in this case?

21      A.    Yes.

22      Q.    So Ms. Killien didn't have to see a folder and

23  then click on that to make another step to go in and

24  find those thumbnails, did she?

25      A.    There is no indication of that.

**Page 230**

1                    MR. PHELPS:   Okay.   That's all I have,

2   Judge.

3                    MR. JAMES:   Nothing further.

4                    THE COURT:   You can step down, sir.

5

6

7                    (End of requested excerpt of

8   proceedings.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 231**

1    THE STATE OF TEXAS        )
     BRAZOS COUNTY, TEXAS      )
2

3           I, Susan R. Rainwater, Visiting Court Reporter
     in and for the 272nd Judicial District Court of Brazos
4    County, State of Texas, do hereby certify that the above
     and foregoing contains a true and correct transcription
5    of all requested excerpted portions of evidence and
     other proceedings as requested to be included in this
6    volume of the Reporter's Record, in the above-styled and
     numbered cause, all of which occurred in open court or
7    in chambers and were reported by me.

8

9           I further certify that this Reporter's
     Record of the proceedings truly and correctly reflects
10   the exhibits, if any, admitted by the respective
     parties.

11

12          I further certify that the total cost for
     the preparation of this **expedited** copy of the Reporter's
13   Record is $610.00 and was/will be paid by Mr. Jim James.

14          MY OFFICIAL HAND this the 26th day of
     February, 2010.

15

16

17   _Susan R. Rainwater_

18   Susan R. Rainwater, Texas CSR #6561
     Expiration Date:  December 31, 2010
19   3708 East 29th Street, PMB 137
     Bryan, Texas  77802-3901
20   (979) 209-4201

21

22

23

24

25

**Page 232**

February 26, 2010

1          REPORTER'S RECORD
           VOLUME 3 OF 4 VOLUMES
2
           TRIAL COURT CAUSE NO. 09-02484-CRF
3

4  THE STATE OF TEXAS            §  IN THE DISTRICT COURT OF
                                 §
5  v.                            §  BRAZOS COUNTY, TEXAS
                                 §
6                                §
   GREGG CARL BAIRD             §  272ND JUDICIAL DISTRICT
7

8

9

10

11

12          - - - - - - - - - - - - - - - - - - - -

13                 MOTION TO SUPPRESS

14          - - - - - - - - - - - - - - - - - - - -

15

16

17

18

19      On the 26th day of February, 2010, the following

20  proceedings came to be heard in the above-entitled and

21  -numbered cause before the Honorable Travis B. Bryan

22  III, Judge presiding, held in Bryan, Brazos County,

23  Texas:

24      Proceedings reported by computerized stenotype

25  shorthand.

COPY

1                          A P P E A R A N C E S

2    Mr. Shane P. Phelps
     Brazos County District Attorney's Office
3    SBOT No. 15907530
     300 East 26th Street
4    Suite 310
     Bryan, Texas 77803
5    (979) 361-4338
     ATTORNEY FOR THE STATE OF TEXAS
6
     Mr. Jim W. James III
7    James & Reynolds
     SBOT No. 10554250
8    PO Box 1146
     Bryan, Texas 77806-1146
9    (979) 846-1934
     ATTORNEY FOR THE DEFENDANT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    I N D E X
                       VOLUME 3
2                 (MOTION TO SUPPRESS)

3                                           Page   Vol.
     FEBRUARY 26, 2010
4
     DEFENDANT'S WITNESSES  DIRECT    CROSS   VOIR DIRE
5
     ROSE MARIE HUBBARD    N/A      10, 5    N/A          3
6
     WILLIAM ODOM          25, 32   18, 41   22, 53       3
7
     GREGG BAIRD           25, 54    3, 58   N/A          3
8                          17, 68   23, 68   N/A          3

9    DEFENDANT RESTS...............................70      3

10   BOTH SIDES CLOSE..............................70      3

11   CLOSING ARGUMENTS BY MR. JAMES................70      3
     CLOSING ARGUMENTS BY MR. PHELPS...............76      3
12

13   COURT'S FINDINGS..............................86      3

14   ADJOURNMENT...................................86      3

15   COURT REPORTER'S CERTIFICATE..................87      3

16
                 ALPHABETICAL WITNESS INDEX
17                      VOLUME 3
                  (MOTION TO SUPPRESS)
18
                     Direct   Cross    Voir Dire   Vol.
19   Hubbard, Rose Marie  N/A      10, 5    N/A         3

20   Odom, William        25, 32   18, 41   22, 53      3

21   Baird, Gregg         25, 54    3, 58   N/A         3
                          17, 68   23, 68   N/A         3
22

23

24

25
```

```
1                          EXHIBIT INDEX
                              VOLUME 3
2                         (MOTION TO SUPPRESS)

3
     STATE'S
4
     NO.  DESCRIPTION                OFFERED    ADMITTED    VOL.
5     9   REPRESENTATION OF            44          44         3
          RECYCLE BIN FILES
6
     10   CHART                        53          53         3
7

8    DEFENDANT'S

9    NO.  DESCRIPTION                OFFERED    ADMITTED    VOL.
      1   COMPUTER SCREEN SHOT         38          38         3
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kaethryne B. Kyrkll, CSR
(936) 443-3312 - wordsmithreporting@gmail.com

1           P R O C E E D I N G S

2               (Open court, defendant present, no jury,

3   2:14 PM.)

4               THE COURT:  All right.  You are still under

5   oath.  Go right ahead.

6               MR. PHELPS:  May I proceed?

7               THE COURT:  Yes, sir.

8               ROSE MARIE HUBBARD,

9   having been first duly sworn, testified as follows:

10              CROSS-EXAMINATION

11  BY MR. PHELPS:

12      Q.   Hi, Rose.  How are you?

13      A.   I'm doing fine.  Thank you.

14      Q.   I'm sorry.  Would you state your name for the

15  court reporter, please?

16      A.   Yes.  My name is Rose Marie Hubbard.

17  H-U-B-B-A-R-D.

18      Q.   Let me start first of all by asking the last

19  time we were talking when you were testifying was a

20  couple of days ago.  You indicated at that time that you

21  had examined the event logs of the computer; is that

22  right?

23      A.   Yes, sir.

24      Q.   And I think we established, and correct me if

25  I'm wrong, that's all you looked at, correct?

1      A.   No, sir.  I looked at several computer logs.

2      Q.   Okay.  What kind of computer logs did you look

3  at?

4      A.   I looked at the registry file listings.  I

5  looked at the master file index.

6      Q.   We had introduced it at pretrial Exhibit No. 8.

7  State's Pretrial Exhibit No. 8.  That is your basically

8  listing, I guess, of what happened on this computer

9  according to what you looked at?

10     A.   Yes, sir.  Those are just my notations as to

11  the events.

12     Q.   Is this the only report you generated or --

13     A.   No, sir, that's just what I brought with me to

14  recall the dates and times.

15     Q.   What other notes or reports did you generate?

16     A.   I have an event log with the sleep time and

17  wake time screen shot.

18     Q.   Did you do any kind of a report for Mr. James?

19     A.   No, sir.

20     Q.   Did you, I mean, write him a letter or any

21  e-mails indicating the results of your findings?

22     A.   No, sir.

23     Q.   And is this information in State's Exhibit

24  Pretrial Exhibit No. 8 -- is that based on all of those

25  various things you looked at or just the event logs?

1     A.   The sequence, the time lines, that you have

2  here are from event logs and the master file index as

3  well.

4     Q.   Okay.  And just to refresh the judge's memory,

5  you indicate that the, as I recall your testimony, at

6  5:21 the day before, which would have been May 7th,

7  until 9:06 PM on May 8th the computer was asleep?

8     A.   Till -- yes, sir, May 8th at 9:06 PM.

9     Q.   Is when the -- according to your note -- when

10  the computer wakes you?

11     A.   Yes, sir.

12     Q.   Do you need this in front of you?

13     A.   Yes, sir, I do.  I have the --

14     Q.   Do you have a copy of it in front of you?

15     A.   I do not.

16          MR. PHELPS:  May I approach, your Honor?

17          THE COURT:  You may.

18          MR. PHELPS:  I don't know if we have those

19  exhibits with us?

20          THE COURT:  Yes, I think we may.  Look

21  through those and see.  No, it's not here.

22          MR. PHELPS:  May I?

23          THE COURT:  Yeah.

24     Q.   (BY MR. PHELPS)  This indicates at 9:06 the

25  computer wakes up?

1       A.    Yes, sir.

2       Q.    And your testimony, I believe, yesterday was

3  that basically from 5:21 the day before till 9:06

4  nothing happened on that computer?  It was asleep the

5  entire time?

6       A.    Yes, sir.  There's a sleep mode with wake up

7  noted.

