10-10-00297-CR

```
 1                    REPORTER'S RECORD
                     VOLUME 2 OF 6 VOLUME
 2       TRIAL COURT CAUSE NOS. 09-02492-CRF-272,
            09-02493-CRF-272, 09-02494-CRF-272,
 3          09-02495-CRF-272, 09-02496-CRF-272,
            09-02496-CRF-272, 09-02497-CRF-272,
 4                   09-02498-CRF-272
```

 5  STATE OF TEXAS      )   IN THE DISTRICT COURT OF

 6  VS.                 )   BRAZOS COUNTY, TEXAS

 7  GREGG CARL BAIRD    )   272ND JUDICIAL DISTRICT

 8

 9  ------------------------------------------------

10                  MOTION TO SUPPRESS

11  ------------------------------------------------

12

13

14

15                                      FILED
                                   TENTH COURT OF APPEALS

16                                  FEB 0 7 2011

17                               SHARRI ROESSLER, CLERK

18

19          On the 23rd day of February, 2010, the

20  following proceedings came on to be heard in the

21  above-entitled and numbered cause before the Honorable

22  Judge Travis Bryan, Judge presiding, held in Bryan,

23  Brazos County, Texas:

24          Proceedings reported by computerized

25  machine shorthand transcription.

RECEIVED
DEC 0 8 2010
COURT OF APPEALS
WACO, TEXAS

ORIGINAL

1                          APPEARANCES

2

3    SHANE PHELPS
          Assistant District Attorney
          SBOT No. 15707530
4         300 East 26th Street, Suite 310
          Bryan, Texas 77803
5         Phone:  (979) 361-4320
                    FOR THE STATE
6

7    JIM JAMES
          SBOT No. 10554250
          Law Offices of Jim James
8         1716 Briarcrest, Suite 505
          Bryan, Texas 77802
9         Phone:  (979) 846-1934
                    FOR THE DEFENDANT
10

11                         * * * * * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        VOLUME 2

2

FEBRUARY 23, 2010                          PAGE        VOL.
3   STATE'S WITNESSES
                        DIRECT    CROSS    VOIR DIRE    VOL.
4   DAWN Killien        12,51     30                    2
    Michael Jose        60        --                    2
5   Bill Odom           63,86     79                    2

6   State Rests                            86           2

7   DEFENDANT'S WITNESSES
                        DIRECT    CROSS    VOIR DIRE    VOL.
8   Rose Hubbard        87        91                    2

9   Adjournment                            112          2
    Court Reporter's Certificate          113          2
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT INDEX

**STATE'S PRETRIAL**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|-----|-------------|---------|----------|------|
| 1 | Search Warrant | 10 | 10 | 2 |
| 2 | Copy Thumbnail | 25 | 26 | 2 |
| 3 | Copy Thumbnail | 25 | 26 | 2 |
| 4 | Copy Thumbnail | 25 | 26 | 2 |
| 5 | Copy Thumbnail | 25 | 26 | 2 |
| 6 | CD | 77 | 77 | 2 |
| 7 | Copy Chat | 56 | 57 | 2 |
| 7A | Copy Chat | 56 | 57 | 2 |
| 8 | Timeline | 108 | 109 | 2 |

**DEFENDANT'S**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|-----|-------------|---------|----------|------|
| -- | -- | -- | -- | -- |

1          THE COURT:  State of Texas versus Greg

2    Baird.  Which motion do you want to take up first.

3          MR. JAMES:  Your Honor, I think the

4    Motion To Suppress Evidence.  We should have in all the

5    files a Second Amended Motion To Suppress Evidence.

6          THE COURT:  Yes, sir, I've got it here.

7          MR. JAMES:  Okay.  And I talked to

8    Mr. Phelps about this.  We have, also, a Motion To

9    Suppress Statements.  The only difference between the

10   two is an allegation of a lack of voluntariness on the

11   statements.  He and I have been visiting.

12          Without waiving anything on the

13   statements, I think it would probably be -- since they

14   wouldn't have to bring somebody in from Alpine this time

15   -- any statements that were given out there, just hold

16   that in abeyance and deal only with the Motion to

17   Suppress, the Second Amended Motion to Suppress Evidence

18   today.

19          THE COURT:  Okay.  Is that all right with

20   you?

21          MR. PHELPS:  Yes, sir.  That comports

22   with -- with my understanding.  I would like to make

23   sure we're working off the same page.  As Mr. James

24   said, there is a Second Amended Motion to Suppress.  And

25   my understanding is that that's what we'll be

1  undertaking today.

2             MR. JAMES:  That's correct.  That's in

3  all the files.

4             MR. PHELPS:  Okay.  Nothing in the -- all

5  the files, obviously.  Nothing in the -- I guess, there

6  was a First Amended --

7             MR. JAMES:  Right.

8             MR. PHELPS:  -- and nothing in the

9  original.  We filed a statement for --

10            THE COURT:  Yes, sir.

11            MR. PHELPS:  -- a motion for the deputy's

12 statement and Mr. James complied and so we have that.

13            THE COURT:  Right.

14            MR. PHELPS:  So my understanding of what

15 we are look at today is just really three things.

16 Correct me if I'm wrong, Mr. James, if I misapprehend

17 this.  The first is an allegation, I guess, of simply an

18 illegal search by a private individual.

19            MR. JAMES:  That's correct.

20            MR. PHELPS:  And -- and so that I am

21 clear, are we talking about Fourth Amendment claims

22 or --

23            MR. JAMES:  No, 38.2- -- 38.23, which

24 would, also, if she's not work for government -- I'm not

25 sure how the facts are --

```
 1                    MR. PHELPS:  Sure.

 2                    MR. JAMES:  -- if she's not working for

 3  the government, then there is not a Fourth Amendment

 4  claim; but there is a 38.23 claim that there was a

 5  violation of -- of the law in relation to Mr. Baird.

 6  That's what we're going off, assuming she's not somehow

 7  a government agent.  If she is a government agent, then

 8  the Fourth and Fourteenth and Article 9 -- 9 and 10 of

 9  the Texas Constitution are involved.  If it's not

10  government action, then it's just 38.23.

11                    MR. PHELPS:  So, I mean, we agree that

12  the standard of the law is that if we're just talking

13  about a private search -- or a search by a private

14  citizen, the Fourth Amendment, Article 1, Section 9 are

15  not implicated.

16                    MR. JAMES:  I would agree that is the

17  concept.  That is the status of law.

18                    MR. PHELPS:  The only way that the Fourth

19  Amendment, Article 1, Section 9 becomes implicated is if

20  she's acting as an agent of the State; and it's as if

21  the government were searching illegally --

22                    MR. JAMES:  Yes.

23                    MR. PHELPS:  -- if that were the

24  allegation.

25                    THE COURT:  I understand the distinction.
```

1             MR. PHELPS:  And -- and I don't

2  anticipate the evidence will show that, but we're --

3  we're going to address that.  So that's -- that's No. 1?

4             MR. JAMES:  Yes.

5             MR. PHELPS:  No. 2 is, alternatively, if

6  it is shown that the individual were an agent of the

7  State.  So that's kind of a corollary to that?

8             MR. JAMES:  Uh-huh.

9             MR. PHELPS:  So really the only issues

10 are those two, is whether she is acting as an agent of

11 the State.

12            MR. JAMES:  Well, also, whether there was

13 sufficient information in the --

14            THE COURT:  I'm hearing my --my court

15 reporter is groaning over here.  Y'all are speaking a

16 little too fast.

17            MR. JAMES:  I'm sorry.

18            MR. PHELPS:  But as to issue No. 1 and

19 issue No. 2, what we're talking about is whether she was

20 an agent of the State?

21            MR. JAMES:  Yeah.

22            MR. PHELPS:  Okay.  And then article --

23 or No. 3, there is nothing in the affidavit that would

24 allow a neutral and detached magistrate to conclude that

25 Dawn Killien is a credible and reliable person.  And --

1  so all we're looking at there is the four corners of the

2  affidavit for the Judge to determine.