8       Q.    And the wake up mode was 9:06 PM?

9       A.    Yes, sir.

10      Q.    We talked previously about that something

11 happened at 6:06?

12      A.    Yes, sir.

13      Q.    And that was, according to Mr. Odom, at least

14 consistent with there being a CD put in that computer at

15 that time; do you remember that?

16      A.    I remember you asking me about it.

17      Q.    And is it your opinion that that is not

18 consistent with a CD being put in?

19      A.    It is my opinion that is a CAB file which would

20 not be consistent with --

21      Q.    Okay.  Your opinion is that it is a CAB file

22 that would not be consistent with?

23      A.    Someone inserting a CD to wake up the machine.

24      Q.    Why not?

25      A.    To play a machine, you would have to have some

February 26, 2010

1   type of application to open up the computer, an

2   application to run some type of media such as music.

3       Q.   Okay.   Did you indicate yesterday that you

4   believed that would have been more consistent with the

5   computer being asleep and updating itself?

6       A.   Yes, sir.

7       Q.   Now, if you have an updating like that while

8   the computer is asleep, would you also have a

9   commensurate entry in the computer somewhere something

10  called MC update?

11      A.   There could be updates going on in the

12  background.   That is not an area that I looked into.

13      Q.   But, I mean, I guess my question is:  If the

14  computer is asleep and it does in fact -- that's what

15  explains this 6:06 entry -- update itself, would there

16  be some entry in addition to that called MC update, some

17  indication that was accessed or that it generated

18  something on the commuter with respect to MC update?

19      A.   Again, I don't want to speculate to what I did

20  not look into.   I did see some MC updates in the master

21  file index.   I did not go back to reserve to see what

22  the effect was to CAB file to the MC update.   That was

23  not part of my scope.

24      Q.   If you are correct, however, that at 6:06 this

25  was, in fact, an update such that MC update should have

1   been indicated on the computer, would you have seen that

2   if you had looked?

3       A.   I did see that.  I saw entries to that effect.

4   What I cannot tell you is if it was an update of some

5   sort or what have you.  These entries were in the

6   computer.  They could have happened while there could

7   have been some system processes running in the

8   background, or there could have been some updates

9   running in the background while it's asleep.  I cannot

10  tell you what because that was not my assigned task.  I

11  did not look into that.

12      Q.   I understand that that was not your assigned

13  task.  I'm not asking you that right now.  What I'm

14  asking is your expertise.  If, in fact, that entry at

15  6:06, something happened; do you agree with that?

16      A.   Yes, something happened.  A file was accessed.

17      Q.   If, in fact, the explanation is that while the

18  computer was asleep, the commuter was doing some

19  updating as you testified previously?

20      A.   Possibly, yes.

21      Q.   Would it also at the same time generate some

22  indication on the computer of access to that MC update?

23      A.   There could have been.  Again, I don't know.  I

24  did not delve into that as to what file it was coming

25  from as to what updates.  I can tell you there were some

February 26, 2010

1  updates made.  There was an MC update, I believe, at

2  0:55.

3      Q.   Let me try one more time.  I'm not asking you

4  what you actually did.  I'm not asking you based on what

5  you did on the computer.  What I'm asking you is you

6  have given an explanation that that 6:06 entry rather

7  being some indication of a CD being put in was an update

8  while the computer slept.  Do you agree with that?

9      A.   I'm sorry?

10     Q.   Do you agree that's what you said?

11     A.   It's possible it was done.

12     Q.   Did you not testify previously that you believe

13  it was an update?

14     A.   I believe it's possible, yes.

15     Q.   Okay.  Okay.  Now, I'm asking you just globally

16  in your experience as a forensic computer expert if

17  that, in fact, was the computer updating itself while it

18  was in sleep mode would there be some indication on the

19  computer that you could look at for that time to see if

20  MC update reference?

21     A.   There could possibly be an MC update reference.

22     Q.   So are you saying it could update itself and

23  not have that reference?

24     A.   I would think it would tie back to reference.

25  Again, I'm not an expert in Microsoft updates.

1    Q.   Okay.  Okay.  I want to talk to you just

2    briefly about the times on the computer.  And on your

3    time line, you have given a number of times 9:06 PM,

4    9:15, and so on through 1:41 AM.  And I presume the

5    thrust of this is that nothing happened on this computer

6    before 9:06; is that correct?

7    A.   What I'm referring to is just user activity.

8    Q.   Okay.

9    A.   A lot of activity occurred prior to that but

10   not -- my point is from user activity when was that

11   machine powered up and what happened after that.

12   Q.   Well, I guess what I want to try and see if we

13   can clear up is we've had a lot of conversations about

14   times.  Is it possible for a computer -- computers have

15   an internal clock, right?

16   A.   Yes, sir.

17   Q.   And the time that it shows and the time it

18   registered stuff on like the event log, such is

19   dependent on how that computer internal clock is set; is

20   that correct?

21   A.   Yes, sir.

22   Q.   I can go into a commuter, and I can set that

23   for Central Time.  I can set it to Pacific Standard

24   Time.  I can set it for Hong Kong time if I wanted to,

25   right?

February 26, 2010

1       A.    Yes, sir.

2       Q.    And then that computer when you look at the

3  event logs would be recording that time, not the time

4  where the commuter physically is?

5       A.    The event log is going to register the machine

6  time.  Is that what you're asking me?

7       Q.    Yes.

8       A.    Yes.

9       Q.    And that machine time is dependent on whatever

10 you set it at?

11      A.    Yes, whatever the machine is set at.

12      Q.    I can go into my computer, my PC, go to the

13 internal clock, set it for California time?

14      A.    Yes, sir.

15      Q.    Then anything I do on it, the event log is

16 going to register that happened according to California

17 time?

18      A.    Yes, sir.

19      Q.    Did you look to see what particular -- how this

20 clock, particular computer was set?

21      A.    Yes, sir.

22      Q.    And how was it set?

23      A.    It was set for Central Time, Central Standard

24 Time.

25      Q.    How did you check that off?

Kathryne B. Kyrllol, CSR
(936) 443-3312 - wordsmithreporting@gmail.com

February 26, 2010

1        A.    Through the registry.

2        Q.    Did you ever look to see what the internal

3    clock said and compared it to the actual time then?

4        A.    The data registry just tells you which time

5    that it is, and I can go by what I see at that time.

6        Q.    Okay.

7        A.    It also shows in the event log the consistency

8    with the MFT, the master file index, and so on.  That's

9    how I determined the machine time.

10       Q.    Is it possible that the times here on your time

11   line -- the one that says 9:06 PM -- it actually could

12   have been 8:06 PM?

13       A.    Yes, sir.

14       Q.    Is that the fact you found?

15       A.    No, sir.

16       Q.    I mean, would it surprise you that both

17   Investigator McCune --

18             MR. JAMES:  Objection.  That's stating

19   facts not in evidence.

20             THE COURT:  Sustained.

21             MR. PHELPS:  Rules of evidence do not

22   apply.  And I can give her facts and ask her to give her

23   opinion based upon those facts.  Also even if --

24             THE COURT:  You asked her hypothetical

25   question.

1  actually then housed or headquartered; are you familiar

2  with that?

3       A.   Basically somewhat, yes.

4       Q.   You have done that before, have you not?

5       A.   I have got gone in and looked at Web sites but

6  not necessarily going into IP addresses.

7       Q.   Just looking at this document, this Web site

8  mpwh.net gives an IP address, does it not?

9       A.   Yes, sir, it does.

10      Q.   That IP address, that same one, is for where?

11      A.   It says New York.

12      Q.   And New York is an hour ahead of us, right?

13      A.   Yes, sir, it is.

14      Q.   So just so we are clear, at least it looks like

15 the times that are listed on this chat log are probably

16 an hour ahead of our time?

17      A.   That could -- yes, that could possibly be.

18      Q.   And the computer itself could be an hour ahead

19 of our time?

20      A.   Yes, sir, there's a lot of variables.

21      Q.   And oftentimes when you see times on computers,

22 computers can be off two or three minutes.  One can say

23 8:53, and another can show 8:50.  That doesn't mean

24 they're inconsistent, does it, necessarily?

25      A.   That's correct.  It can be off an hour or an

1  hour and two minutes.  There's variables.

2      Q.   One thing, however, we did determine is that

3  the chat that you reviewed, right?

4      A.   I just perused it.  Again, that fell outside my

5  assigned task.

6      Q.   According to your time line, the video itself

7  was accessed at 9:15 PM?

8      A.   Yes, sir.

9      Q.   And the chat entry regarding that video by

10  Ms. Killian where it says, "Okay, I opened one video.

11  It confirms child porn," was at 9:14 PM, right?

12      A.   Yes, sir.

13      Q.   So at least it looks as though the times that

14  are on -- at least with respect to that particular

15  transaction --

16      A.   I'm sorry?

17      Q.   At least with respect to that particular

18  transaction, the time that she posted it, her comment,

19  is the same time that she actually accessed that video?