3                    MR. JAMES:  That's correct, and that

4  would implicate the Fourth and Fourteenth Amendment.  It

5  would say that there wasn't sufficient evidence there --

6                    MR. PHELPS:  Yeah, that's just a

7  straightforward argument --

8                    MR. JAMES:  Yeah, that's just a

9  regular --

10                    THE REPORTER:  Okay.

11                    MR. JAMES:  Sorry.

12                    THE COURT:  Y'all don't talk over each

13  other.

14                    MR. PHELPS:  That's just an allegation

15  the search warrant on it's four corners is insufficient

16  --

17                    MR. JAMES:  Correct.

18                    MR. PHELPS:  -- for those reasons.  And

19  -- and, I guess, that's all we'll be going into?

20                    MR. JAMES:  Yes.

21                    MR. PHELPS:  Okay.

22                    THE COURT:  Opening statement, or do you

23  care to make one?

24                    MR. PHELPS:  I don't think it's

25  necessary.  Judge, I -- I -- so that the Court knows

1  what Mr. James is attempting to ultimately suppress is

2  -- are the fruits of the search warrant.  And we have a

3  copy of the search warrant that we would like to offer

4  at this time, a certified copy we would mark as pretrial

5  -- State's Exhibit Pretrial No. 1.  I think we've

6  tendered a copy, or Mr. James has a copy of it.

7                    MR. JAMES:  No -- no objection for

8  purposes of this hearing.

9                    MR. PHELPS:  And this includes the return

10  and the inventory.  So we'll offer that at this time.

11                    THE COURT:  State's Exhibit No. 1 is

12  admitted for the purposes of this hearing.

13                        (State's Exhibit No. 1 admitted

14  into the record.)

15                    MR. PHELPS:  And, your Honor, I think

16  that normally kind of shifts the burden.  We're happy to

17  -- to call our first witness.

18                    THE COURT:  All right.  Go right ahead.

19                    MR. JAMES:  Judge, if we could ask that

20  the rule be enforced with exception of expert witnesses,

21  who obviously have a right to be in here testifying,

22  none expert.

23                    MR. THOMAS:  That would cover Officer

24  Jose there.

25                    THE COURT:  That would be the only one

1   under the rule or the only one excluded under the rule?

2                    MR. PHELPS:  I think for the purpose of

3   this, I'll identify the players, your Honor.

4                    THE COURT:  All right.

5                    MR. PHELPS:  This is Bill Odom, who is

6   our expert witness in forensic computer examination.

7   Travis Lively is the -- the forensic computer detective

8   with the University Police Department.  He is not going

9   to testify in this hearing.  Nathan McCune, our

10  investigator, also a forensic computer guy; but he won't

11  be testifying in this -- in this hearing.  And Greg

12  Silverman (phonetic) in the back, an investigator with

13  our office; but he's not involved in this case other

14  than helping me.

15                   THE COURT:  So who should be excluded

16  under the rule then?

17                   MR. JAMES:  Just the gentlemen who

18  already --

19                   THE COURT:  I don't need to instruct him.

20  We'll just let him go outside.

21                   MR. JAMES:  That's fine.

22                   MR. THOMAS:  He knows what the rule

23  means.  He's headed for the door.

24                   THE COURT:  Raise your right hand, please

25  ma'am.

1                      <u>DAWN RENEE KILLIEN,</u>

2    Having been duly sworn, testified as follows.

3                  THE COURT:   You can have a seat.

4                   <u>DIRECT EXAMINATION</u>

5    <u>BY MR. PHELPS:</u>

6        Q.    Ma'am, would you state your name for the

7    record, please?

8        A.    My name is Dawn Renee Killien.

9        Q.    How do you spell your last name?

10       A.    Killien.

11       Q.    And I know that sometimes people spell Renee

12   differently.   How do you spell Renee?

13       A.    R-e-n-e-e.

14       Q.    And Dawn is D-a-w-n?

15       A.    Yes, sir.

16       Q.    Dawn, would you tell the Judge just a little

17   bit about yourself, where do you work, where you live?

18   We don't need addresses or anything.

19       A.    I'm an employee in G.I.S. for the City of

20   College Station, and I currently live in College Station

21   near Half Price Books.

22       Q.    You mentioned G.I.S.  What does that mean?

23       A.    I did G.I.S., which is Geographic Information

24   Systems.   It's a spacial software data in mapping.

25       Q.    And do you work for the City of College

1  Station?

2       A.    Yes, sir.

3       Q.    From time to time you do work with the police

4  department?

5       A.    There are times when I may be involved in

6  their data, but it's not -- it's not looking at their

7  data so much as making their data spatially aware within

8  the system.

9       Q.    But you're not a -- you're not a police

10 officer?

11      A.    No, sir.

12      Q.    You're not an employee of the police

13 department?

14      A.    No.

15      Q.    You don't do any investigative work or

16 anything like that?

17      A.    No.

18      Q.    Okay.  And I'm going to try to make this as

19 brief as I can, because we've narrowed the scope of this

20 hearing pretty significantly.  So I just want to go

21 through details to see -- excuse me -- very briefly.

22 First of all, can you briefly tell the Court how you

23 know Greg Baird?

24      A.    Greg Baird is a very -- an acquaintance that

25 I've met twice; and after the second meeting, he

1   arranged for me to pet sit for him through a mutual

2   friend.

3                   THE COURT:  He arranged for what to you?

4   I didn't understand.

5                   THE WITNESS:  Pet sitting, sir.

6                   THE COURT:  Say it again.

7                   THE WITNESS:  Pet sitting.

8                   THE COURT:  Pet sitting.  Okay.  Go

9   ahead.

10      Q.    (By Mr. Phelps)  Like house sitting but there

11  is an animal involved.  Why don't you bring that

12  microphone over to you?  Okay.  Try and keep your voice

13  up.

14      A.    Okay.

15      Q.    The first time that you mentioned meeting him,

16  just briefly, what was the context of meeting Mr. Baird?

17      A.    The first time I met Greg was, I believe, two

18  or three years ago, very briefly, at a bike ride that

19  was organized by a friend.  He was practicing to be a

20  ride marshal, and it was a commuter ride through town, I

21  think, like 14 miles or something, a day ride.

22      Q.    And did you ever subsequent to that, after

23  that, did you ever meet with him or see him?

24      A.    I saw him, I guess, a little over a year, a

25  year and a half ago, at -- at my boss's house for a

1  dinner party.  And it was -- the guests involved myself

2  and another co-worker and his family and Greg.

3        Q.    And to your knowledge, I mean, you know, this

4  -- does Mr. Baird have any kind of relationship with

5  your boss?

6        A.    They are both tri-athletes, and I believe that

7  they are acquaintances only through that.

8        Q.    Okay.  Is that -- Okay.  At some point did you

9  -- were you asked to pet sit --

10       A.    Yes.

11       Q.    -- for Mr. Baird?

12       A.    Yes.

13       Q.    How did that come about?

14       A.    I don't remember exactly.  I believe that he

15  either contacted my boss and contacted me that way.

16  Then -- then we spoke together on the phone, and I met

17  him and his dog and agreed to accept the pet sitting.

18       Q.    Okay.

19       A.    And then I met with him again the day that he

20  left.

21       Q.    What was your understanding of the need to

22  have the pet sitter?

23       A.    Well, he was going to be out of town; and

24  generally speaking; it's much better for animals to

25  reside at its own residence rather than be in a kennel

1  in a cage.

2      Q.    Okay.  So did you at some point meet with him

3  about familiarity with the house and -- and duties as

4  pet sitter, what was expected?

5      A.    Yes.  The first time we just met was really

6  just kind of meeting with the dog.  And, you know, of

7  course, then I knew where the house was.  The day that

8  he was leaving, we walked through the house and -- and

9  went over the layout of the house and the -- the TV and

10 "just help yourself to everything, here is the guest

11 room, here is the -- the spare shower," that type of

12 thing.

13     Q.    Okay.  Well, was it your understanding when

14 you entered into this agreement with Mr. Baird that you

15 would be staying at his house and access to his house?

16     A.    I don't think I knew that initially.  I

17 thought maybe I would be coming by and letting the dog

18 out a couple of times a day; but when I arrived, it was

19 I was going to be staying at the house.  That wasn't a

20 problem for me at that point in time.

21     Q.    Well, is this there any question when you

22 arrived at the house to have this meeting about what you

23 would be doing, that it was expected that you would be

24 staying at his house?