20      A.   No, sir.  I'd have to disagree with you.

21      Q.   How so?

22      A.   Because, like I stated on Tuesday, I cannot

23  testify to the times from those servers.  I can only

24  testify to machine time.

25      Q.   Okay.  Well, I have just shown you that the

February 26, 2010

```
 1   server is located Albany, New York, which is an hour

 2   ahead?

 3        A.   Yes, sir.

 4        Q.   But put that aside for a second.  If the chat

 5   says 9:14 --

 6        A.   Yes, sir.

 7        Q.   -- and your own examination on the computer

 8   shows that she looked at that video at 9:15 --

 9        A.   Yes, sir.

10        Q.   -- that's pretty consistent, isn't it?

11        A.   If you're going to separate the server times,

12   the server times probably remain consistent; but if you

13   look at the computer's time, what time did that entry

14   come into that computer, that computer will note the

15   date and the time.  So you don't depend on one.  You

16   depend on both to make that determination, which is what

17   I did.  I did not rely on one time.

18        Q.   Which time?

19        A.   Because there are so many variables.  As you

20   said, there could be.  Could come from New York.  That's

21   an hour ahead.  We're Texas.  We're Central.  An hour

22   behind.  The server could have been off two or

23   three minutes.  The machine could have been off two or

24   three minutes.

25             So I don't look at one log.  I look at
```

1    several.  And I see at what time this entry, the chat

2    log that you refer to, comes into the machine.  The

3    machine notes that time.  That's the time that I go

4    with.

5        Q.   Okay.  But --

6        A.   Does that make sense?

7        Q.   According to the machine, she accessed that one

8    video at 9:15?

9        A.   Yes, sir.

10       Q.   According to the chat, she says, "I opened one

11   video.  It showed confirmed child porn."  That happened

12   at 9:14.

13       A.   Yes, sir, I understand.

14       Q.   Does that indicate we have got some consistency

15   between these in terms of time?

16       A.   Again, I have to answer it, if you're looking

17   at the server time versus the machine time, the machine

18   time when this entry that you refer to, this chat log,

19   when it comes in it is noted on the machine.  That

20   machine time is noted on that little sheet that you

21   have.

22       Q.   Okay.  So I mean the thrust of what you're

23   telling me is there are so many variables you can't tell

24   me?

25       A.   No, sir.  I can tell you -- I can tell you

1    definitively what time that entry came into that

2    machine.

3        Q.    Well, no, you can't.  Did you just testify that

4    that entry about her opening that video -- does it not

5    say on this 9:15, right?

6        A.    Yes, sir, it was opened on that machine at

7    9:15.

8        Q.    So what you're saying is that the computer

9    reflects 9:15?  You're not saying that's the exact --

10   that's the time, in fact, that that occurred?  Do you

11   understand what I'm asking?

12       A.    I believe so.  If you're asking me what time

13   that file, that ABI file, was opened, 9:15 PM, if you're

14   asking me what time the chat log was introduced into

15   that computer -- the server over here in New York may

16   say 8:42.  His, when it comes across onto his machine,

17   it's going to register.  The computer is going to put a

18   time on there.  It's going to state 9:42.  It's the same

19   file.  But New York has it at 8:42.  His machine has it

20   at 9:42.  That is the log I go by.  I don't care about

21   New York, Singapore, Australia.  I care what comes in on

22   that machine at that time.

23       Q.    But, again, that's not my question.

24       A.    Okay.  I'm sorry.

25       Q.    A moment ago you said you could definitively

```
 1  state that it happened at 9:15 when this entry is.
 2  That's when the machine says this happened, right?
 3       A.   That video file was opened up.
 4       Q.   There is a difference between what the machine
 5  says in some circumstances and what actually is the
 6  case; would you agree with me?
 7       A.   No, I would not.  If the log says that an entry
 8  was made at that time, that entry was made.  I am there
 9  to read that --
10       Q.   Okay.  If I am on this computer --
11       A.   Yes.
12       Q.   -- I access this video according to the
13  machine.
14       A.   Yes.
15       Q.   And machine's clock at 9:15.  That's what the
16  machine says.
17       A.   Yes.
18       Q.   Is it possible that I could look at my clock,
19  my watch --
20       A.   Yes.
21       Q.   -- and it say 8:15 Texas time?
22       A.   That is possible.
23       Q.   Okay.  So it is not -- you cannot say
24  definitely.  That's kind of the point of my question.
25  You cannot say definitively the times that these things
```

February 26, 2010

1   happen?  Only the time that the computer says they

2   happened?

3        A.   That is correct, at the time that the computer

4   says it happened.  And then we also look at the master

5   file index to see the sequence of events, and the

6   sequence of events are consistent with those times,

7   those date and times.  So one could not have happened

8   before the other.

9        Q.   I understand that.  Relative to the machine's

10  internal clock?

11       A.   Plus the sequence of events.  The natural order

12  reflects the sequence of events that occurred from 9:06

13  PM until that chat log was put on that -- till it came

14  in or was introduced into that computer.

15       Q.   Is there --  and, again, that's not the

16  question I'm asking.  But just so that we're clear, I

17  understand that you're saying that the computer's

18  internal clock is going to be consistent with respect to

19  its own clock, right?

20       A.   Yes.

21       Q.   That doesn't mean it's necessarily consistent

22  with the actual time on my wrist, right?

23       A.   That is correct.

24       Q.   Okay.  And in this case did you, in fact, find

25  that the internal clock of this computer was one hour

1  ahead of the time that it actually -- that it actually

2  was?

3      A.   No, I did not.

4      Q.   Did you check?

5      A.   No, I did not.

6      Q.   All right.  With respect to the things that

7  Dawn Killian said she did on the computer, we know she

8  accessed one video; is that correct?

9      A.   One video.  That's correct.

10     Q.   No evidence she accessed any other videos?

11     A.   No.

12     Q.   Because no evidence that she accessed any other

13  files other than the recent document file and maybe she

14  went in the recycle bin?

15     A.   That's correct.

16     Q.   She's not deep in the computer fishing around

17  Mr. Baird's stuff, is she?

18     A.   Not that I could see, no.

19     Q.   In fact, in order to get to the recent

20  documents on a computer -- what operating system was

21  this?

22     A.   This is going to be Vista Home Premium.

23     Q.   On Vista Home Premium to get to the recent

24  documents folder, you click on the start button on the

25  lower left-hand corner, right?

February 26, 2010

1      A.   Yes, sir.

2      Q.   And then you move up to recent documents.  As

3  you mouse up and the mouse arrow hits that, it actually

4  springs out what's in there, right?

5      A.   Yes, sir, it creates a little pop-up window.

6      Q.   You don't even have to click again?

7      A.   No.

8      Q.   So one click, mouse up, and there's the file?

9      A.   Yes, sir.

10      Q.   And that's pretty superficial; would you agree

11  with that?

12      A.   That's average, yes.  Nothing -- no other steps

13  are needed to be taken, if that's what you're asking me.

14      Q.   No evidence that you found, and this would be

15  definitive, that Dawn Killian ever went into my

16  computer, explored Mr. Baird's files, opened any file

17  folders, right?

18      A.   The only -- that's correct.  The only file that

19  was accessed was the one --

20      Q.   Was the one video?

21      A.   Yes.

22      Q.   And you don't find any evidence that she went

23  into the recycle bin, but that doesn't mean she didn't;

24  do you agree with that?

25      A.   Yes.

Arlene B. Kyriell, CSR
(936) 443-3312 - wordsmithreporting@gmail.com

1      Q.    In fact, to get to the recycle bin on Windows

2   Vista, all you have to do is click the trash can?

3      A.    Yes, you click.

4      Q.    When you click that trash can, it's going to

5   give you recycle of the trash on the hard drive, the

6   resident hard drive of the computer, but also any

7   external it's hooked up to?

8      A.    That's correct.

9      Q.    So when Dawn Killian goes into recycle bin, all

10  she has to do is one click?

11     A.    Correct.

12     Q.    She could see what's in the recycle bin?

13     A.    Well, she can do one double click to open or

14  one right click to open technically.  But, yes, in

15  general one click.

16     Q.    They're very easy to get into?

17     A.    Very easy.

18     Q.    Not hidden in any way from a user?

19     A.    No, sir.

20     Q.    In fact, it's intended to be as simple as

21  possible for somebody just looking at the desktop?

22     A.    Yes, sir.

23     Q.    Now, you have indicated according to your time

24  line that there was no Internet activity that began at

25  -- before 9:54 PM; is that right?