25     A.    I don't remember that.

1        Q.    Did he show you where you would be sleeping?

2        A.    Not -- not the first time we met; but when he

3 was leaving, yes, he --

4        Q.    Let's talk about that time, when he was

5 leaving.

6        A.    Okay.

7        Q.    Did he show you through the house?

8        A.    He did the time he was leaving.

9        Q.    Okay.  Let's talk about that time.  Did he

10 show you through the house at that time?

11       A.    Yes.

12       Q.    Did he show you the master bedroom, the master

13 bathroom?

14       A.    Yes.

15       Q.    Did he actually take you physically in there?

16       A.    We -- we kind of walked through everywhere,

17 yes.

18       Q.    Okay.  But specifically did he walk you

19 through the master bedroom and the master bathroom?

20       A.    Yes.

21       Q.    Okay.  Did he show you the guest bathroom or

22 bedroom?

23       A.    Yes.

24       Q.    Did he indicate to you that that was where you

25 would be sleeping?

1        A.    Yes.

2        Q.    Did he indicate to you that -- where -- what

3   bathroom you would be using?

4        A.    Yes.

5        Q.    During the course of this meeting, did you

6   have an understanding from him kind of the dog's habits

7   and where the dog liked to be in house?

8        A.    Yes.

9        Q.    Okay.  And where was that?

10       A.    That -- either his bed or if he wasn't there

11  at home, there was blankets over the furniture for the

12  dog to have access everywhere.

13       Q.    Okay.  And you indicated that he, also, showed

14  you something about the remotes.  Tell the Judge just

15  briefly about that.

16       A.    Yes, he had four or five TV remotes with a

17  very large TV and tried to show me how to use those

18  items and a DVD with a photo slide show on it.  And I

19  asked if he could write it down because there were so

20  many remotes, and I don't actually use a TV at home.

21  So --

22       Q.    During the time that you stayed there, were

23  you ever actually able to use that?

24       A.    No, actually when he left, he left the TV on;

25  and the volume was really loud.  So it took me awhile.

1    I got the screen turned off, but I couldn't get the

2    volume turned off.  I finally got it turned off and

3    never knew how to turn it back on.

4         Q.    By the way, did Mr. Baird know what you did

5    for a living?

6         A.    Well, yes, he knew that I worked with -- with

7    Greg.  So he at least knew where I worked.

8         Q.    Okay.  And after you went through the house

9    with Mr. Baird on this particular occasion, just before

10   he left, did he indicate to you that anything was off

11   limits?

12        A.    He did point out that the spare -- there was a

13   roommate and this was the roommate's bedroom and that

14   this was the roommate's office.  You know, kind of

15   indicating that those were probably places that neither

16   I or the dog would be going.  But, no, he said help

17   yourself to everything.

18        Q.    Okay.  And I know you indicated to the police

19   at the time that you reported this, that Mr. Baird told

20   to you help yourself to anything or some words to that

21   effect.

22        A.    Yes.

23        Q.    Do you recall that?

24        A.    Yes.

25        Q.    And did he say that?

1       A.    Yes, you know, he -- in the kitchen he was

2  opening cabinets and cupboards to show that the dog

3  lease was underneath the stove and just kind of showing

4  me where things were at.

5       Q.    Okay.  Did he indicate to you at any time that

6  -- other than the roommate's -- Well, let me ask this

7  first.  With respect to the roommate's room and his

8  bathroom or his study, I guess, did he specifically tell

9  you not to go in there or just --

10      A.    No, but I would just assume, you know, that

11 they're roommates.

12      Q.    Sure.  Okay.  With respect to any part of the

13 house, did he give you any specific instructions about

14 where you could and could not go?

15      A.    No.

16      Q.    Did he ever specifically instruct you not to

17 go in the master bedroom?

18      A.    No.

19              MR. JAMES:  Objection.  Leading, your

20 Honor.

21              THE COURT:  Overruled.

22      Q.    (By Mr. Phelps)  Did he ever specifically tell

23 that you that you could not access his computer?

24      A.    No.

25      Q.    Okay.  At some point while you were there, did

1  you, in fact, access his computer?

2      A.    Yes.

3      Q.    When you being accessed his computer -- First

4  of all, where was it located?

5      A.    It was located in the master bedroom.

6      Q.    All right.  And what was the purpose for

7  accessing the computers, just briefly?

8      A.    I wanted to listen to some music.

9      Q.    Okay.  And when you say "listen to music," can

10 you elaborate on that just a little?

11     A.    There were a collection of CDs in the informal

12 dining area and at that point I had gotten the TV off

13 and there was no way I could get it back on without

14 possibly messing it all up.  So I knew how to put a CD

15 into the computer and listen to music.

16     Q.    Okay.  Did you have an intention to -- to

17 record some of that music or put it on your phone or

18 anything like that?

19     A.    Yes, I did.  I was kind of new to my iPhone,

20 and my thought process was to pull some of that music

21 off and put it onto the phone.  At that point in time, I

22 recalled that my old phone was a very simple process of

23 doing such a thing, and on the new phone it would

24 involve going through iTunes.  At that point I realized

25 I should just not do that.

1    Q.    Okay.  When you first accessed the computer,

2  exactly how did you do it?

3    A.    Quite simply, I walked over to it and shook

4  the mouse.

5    Q.    Okay.  You a know a little bit about

6  computers.  Was the computer on at the time?

7    A.    It was on, and it was in sleep mode.

8    Q.    Okay.  And you just shook the mouse?  Did it

9  wake the computer up?

10    A.    Yes, it did.

11    Q.    What was the first thing you saw when you woke

12  the computer up with the mouse?

13    A.    It sat on the desktop view, and there was just

14  a bunch of icons on the desktop.

15    Q.    Was there anything on -- on the desktop or on

16  the computer by way of a password that was required to

17  access the computer?

18    A.    No.

19    Q.    Once you kind of woke up the computer, were

20  you able to -- to just click on things and do what you

21  wanted to do?

22    A.    Yes.

23    Q.    Okay.  At some point did you access the Recent

24  Documents file?

25    A.    Yes.

1      Q.    And what was the purpose of getting into the

2   Recent Documents file?

3      A.    At the point that I realized that I would have

4   had to log into iTunes, I decided that I would just

5   delete the songs from the folder that I put them in and

6   clean up what I had done.

7      Q.    Was the -- was the purpose of -- of putting

8   the songs in a folder to transfer them to your phone?

9      A.    Yes, my old phone would have just been drag

10  and drop.

11     Q.    Okay.  So when you got into the documents

12  folder, did you see anything that -- that kind of

13  surprised or alarmed you?

14     A.    Yes.

15     Q.    What did you see?

16     A.    I saw some document titles that were

17  suggestive of indiscretion.  I -- I don't know what the

18  right term is there.  I saw document titles that were

19  suggestive of child porn.

20     Q.    Okay.  Did you specifically see a document

21  that was entitled, something to the effect of "younger

22  boy sucks older man," or something to that effect?

23     A.    Something to that effect, yes.

24     Q.    And at that point -- Let me ask this:  At some

25  point did you access the recycle bin?

1      A.    Yes.

2      Q.    And what was the purpose of accessing the

3  recycle bin?

4      A.    To take the second step of deleting the music

5  that I was --

6      Q.    When you accessed the recycle bin, did you see

7  anything that caused you alarm?

8      A.    Yes.

9      Q.    What did you see?

10     A.    There were thumbnail images that were, I

11  guess, place holders for documents within the recycle

12  bin.

13     Q.    Okay.  Now, when you spoke to the police, you

14  described some -- I think, you described specifically

15  four documents that you saw in the recycle bin on

16  Mr. Baird's computer?  Do you recall that?

17     A.    Yes.

18     Q.    Now, specifically when you entered the Recent

19  Documents folder or the recycle bin, were there any kind

20  of protections in place to prevent you from doing that?

21     A.    I did not have to bypass any type of system,

22  no, I just clicked.

23     Q.    Okay.  Are you familiar with passwords on

24  computers?

25     A.    Yes.

1      Q.    Is it possible to put passwords in place to

2    keep people from going certain places on a computer?