1      A.   Yes, sir.  Again, you have the time line.

2      Q.   Now, we do know that there is a rather

3  extensive chat, correct?

4      A.   Yes, sir.

5      Q.   And in order to do those chats, you have to get

6  on the computer, right?

7      A.   You can use a computer.  You can use a cell

8  phone.  There's various ways of getting onto.

9      Q.   Can I use one of those?

10     A.   You could.

11     Q.   My iPhone?

12     A.   Yes, sir.

13     Q.   I could get on this iPhone right now.  Access

14  mpwh.net, if I was a member.  Start a chat thread.

15  Enter a post.

16     A.   Yes, sir.

17     Q.   And then monitor those posts.  Respond to other

18  posts.  Would you agree with that?

19     A.   Yes, sir.

20     Q.   So prior to 9:54 if there was no Internet

21  activity on that computer, Mr. Baird's computer, that

22  doesn't mean that Dawn Killian wasn't on her iPhone?

23     A.   I cannot say one way or another if she was on

24  her iPhone or not.

25     Q.   We know she was on some computer, don't we?

February 26, 2010

1      A.    Yes, sir.

2      Q.    Because there is no Internet activity before

3   that access of that video, right?

4      A.    Before that, no.

5      Q.    And at least according to the chat, quite a bit

6   of stuff happened before she got on and said, "I opened

7   one video and confirmed child porn."

8      A.    Yes, sir.

9      Q.    And the chat, obviously, was started before

10  that?

11     A.    The chat was started before what?  Because it

12  was not started before the video was played, not onto

13  that computer.

14     Q.    Aha.  Not on that computer?

15     A.    That's correct.

16     Q.    But it was started before that happened?

17  Before that entry?

18     A.    No, sir.

19             MR. PHELPS:  May I approach, your Honor?

20             THE COURT:  Yes, sir.

21     Q.    (BY MR. PHELPS)  I want you to explain to me

22  then how she could be on at this point in the chat and

23  not be on a computer before when she starts the computer

24  or starts the thread.

25     A.    For example, this could have been on -- this

February 26, 2010

1    thread could have started on the computer.  This thread

2    whichever page it was -- I apologize.

3        Q.    This is all one thread.

4        A.    It could have been on the iPhone.

5        Q.    Okay.

6        A.    Or whatever device.

7        Q.    But your statement a moment ago -- I think

8    we're just missing each other here.  Your statement a

9    moment ago is that thread could not have started before

10   she accessed that video?

11       A.    I'm saying --

12       Q.    That is what you said a minute ago?

13       A.    Okay.

14       Q.    Let me just make the statement, and you agree

15   with this.  I think what you intended to say, or I

16   misunderstood you, was she could not have started that

17   thread on that computer before she accessed that video.

18   Is that what you're saying?

19       A.    I can testify to any of the -- the files that

20   came in on this computer according to the master file

21   index is registered.  I can state with certainty that

22   that particular file that came in on that computer

23   occurred at a certain time.  It happens to match the log

24   that he has presented to the court.  The same verbiage.

25       Q.    Okay.  Again, I apologize if I'm not making

February 26, 2010

1   myself clear.  All I want to establish, the only

2   concession I want from you, is that there was a chat

3   thread, right?

4       A.   There was.

5       Q.   At some point in that chat thread she says, "I

6   opened one video.  It confirms child porn."  Right?

7       A.   Yes, sir.

8       Q.   Would you agree with me that all of the entries

9   on that chat thread before that had to have occurred

10  before she posted that?

11      A.   Before she -- that's where I'm losing you.

12  Before she posted what?

13      Q.   "I opened one video."

14      A.   Oh, if you're asking my opinion if this event

15  occurred before she posted that, yes, it could have

16  occurred at that time.

17      Q.   All of the previous postings in that thread

18  happened before?

19      A.   I disagree with you on the time that those

20  threads were posted or came -- were introduced into this

21  computer.

22      Q.   Okay.  Again, that's not my question.

23      A.   Okay.

24      Q.   Just looking at the thread itself, if she makes

25  a post mid-thread, that means the post before it

1    happened before.  Yes or no?

2         A.   It could have.  Again --

3         Q.   How could it be generated before and she could

4    go into the middle of a chat thread and there's nothing

5    there and she responds to other threads?  All I'm asking

6    is if you have a chat thread and you have something in

7    the middle of it, then that means the stuff that

8    happened before in that chat thread in time happened

9    before she posted?

10              MR. JAMES:  Judge I just want to make sure.

11   I think they're doing like this.  Are you asking,

12   Mr. Phelps, that the earlier thread, the earlier chat,

13   occurred before what is in the middle of the --

14              MR. PHELPS:  Yes.

15              MR. JAMES:  Okay.  I think they're having

16   one of these, Judge.  Do you understand the question?

17              THE WITNESS:  Yes.  And I can't answer if

18   it occurred in the middle of it or not.

19              MR. JAMES:  It occurred.  He's talking

20   about the thread.  The earlier posts occurred before the

21   middle post.

22              THE WITNESS:  Yes.  Okay.

23              MR. JAMES:  That's it.

24        Q.   (BY MR. PHELPS)  And all I would kind of like

25   us to agree on is that just because there doesn't appear

1   anything in your opinion on that computer before 9:54

2   doesn't mean that Dawn Killian started that thread

3   prior?

4        A.   She may have.

5        Q.   In fact, she has to have, right?

6        A.   No, sir.  Again, because of the time variations

7   that we discussed previously.

8        Q.   And the time variation being that she posted

9   this at 8:42 PM Albany time, which is an hour ahead, and

10   the computer internal clock was an hour ahead of our

11   time.  Are those the variations you're talking about?

12        A.   If you put those conditions in place, that

13   could be possible.

14        Q.   All right.  But you don't have any argument at

15   all that Dawn Killian could have gotten on iPhone or

16   different phone?  In fact, she must have to start this

17   thread because it did start on that computer?

18        A.   I can't testify to anything she did with the

19   iPhone or any other device with that log.

20        Q.   You don't have any argument -- and I'm going to

21   make this as simple as I can --

22             MR. JAMES:  Objection.  Sidebar.

23             MR. PHELPS:  I'm trying to make this as

24   quick and concise as I can, your Honor.

25             THE COURT:  Go ahead.

February 26, 2010

1          MR. PHELPS:  I think I have right to do

2  that.

3      Q.   (BY MR. PHELPS)  I can start a chat on one

4  computer and continue it later on another.  Do you

5  agree?  Yes or no?

6      A.   Yes, I agree.

7      Q.   Thank you.  Thank you.  And, again, you saw no

8  evidence at all on this computer that would suggest from

9  the computer that Dawn Killian did not have consent to

10 be on that computer?

11     A.   I have no way of knowing if she had consent or

12 not to get on computer.

13     Q.   Well, you do know there were no passwords?

14     A.   That is correct.

15     Q.   You do know there was no inscription?

16     A.   That's correct.

17          MR. PHELPS:  All right.  I pass the

18 witness, your Honor.

19          MR. JAMES:  Call Bill Odom.

20          THE COURT:  You may step down.

21          Mr. Odom is still under oath; is that

22 right?

23          WILLIAM ODOM,

24 having been first duly sworn, testified as follows:

25          DIRECT EXAMINATION

1  BY MR. JAMES:

2    Q.   Mr. Odom, you and I visited the other day?

3    A.   Yes, sir.

4    Q.   And I made a mistake, I guess.  I asked you

5  when you click that -- what do you call it?  It's not

6  the recent folder.  What is it?  It's what you have

7  gotten through with.  You have deleted items.

8    A.   The recycle bin.

9    Q.   The recycle bin?

10   A.   Yes, sir.

11   Q.   I asked you, I said, "Well, that wouldn't show

12  pop-ups.  That would show words."  You remember me

13  asking you that?

14   A.   I do recall that.

15   Q.   You said, "No, not necessarily."  Do you

16  remember saying that?

17   A.   Yes, sir.

18   Q.   That depends on the view which way it is set,

19  correct?

20   A.   That's correct.  Yes, sir.

21   Q.   That's correct?

22   A.   Yes, sir.

23   Q.   And you read -- we've talked a lot about the

24  chat here, haven't we?

25   A.   Yes, we have.

1    Q.   And you read through that, didn't you?

2    A.   I did.

3    Q.   It's at a different place.  These are -- is

4  this the same thing?  Just so we're clear, this is the

5  same thing?  It's just in a different format?

6    A.   May I see that?

7    Q.   Sure.

8    A.   From what I see here, it appears to be the

9  same.

10   Q.   Now, where are we?  This has the times on it?

11   A.   Yes, sir.

12   Q.   9:03.  Where would 9:03 be on that one?

13   A.   It would be -- there's an entry for 9:03.

14        MR. PHELPS:  May I see what you're looking

15  at?