3      A.    It could be.

4      Q.    Okay.  And you didn't see anything like that?

5      A.    No.

6              MR. PHELPS:  Your Honor, may I approach?

7              THE COURT:  Yes.

8      Q.    (By Mr. Phelps) You described these -- these

9    images that you saw to the -- to the detective.  And I

10   want to show you what's been marked as State's Exhibits

11   2, 3, 4, and 5 and ask you if those appear to be the

12   documents or at least blowups of the thumbnail that you

13   saw that you described to the detective?

14     A.    Yes, they do.

15     Q.    Okay.  And I've shown you these, also, briefly

16   earlier today, did I not?

17     A.    Correct.

18             MR. PHELPS:  Your Honor, at this time

19   I'll offer State's Exhibits 2, 3, 4, and 5 for the

20   purposes of this hearing.

21             MR. JAMES:  Judge, I don't think that

22   it's -- you've got to judge the -- the warrant on the --

23   on the four corners.  So I don't really see that -- that

24   it's relevant.  Other than that, it's the Court; and I

25   don't have any huge objection it to.  But the Court

1  can't look at these and say:  Well, this takes care of

2  -- if the description was lacking or something like

3  that.

4              But I don't have any -- any other

5  objection, your Honor.  Have I made that clear about --

6  I mean, the Court, obviously, has to judge the warrant

7  on the four corners.  It can't bootstrap itself and say:

8  Well, the description wasn't that good; but these

9  pictures make it good.

10             THE COURT:  I understand.

11             MR. PHELPS:  I agree with that.

12             THE COURT:  Understanding that, State's 2

13 through 5 are admitted.

14             (State's Exhibit Nos. 2, 3, 4, and 5

15 admitted into the record.)

16     Q.    (By Mr. Phelps)  After you saw those images,

17 did you believe at that point that you were looking at

18 child pornography?

19     A.    I strongly suspected it, yes.

20     Q.    At some point after that, did you access a

21 video, I think, of the -- on his computer to confirm

22 your suspicions that it was child pornography?

23     A.    Yes, I did.

24     Q.    And did that confirm your suspicions that it

25 was child pornography?

1      A.    Yes.

2      Q.    Is there any question in your mind that what

3 you were looking at involved sexual acts with underage

4 boys?

5      A.    My only question was whether or not the child

6 was under 18 or not, which led me to the police.

7      Q.    And did you believe that that was the case?

8      A.    I believed that it was.

9      Q.    Okay.  Now, at -- at some point I understand

10 you, also, accessed a website chat forum?

11     A.    Yes, I did.

12     Q.    Did you post information consistent with what

13 you said today on that website for the purposes of

14 seeking advice?

15     A.    Yes, I did.

16     Q.    And did you receive advice?

17     A.    I did.

18     Q.    Okay.  After -- Let me ask this:  This

19 activity on the computer, did you -- did you do this on

20 a particular date, like -- Let me ask it this way:  When

21 was Mr. Baird supposed to be out of town and you were

22 supposed to be pet sitting and living in his house?

23     A.    I believe that he left on a Thursday and was

24 coming back about ten days later.  However, there were

25 times when the roommate was going to be in town and I

1  was not going to be staying at the house.  So it was not

2  a consistent or contiguous timeline that I was there

3  every single night.

4      Q.    Were you there May 7th and May 8th?

5      A.    Yes.

6      Q.    And was -- was your access, as we've described

7  it, on May 8th, the evening hours of May 8th?

8      A.    Was May 8th a Friday?

9      Q.    I believe so.

10     A.    Yes.

11     Q.    Okay.  After you observed these -- these

12  images and formed the opinion that you were looking at

13  child pornography, did you -- did you determine at that

14  point that you were going to report it to the police?

15     A.    At that point I determined that I need more

16  information and I used the -- the social forum that I

17  wrote a note into and I, also -- I think that I looked

18  up some information on the internet to determine what I

19  needed to do next.

20     Q.    Okay.  At what point did you actually report

21  this to the police?

22     A.    I spoke off record to the crime analyst for

23  College Station P.D. and -- to ask her about reporting

24  anonymously.

25     Q.    Why did you want to report anonymously?

1    A.   I wanted to report anonymously because this is

2  a very small town and the information could be not only

3  devastating to the person I was reporting on but to

4  myself as well.

5    Q.   How -- how so?

6    A.   My director informed me that I could lose my

7  job.

8    Q.   Okay.  Is that what you were worried about at

9  that point?

10   A.   At that point I was just worried about the

11  size of the town.

12   Q.   Ultimately, you did report it to the police?

13   A.   Yes.

14   Q.   You made a formal report and it was not

15  anonymous?

16   A.   No.

17   Q.   They knew your name?

18   A.   Correct.

19   Q.   Okay.  From the point -- Let me ask this:

20  When was your first contact with anybody from the police

21  department?

22   A.   I don't remember the exact date.  I spoke with

23  Detective Michael Jose.  After speaking with Kabrina

24  (phonetic) Scott, I spoke with Michael Jose by phone;

25  and then I believe that there was a weekend intervening

1  there.  I then made a sworn statement to Detective

2  Falwell.

3      Q.   Okay.  Let me -- let me ask a very important

4  question.  At any time that you had any access to

5  Mr. Baird's computer, did you do so at the request of

6  any police authority?

7      A.   No.

8      Q.   From the point that you contacted the police,

9  did you ever go back and access his computer?

10     A.   No.

11     Q.   Were you ever asked by police to make any

12  copies or go back into the computer at all?

13     A.   No.

14          MR. PHELPS:  I think that's all with

15  respect to the issues at hand.  So I'll pass the

16  witness, your Honor.

17          THE COURT:  Yes, sir.

18               CROSS-EXAMINATION

19  BY MR. JAMES:

20     Q.   Ms. Killien, what's your birthday?

21     A.   My birthday?

22     Q.   Uh-huh.

23     A.   It's June 23.

24     Q.   Of what year?

25     A.   1969.

1          Q.    Okay.  And what's your -- what's your

2   educational background?

3          A.    My educational background --

4          Q.    Uh-huh.

5          A.    -- involves junior college and Texas A&M.

6          Q.    Okay.  You say involves junior college,

7   involves Texas A&M.  Did you graduate from junior

8   college?

9          A.    Yes.

10          Q.    Okay.  And did you graduate Texas A&M?

11          A.    No.

12          Q.    And what about your work issue?  How long have

13   you been with College Station Police Department?

14          A.    I'm not --

15          Q.    I'm sorry.  I miss spoke.  How long have you

16   been with the City of College Station?

17          A.    I've been with the City of College Station

18   slightly over two years.

19          Q.    Okay.  And would it be fair to say that your

20   dealings with the police department are somewhat

21   tangential?

22          A.    Definitely.

23          Q.    Okay.  You certainly haven't acquired any kind

24   of reputation in law enforcement or statewide reputation

25   of any sort as far as what you do or with law

1   enforcement, have you?

2        A.    I don't quite understand what you're asking

3   here.

4        Q.    You haven't acquired any kind of statewide

5   representation as far as your work with law enforcement

6   or the kind of work you do, have you?

7        A.    I have acquired a reputation with G.I.S.

8        Q.    With what?

9        A.    G.I.S.

10       Q.    Now, let's try to get our dates down.  In May

11  of last year, you said that he was -- that Greg was

12  going to take a trip, right?  Do you remember if it was

13  Costa Rica or Belize with his parents?  Does that sound

14  familiar?

15       A.    I believe he told me he was going to Panama

16  with his parents.

17       Q.    Panama.  Okay.  And that you were going to dog

18  sit, and do you remember the name of the dog?

19       A.    Not at this time.

20       Q.    Okay.  And when -- when you came to the -- the

21  house, probably -- Have you ever been convicted of a

22  felony or misdemeanor of moral turpitude?

23       A.    No, sir.

24       Q.    Okay.  Now, when did you attend M.I.T.?

25       A.    I took an on-line class through their open

1  courseware.  It's not actually attending M.I.T.  It's a

2  program that they have instated to reduce education

3  barriers.

4       Q.   And what courses did you take?

5       A.   An entry level philosophy class.

6       Q.   Okay.  When was that?

7       A.   Last year, I guess.

8       Q.   Just roughly, I'm not asking for -- Okay.  And

9  so you work a lot with computers, don't you?