16        MR. JAMES:  Yeah.

17        MR. PHELPS:  You're just talking about --

18        MR. JAMES:  Yeah.

19   Q.   (BY MR. JAMES)  So it can either show pop-ups,

20  or it can show words or descriptions depending on how

21  the view is set, correct?

22   A.   I would agree with that, yes.

23   Q.   And you read everything Ms. Killian said,

24  right?

25   A.   I did read through that, yes.

1    Q.   And there was something very important in

2    there.  And you didn't mention this in our discussion

3    earlier.  She says, "I am not sure what the legal

4    descriptions are for child porn.  But I did open the

5    folder and flip it to the thumbnail view."

6    A.   Yes, sir.

7    Q.   So, apparently, while Mr. Phelps has been

8    talking about, well, it's just showed up automatically.

9    It showed up after she knew to go to view and change the

10   computer setting from descriptive words to the

11   thumbnail, correct?

12   A.   I'm sorry.  Can you repeat that just to make

13   sure I'm clear?

14   Q.   Okay.  Mr. Phelps made a while ago, well, it's

15   just real easy.  Just click, click.  There you are.

16   Doesn't take any real knowledge.  She only was able to

17   see those thumbnails after she changed the view setting

18   on the computer from words to images, pop-ups?

19   A.   Well, certainly would have to have -- the

20   settings would have to be set for thumbnail view

21   settings.

22   Q.   Well, that's what she says she did.

23   A.   I understand.

24   Q.   "I'm not sure what the legal descriptions are

25   for child porn, but I did open the folder and flip it to

1    the thumbnail view."  She changed the settings on the

2    computer so she could see those images, didn't she?

3         A.   I can't speak to what she did or didn't do.

4         Q.   That's what she says she did?

5         A.   I agree with that, yes.

6         Q.   Did you know that before I just pointed that

7    out?

8         A.   I had read through that.

9         Q.   You didn't mention it in your testimony that

10   she flipped the thumbnail view.  You didn't mention that

11   the other day?

12        A.   No, sir, I wasn't asked that.  I didn't mention

13   it.

14        Q.   You knew it was important.  You knew it was

15   important, didn't you?

16        A.   Is that a question?

17        Q.   Yes.

18        A.   I think it's consistent with usage.

19        Q.   Did you know it was important?

20        A.   Important in what sense?

21        Q.   Mr. Phelps talked a lot about the server.  The

22   server isn't necessarily hosted in the locale where the

23   Web site is, is it?

24        A.   Which server are we speaking about?

25        Q.   Any server, Mr. Odom.  Any server.  Whether

February 26, 2010

1  it's this chat room, another chat room.  If a company is

2  located in one place, you don't know where the server is

3  located, do you?

4      A.   Well, the server and the company can be located

5  in two different places.  That's true.

6      Q.   And on this server you don't know -- excuse me.

7  The server on this chat room you don't know where it's

8  located, do you?

9      A.   Yes, I believe it's located in Albany, New

10  York.

11      Q.   You know the server is located there?

12      A.   Yes, sir, I believe that.

13      Q.   Do you believe it -- did you check to see where

14  the server -- we are not talking about where the company

15  is located.

16      A.   Yes, sir, I understand the question.  Based on

17  the information that Mr. Phelps actually presented

18  earlier with the IP lookup, that is, in fact, where the

19  server should be located.

20      Q.   You know all of this we talked about -- you

21  told us under oath the other day that that video was

22  accessed at 9:15, didn't you?

23      A.   Yes, sir.

24      Q.   Mr. Phelps has made a major deal about what

25  time that video was accessed.  Is it still your

February 26, 2010

1  testimony that that video was accessed at 9:15?

2      A.   9:15 based on the computer's internal clock.

3      Q.   Tell us about the -- I mean, all of this --

4  well, I'll get there.  Show you what's been marked as

5  Defendant's Exhibit 1.  Can you tell us what that is,

6  please?

7      A.   This looks to be a screen shot or some

8  graphical representation of what would appear to be an

9  event that occurred at -- on -- or sorry -- May 8th,

10  2009, at 9:06 PM.

11      Q.   And does it indicate that the machine had gone

12  -- was asleep?  And this is UTC time up here, right?

13      A.   Correct.

14      Q.   This would be machine time, right?

15      A.   I would agree with that, yes.

16      Q.   And this shows that the first time that the

17  machine was awakened was on May the 8th at 9:06 and

18  43 seconds, correct?

19      A.   Correct.

20           MR. JAMES:  We offer Defendant's Exhibit 1,

21  your Honor.

22           THE COURT:  Defendant's Exhibit 1 is

23  admitted.

24      Q.   (BY MR. JAMES)  Did you ever check the system

25  event log to see when the computer was opened or when it

1    was awakened and when it went to sleep?

2         A.   Yes, sir.

3         Q.   What did you find -- that was the system event

4    log, correct?

5         A.   Well, that appears to be the one that I looked

6    at as well, yes, or similar.

7         Q.   And does it indicate it went to sleep at what

8    would be on May the 7th and was awakened at 9:06?

9         A.   On May the 8th?

10        Q.   Yes.

11        A.   Yes, I would agree that was the entry in the

12   log.

13        Q.   You knew that yesterday?

14        A.   Yes, sir.

15        Q.   And you didn't volunteer that information

16   either yesterday, did you?  I said yesterday.  I'm

17   talking about the last time we had a hearing.

18        A.   I understand.  I'm not sure that --

19        Q.   You weren't asked?

20        A.   No, sir.

21        Q.   Did you think it was important?  You knew it

22   was important, didn't you?

23        A.   Again, I would ask how you define what's

24   important?  Important in what respect?

25        Q.   Let me ask you something.  You answered under

1  oath -- and you know all this really is smoke and

2  mirrors.  But what is really important, you were asked

3  under oath if there was any indication that music was in

4  any way dragged onto that computer.  And you said no.

5  Is that still your testimony?

6      A.   Yes, sir.

7      Q.   That is really what all this is about.  Was

8  there music put onto that computer?  Your answer is no.

9  Was there music deleted off of that computer that night?

10     A.   Which night?

11     Q.   May 8th.

12     A.   There's no indication that I was able to find

13 of that.

14     Q.   So all this other stuff that we've been talking

15 about -- if Dawn Killian said that she dragged music

16 onto that computer, that's just not correct.  There's no

17 evidence of that, is there, at all?

18     A.   That she dragged music onto that computer?

19     Q.   Yes, sir.

20     A.   I have not been able to find evidence of that.

21 That's correct.

22     Q.   You knew that was important when Mr. Phelps was

23 asking you that the other day and you didn't volunteer

24 that information either, did you, Mr. Odom?

25     A.   Again, which question are we speaking to

1  specifically?

2      Q.   Did you ever volunteer when Mr. Phelps in the

3  pursuit of justice was asking you questions?  Did you --

4           MR. PHELPS:  Your Honor, I'm going to

5  object to obvious sidebar and --

6           MR. JAMES:  Your Honor, he's been

7  "sidebarring" this whole hearing.

8           MR. PHELPS:  This is argumentive.  He's

9  asking him questions that, I think, are improper with

10  given his scope.

11           THE COURT:  Overruled.

12      Q.   (BY MR. JAMES)  Did you ever volunteer that

13  information during Mr. Phelps' direct exam?

14      A.   No, sir.

15           MR. JAMES:  One moment, sir.

16           THE COURT:  Yes, sir.

17           MR. JAMES:  Pass the witness.

18                  CROSS-EXAMINATION

19  BY MR. PHELPS:

20      Q.   Mr. Odom, did you check Mr. Baird's computer to

21  find out whether the internal clock was consistent with

22  the actual time?

23      A.   Yes, I did.

24      Q.   And what's the result?

25      A.   That the clock is actually an hour off from

1  actual time.  It's an hour ahead.

2      Q.    So if the internal clock says 9:15, the actual

3  Texas time that it occurred would have been 8:15?

4      A.    That's correct.

5      Q.    And in your opinion based on the IP address

6  location, the IP address for this Web site mpwh.net is

7  Albany?

8      A.    That's my opinion.

9      Q.    If you know, are they an hour ahead of us?

10     A.    I understand Albany is an hour ahead, yes.

11     Q.    So there's some correlation between the times

12  on this chat and the time on the computer clock?

13     A.    The internal computer clock, yes, they're

14  consistent.

15     Q.    And both those are an hour ahead?

16     A.    That would be correct.

17     Q.    And with respect to what Mr. James was talking

18  to you about the gallery view, I want to make sure that

19  --

20           MR. PHELPS:  May I approach the board, your

21  Honor?

22           THE COURT:  Yes, sir.

23     Q.    (BY MR. PHELPS)  Just a couple of things I want

24  to establish.  First of all, if I am looking at that

25  recycle bin, am I just looking at a screen?  And correct

1    me if I'm wrong, but are there usually little buttons up

2    here that are like -- be like lines.  Then something

3    else be will be -- so if you push this button, it's

4    text.  If you push this button, it's what they call

5    gallery view so you see the thumbnails.