10       A.   I work on computers.  I don't work with

11  computers.

12       Q.   You don't do any kind of IT work or anything

13  like that?

14       A.   I am housed within the department of IT.  I'm

15  not considered an IT person.

16       Q.   Okay.  Well, when you have a computer does

17  something -- does it -- does it leave a footprint?

18       A.   That's beyond my scope to answer.

19       Q.   You don't know if when you access something,

20  it -- it leaves what's called a footprint?  You've never

21  heard of that before?

22       A.   It's not something I have to deal with in

23  G.I.S.

24       Q.   Well, are you familiar -- you're familiar with

25  computers?

1        A.    It's possible that it could, and it's also

2   possible it could not be.

3        Q.    Why would it not be?

4        A.    I don't know.

5        Q.    Okay.  And so you don't know if a computer

6   leaves a footprint as to where it is directed to go?

7        A.    I believe that it can.

8        Q.    Okay.  And if I tell a computer to go to

9   iTunes, that would leave a footprint, wouldn't it?

10       A.    Yes, it would possibly.

11       Q.    And if I tell it to go to the internet, it

12  leaves a footprint, doesn't it?

13       A.    Quite possibly.

14       Q.    And if I tell it to go to Recent Folders, it

15  leaves a footprint, doesn't it?

16       A.    It could.

17       Q.    Okay.  And if I tell it to go to the Deleted

18  Items, it would leave a footprint, wouldn't it?

19       A.    It could.

20       Q.    And you're aware that we've had our experts

21  look for the footprints on this computer from the time

22  you -- May the 8th, when you accessed the computer?

23  You're aware of this, aren't you?

24       A.    Yes, I was told this.

25       Q.    And you understand that all anybody wants here

1  today is for you to tell the truth?

2      A.   Yes.

3      Q.   Okay.  That's all Mr. Phelps wants.  That's

4  all I want.  That's all Judge Bryan wants, is to tell

5  the truth?

6      A.   Yes.

7      Q.   Now, would you have any explanation as to why

8  that computer would show that the first place that you

9  went on May 8th and after you woke it up would be to the

10 Recent Files?  Do you have any idea why it would show

11 that was the first place you went?

12     A.   No.

13     Q.   Well, is it going to show -- is the computer

14 -- and we're all talking about is the computer in Greg

15 Baird's bedroom, right?

16     A.   Yes.

17     Q.   Is it going to show that you accessed iTunes?

18          MR. PHELPS:  Judge, I'm going to object.

19 This is -- She's already tried to say, "I don't know

20 these things.  I'm not -- it's beyond my --"  She said

21 it was beyond her ability to answer that question.

22 She's having to speculate at this point.

23          Mr. James has his expert here who can say

24 these things.  I've got my expert here he can cross.  I

25 don't quite understand the point of this, if this issue

1    -- or the issues -- we're only talking about the issue

2    about whether she was an agent of law enforcement and

3    whether the search warrant -- that doesn't have anything

4    to do with her shield.

5              MR. JAMES:  Well, it's not just a shield.

6    38.23 prohibits an illegal search by an individual,

7    Judge, if her story is not truthful, the story she told

8    and the story that's been relayed.  And that is the crux

9    of our argument.

10             MR. PHELPS:  But how can it be an illegal

11   search?  It's not illegal under the Fourth Amendment

12   because she's a private citizen.  My understanding, if

13   you're going to a 38.23, which is not my understanding

14   of what you are claiming, other than the subject is

15   you've got to violate some law, that you violated --

16             MR. JAMES:  That's right.

17             MR. PHELPS:  What law are you claiming

18   that she violated?

19             MR. JAMES:  The law would be 30.02,

20   accessing the computer without permission, burglary,

21   30.02, and criminal trespass, 30.05.

22             MR. PHELPS:  Now, that doesn't have

23   anything to do with whether the search was illegal.

24   What -- what I think you have to be able to persuade the

25   Court is that she committed a crime in doing any of

1  those three things and that led to the discovery of this

2  evidence and that was placed into the warrant and then

3  the warrant becomes --

4                    If that's what you're arguing, this whole

5  idea, that there is this global idea that it's an

6  illegal search, I don't think it's access.

7                    MR. JAMES:  Those are the areas why it is

8  illegal.

9                    MR. PHELPS:  Do we agree that in order to

10  claim 38.23, you have to point to a particular law that

11  she violated?

12                    MR. JAMES:  Yes, and we are going to do

13  so, 33.02 -- 30.02, 30.05.

14                    THE COURT:  That's Penal Code?

15                    MR. JAMES:  Yes, sir.

16                    THE COURT:  30.02.

17                    MR. PHELPS:  I'm not sure that's

18  completely clear from your -- from your motion but --

19                    MR. JAMES:  It's an illegal search.  I

20  mean --

21                    MR. PHELPS:  Again, I think it's a

22  different thing to say just globally it's an illegal

23  search by a private citizen, which we know doesn't

24  violate -- Article 38.23 says a specific statute.  It

25  says:  Show me the law that she violated if she

1  committed a crime that resulted in discovery of the

2  evidence.  And those are different issues.  So --

3           MR. JAMES:  I'm sorry.  Mr. Phelps is

4  mistaken.  We are claiming it was an illegal search.  It

5  was illegal because she violated those provisions.

6           MR. PHELPS:  I understand 30.02 sets

7  forth a law that says an offense -- if a person

8  knowingly accesses a computer without the effective

9  consent of the owner.  So you're trying to set up a

10 proof that she went into his computer without his

11 consent?

12          MR. JAMES:  Yes, sir.

13          MR. PHELPS:  Therefore violated the penal

14 law and therefore 38.23 is triggered by that?

15          MR. JAMES:  Sure.

16          MR. PHELPS:  And I guess burglary --

17 although I don't know how you show she didn't have

18 consent to the house and criminal trespass -- criminal

19 trespass to the house or to that room?

20          MR. JAMES:  To that room.  Only burglary

21 can be completed if you go into a place where you're not

22 supposed to be.  That's what my client is going to

23 testify.

24          MR. PHELPS:  The genesis of my objection

25 initially was:  He's asking her questions about whether

1   a computer leaves footprints and should it show this,

2   should it show that?  It's beyond her ability to say

3   that.  She said that.  And I don't think she should

4   answer question further about what the --

5                MR. JAMES:  Well, Judge, these are

6   different questions.  I'm not asking the same question.

7   These are not the same questions.

8                MR. PHELPS:  I mean, I think you can ask:

9   Did you access I.T.?  And if he thinks that the evidence

10  shows she did, he puts on his witness that says she did

11  not.  But to ask her:  Should it show this?

12                She said it could; but she also at the

13  very beginning said:  That's beyond my ability to say

14  that.  She's not an I.T. person, as she said.  To the

15  extent he's asking her questions that are based upon her

16  knowledge of what computers might do --

17                THE COURT:  Tell me the question you're

18  seeking to ask her, Mr. James, that you have not been

19  able to establish.

20                MR. JAMES:  Judge, I think I was asking

21  her:  Did you access iTunes?

22                MR. PHELPS:  My objection was:  He's

23  asking her:  Is there some reason the computer wouldn't

24  show she accessed it?  And that's different than asking:

25  Did you access I.T.?  Then we're talking about her

1  knowledge, which she's stated she doesn't know.

2              MR. JAMES:  If she says:  Yes, there is a

3  reason, because I deleted that or something like that.

4  If she doesn't know, she can say she doesn't know.

5              THE COURT:  Let's start with a new

6  question and let me take these objections as they come.

7      Q.    (By Mr. James)  Did you access iTunes?

8      A.    No, I did not.

9      Q.    Did you plug in your iPhone?

10     A.    No, I did not.

11     Q.    Did you plug in a U.S.B. cord?

12     A.    No, I did not.

13     Q.    What CDs did you record?

14     A.    I did not actually -- well, I did not record

15 a CD.

16     Q.    What -- I want to watch my language.  What CD

17 did you transfer to the -- the desktop?

18     A.    I did not transfer an entire CD to the

19 desktop.

20     Q.    What song did you transfer to the desktop?

21     A.    I removed two U2 songs from a CD and put it on

22 the desktop.