6        A.    Yes.  It's similar to that.  It's actually one

7    button that allows you to click, and it changes the type

8    of view.

9        Q.    Okay.  So it just toggles?

10        A.    Effectively, yes.

11        Q.    So if I get rid of this, does it take one click

12    to get into the recycle bin?

13        A.    Yes, sir.

14        Q.    That's the trash can on the --

15        A.    Trash can icon that would be on the desktop.

16        Q.    And then depending on how that toggle is set,

17    when I go in there, I can see lines of text; is that

18    right?

19        A.    That's one option, yes.

20        Q.    And if the computer is toggled to that, that's

21    what you are going to see, right?

22        A.    That's correct.

23        Q.    When I asked you about this initially, did you

24    or somebody in our office generate if it had been text

25    mode what the spreadsheet of those documents?

February 26, 2010

1    A.    I'm sorry.  Can you repeat that question?

2    Q.    Terrible question.  I'm sorry.  Do you

3 recognize that?

4    A.    Yes, this is a representation of the files that

5 were in the -- that are in the recycle bin.

6    Q.    So if you were to click on this button for text

7 or the recycle bin and it was set that way, you would

8 see these files in that form roughly?

9    A.    Roughly, yes.  Not exactly.  But close.

10    Q.    But you could read the file names?

11    A.    Correct.

12          MR. PHELPS:  Your Honor, I'll offer State's

13 Exhibit 9.

14          MR. JAMES:  No objection.

15          THE COURT:  Nine is admitted.

16    Q.    (BY MR. PHELPS)  Now, there are a number of

17 files here.  File names are on the left.  So if you were

18 to just pop this up and it was in this mode, would you

19 be able to read "10-year-old boy with 17-year-old

20 boyfriend"?

21    A.    Yes, you would.

22    Q.    Would you be able to read "Boy Scout David part

23 three"?

24    A.    Yes.

25    Q.    "Ten-year-old boy."  That's part two of that

1   other one.  I'm not going to go through all of them, but

2   there are a number of obviously suspicious titles, are

3   there not?

4       A.   Yes, I would have to agree with that.

5       Q.   And by obviously suspicious, I mean potentially

6   child pornography?

7       A.   Yes, sir.

8       Q.   So somebody who, if the computer was in this

9   mode, just clicked on that recycle bin, they would be

10  able to read those files like that?

11      A.   By name, yes.

12      Q.   If they clicked on this button to toggle it,

13  would it turn it into gallery view showing thumbnails?

14      A.   That's also another option.

15      Q.   That's not the same as opening a folder, is it?

16      A.   No, sir.  The folder is already open.

17      Q.   And the folder is the recycle bin?

18      A.   Right.

19      Q.   So to get to here, you click one time.  Well,

20  there's a trash -- it's usually over there, is it not?

21  I don't know what it looks like, but usually a trash bin

22  can icon in the corner.  You click on that.  You go

23  here, right?

24      A.   Yes, sir.

25      Q.   Potentially, depending on how it's toggled, you

1    can either see this listing of names or you can see some

2    names, right?

3        A.    Right.

4        Q.    Most -- well, if you see the text, all you have

5    to do is toggle it.  It turns into the thumbnails,

6    correct?

7        A.    Correct.  That is one of the option.

8        Q.    Would you see thumbnails without having to open

9    up some other file somewhere else?

10       A.    Yes.

11       Q.    So when Dawn Killian -- Mr. James asked you

12   about that -- talked in that chat about opening a

13   folder, she wouldn't have to open a folder other than

14   the recycle bin to look at those thumbnails, would she?

15       A.    That's correct.

16       Q.    And, in fact, there are files here, these

17   images that we've marked, that are -- that she described

18   to the police department and they put in their search

19   warrant affidavit.  Do you recall that?

20       A.    Yes, I do.

21       Q.    And you've looked at those?

22       A.    Yes, I have.

23       Q.    And those are in here, are they not?

24       A.    Yes, they are.

25       Q.    So when we're talking about time lines, if the

1    computer says 6:06, which is the thing you identified

2    yesterday as being consistent with a CD put into a

3    computer, that it would be 5:06?

4        A.   The actual time would be 5:06.

5        Q.   Just so that we have kind of a quick time line

6    of what we know, I think, and it's not disputed, you

7    indicate that there is something the computer says it's

8    6:06.  But you said it's an hour ahead.  So let's just

9    say 5:06.  That's when that whatever it was indicates

10   that possibly a CD was put in?

11       A.   A file being accessed, yes.

12       Q.   And along this time line, the chat post says

13   8:42, right, the initial thread?

14       A.   Yes, sir.

15       Q.   Started at 8:42?

16       A.   Correct.

17       Q.   According to, presumably, Albany time, right?

18       A.   The server in Albany, correct.

19       Q.   So our time would have been 7:42?

20       A.   In actuality, yes.

21       Q.   And could that have been started on another

22   computer?

23       A.   Yes.

24       Q.   And, in fact, is there any evidence that it was

25   started on Mr. Baird's computer?

February 26, 2010

1    A.    No, there's none.

2    Q.    So it was started on another computer?

3    A.    (Moving head up and down.)

4         MR. JAMES:  Objection, your Honor.  He says

5    there's no evidence it was started there.  He says,

6    well, then it was started somewhere.

7         MR. PHELPS:  On another computer.

8         MR. JAMES:  If you are asking him was it,

9    rather than making a conclusory statement.  Ask him if

10   it was.  That's fine.

11        MR. PHELPS:  I don't think you're

12   listening, but I'll try and --

13        MR. JAMES:  I don't think you're making

14   your questions very good, Mr. Phelps.

15   Q.    (BY MR. PHELPS)  According to the chat thread,

16   this would have been started at 7:42 started this time?

17   A.    That's correct.

18   Q.    From the evidence we have was actually started

19   on another computer; is that right?

20   A.    I would agree with that.

21   Q.    It was not started on Gregg Baird's computer?

22   A.    It was not.

23   Q.    Could you agree with their expert that it could

24   have been done on iPhone?

25   A.    Yes.

February 26, 2010

```
 1        Q.    iPhones, do they have access to the web?

 2        A.    Yes.

 3        Q.    The chat indicates at 9:14, which would be 8:14

 4   our time, is when Dawn Killian says, "I open one video.

 5   It confirms child porn."  Does that comport with your

 6   review?

 7        A.    I recall that from the chat.

 8        Q.    Yeah, and it's in evidence.  And then the

 9   computer says our time because it's an our ahead, as you

10   said.  Eight-fifteen is when the video was accessed, the

11   one video that was accessed on this computer.  Do you

12   agree with that?

13        A.    Yes, sir.

14        Q.    Computer says 9:15, but the computer is an hour

15   ahead; is that right?

16        A.    Correct.

17        Q.    And then according to, I think everything we've

18   been talking about, 8:54 -- the computer says 9:54 --

19   but it's an hour ahead -- is when on the defendant's

20   computer Internet is accessed it the first time, right?

21        A.    That's what I recall for the first time, yes.

22        Q.    So is this basically a fairly accurate time

23   line based on what we know?

24        A.    Of the key events that evening, yes.

25        Q.    Based on what you've done and based on you were
```

February 26, 2010

1    here for their expert's testimony?

2         A.    Yes, sir.

3         Q.    Okay.  And we had some discussion, I did, with

4    their expert about her opinion day before yesterday that

5    that 5:06 event on the computer I think she said was an

6    update but could have been an update.  Do you agree with

7    that?

8         A.    That it could have been an update?

9         Q.    Yes, sir.

10        A.    I don't believe that it was.

11        Q.    Why not?

12        A.    Because there was no other activity that is

13   indicative that it was an update.

14        Q.    And how do you judge that?  How do you --

15        A.    For the particular file that the access time

16   was updated on, that file is -- I'm sorry -- I'm getting

17   this by name -- MCE Spotlight by DLL -- or CAB.  Sorry.

18   C-A-B.  It's a container file, a file that contains

19   other files, and the only way that typically is going to

20   be accessed is through some windows or other application

21   accessing that.  If it were in the course of being

22   updated, then it would have to access a program called

23   MC update.

24              And so I reviewed the access times for MC

25   update on Mr. Baird's computer.  And there was no access

Kathryne B. Kyrlell, CSR
(936) 443-3312 - wordsmithreporting@gmail.com

1  to that file during that time, and, in fact, none at all

2  during that day.

3      Q.   And why is that significant with respect to

4  that particular entry at 5:06?