23              THE COURT:  I didn't understand.

24              THE WITNESS:  I never moved the two U2

25 songs from a CD and put those on the desktop.

1    Q.   (By Mr. James)  Okay.  And -- and just so

2    we're all together on the time, you had gone over to

3    Greg's house on May 7th, correct?

4    A.   If that was a Thursday, then yes.

5              MR. JAMES:  We stipulate that was a --

6              MR. PHELPS:  I'm pretty sure that was a

7    Thursday.

8              MR. JAMES:  That was Thursday.  I'm

9    pretty sure we can stipulate.

10             THE COURT:  All right.

11   Q.   (By Mr. James)  Now, you didn't access the

12   computer at all that Thursday, did you?

13   A.   Not that I'm aware of, no.

14   Q.   And the next day would have been May 8th; and

15   sometime in the evening you burned the -- you woke it

16   from its sleep mode; is that correct?

17   A.   Yes.

18   Q.   Okay.  Now, you were sleeping in the -- in the

19   guest room; is that right?

20   A.   Correct.

21   Q.   Did Greg ever tell you that you were to keep

22   the bedroom door closed because he didn't want the dog

23   sleeping on his bed?

24   A.   He did state that.

25   Q.   Okay.  And did you -- did the dog, in fact,

1  sleep with you?

2      A.    It did.

3      Q.    And he inferred when you said -- when you

4  talked to the police -- and Mr. Phelps was kind enough

5  to give us a copy of the CD -- you talked to them and

6  you said he said something like:  Go anywhere in the

7  house or help yourself to anything.  Do you remember

8  saying that?

9      A.    Yes, I do.

10     Q.    Have you listened to that CD in the last week,

11  ten days?

12     A.    Yes.

13     Q.    Okay.  And you, in fact, weren't real sure

14  exactly what was said, were you?

15     A.    I did not have the exact wording.

16     Q.    And certainly if you had seen a -- a hundred

17  dollar bill in the house, you would not have thought

18  that you could take that hundred dollar bill and spend

19  it, would you?

20     A.    I don't understand the question.

21     Q.    That's okay.  If you had seen a one hundred

22  dollar bill laying there, you would not have thought you

23  could help yourself to that, would you?

24     A.    I believe this is -- I don't understand this

25  question, but the answer is no.

1     Q.    Okay.  Isn't it true that what Greg actually

2 told you was that you could help yourself to anything to

3 eat?

4     A.    Not directly, no.

5     Q.    Well, that was -- that was the implication.

6 He was looking in refrigerator and said, "You can help

7 yourself to anything," while y'all are looking in the

8 refrigerator?

9     A.    That's not the only time he said that.

10     Q.    Well, he certainly did say that when looking

11 in the refrigerator, didn't he?

12     A.    I don't recall him looking in the

13 refrigerator.

14     Q.    Now, this is very important.  You never have

15 told -- you never told the police anything about having

16 him show you his bedroom, did you?

17     A.    He gave me a tour of his entire house,

18 including his bedroom.

19     Q.    Okay.  He gave you a tour of the house; but he

20 told to you keep the door closed, is that right --

21     A.    He said to --

22     Q.    -- to his bedroom?

23     A.    Closed when he wasn't there -- when I wasn't

24 there.

25     Q.    Did he add that, "when you were there"?

1      A.    He added that.   It was part of the statement,

2   I believe.

3      Q.    Now, you can't download -- or what kind of

4   phone did you have when you downloaded things directly

5   from the -- from the CD to the -- excuse me -- from a

6   desktop to a phone without going through iTunes or

7   anything?

8      A.    I had a Sony Ericsson, and it had drag and

9   drop file protocol with an eight gig memory stick in it.

10      Q.    That day did you, in fact, burn the CD, the U2

11   CD, onto the desktop?

12      A.    I drug two songs over.   That's not exactly

13   called burning.

14      Q.    Okay.   You drug them?

15      A.    Yes.

16      Q.    Onto the desktop?

17      A.    Yes.

18      Q.    And then you couldn't transfer those to your

19   iPhone; is that right?

20      A.    Then I realized, yes, that I had to go through

21   iTunes and didn't want to take that extra step.

22      Q.    And so it was at that point that you went to

23   Recent Documents to open the recently opened files?

24      A.    Yes.

25      Q.    Now, you didn't have to do anything to delete

1   those, did you, or you could have left them on his

2   computer?

3        A.   I could have.

4        Q.   But then he would have known that you had been

5   messing with his computer, wouldn't he?

6        A.   He would have known anyway.  I would have told

7   him.

8        Q.   Did you in any of your correspondence, and

9   y'all e-mailed back and forth, mention that you were on

10  his computer?

11       A.   No.

12       Q.   Did you tell his roommate you had been on his

13  computer?

14       A.   No.

15       Q.   So you wanted to delete off of his computer

16  these two songs; is that right?

17       A.   Yes.

18       Q.   And you opened his recent -- his file that

19  showed where he had recently been; is that correct?

20       A.   It's called "My Recent Documents," yes.

21       Q.   And those are user created, because it depends

22  on what they've done, correct?  It's not like the

23  internet?

24       A.   It's -- it's -- no, it's not user created.

25       Q.   It's not?

1        A.    It's machine created.

2        Q.    I understand.  It's machine created; but it's

3  created after you go somewhere, right?

4        A.    It's created by whoever is using that machine

5  at that time.  So it's created to the machine specific,

6  not to a user specific.

7        Q.    Greg never told you, "You can use the

8  computer," did he?

9        A.    No.

10        Q.    Now, he never told you could -- you could drag

11  his CDs and put them on your phone, did he?

12        A.    No.

13        Q.    Did you ever tell the police officer that you

14  were going to put it on your phone to see if you like it

15  and then you would buy it?

16        A.    Yes.

17        Q.    Why would you buy it if you had it on your

18  phone already?

19        A.    Because, as I told you, I was only doing two

20  songs.

21        Q.    You told -- you told the chat -- when you were

22  on the chat room that night or -- excuse me -- on the

23  11th, that your employer's legal department is

24  researching a list of attorneys for you to review.  Was

25  that true?

1      A.    Yes.

2      Q.    Okay.  All right.  Your employer was doing

3 that for you?

4      A.    At that point in time, I don't know the exact

5 person I spoke to, my I.T. director; and he advised a

6 lawyer to me who I actually saw rather than waiting for

7 I.T. -- the Human Resource Department to get back to me.

8      Q.    What lawyer was that?

9      A.    I don't recall his name.

10      Q.    Where was his office?

11      A.    It was in Bryan.

12      Q.    Where in Bryan?

13      A.    They have his name.  I don't remember his

14 name.

15      Q.    Okay.

16            MR. THOMAS:  Kyle Hawthorne.

17      Q.    (By Mr. James)  And just so I understand, did

18 you do anything at the request of the police on the

19 computer?

20      A.    No, I did not.

21      Q.    Okay.  Now, when you saw these thumbnails, how

22 did you see the thumbnails?

23      A.    They were on the computer.

24      Q.    I understand, but where did you go to get

25 those thumbnails?

1          A.    I didn't go anywhere to get those thumbnails.

2          Q.    What did you access so that the thumbnails

3    appeared?

4          A.    I accessed the recycle bin icon.

5          Q.    Now, did they automatically appear; or did you

6    see words that you then clicked on to access the photos?

7          A.    I think -- I don't -- I don't remember

8    exactly.  I don't want to speculate.

9          Q.    In fact, when you were in that folder in the

10   recycle bin, you saw words and you accessed something

11   that caught your attention?  You accessed that and saw

12   the thumbnails, didn't you?

13         A.    I don't know.

14              MR. JAMES:  May I have one moment, your

15   Honor?

16              THE COURT:  Yes, sir.

17                (Brief pause in the proceedings.)

18         Q.    (By Mr. James)  Did you access any kind of

19   video player on the computer?

20         A.    Yes, I did.

21         Q.    Okay.  What did you access?

22         A.    I accessed a -- a video that was in My Recent

23   Documents.

24         Q.    Okay.  Did you have to separately access the

25   video player, or did you just click on a video and it

1   started automatically?