5      A.   Because that would have to be the file that

6  would be accessed to update this particular file.

7      Q.   So in your opinion was that an update?

8      A.   No.

9      Q.   And there was some discussion, and I just want

10  to clear this up, with Mr. James about Ms. Killian

11  changing the settings on the computer.  When we talk

12  about just clicking that button, the toggle, is that

13  changing the settings on the computer?  Can you explain

14  that to the judge?

15      A.   It's, in fact, changing the settings for the

16  user that's accessing that computer.  So it would, in

17  fact, be a temporary type of view while that folder was

18  being viewed.

19      Q.   So is it making any permanent changes to the

20  computer at all?

21      A.   Through that process, no.

22      Q.   And, correct me if I'm wrong, but is it simply

23  a toggle that changes the way you view what you're

24  looking at?

25      A.   Yes.

1    Q.   So pop-up that recycle bin.  Shows up text.  If

2  you want to look at thumbnails that go along with that,

3  you just hit that button?

4    A.   Yes.

5    Q.   In your experience are there varying levels of

6  experience and familiarity with computers from person to

7  person?

8    A.   Certainly.

9    Q.   Can some people say something about a computer

10  and it turn out not to be the actual thing that is

11  happening on the computer, like I went into a folder and

12  it's just clicking that toggle?  Does that make sense?

13    A.   I guess so.  Generally speaking, I would have

14  to agree.  Yes.

15        MR. PHELPS:  That's all I have, your Honor.

16  Pass the witness.

17        MR. JAMES:  Judge, could I have five

18  minutes?

19        THE COURT:  Yes, sir.  Take a five-minute

20  break.

21        (Break was had from 3:16 PM to 3:27 PM.)

22        THE COURT:  All right.  We ready to

23  proceed?

24        MR. PHELPS:  Yes, sir.

25        THE COURT:  Go ahead.

1      MR. PHELPS:  I have just one more question

2  of Mr. Odom.  May I approach, your Honor?

3      THE COURT:  Yes, sir.

4      Q.  (BY MR. PHELPS)  Mr. Odom, we just went through

5  this time line on the board.  Let me show you what I

6  marked as State's Pretrial Exhibit No. 10.  Do you

7  recognize that?

8      A.  Yes, sir, I do.

9      Q.  Now, is that basically a chart that I put

10 together and showed you earlier?

11     A.  Yes, to corroborate the times.

12     Q.  And you got a chance to take a look at it.  Is

13 it based upon your examination of the computer, your

14 examination of the chat log, and other information I

15 think that's been introduced in this hearing?

16     A.  Yes, sir.

17     MR. PHELPS:  Your Honor, I'll offer State's

18 Exhibit Pretrial 10.

19     MR. JAMES:  The only thing I would point

20 out -- on voir dire, your Honor?

21     THE COURT:  Yeah.

22     VOIR DIRE EXAMINATION

23 BY MR. JAMES:

24     Q.  This says, on what he prepared, evidence CD put

25 in.  You said possible CD.  You don't know if the CD was

1   put in at that point, do you, at 5:06?

2        A.   Specifically, no, sir.

3        Q.   And if it was, there was certainly no evidence,

4   it was downloaded onto the desktop, is there?

5        A.   No, sir.

6        Q.   And there's no evidence that it was ever erased

7   from the desktop, is there?

8        A.   No, sir.

9             MR. JAMES:   Then I have no objection.

10            MR. PHELPS:   I actually wrote in possible

11  CD.

12            MR. JAMES:   Now with that understanding,

13  Judge, I have no objection.

14            THE COURT:   That's ten?

15            MR. PHELPS:   Yes, sir.   I wanted to

16  memorialized what we had there.

17            THE COURT:   Yeah, ten it is.

18            MR. PHELPS:   That's all I have.

19            MR. JAMES:   We have nothing further.

20            THE COURT:   You can step down, sir.

21            MR. JAMES:   Call Gregg Baird.

22            (The witness was duly sworn.)

23                 GREGG BAIRD,

24  having been first duly sworn, testified as follows:

25                 DIRECT EXAMINATION

```
 1   BY MR. JAMES:
 2       Q.   Would you state your name?
 3       A.   Gregg Baird.
 4       Q.   Mr. Baird, all these discussions I think we can
 5   all -- I think we can all agree and stipulate this all
 6   happened at your house with your computer; is that
 7   correct?
 8       A.   Yes.
 9       Q.   Now, let me ask you, sir, how old a man, are
10   you?
11       A.   Thirty-nine.
12       Q.   And what's your -- where were you working prior
13   to this?
14       A.   Aggieland Credit Union.
15       Q.   What's your educational history?
16       A.   I have a master's in international trade, MBA
17   in international trade, and an undergraduate degree in
18   finance.
19       Q.   Now, in May of last year, were you going to
20   take a trip?
21       A.   Yes.
22       Q.   Where were you going?
23       A.   Panama.
24       Q.   Who were you going with?
25       A.   My family.
```

1    Q.    Is that your parents that you were --

2    A.    Yes.

3    Q.    And did you have a dog?

4    A.    Yes.

5    Q.    What's the dog's name?

6    A.    Copper.

7    Q.    And what were you going to do with that dog?

8    A.    I was looking at leaving him at home with a pet

9  sitter.

10    Q.    Who was going to be the pet sitter?

11    A.    Dawn Killian.

12    Q.    Did she come to your house?

13    A.    Yes, she did.

14    Q.    And did you essentially introduce her to your

15  dog and that sort of thing?

16    A.    Yes.

17    Q.    What did you tell her about your bedroom door?

18    A.    I told her my bedroom door should remain shut.

19    Q.    And where was the computer involved in this

20  case?

21    A.    In my bedroom.

22    Q.    Did you ever take her into your bedroom, show

23  her your bedroom, or anything else?

24    A.    I never took her into my bedroom or my

25  bathroom.

1    Q.   Did you ever tell her she could have whatever

2  she wanted or use whatever she wanted?

3    A.   No, I did not.

4    Q.   Did you tell her she could have whatever food

5  she wanted?

6    A.   Yes.  In fact, we made arrangements about the

7  type of food she wanted before she arrived.

8    Q.   Did you ever give her any indication she could

9  enter your bedroom?

10    A.   Never.

11    Q.   Did you ever give her any indication she could

12  record any CDs?

13    A.   No.

14    Q.   Did you ever give her any indication she could

15  use your computer?

16    A.   No.

17    Q.   Did you ever give her any indication that she

18  could access any user-generated files such as recently

19  opened or deleted files?

20    A.   No.

21    Q.   Did you ever have an expectation of privacy in

22  that computer located in your bedroom?

23    A.   Yes.

24    Q.   Are you asserting today that privacy and

25  objecting to her actions vis-a-vis your computer?

```
 1        A.    Yes.
 2                    MR. JAMES:  Pass the witness.
 3                         CROSS-EXAMINATION
 4  BY MR. PHELPS:
 5        Q.    Mr. Baird, my name is Shane Phelps.  I'm the
 6  prosecutor in the case.  I just have a few questions for
 7  you.
 8                    First of all, there's no question you
 9  invited her to stay in your home for the period you were
10  in Panama, correct?
11        A.    Correct.
12        Q.    You also have a roommate, do you not?
13        A.    Yes.
14        Q.    You were in Panama, or were going to be in
15  Panama, correct me if I'm wrong, from May 7th to
16  May 17th?  Is that roughly the dates, or am I wrong?
17        A.    I believe May 8th through the 17th.  But the
18  same, yes.
19        Q.    So on May 7th -- did you leave on May 7th?
20        A.    Left on May 7th.
21        Q.    By leaving on May 7th, did you leave your house
22  or did you actually get on a plane and go to Panama?
23        A.    Left my house on the 7th.
24        Q.    Where did you go from there?
25        A.    To my parents' house.
```

1    Q.   Which is where?

2    A.   In Spring.

3    Q.   That's near Houston?

4    A.   Yes.

5    Q.   Did your plane leave the next day?

6    A.   Yes.

7    Q.   So you actually left on May 8th in terms of

8    getting on a plane and going to Panama?

9    A.   Yes.

10   Q.   Your plane came back on the 17th?

11   A.   I believe so.

12   Q.   Did you make any stops on the way?  Did you get

13   out to the airport and come straight home?

14   A.   Once the plane landed, I dropped my parents off

15   at their house and returned home.

16   Q.   So no question you actually invited Dawn

17   Killian to come stay in your home?

18   A.   Yes.

19   Q.   That was the agreement, correct?

20   A.   Yes.

21   Q.   Now, with respect to your bedroom, does your

22   bedroom door have a lock on it?

23   A.   I believe it locks from the inside, yes.  I

24   believe it has that capability.  I'm not certain though.