2       A.    It started automatically.

3       Q.    Just so I understand what you're telling us,

4   you're saying that you had dragged two songs off the CD

5   onto the -- onto the desktop.  You wanted to erase any

6   evidence of those CDs; and you went to -- you were going

7   to go to your Recent Documents; is that right?

8       A.    That was not my exact plan, no.

9       Q.    What was your exact plan?

10      A.    My plan was to put those songs on my iPhone.

11      Q.    Okay.

12      A.    And when that did not work, I stopped the

13  process.

14      Q.    Well, did you try to plug your iPhone in?

15      A.    No, I did not.

16      Q.    Did you tell the police that you created a

17  folder for the music?

18      A.    I don't remember exactly.

19      Q.    Well, what you're describing would not have a

20  folder, would it?

21      A.    It could.

22      Q.    Okay.  Do you remember telling the police that

23  you created a folder specifically for that music?

24      A.    I don't remember exactly.

25      Q.    So after going -- you didn't have any clue

1   that there was anything improper on that computer until

2   you went to the recycle bin and saw a -- a title that

3   you thought suspicious, correct?

4        A.    Incorrect.

5        Q.    Okay.  What -- excuse me.  Until you went to

6   Recent Documents and saw a title that you thought was

7   questionable?

8        A.    Correct.

9        Q.    And then you clicked on that title, correct?

10       A.    Not right then, I don't think.

11       Q.    You didn't?

12       A.    Not that exact moment -- or actually, yes, I

13  did.

14       Q.    And that was to see what was stored on Greg

15  Baird's computer, correct?

16       A.    No, that was to see that exact document.

17       Q.    Well, it was to find out what he had been

18  looking at, correct?

19       A.    No, it was to see that exact document.

20       Q.    Well, you knew that was a recently opened

21  document, correct?

22       A.    I didn't know he was the most recent person on

23  that computer.

24       Q.    Well, you -- you went to see what was on that

25  computer, right?

1   A.   No, I went to that computer to down load music
2  on my phone.

3   Q.   No, I mean at that point when you clicked on
4  the words --

5   A.   Yes, to look at that document.

6   Q.   -- you wanted to see what was in that
7  document?

8   A.   Yes.

9   Q.   And then later you clicked on the delete or
10 Deleted Items and you clicked on several of those.  Then
11 you got words; and you clicked on those to see the
12 images, correct?

13   A.   I don't remember exact process.

14           MR. JAMES:   I'll pass the witness.

15              REDIRECT EXAMINATION
16 BY MR. PHELPS:

17   Q.   I just have a couple more questions for you.
18 First of all, would you explain to the Judge why you
19 wanted to go see the lawyer?  What were you concerned
20 about?

21   A.   I was concerned because it's a small town.  I
22 -- I knew that if I was involved in anything that --
23 We're told where I work, we go through a background
24 check, that if we're involved with anything to do with
25 seeing the police or a crime, then we have to report

1  that to our I.T. director or whoever your director is.

2           And so I -- I made the decision to speak

3  with my director, without revealing any names, of what

4  my situation was at that point in time and to ask him:

5  Did I have access to a list of attorneys recommended by

6  the city or could he himself recommend an attorney to

7  me?  Did I need an attorney; and my concern, how could

8  this impact my job, because I -- I need my job or a job.

9           And he let me know that if there was

10 negative impact, it could negatively impact my job and I

11 could, in fact, lose my job, is what my I.T. director

12 said to me.  He called Human Resources for me and spoke

13 with them about, you know -- you know, seeing if we had

14 a list or recommendation for attorneys.

15           And then he said to me himself that he has

16 used the lawyer that they stated I saw and that perhaps

17 I should call him and go see him, which I immediately

18 did, because I was concerned with losing my job or

19 somehow creating, you know, not knowing could it be

20 since the computer had been open and available, were

21 they files that the roommate had placed there?

22           So when I -- when I filed the report, I

23 made sure to state the house's address and that there

24 were two men living there.  That's why I saw a lawyer,

25 to find out did I need a lawyer, not that I could afford

1  one, but did I need one to go forward with this process

2  if I was unable to file anonymously, which I learned to

3  my dismay that neither the F.B.I. or our local police

4  department allowed this type of crime to be filed

5  anonymously.

6       Q.    When you met with the lawyer, was that on

7  Monday, May 11th?

8       A.    I believe so.

9       Q.    Okay.  Was that after you had seen the things

10 you saw on Mr. Baird's computer?

11      A.    Yes.

12      Q.    In fact, any of the discussions that you had

13 with -- with Kabrina or with your supervisor or anybody,

14 was that after you saw the things that you saw?

15      A.    Yes, they were.

16      Q.    The -- as I understand it, you accessed at

17 some point the Recent Documents file; is that correct?

18      A.    Correct.

19      Q.    And that's where you saw -- something, I think

20 you told the police was bad names?

21      A.    Yes.

22      Q.    And at some point you accessed the recycle bin

23 where you saw 24 to 60 thumbnail images that appeared to

24 be child pornography?

25      A.    Correct.

1      Q.     And as I understand it, also, at some point

2   during your chat session, you accessed a particular

3   video and opened it and looked at it; is that right?

4      A.     That's true.

5      Q.     And that was to help you confirm to yourself

6   it was, in fact, child pornography?

7      A.     Yes.

8      Q.     Did all of those events happen in the first --

9   either leading up to or during that first chat session?

10     A.     Yes.

11     Q.     Okay.  Did any of them happen that next Sunday

12   or that next Monday?

13     A.     No.

14     Q.     Okay.  And so the Court is crystal clear on

15   this, anybody from the city, anybody from the police

16   department, ever tell you, "Go into his computer."?

17     A.     No.

18     Q.     Did they ever ask you to copy anything?

19     A.     No.

20     Q.     When you went on Mr. Baird's computer to begin

21   with, was it your intention to look into his files?

22     A.     No.

23     Q.     If you had seen pass word protection or

24   anything indicating that you should not look at those

25   files, would you have not looked at them?

1     A.    Yes, I would not have looked.  I would have

2   said, well, it's pass word protected, and not listen to

3   music.

4     Q.    Okay.  And that Recent Documents tab, is that

5   -- do you get to that by just pushing the start button

6   and that's one of the things that pops up?

7     A.    Yes.

8     Q.    Pretty easy to get to?

9            MR. JAMES:  Objection.  Continued

10   leading, your Honor.

11            THE COURT:  I'll sustain.

12     Q.    (By Mr. Phelps)  Was it hard for you to get to

13   it?

14     A.    No.

15     Q.    How about the recycle bin?

16     A.    It was easily accessible by it's icon.

17     Q.    And was that -- was that icon on the desktop?

18     A.    I believe it was either on the desktop or

19   within the start menu.

20     Q.    Okay.  And you indicated that -- that you had

21   accessed that chat website.  What was the purpose of

22   getting on that website?  What were you grappling with?

23     A.    I was dealing with a lot of different

24   thoughts, and I was trying to weigh the questions out

25   so that not only could I see what I was concerned with,

1    but I could acquire other people's responses or answers

2    to those questions and they would be people that are not

3    local and wouldn't have any possibility of knowing

4    anyone involved.

5         Q.   Okay.

6              MR. PHELPS:  May I approach, your Honor?

7              THE COURT:  Yes, sir.

8         Q.   (By Mr. Phelps)  Let me show you State's

9    Exhibit Pretrial 7 and 7A.  Have you seen these before?

10        A.   Yes, I have.

11        Q.   And looking at this, does this appear to be a

12   fair and accurate representation of that chat that you

13   participated in that night and then subsequent to then?

14        A.   Yes, it does.

15        Q.   Okay.

16             MR. PHELPS:  Your Honor, at this time

17   we'll offer 7 and 7A for the purposes of this hearing.

18             MR. JAMES:  Judge, I'm not sure the --

19   the relevance of the text of her chat.

20             MR. PHELPS:  Well, he's attempted to

21   attack her credibility.  This shows --

22             THE COURT:  Well, I mean, you brought it

23   up, didn't you; and he's entitled to --

24             MR. JAMES:  That's fine.

25             MR. PHELPS:  Plus, I don't think the

1    rules of evidence apply here.  So, I mean, it's not

2    hearsay evidence.