25   Q.   But you didn't lock your bedroom door?

February 26, 2010

```
 1      A.    No.

 2      Q.    Now, you indicated you told her the bedroom

 3  door should remain shut.  You never told her she could

 4  not go into your bedroom.  Is that correct?

 5      A.    Correct.

 6      Q.    The idea of keeping the bedroom door shut

 7  really had to do about keeping the dog out while she was

 8  not there; is that right?

 9      A.    True.

10      Q.    And the dog actually hangs a lot in your

11  bedroom, doesn't it?

12      A.    Not when I'm not at home.

13      Q.    But when you're home?

14      A.    Typically in the room I am.

15      Q.    Dog stay asleep in your bedroom?

16      A.    Most of the nights.

17      Q.    So your dog is pretty comfortable.  It's one of

18  those places in your house he spends a lot of time?

19      A.    Sure.

20      Q.    So no question you never told Dawn, "Do not go

21  into my bedroom"?

22      A.    I never stated -- I told Dawn to keep the

23  bedroom door shut.

24      Q.    And that was in connection with keeping the dog

25  out of there when she wasn't in there?  Yes or no?
```

Charlene B. Kyriell, CSR
(936) 443-3312 - wordsmithreporting@gmail.com

1    A.    Correct.

2    Q.    Your computer is in your bedroom?

3    A.    Yes.

4    Q.    Is it just pretty much out there in plain view?

5    A.    You can't see it from the main area of the

6  house.

7    Q.    Is it enclosed in an armoire or any kind of

8  cabinet?

9    A.    No.

10    Q.    So if somebody were walking into your bedroom,

11  they'd be able to find your computer pretty easily?

12    A.    Yes.

13    Q.    You never told Dawn that she could not get on

14  your computer?

15    A.    I never mentioned my computer to Dawn at all.

16    Q.    So you never told her, "Dawn, I really don't

17  want you on my computer"?

18    A.    Never said that.

19    Q.    You never made any limitations whatsoever

20  expressly to Dawn about getting on a computer or doing

21  anything at all on your computer?

22    A.    Again, I never mention the computer to Dawn.

23    Q.    Now, your roommate has access to your computer,

24  does he not?

25    A.    He would.

1      Q.   So at least with respect to your roommate, he

2   can come into your room any time and get on your

3   computer.   Is that accurate?

4      A.   That's a fair statement.

5      Q.   In fact, there's a file on Andrew's stuff,

6   correct?

7      A.   Correct.   That's a file I generated.   Not

8   Andrew.

9      Q.   Okay.   With respect to the statement -- you

10  heard Dawn Killian testify you said something to the

11  effect of help yourself to anything?

12     A.   I never said that.

13     Q.   You heard her say that, right?

14     A.   I did.

15     Q.   What do you remember her saying that she must

16  be referring to?

17     A.   I'm sorry.   I don't understand your question.

18     Q.   Are you saying that no conversation like that

19  took place at all, or are you simply telling the judge

20  that it wasn't in reference to anything in the house?

21  Does that make sense?

22          Let me ask this:   I think you were present

23  in the courtroom when Mr. James asked Dawn Killian when

24  he said, "Help yourself to anything," you were referring

25  to the refrigerator.   Do you recall that?

1      A.    No.

2      Q.    Did she say or did you tell her anything to the

3    effect "Help yourself to anything in the house or help

4    yourself"?

5      A.    I told her -- I was very specific -- I said,

6    "You can help yourself to any food you find."  And, in

7    fact, before her visit to the house, we arranged -- I

8    arranged the type of beer she wanted and asked her if

9    there was any particular food she would like while she

10   was at the house.

11     Q.    You wanted her to feel comfortable in your

12   home?

13     A.    Yes.

14     Q.    So something like "help yourself" at least

15   those two words were said, right, by you?

16     A.    Very specifically I told her -- my quote was,

17   "Please help yourself to any food you find."  At the

18   time I pointed to the refrigerator.

19     Q.    Was it clear to you from being present in the

20   courtroom when Dawn William testified that what she

21   heard, or at least what she says you said was, "Help

22   yourself to anything in the house"?

23     A.    She apparently doesn't remember what happened.

24     Q.    Okay.  Now, you have the ability to turn your

25   computer off, do you not?

1     A.    Correct.

2     Q.    And you did not do that on this occasion?

3     A.    I thought I had.

4     Q.    You thought you had?

5     A.    Yes.

6     Q.    Is it your sworn testimony that you had a

7  conscious decision you had made to turn your computer

8  off?

9     A.    Yes, I thought I had turned my computer off.

10    Q.    But, in fact, it was not turned off.  Do you

11 agree with that?

12    A.    I agree with that.

13    Q.    If any person had wandered in there like Dawn

14 Killian, what she would have seen when she shook the

15 mouse was your computer would come awake?  Do you agree

16 with that?

17    A.    No.  She would have to turn the monitor on as

18 well.

19    Q.    You have a recollection of turning the monitor

20 off?

21    A.    Yes.

22    Q.    Okay.  Did you tour her around the house?  Did

23 you show her around the house?

24    A.    Yes, I did.

25    Q.    I presume showed her the kitchen?

February 26, 2010

```
1       A.    Correct.

2       Q.    Bathroom?

3       A.    Correct.

4       Q.    Guest room?

5       A.    Correct.

6       Q.    Showed her where your roommate lived in his

7   study?

8       A.    I pointed to it.

9       Q.    Showed her the living room?

10      A.    Correct.

11      Q.    Any other place?  A garage?  Anything like

12  that?

13      A.    I took her to the garage because that's where

14  the dog food is.

15      Q.    Your testimony is you took her pretty much

16  everywhere or showed her everywhere but you did not take

17  her into your bedroom?

18      A.    Correct.

19      Q.    Was it your intention that your dog not be

20  allowed in that bedroom for that entire ten days?

21      A.    Correct.

22      Q.    Did you tell her that?

23      A.    Yes.

24      Q.    Exactly what words did you use to convey?

25      A.    I told her I didn't want the dog -- Copper had
```

1  separation anxiety sometimes.  I didn't want him in my

2  bedroom.

3      Q.   Actually, wouldn't him being able to go in your

4  bedroom help the separation anxiety?

5      A.   I'm not a dog psychologist.  I couldn't answer

6  that.

7      Q.   But your recollection now is that you

8  specifically told her, "I don't want Copper in my

9  bedroom"?

10     A.   Correct.

11     Q.   Even though that's a place that Copper spent a

12 lot of time?

13     A.   When I'm home, he does.

14     Q.   You did show her how to use the television?

15     A.   Correct.

16     Q.   Showed her how to use the stereo?

17     A.   Yes.

18     Q.   Your CDs were in plain site?

19     A.   Yes.

20     Q.   You didn't tell her she couldn't use the CDs?

21     A.   No.

22     Q.   In fact, you showed her how to use stereo,

23 right?

24     A.   Correct.

25     Q.   Showed her how to use the remotes?

February 26, 2010

1  A. Correct.

2  Q. Do you remember anything else about what you

3 showed her to kind of get her comfortable and orient her

4 to your home?

5  A. I believe that you mentioned the high points,

6 yes.

7  Q. Anything else you remember?

8  A. No.

9  Q. After you got home, you discovered that a

10 search had been conducted at your home?

11  A. Correct.

12  Q. And you left, did you not?

13  A. Correct.

14  Q. In fact, you were ultimately arrested in

15 Alpine?

16  A. Correct.

17  Q. At some point you communicated with Dawn

18 Killian by e-mail?

19  A. I believe so.

20  Q. Did you ask her to take care of your dog

21 Copper?

22  A. I do not remember.

23  Q. You don't remember the e-mail you sent?

24  A. No.

25  Q. Do you remember writing down, "Get off the road

1   her parents pay her $5,000"?

2      A.   I'm not disputing that.  That area, that

3   24 hours of my life is very fuzzy.

4      Q.   So you're not saying it didn't happen?

5      A.   Correct.

6      Q.   Was it your intention that Dawn Killian adopt

7   your dog?

8      A.   If that's what the e-mail said, sure.

9      Q.   Well, I'm just asking if you recollect that?  I

10  mean --

11     A.   I don't recollect that e-mail exactly.

12     Q.   You did spend some time thinking about what was

13  going to happen to your dog, right?

14     A.   Sure.

15          MR. PHELPS:  That's all I have.  Pass the

16  witness.

17              REDIRECT EXAMINATION

18  BY MR. JAMES:

19     Q.   Mr. Baird, next with keeping that door closed,

20  you didn't want your dog going in but you didn't want

21  Dawn Killian going in your bedroom either?

22     A.   Correct.

23              RECROSS-EXAMINATION

24  BY MR. PHELPS:

25     Q.   But you didn't tell her not to go in, did you?