3                    THE COURT:  State's 7 and 7A are

4    admitted.

5                    (State's Exhibit Nos. 7 and 7A

6    admitted into the record.)

7                    MR. PHELPS:  May I approach, your Honor?

8        Q.    (By Mr. Phelps)  So that the Judge knows what

9    he's looking at, did you start this particular thread on

10   this chat forum?

11       A.    Yes, I did.

12       Q.    Are you Sublime Serenity?

13       A.    Yes.

14       Q.    And on the first and second and it looks like

15   third pages, is that a recitation of what you did?

16       A.    That was my entry, "Here's the questions I'm

17   dealing with.  Please let me know what you're thinking."

18       Q.    Okay.  There were actually two chat sessions,

19   right?

20       A.    I believe that I accessed it two different

21   times.

22       Q.    Okay.  And Mr. --

23       A.    It continues.  It's not actually chat so much

24   as a conversation thread.

25       Q.    Thread?

1        A.     Yeah.

2        Q.     You post something, somebody literally a week

3    later can look at it, post something, and that continues

4    the thread?

5        A.     Correct.

6        Q.     Okay.  Mr. James indicated specifically about

7    you seeing -- getting a list of attorneys.  But that

8    doesn't appear until it looks like 7:00 to 11:00 p.m. on

9    Sunday, May 11th; is that right, where you begin, "I

10   will be filing tomorrow with no anonymity," etcetera,

11   "My employer's legal department is researching a list of

12   attorneys for me to review."

13       A.     And what they said was -- yes, that's true.

14       Q.     But that's Monday, right?

15       A.     Yes.

16       Q.     And there are -- I mean, you get on -- back on

17   and respond to some of these folks who were -- who were

18   talking to you; is that right?

19       A.     Correct.

20       Q.     So where it says "Sublime Serenity," that's

21   you talking?

22       A.     Correct.

23       Q.     Okay.  And at some point that evening, do

24   these events occur, what I just recited, the access to

25   the Recent Documents folder, the access to the recycle

1  bin, the viewing of that video, the looking at those

2  thumbnails that we've offered, that all occurred that

3  first night, is that right, May 8th?

4      A.    Yes.

5      Q.    Okay.  And at some point during that evening,

6  did you put a CD into the computer --

7      A.    Yes.

8      Q.    -- as you've testified?  Okay.  Thank you,

9  Dawn.

10              MR. PHELPS:  Your Honor, we pass the

11  witness.

12              MR. JAMES:  I'll pass the witness, Judge.

13              THE COURT:  You can step down, ma'am.

14              THE WITNESS:  Thank you, sir.

15              MR. PHELPS:  Your Honor, at this time

16  briefly for the purposes of -- of the assertion that she

17  was an agent of the State, I'll call Detective Jose.

18              MR. JAMES:  Just so we're all clear,

19  Judge, I'm not necessary asserting that.  I was just --

20  wasn't sure what the evidence would show.

21              MR. PHELPS:  Do you want -- I mean, we

22  can save some time, your Honor.  Detective Jose will say

23  he never told her anything.

24              MR JAMES:  Well, why don't you --

25              MR. PHELPS:  I will.

1    THE COURT:  Let's me swear you in, sir.

2    MICHAEL JOSE,

3 Having been duly sworn, testified as follow:

4    THE COURT:  Have a seat.

5    DIRECT EXAMINATION

6 BY MR. PHELPS:

7    Q.    Detective, would you state your name, first

8 and last, and spell your last name?

9    A.    Michael Jose, J-o-s-e.

10    Q.    How are you employed?

11    A.    I'm a detective for the College Station Police

12 Department.

13    Q.    I'm -- I'm going to cut right to the chase

14 here.  Were you involved in the investigation into the

15 Possession of Child Pornography at the home of Greg

16 Baird?

17    A.    Yes, sir.

18    Q.    When did you become aware of that case?

19    A.    March -- or May the 11th, 2009.

20    Q.    Okay.  How did you become aware of it?

21    A.    Our crime analyst, Careen (phonetic) Scott,

22 notified us she had talked to Dawn Killien.

23    Q.    Did she tell you when she talked to her?

24    A.    I believe it was that day.

25    Q.    That same day?

1        A.      I believe.

2        Q.      Would -- would it have been May 11th?

3        A.      I believe so.

4        Q.      Okay.  During the course of your

5    investigation, did you have an occasion to talk to Dawn

6    Killien?

7        A.      Yes, I did.

8        Q.      At any point did you or any other officer of

9    the College Station Police Department ask Dawn Killien

10   to do anything with respect to Greg Baird's computer?

11       A.      What do you mean exactly?

12       Q.      Did you ever ask her to go into his computer?

13       A.      No, we did not.

14       Q.      Were the events that she related to you,

15   obviously, prior to when you first talked with her?

16       A.      Yes, sir.

17       Q.      And did those events include access to the

18   computer and the observation of which she suspected to

19   be child pornography?

20       A.      Yes, sir.

21       Q.      Based upon what she told you and -- and your

22   investigation at that point, did you obtain a search

23   warrant?

24       A.      Not from what she told me.  She -- My

25   conversation with her was very brief.

1    Q.    Okay.

2    A.    She wanted to remain anonymous at the time.

3  She met with Detective Falwell at some point after I

4  talked to her on another day.

5    Q.    And did you -- did you discuss with Detective

6  Falwell what she told you -- what she told him?

7    A.    Yes.  Yes.

8    Q.    Did -- Who was the detective in charge?

9    A.    I was.

10    Q.    Did Detective Falwell at any time to your

11  knowledge advise her to go into --

12    A.    Not to my knowledge, no.

13    Q.    Did you give her any instructions when you

14  talked to her about whether she should go on the

15  computer?

16    A.    I believe I told her not to go back on the

17  computer and collected information based on what she had

18  originally observed when she saw the images that she

19  saw.

20    Q.    When you say "collect information," just

21  exactly what do you mean?

22    A.    Collect from her own memory from what she saw.

23    Q.    Okay.  So, I guess, the bottom line is at any

24  point did you or anybody else from the City of College

25  Station assist her, encourage her, ask her to get on

1    Greg Baird's computer?

2        A.    No.

3        Q.    Okay.   At any point prior to May 11th of 2009,

4    was Dawn Killien acting as an agent of College Station

5    Police Department?

6        A.    Not to my knowledge.

7               MR. PHELPS:   Okay.   I'll pass the

8    witness.

9               MR. JAMES:   No questions.

10              THE COURT:   You can step down, sir.

11                   WILLIAM (BILL) ODOM,

12    Having been duly sworn, testified as follows.

13              THE COURT:

14                   DIRECT EXAMINATION

15   BY MR. PHELPS:

16       Q.    Sir, would you state your first and last name

17   and spell your last name, please?

18       A.    O-d-o-m.

19       Q.    How are you employed, sir?

20       A.    I am a computer forensic expert, and I have my

21   own company.

22       Q.    Would you tell the Judge a little bit about

23   your training and experience as a computer forensic

24   expert?

25       A.    Yes, my initial entry into computer forensics

1  was in 1997.  I -- at the time I was a special agent

2  with the Federal Bureau of Investigation in the New York

3  office.  During my tenure with the F.B.I. from '97 until

4  I left in 2001, I was a computer forensic experts with

5  the F.B.I.  All of my training during that time was

6  received through the F.B.I.

7              I was certified as a computer forensics

8  examiner; and I took, I think, somewhere in the

9  neighborhood of seven or eight courses that allowed me

10  to become a computer forensics expert and, again,

11  through certification through the F.B.I. allowed me to

12  practice that with the F.B.I.

13              During that time I did several hundred

14  computer forensic examinations as an F.B.I. agent.  All

15  in federal courts and testified probably about four

16  times in federal court, both in New York and then in

17  Houston, when I transferred to Houston in 1999.  After

18  2001, I went into private practice with a company,

19  Deloitte Touche, continuing with my computer forensics,

20  primarily on civil matters as opposed to criminal.

21              During that time and since 2001, I've been

22  in private practice as a consultant, again, going

23  through hundreds, into thousands, of computer forensic

24  examinations on thousands of pieces of evidence.  And

25  all those have either been civil or criminal and in one