1  case administrative courts, either in Texas or in

2  federal cases throughout the country.

3      Q.   Okay.  At the -- at the State's request, did

4  you examine a computer hard drive in this case?

5      A.   Yes, I did.

6      Q.   It will tell the Judge, if you would, just

7  briefly what you do when you examine these hard drives?

8      A.   The -- the basic principle is to perform the

9  forensic examination, which is to perform analysis on a

10 forensic copy of the original evidence.  So in other

11 words, I don't actually look at the original computer;

12 but I look at a forensic copy of that computer.

13          And the analysis, obviously, can vary from

14 the -- the request for the type of work that's involved;

15 but in this specific case I was -- reviewed evidence of

16 access to the computer, specifically to the computer and

17 information related to access dates and times and the

18 types of files that would have been accessed during a

19 particular time period.

20     Q.   Now, were you made aware of certain facts in

21 this case with respect to what Dawn Killien said she did

22 on the computer?

23     A.   Yes, I was.

24     Q.   And during the course of your examination, did

25 you recover chat that was -- chat thread that Dawn

1  Killien started?

2      A.    That's correct, I did.

3      Q.    And have you reviewed her statements on that?

4      A.    I -- the --

5      Q.    Did you read through what she said she did,

6  the transcription?

7      A.    The transcript of what I recovered, yes.

8      Q.    Yes, sir.

9      A.    Yes, I did review that and read that.

10     Q.    So was -- was the purpose of your examination

11 partly to determine whether what you found on the

12 computer was consistent with what she said she did?

13     A.    Yes, that's correct.

14     Q.    Okay.  Well, let me ask you a few questions

15 about that first of all.  The date that we're talking is

16 May 8th, actually May 7th and May 8th is when she stayed

17 the night.  From your examination did you determine when

18 the first time that Dawn Killien accessed the computer,

19 approximately?

20     A.    Yes.  That was -- approximate time, yes, I was

21 able to determine approximately 6:00 p.m. on May 8th,

22 she accessed the computer.

23     Q.    When you examined the computer, were you able

24 to determine or make any kind of conclusion about

25 whether the computer was on or off when Dawn Killien

1  accessed it?

2      A.    It was in -- it was consistent with it being

3  in a sleep mode.  In other words, the computer was not

4  turned off.  It was on, but in a -- a mode to reserve

5  power and -- and the act of moving a mouse or pushing a

6  key would wake the computer up effectively.

7      Q.    So is -- is what you found on Greg Baird's

8  computer consistent with it being woke up with a

9  movement of a mouse?

10     A.    Yes, it is.

11     Q.    Did you see or were you able to determine when

12  the last time that computer was accessed before that?

13     A.    Yes, I was.

14     Q.    And when was that?

15     A.    That was May 7th, I believe, at 5- --

16  5:21 p.m.

17     Q.    Okay.  So that would have been the day before?

18     A.    That's correct.

19     Q.    And was there anything that indicated to you

20  or that showed you that the computer was on before Dawn

21  Killien accessed it on Friday May 8th?

22     A.    Between the time that the computer was last

23  accessed at 5:21 and -- and 6:00 p.m. on May 8th, the

24  next day, there was an activity that's consistent with

25  Windows system updates.  Basically, the -- the computer

1  is being updated automatically by windows and that's

2  fairly common and that occurred later in the evening.  I

3  don't specifically recall the time, but it occurred

4  later in the evening of May 7th.

5      Q.   If a computer is in sleep mode, is it still

6  capable of searching for updates on the internet and

7  downloading those?

8      A.   Well, if it's in sleep mode, no.  So it would

9  have gone to sleep at some point after that point, yes.

10     Q.   Now, I -- I just want to get a couple of

11 basics out of the way about recent -- My Recent

12 Documents files and recycle bins and that sort of thing.

13 First of all, where is My Recent Folders -- My Recent

14 Documents file located?

15     A.   The folder is physically located in -- on the

16 hard drive in a place called "Recent."  That's the name

17 of the folder, and there are a number of files that are

18 stored in that folder that are created -- they're what's

19 called shortcuts.  They are effectively files used to

20 reference Recent Documents.

21          The way that it's viewed, however, is

22 different that someone doesn't actually access that

23 folder directly.  That's simply viewed by going to the

24 start button on the Windows menu, and one of the many

25 options that pops you up is the Recent Documents.  And a

1   list is populated that the user sees, and that list is

2   generated from the Recent Folder.

3        Q.   Okay.  So if I -- if I, as I do from time to

4   time, take work home with me on a flash drive and I put

5   it into my computer at home and I access a document

6   there from that flash drive?

7        A.   Yes.

8        Q.   Will that pop up on my Recent Documents?

9        A.   It -- it would populate that folder; and at

10  some point after that, that's right.

11       Q.   Okay.  And you indicated that -- that it was

12  in the start menu.  Can you just explain -- first of

13  all, we are talking about Windows?

14       A.   The Windows operating system.

15       Q.   Is there a start button at the bottom left

16  hand corner?

17       A.   There is.

18       Q.   And if you click that one time, will you see

19  among other files my Recent Documents?

20       A.   Yes.

21       Q.   So do you have to go very deep into the

22  computer at all or access any files, go to My Computer,

23  or do any of that stuff in order to find that My Recent

24  Document -- My Recent Document file or folder?

25       A.   No.

1      Q.    In your examination of a computer with respect

2   to what Dawn Killien did, is it your opinion that what

3   we're talking about is a -- was it a superficial --

4                    MR. JAMES:  I'm sorry.

5      Q.    (By Mr. Phelps)  Was it a superficial access

6   to the computer or was there deep access like look into

7   files and things like that?  Do you understand what I'm

8   asking?

9      A.    Not exactly.  I'm sorry, no.

10     Q.    I guess what I'm trying to figure out is:

11  With respect to Dawn Killien's access, when we're

12  talking about My Recent Documents file and trash bins,

13  is that something difficult at all for somebody to do?

14     A.    No, it's fairly straight forward.

15     Q.    Okay.  Do those -- the recycle bin, is that an

16  icon on the desktop?

17     A.    It's represented by an icon on the desktop.

18     Q.    Okay.  If you hit that start button, will you

19  also see the recycle bin?

20     A.    You can, yes.

21     Q.    Okay.  With respect to Dawn Killien's access,

22  you said the first access, you said the first access was

23  about 6:00 o'clock on Friday, May 8th.  Did you see any

24  indication that Dawn Killien or somebody at about that

25  time put a CD in the computer?

1    A.    The -- What I located at 6:00 o'clock was

2   access to a system file that was being used, being

3   called, that was -- it's necessary for the media center

4   for music or other media that's been inserted into the

5   CD.  So that's consistent -- the access of that is

6   consistent to a CD being put into a computer and being

7   accessed.

8    Q.    So if you put a -- a music CD in there to

9   listen to it or anything else with it, would that show

10  up that way?

11   A.    Yes.

12   Q.    And is that what you found?

13   A.    That is what I found, yes, sir.

14   Q.    Is that consistent with what your

15  understanding of what Dawn Killien said?

16   A.    Yes, it is.

17   Q.    Now, did you find evidence that Dawn Killien

18  accessed the My Recent Documents folder or file?

19   A.    I found evidence that she accessed a specific

20  file in the Recent Documents folder.

21   Q.    And in your examination did you find in that

22  Recent Documents folder, a file with the name, something

23  to the effect of "boy sucks older men" or "older men

24  sucks boy," or something to that effect?

25   A.    Something, a name to that effect, yes.

1     Q.    And would that have been obvious or visible to

2  somebody that had opened up that Recent Documents file?

3     A.    Yes.

4     Q.    Okay.  Again, that would have been with just

5  one click of the start menu and then to my Recent

6  Documents?

7     A.    Correct.

8     Q.    Okay.  Do you -- did you in your examination

9  find evidence that she accessed the recycle bin?

10     A.    Yes, I did.

11     Q.    Now, if you would, explain to the Judge

12  exactly what a recycle bin is?

13     A.    Okay.  A recycle bin is a term that's, and

14  specifically in this case, deals with a Windows

15  operating system.  The act of deleting a file is a user

16  initiated act.  And when I, as a user, chooses to delete

17  a file, Windows allows me the ability to store it in a

18  temporary place called a recycle bin.

19         The reason for that is in case I need to

20  recover that file for whatever reason, I can.  So it

21  acts as temporary storage facility.  The only way that

22  files are emptied out of the recycle bin is if I need

23  the recycle bin to be emptied by, again, user

24  interaction.  So all of that requires user interaction.

25         The recycle bin, also, acts as -- again,

1  it's -- it's a way to recover files that may have been

2  inadvertently deleted by the user; but it's, also,

3  representative of files not only on the computer but,

4  also, additional hard drives or other drives, external

5  drives, that may be attached to the computer.

6            So, in -- in other words, if -- if I have

7  a computer plugged in an external drive, a recycle bin

8  -- the recycle bin will not only show me which files I

9  delete off of my hard drive on the computer but anything

10  that I delete off of the external drive as well with the

11  same -- And if I didn't mean to delete that, then I can

12  restore that back to the external drive that I

13  originally deleted it from.

14     Q.    So if I want to delete something, I would

15  delete it and I would have to go into -- actually delete

16  it from the computer and go into the recycle bin and

17  delete it from there?

18     A.    That's correct, or empty the recycle bin is

19  the term that is used.

20     Q.    Okay.  And on Mr. Baird's computer, as it was

21  on that particular night May 8th, did you discover that

22  there were thumbnails of child pornography on that -- in

23  that recycle bin?

24     A.    Yes, there is indication that there was a

25  thumbnail that was representative of files on the

1  recycle bin.

2          MR. PHELPS:  Your Honor, may I approach?

3          THE COURT:  Yes, sir.

4          MR. PHELPS:  Those four images, your

5  Honor.

6      Q.  (By Mr. Phelps)  Let me show you State's

7  Exhibits 2, 3, 4, and 5.  Did you recover these from

8  that recycle bin?

9      A.  Yes.

10     Q.  Okay.  And were those from the computer hard

11 drive or from the external hard drive?

12     A.  They were from the -- the external hard drive

13 that was attached to the computer.

14     Q.  Okay.  And have you reviewed what Dawn Killien

15 told the police about those four pictures?

16     A.  I only reviewed her statement that was in the

17 police report.

18     Q.  Okay.  Do you -- do you recall whether her

19 description of those four documents was consistent --

20     A.  Yes.

21     Q.  -- with -- with what we discovered on the file

22 of the external drive?

23     A.  Yes, they are consistent with her statement.

24     Q.  During your examination did you discover

25 whether there were any attempts at protecting any of

1    this information?

2         A.    There was no incription or any passwords that

3    were either through Windows or otherwise that I was able

4    to locate that limited access to them, any of the files.

5         Q.    Is it possible in that operating system if --

6    to require that when a computer goes to sleep, that when

7    it comes back there up, there would be a password to go

8    any further?

9         A.    Yes.

10        Q.    And was that done in this case?

11        A.    No.

12        Q.    Is it possible with respect to any particular

13   file, to password protect a file?

14        A.    Generally speaking, yes.

15        Q.    And -- and did you see any of that with

16   respect to these images?

17        A.    No.

18        Q.    Or anything on the Recent Documents file?

19        A.    No.

20        Q.    By the way, did you also -- Ms. Killien made

21   reference to clicking on a video to determine whether it

22   was, in fact, child pornography from the recent

23   documents file?  Did you observe any evidence of that?

24        A.    Yes, I did.

25        Q.    Can you tell the Judge what you observed?

1    A.    I observed two pieces.  The -- the first piece

2  of evidence was on the computer itself.  It was a

3  shortcut in the Recent Documents folder, which acts --

4  I'm sorry -- pointed to the video.  Again, it was

5  something to the effect of "man sucks boy" or "boy sucks

6  man."  I don't recall specifically.

7         That was on the computer, and then it was

8  accessing the video that was actually on an external

9  drive that was attached to the computer.  And then I was

10  able to locate the video on the external drive and

11  review that as well.

12         MR. PHELPS:  Your Honor, may I approach?

13         THE COURT:  Yes, sir.

14    Q.    (By Mr. Phelps)  Looking at -- is this a

15  document that you generated regarding that particular

16  access to that video?

17    A.    Yes, it is.

18    Q.    Okay.  And does it indicate the time that it

19  was accessed, or do you recall based on that?

20    A.    It was accessed on February (sic) 8th, 2009 at

21  9:15 p.m.

22    Q.    And in the chat that we have offered into

23  evidence, is there a -- kind of a commensurate entry

24  from her indicating she's now looked that video?

25    A.    Yes.

1          MR. JAMES:  Judge, just for -- I think he

2    said February.  Just so the record --

3          MR. PHELPS:  May 8th is the date.

4          MR. JAMES:  May 8th, yeah.  Did you

5    intend to say -- did you intend to say May 8th?

6          THE WITNESS:  Yes, I did.

7     Q.    (By Mr. Phelps)  In this State's Pretrial

8    Exhibit No. 6, is that -- that video clip put onto this

9    CD?

10     A.    Yes, it is.

11     Q.    Was that recovered by you from Mr. Baird's

12    computer?

13     A.    Yes, from the external hard drive.

14     Q.    From the external hard drive.

15          MR. PHELPS:  Your Honor, at this time we

16    offer State's Exhibit No. -- Pretrial No. 6.

17          (Discussion held off the record.)

18          MR. JAMES:  We don't have any --

19          THE COURT:  That's 6?

20          MR PHELPS:  Yes, sir.

21          THE COURT:  State's 6 is admitted.

22          (State's Exhibit No. 6 admitted

23    into the record.)

24     Q.    (By Mr. Phelps)  And have you taken a look at

25    that video?

1  A. Yes, I did.

2  Q. What's the name of that video?

3  A. I'm sorry.  I don't recall again.  It's called

4 "Boy Scout David," comma, "Part 2-3."

5  Q. And have you looked at the video?

6  A. Yes.

7  Q. Is it child pornography?

8  A. Yes.

9  Q. You've seen child pornography before --

10  A. Yes, I have.

11  Q. -- in your previous experience?

12  A. Yes.

13  Q. Was the access to the Recent Documents folder,

14 the recycle bin, and the video that we just talked

15 about, did that occur on May 8th of 2009?

16  A. Yes, it did.

17  Q. Other than that access to the computer, did

18 Dawn Killien from your examination do anything else with

19 the computer of any significance?

20  A. Her activity was limited to accessing the web

21 and specifically accessing the forum where she was

22 posting and reviewing that information.  My examination,

23 that was the significant portion of her activity, was

24 internet access.

25  Q. After she accessed that video at about 9:15,

1  do you see any further activity on her part in which she

2  is examining files of the Defendant?

3       A.   No.

4       Q.   Other than the access to the Recent Document

5  folder, the recycle bin, and that video, do you see her

6  examining any other folders?

7       A.   No.

8            MR. PHELPS:  Thank you.  We pass the

9  witness.

10            MR. JAMES:  Can we have one moment, your

11  Honor?

12            THE COURT:  Yes.

13            (Brief pause in the proceedings.)

14                  <u>CROSS-EXAMINATION</u>

15  <u>BY MR. JAMES:</u>

16       Q.   Mr. Odom, let me ask a couple of questions

17  here.  Was that -- You don't know what happened as far

18  as whether Greg told her to keep the bedroom door closed

19  or not, do you?

20       A.   No, sir, I do not.

21       Q.   You don't know whether or not he told her she

22  could use the computer, do you?

23       A.   No, sir.

24       Q.   You don't know whether or not she used that

25  computer without his permission, do you?

1      A.    No, sir.

2      Q.    Okay.  So those are all the things that you --

3  you don't know.  Let's talk about the things that you

4  were able to discern.  Okay?

5      A.    Okay.

6      Q.    Were you able to find any evidence that songs

7  had been moved from the CD onto the computer?

8      A.    Specifically, no.

9      Q.    Now, you heard -- you heard Ms. Killien say

10  that she dragged songs on -- from the CD onto the

11  computer.  You never found any evidence of that, did

12  you?

13      A.    I didn't see the songs on there, no, sir.

14      Q.    And you didn't see that they had ever been

15  deleted, did you?

16      A.    No, sir.

17      Q.    And if they had been dragged on there, there

18  would be a fingerprint -- a footprint or if they had

19  been deleted there would have been a footprint, wouldn't

20  there?

21      A.    If they were deleted on that computer, that's

22  correct.

23      Q.    And you didn't see that, did you?

24      A.    Not on that computer.

25      Q.    And, in fact, at 9- -- Did you make a timeline

1  or something?  Do you have any notes that you made about

2  your -- your findings?

3      A.    I have just some printouts that were part of

4  my examination that are related.

5              MR. JAMES:  May I?

6              THE COURT:  Yes, sir.

7      Q.    (By Mr. James)  The problem is, Mr. Odom, I

8  don't always know what I'm looking at.

9              MR. JAMES:  Your Honor, could I have

10 Ms. Hubbard, who is my expert, look at these, because

11 this is essentially Greek to me.  And this also -- these

12 are --

13     Q.    (By Mr. James)  What are these, sir?

14     A.    That is a listing of the files in the recycle

15 bin from the external hard drive.

16             MR. JAMES:  May I have her -- I can

17 continue my cross of him, Judge.

18             THE COURT:  Okay.

19     Q.    (By Mr. James)  Now, you said at -- at 6:00

20 p.m. it was action consistent with somebody listening to

21 music, right?

22     A.    That's correct, yes.

23     Q.    And then it's three hours -- The computer goes

24 back to sleep, doesn't it?

25     A.    I don't believe it did.  It's possible it

1   could have, but I --

2        Q.   Well, at -- the next thing that happens after

3   somebody is listening to music, you don't see any

4   evidence of anything being dragged onto the computer,

5   you don't see anything else until 9:15; is that right?

6        A.   That sounds about right.  I'm not sure of the

7   specific times, but --

8        Q.   And then at that time somebody accesses the

9   Recent Folder, correct?

10        A.   Well, there is access to a file on the Recent

11   Folder.

12        Q.   Well -- but they get to it through going to

13   the recent -- Recent Folder, right?

14        A.   That's correct.

15        Q.   And you don't see any sign that anybody is

16   deleting music or trying to add music or anything else

17   on the computer, but we go straight to Recent Folders

18   and it's got a -- a list with names on it, right?

19        A.   Yes, sir.

20        Q.   And then somebody clicks "Boy Scout David,

21   Part 2-3;" is that right?

22        A.   That's the name of the file, yes.

23        Q.   Okay.  And somebody plays that and the video

24   comes on.  So we're getting that played, right?

25        A.   Yes.

1        Q.     And then somebody later clicks on the

2    deletion.   And before those pop up -- those thumbnails

3    come up -- they don't just come up when you pop on them

4    or when you click on that.   What you get is a -- a

5    wording, a description, and you click on that

6    description; and that's what gives you the thumbnails,

7    right?

8        A.     I would not say that's an accurate

9    characterization of how that works.   In fact, with

10   Windows and certainly with Windows Vista, it has the

11   ability to store thumbnails to allow for any folder

12   containing any sort of photograph to have a thumbnail

13   version of that photograph for the purposes of seeing

14   that.

15       Q.     Well, what is the case in this -- on this

16   instance on this computer?

17       A.     Well, by my accounts there's thumbnail

18   versions of that.

19       Q.     Okay.   But did you have to click on something

20   to get those thumbnails?

21       A.     You would have to access the folder in which

22   the thumbnails reside in -- in which the pictures reside

23   in.   Sorry.

24       Q.     Okay.   Just for demonstrative purposes, you

25   click on the recycle bin, right?

1      A.    Okay.

2      Q.    And what the recycle bin is going to give is

3  descriptions of files.  It may be holiday vacation, or

4  it may be anything.  It may be something horribly

5  suggestive, but it's going to give you those words.  And

6  then you click on this (Indicating); and then up will

7  pop what's there, correct?

8      A.    I'm not sure I follow your question.  Are you

9  saying that "holiday vacation" is a folder that has

10  pictures within that folder?

11      Q.    Yes, sir.  Yes, sir.

12      A.    Certainly, that's one way that they could be

13  viewed.  In some instance the thumbnail will actually

14  put thumbnails of the photos on a folder -- on this

15  folder so that you would see the thumbnails from the

16  folder view as well.

17      Q.    But that's not what the situation is here, is

18  it?  In here we've got words, some word that was

19  suggestive, "Boy sucks man" or whatever it was.  That

20  was clicked on, because there has been testimony.  It

21  said this "boy sucks man" or whatever and then you click

22  on that and that's when you get the -- the thumbnails,

23  correct?

24      A.    No, sir, that's not my testimony actually.

25  The -- the video in question that we're discussing is

1   actually an active file stored on the external hard

2   drive.  That's not the name of any of the files and

3   certainly not the name of files that were here.  In

4   fact, the name of the files here are not suggestive at

5   all.  They're simply numerical.  So it would not be a

6   suggestive name at all.  It's only a number that would

7   show up.

8                   And, again, to answer question, I mean,

9   that -- those are two different places, that's two

10  different files.  The pictures that are being -- that

11  are viewed that were representative of the pictures of

12  the thumbnail, are simply that they're pictures that

13  would be represented in a smaller version so that a user

14  would be able to see those in what's known as a

15  thumbnail size version.

16                  And those files were in the recycle bin.

17  That's separate from the video that's stored in an

18  active file on the -- on the hard drive -- or the

19  external drive.  Sorry.

20      Q.    There is no doubt that somebody -- it appears

21  nobody other than Ms. Killien went in and accessed both

22  the recent files to see what had been put on there

23  recently as well as the recycle bin.  That's true, isn't

24  it?

25      A.    She accessed one file in the recent files.

1      Q.    Yes.

2      A.    One specifically.

3      Q.    And, also, accessed the recycle bin, correct?

4      A.    Yes.

5                MR. JAMES:  I'll pass the witness.

6                        REDIRECT EXAMINATION

7   BY MR. PHELPS:

8      Q.    When you opened up that recycle bin on the

9   external drive, would you see thumbnails?

10     A.    Yes, sir.

11     Q.    And is that what happened in this case?

12     A.    Yes.

13     Q.    So Ms. Killien didn't have to see a folder and

14  then click on that to make another step to go in and

15  find those thumbnails, did she?

16     A.    There is no indication of that.

17               MR. PHELPS:  Okay.  That's all I have,

18  Judge.

19               MR. JAMES:  Nothing further.

20               THE COURT:  You can step down, sir.

21

22               MR. PHELPS:  Your Honor that's all I

23  have.

24               MR. JAMES:  Call Rose Hubbard, your

25  Honor.

1                        ROSE HUBBARD,

2       Having been duly sworn, testified as follows.

3                    DIRECT EXAMINATION

4       BY MR. JAMES:

5           Q.     Would you state your name, please?

6           A.     My name is Rose Marie Hubbard.

7           Q.     How are you employed?

8           A.     I am employed with Compton & Wendler, C.P.A.,

9       law firm, accounting firm.

10          Q.     And what is your educational background?

11          A.     I have an under-grad degree in Criminal

12      Justice and master and minor in Psychology.

13          Q.      And what is your professional background --

14      excuse me -- what -- how were you previously employed?

15      Were you employed -- assigned to the F.B.I. as a task

16      force officer?

17          A.     Yes, I was.

18          Q.     Okay.  What was your jobs there?

19          A.     Computer forensic examiner.

20          Q.     Okay.  And do you have any idea how many

21      computer files that you examined while you worked there?

22          A.     Computer files?  Millions.

23          Q.     Okay.  And have you previously been qualified

24      as an expert witness in the State of Texas?

25          A.     Yes, I have.

1      Q.      And I'm sorry.  How long did you work as a

2 forensic examiner with the F.B.I. examining computers?

3      A.      Five years.

4      Q.      And you currently work in conjunction with

5 Paul Price, who used to be with College Station Police

6 Department?

7      A.      That's correct.

8      Q.      What kind of training and certifications do

9 you have?

10     A.      I was trained and certified by the F.B.I. as a

11 computer forensic examiner.  I'm also certified with the

12 -- as a C.F.C.E. with the International Association of

13 Computer Investigative Specialists, also known as IACIS.

14     Q.      And let me ask you, ma'am:  When a computer is

15 being utilized, does it leave a footprint or evidence of

16 what has been accessed or opened?

17     A.      Yes, it does.

18     Q.      And were you able to examine the computer that

19 was seized from Greg Baird's home at the district

20 attorney's office here?

21     A.      Yes, I did.

22     Q.      Were you able to determine the history of

23 where that computer had been directed to go?

24     A.      Yes, I did.

25     Q.      Can you tell us, please, prior to May the 8th

1   was the -- was the computer used on May the 7th?

2       A.   Yes, it was.

3       Q.   And then was it used again until May -- or was

4   it used again May -- pardon me -- on May the 8th?

5       A.   That's correct.

6       Q.   Okay.  You heard Mr. Odem talk about there was

7   no indication that any songs had been dragged onto the

8   computer.  Did you find any indication that any songs or

9   -- or music had been dragged from a CD onto that

10  computer?

11      A.   No, I did not.

12      Q.   As soon as the computer was awakend -- okay?

13      A.   Yes.

14      Q.   -- about what time did you find it to be

15  awakend?

16      A.   The computer woke up at approximately

17  9:06 p.m.

18      Q.   And if I didn't ask you this, if music had

19  been dragged onto the computer, there would be a

20  footprint of that, wouldn't there?

21      A.   There would be some type of footprint, yes.

22      Q.   You didn't see that, did you?

23      A.   No, I didn't.

24      Q.   9:06 the computer was awakend, and where was

25  the first place that the computer was directed to go?

1      A.    To the Recent Links' folder or what has been

2  commonly referred to as -- this afternoon as recent

3  items.

4                  THE REPORTER:  I'm sorry.  Could you

5  repeat?

6                  THE WITNESS:  Recent Links' folder or

7  Recent Items.

8      Q.    (By Mr. James)  And then was a -- and that

9  would be consistent with what Mr. Odem said, wouldn't

10  it?

11      A.    Yes, it is.

12      Q.    And then at that point did somebody play one

13  of the -- or click on one of the Recent Documents?

14      A.    Yes.

15      Q.    And was that Recent Document that was played

16  Boyscout David part 2 dash 3?

17      A.    Yes, Boyscout David part 2 dash 3.

18      Q.    Okay.  And the video player automatically come

19  on at that point?

20      A.    Yes, it did.

21      Q.    And just so we're all clear, the Recent

22  Folders or Recent Documents is repository of the most

23  recently used items; is that correct?

24      A.    That's correct.

25      Q.    Was an iPhone ever connected to that computer

1  that night?

2       A.    No, there was not.

3             MR. JAMES:   Pass the witness.

4                    CROSS-EXAMINATION

5  BY MR. PHELPS:

6       Q.    Ms. Hubbard, my name is Shane Phelps.  We've

7  actually met before?

8       A.    Yes.

9       Q.    You've come up to our office, I think, at

10  least five times to --

11       A.    Four times, I believe.  Yes, sir, I've been

12  there.

13       Q.    My office has been real helpful to you and

14  given you access to everything you needed?

15       A.    Yes, sir.

16       Q.    My investigator, Nathan McCune, advised you

17  there were external drives that were -- that were also

18  available to you?

19       A.    Yes, sir, he advised me of the media devices.

20       Q.    Did you not know until today that there was an

21  external drive that was actually hooked up to that

22  computer the night that Dawn Killien used it?

23       A.    No, sir, I've known it all along.

24       Q.    Okay.  Why didn't you ask to look at that

25  external drive?

1          A.     Because my -- my primary task was to find out

2    how the computer was turned on.  Once it was turned on,

3    what sequence of events occurred.

4          Q.     Well, wouldn't that sequence of events involve

5    what files were accessed?

6          A.     Yes, from the K Drive.

7          Q.     Okay.  And isn't it -- isn't it true that some

8    files that were accessed, were actually accessed from

9    the external drive that was hooked up to the computer

10   that night?

11         A.     Files could have -- files were accessed from

12   the K Drive there that night.

13         Q.     Okay.  Did you know about that prior to today?

14         A.     Yes, sir.

15         Q.     Did you know that the recycle bin that that

16   Dawn Killain accessed through the icon on the desktop

17   was partly at least the recycle bin on the external

18   drive?

19         A.     In the recycle bin there will appear links to

20   K Drive, which in this case is this external device that

21   you're talking about.

22         Q.     Okay.  But you didn't look through that

23   external device at all?

24         A.     No, sir, I did not.

25         Q.     So you've never examined the contents of that

1  recycled bin to determine whether Dawn Killien saw the

2  things she said she saw?

3     A.   I can determine that she did see some of the

4  things that she saw, yes, I can, via the Recent Links --

5     Q.   Without looking at the -- without looking at

6  the external drive?

7     A.   I can -- I can look at the Recent Links and --

8  or the Recent Items or recent doc's folder, whatever

9  term you would like to use in this instance, and confirm

10  that she did see some files she described.

11     Q.   Okay.  Well, let me ask her (sic) just for a

12  moment about some of the things that I think we can

13  agree on.  No. 1, you agree that -- that Dawn Killien

14  accessed the Recent Documents file; is that right?

15     A.   Yes, sir.

16     Q.   Do you know what time that was?

17     A.   Yes, sir, I do.  She asked -- accessed it at

18  9:15 p.m.

19     Q.   Okay.  9:15 p.m.  Have you read the chat that

20  she put on the computer?

21     A.   Yes, sir, I have.

22     Q.   That is consistent with her accessing the

23  Recent Documents to look at that particular video that

24  she referenced in the chat, is it not?

25     A.   What she describes as far as what she -- I

1    want to make sure I understand.

2        Q.    Okay.  Well, you know that there's some chat

3    that she got onto about 8:42, right?

4        A.    Yes.

5        Q.    And posted what -- what happened, right?

6        A.    Yes, sir.

7        Q.    And at some point around 9:15 in that chat,

8    she indicated:  I looked at a video, it's child porn.

9    Do you recall that?

10        A.    Yes, sir, that is correct.

11        Q.    And that was consistent at that time with what

12    you're saying was her access to the Recent Documents'

13    file?

14        A.    That is correct.

15        Q.    Okay.  Is it your testimony that she did not

16    access the Recent Documents' file prior to that?

17        A.    It is not my testimony that she did not access

18    it.

19        Q.    So when was the last time she accessed the

20    Recent Documents' file?

21        A.    The first time was when she woke up the

22    computer at 9:06 p.m.  At 9:15 she went into the Recent

23    Items' list and clicked on the link to the Boyscout

24    David.  That was the first time.

25        Q.    Okay.  Is it -- is it possible that she

1    accessed and woke up the computer earlier that evening?

2         A.    Not according to the logs that I viewed.

3         Q.    Okay.  If she were to have put in the CD

4    earlier that evening, she would have had to wake up the

5    computer to do?  Do you agree with that?

6         A.    Yes, sir.

7         Q.    Okay.  And did you see evidence that she

8    actually put a CD in?

9         A.    No, sir.

10                MR. PHELPS:  May approach, your Honor?

11                THE COURT:  Yes, sir.

12        Q.    (By Mr. Phelps)  Do you know what this is?

13   Are you familiar with this kind of a form?

14        A.    Somewhat familiar, yes, sir.

15        Q.    Okay.  Does this form, obviously generated by

16   Mr. Odem, our computer forensic expert, indicate that at

17   6:06 that evening there was access, as he described in

18   his testimony?

19        A.    Yes, sir, I see that.

20        Q.    Okay.  Does that not mean in your training and

21   experience that she actually put a CD in at 6:06 p.m.

22   when the computer should -- obviously had been to be

23   woken up to do that?

24        A.    The -- the logs reflect that the computer was

25   put to sleep and did not -- at, I believe, it was

1  5:21 p.m. on the 7th and it did not wake up until

2  9:06 p.m. or, I believe, it was U.T.C.

3      Q.    At least from -- from what you were able to

4  determine from your examination?

5      A.    From -- from what I'm able to determine based

6  on my examination, the logs state -- the computer logs

7  state that the computer was in sleep mode until

8  9:06 p.m.

9      Q.    So that I understand your testimony, your

10  testimony is that from 5:21 the day before until 9:06

11  p.m. the evening of May 8th, that a computer was asleep?

12      A.    Yes, sir.

13      Q.    And that it was not woken up until 9:06 p.m.?

14      A.    That is correct.

15      Q.    Is that consistent with that chat?

16      A.    The chat?

17      Q.    Have you read the chat?

18      A.    Basically, I've gone through the chat; but I

19  haven't reviewed it.

20      Q.    This is State's Pretrial No. 7.  I mean, this

21  is 8:42 p.m. on Friday May 8th, 2009, right?

22      A.    Yes, sir.

23      Q.    And this is Sublime Serenity.  You understand

24  that to be Dawn Killien?

25      A.    That's right, yes, sir.

1    Q.    And -- and she goes through almost three pages

2    explaining her access to that computer prior to this

3    time, right?

4    A.    Yes, sir.

5    Q.    So I don't understand how that reconciles with

6    your testimony that --

7                    MR. JAMES:  Judge --

8                    MR. PHELPS:  -- it not open up and it was

9    asleep from 5:21 the next day until 9:06, after she must

10   have put that on the computer.  How did that happen?

11                   MR. JAMES:  Judge --

12                   THE COURT:  Yes, sir, you have an

13   objection?

14                   MR. JAMES:  I think I understand his

15   problem.  May I see that, your Honor?

16                   MR. PHELPS:  Let me -- let me clear it

17   up.

18                   MR. JAMES:  Okay.  Go ahead.  Go ahead.

19   I have no objection.

20   Q.    (By Mr. Phelps)  At a minimum she was on this

21   computer at 8:42.  Do you agree with that?

22                   THE WITNESS:  May I explain, your Honor?

23                   THE COURT:  Yes, ma'am.

24   Q.    (By Mr. Phelps)  Can you answer my question

25   first?  Does that mean she was on the computer?

1     A.    The computer at 8:42 p.m. Texas time --

2     Q.    Okay.

3     A.    -- no.

4     Q.    Do you know where this is?

5     A.    No.

6     Q.    So how do you know what time it is?

7     A.    All the -- all the logs that I refer to, I go

8  by the local machine time or the U.T.C. code.

9     Q.    Okay.

10     A.    What you see here is from a server.  I cannot

11  testify to the time of the server.  I can only testify

12  to the machine that I see.

13     Q.    Okay.  So in your -- your testimony is that --

14  that that we're looking at, that chat, has to have been

15  generated by Dawn Killien after 9:06 p.m. on May 8th?

16     A.    I'm saying that the internet activity that's

17  right here according to his machine, started at

18  9:54 p.m.

19     Q.    According to -- Okay.  So are you saying that

20  this is off by about an hour?

21     A.    Yes, sir.

22     Q.    Okay.  Do you agree with me that all of the

23  activity listed on that chat probably happened before

24  she got on the computer and --

25     A.    No, sir.  It -- it occurred after -- after she

1  got on the computer.   See the timeline?   It comes on at

2  9:06 p.m.

3       Q.    Okay.

4       A.    The recent docs' folder, Recent Links' folder,

5  that we've been discussing?

6       Q.    Yes, ma'am.

7       A.    Okay.  Comes down at 9:15, there is the file

8  that Mr. Odem -- yes.

9       Q.    Okay.

10      A.    And then, of course, the player comes on,

11 because it's got to play the video.

12      Q.    Right.

13      A.    Okay.  Nothing else is done until about 40

14 minutes later when you see the internet activity --

15      Q.    Okay.

16      A.    -- which is this.

17      Q.    Do you show anywhere that she on your timeline

18 -- And let me ask this -- this quickly.

19      A.    Sure.

20      Q.    You've indicated that this is your timeline of

21 Dawn Killien's activity?

22      A.    Yes, sir, on the computer.

23      Q.    The computer, what the computer says she did?

24      A.    Yes, sir.

25      Q.    Where does it say she accessed the recycle bin

1  on the external hard drive?

2        A.    It does not.

3        Q.    Why wouldn't it say that?

4        A.    Because, again, I was assigned with the task

5  as to, one, how did the computer come on --

6        Q.    Okay.

7        A.    -- two, what events happened after the

8  computer came on.

9        Q.    Okay.  Is it possible that this computer

10 was awakend at 9:06 but it was awakend earlier that

11 evening --

12       A.    No, sir.

13       Q.    -- the activity?  It's just not possible?

14       A.    Not according to the records that the computer

15 provides that I've reviewed.

16       Q.    Sometimes in your experience do not find

17 things on computers that you expect to find?

18       A.    I'm sure.

19       Q.    Okay.  Let me show you again what Mr. Odem

20 generated from that computer.  I mean, this is -- this

21 is acceptable in your industry, is it not?

22       A.    Yes, sir.

23       Q.    You're familiar with this form?

24       A.    Sure.

25       Q.    Is there any question in your mind that this

1   form reflects that something happened that looks like a

2   CD being put in that computer at 6:06 p.m.?

3          A.   What I can state is -- May I?

4          Q.   Sure.

5          A.   What I can state is this M.C.E. spotlight is

6   an AOL cap file --

7          Q.   Okay.

8          A.   -- which is used with the AOL.  I do know

9   there were processes running on his P.C., just normal

10  processes that were running before the machine went to

11  sleep and processes that were running after he went to

12  sleep.  But, again, the period of time that I was

13  assigned or tasked to do remains consist with the --

14         Q.   What period of time were you told to do?

15         A.   There was no -- from the time the computer

16  went to sleep, which is May the 7th, 5:21 p.m. --

17         Q.   Okay.

18         A.   -- until it woke up on May the 8th at

19  9:06 p.m. --

20         Q.   Okay.  Is --

21         A.   -- no activity occurred.

22         Q.   Okay.  But isn't this reflective of activity

23  occurring earlier than that -- that evening?

24         A.   I understand.

25         Q.   "Yes" or "no"?  Is this an indicator that

1   there was activity on that computer earlier in that

2   evening?

3       A.   Yes, that is an indicator.

4       Q.   Is it consistent with putting a CD in a

5   computer?

6       A.   Not necessarily.  That -- this is an AOL CAT

7   file.

8       Q.   I understand.  I understand that it may not

9   necessarily be that.  What I'm asking you is:  Is it

10  consistent with putting a CD in a --

11      A.   If you were to put a CD into a computer, it

12  would wake up the power.  If there was a power

13  interruption, it would have been noted -- would have

14  been noted in the event log on the computer.  There was

15  no such notation on the computer's log.

16      Q.   So your testimony is that this just happened

17  while the computer was asleep?

18      A.   Possibly.

19      Q.   Possibly?

20      A.   Yes.

21      Q.   Okay.

22      A.   My concern, again, is with the normal user

23  activity during the period of time from May the 7th,

24  from time it went to sleep, until it was awakend on 5-8.

25      Q.   Okay.  And your testimony is from 5:21 the day

1  before until 9:06 p.m., that computer was asleep and

2  nobody could have used it?  Is that your testimony?

3      A.    I'm saying according to the logs, the computer

4  logs themselves, the records, that was the period of

5  time.

6      Q.    Could you have just misread those logs?

7      A.    According to the event logs, no --

8      Q.    Was --

9      A.    -- it was there, it was asleep, and then the

10  power came up with on.

11      Q.    Were you aware of this until Mr. Odem

12  testified about it earlier today?  Did you know this

13  happened?  Did this pop up on your search?

14      A.    This -- this particular -- I can't state with

15  this particular one, but the M.C.S.C. CAT files that I

16  just described did appear.  I cannot tell you about that

17  particular one.

18      Q.    Okay.  So you can't say this was not, as

19  Mr. Odem testified, putting a CD into the -- into the

20  computer, waking up that program to -- to listen to

21  music?

22      A.    That's correct.

23      Q.    Okay.  Now, as -- as Mr. James asked Mr. Odem,

24  I'll ask you the same questions.  You don't have any

25  information, personal information, that Dawn Killien did

1   not have access to this computer, do you?

2        A.    I'm sorry.  I don't understand.

3        Q.    You don't have any -- any information,

4   personal information, that Dawn Killien was told that

5   she couldn't get on the computer?

6        A.    Oh, no, sir.  No.

7        Q.    You don't have any information or you can't

8   provide anything to this Court to suggest that there was

9   any type of password protection on this computer?

10       A.    There was no password protection.

11       Q.    Okay.  And is there -- is there?

12       A.    Time out.

13       Q.    What?

14       A.    Meaning when it goes into sleep mode and you

15  wake it up --

16       Q.    Yes?

17       A.    -- password does not appear.

18       Q.    Okay.  But that's possible on that computer,

19  is it not?

20       A.    It's possible, yes.

21       Q.    And it's also possible to safeguard these

22  particular files with a password, is it not?

23       A.    Yes, it is.

24       Q.    And that wasn't done?

25       A.    No.

1    Q.    Okay.  And there is no question in your mind

2   that when Dawn Killien accessed this computer, all she

3   did was move the mouse or touch a key?

4    A.    That is correct.  To wake it up?

5    Q.    Yes, ma'am.

6    A.    All she did was move the mouse.

7    Q.    And then the desktop shows up and she can go

8   anywhere she wants on that computer at that point,

9   right?

10   A.    Yes.

11   Q.    Or unless it's password protected or

12  incripted, correct?

13   A.    That's correct.

14   Q.    And that's not the case in this situation?

15   A.    That's not the case.

16   Q.    You have no evidence that the -- that this

17  computer was locked away in a computer armoire or

18  somewhere that -- that somebody would have had to break

19  in or do anything like that?

20   A.    As to it's physical location, I have no

21  knowledge.

22   Q.    Okay.  So you did find evidence that Dawn

23  Killien -- or do you -- accessed the recycle bin?

24   A.    I don't have any evidence that she recycle --

25  accessed the recycle bin.

1      Q.    You knew that that was one of the allegations,
2  right, or one of the things that she said she did?
3      A.    Yes.
4      Q.    And yet did you not make an attempt to
5  document that, or did you just not find it?
6      A.    Well, my -- my -- my concern, again, was with
7  the first sequence of events.
8      Q.    With wasn't -- wasn't your charge to determine
9  based upon what Dawn Killien said she did on the
10  computer to determine whether she, well, basically was
11  lying or that she did other things on the computer that
12  she did not say she did?  Was that -- was that what you
13  were supposed to do?
14      A.    My -- my job or task, again, was to see if she
15  -- if what she said was consistent with what I found in
16  the computer's records.
17      Q.    Okay.  And one of the critically important
18  things she said to the police and on that chat was that
19  she accessed the recycle bin, right?
20      A.    Yes.
21      Q.    And that's where she found those images of
22  child pornography, those thumbnails, right?
23      A.    Yes.
24      Q.    You don't have any evidence to dispute that
25  she did that?

1     A.   I have no evidence to dispute that.

2     Q.   But it is a significant thing that you were

3 looking for, right?

4     A.   Well, no, basically if she -- if she accessed

5 the recycle bin, she accessed the recycle bin.  The

6 question was --

7     Q.   But if you were supposed to determine whether

8 Dawn Killien did what she said she did and there are

9 really only two or three things that are important with

10 respect to what she did when she woke up the computer,

11 when she accessed the recent documents folder, when she

12 accessed the recycle bin, because those are the things

13 that form the basis of the search warrant.  Weren't

14 those significant enough in your mind that you looked

15 for them?

16     A.   Yes, sir, I -- I did look.

17     Q.   Did you find any evidence on your timeline

18 here that she accessed the recycle bin?

19     A.   No, I did not.

20     Q.   You know that she had to have accessd the

21 recycle bin, right?

22     A.   According to her statement, she accessed the

23 recycle bin.

24     Q.   Well, in her statement to the police she

25 rather decriptively described these were these were the

1  images she found on the recycle bin -- in the recyle

2  bin --

3       A.   Yes.

4       Q.   -- that Mr. Odom downloaded from that recycle

5  bin on that external drive.  So in order to made that

6  description to police then, she had to have been in the

7  recycle bin, right?

8       A.   Yes, it's very possible.

9       Q.   On your timeline where it show that she was in

10 the recycle bin?

11      A.   On my timeline it does not show that she was

12 or was not on the recycle bin.  She could have gone into

13 the recycle bin and viewed those and not altered it.

14 However, she would have gone in and deleted two songs

15 from the recycle bin --

16      Q.   But that's not the question I'm asking.

17           MR. JAMES:  Objection.  Side-bar.

18           THE COURT:  Overruled.

19      Q.   (By Mr. Phelps)  Looking at what I've marked

20 as State's Pretrial Exhibit No. 8.  That is your

21 timeline of -- of Dawn Killien's activity on the

22 computer; is that right?

23      A.   Yes, sir.

24           MR. PHELPS:  Your Honor, at this time I

25 offer State's Exhibit Pretrial No. 8.

1          MR. JAMES:  No objection.

2          THE COURT:  State's 8 is admitted.

3          (State's Exhibit No. 8 admitted

4   into the record.)

5      Q.   (By Mr. Phelps)  It doesn't say anything about

6   access to the recycle bin, does it?

7      A.   No, sir.

8      Q.   Okay.  You -- you do indicate:  9:06 p.m., the

9   computer wakes up, accesses recent folder Boyscout David

10  part 2, etcetera.  9:15 Boys New -- that's that starting

11  up to play that, right; or it's --

12     A.   That's -- that's the folder.  The file is

13  within the folder.

14     Q.   Okay.  So all three -- both of those things

15  occur at 9:15.  So she watches the video at 9:15, right?

16     A.   Yes, sir.

17     Q.   And then at 10:00 p.m., internet activity --

18  or 9:54 internet activity starts?

19     A.   Yes.

20     Q.   It stops at 10:00 p.m.

21     A.   Uh-huh.

22     Q.   Trimmed micro virus scans, what is that?

23     A.   That is just a virus scan that he had on his

24  computer that goes in and looks for viruses.

25     Q.   Does that -- does that do that while you're

1  actually on the computer?

2      A.   Yes, sir.

3      Q.   And then 10:45, 10:53, and 11:15 it's internet

4  activity starts, internet activity stops, internet

5  activity starts; and at 1:14 p.m. internet activity

6  stops and the computer goes to sleep?

7      A.   Yes.

8      Q.   Okay.  And that is your timeline of the

9  significant events according to the event log in the

10  computer?

11      A.   Yes, sir.

12          THE COURT:  Let me interpret just a

13  minute.  I've got a note here that says:  By order of

14  Judge Simms the courthouse will close by 4:00 p.m.

15          MR. PHELPS:  I'm almost done.

16          MR. JAMES:  I'm not.

17          THE COURT:  You're not?

18          MR. JAMES:  I'm not.  I don't know if we

19  want to get through with her.  I've got some more but --

20          MR. PHELPS:  We can shut down now,

21  because I'm sure people have to get our stuff together.

22          THE WITNESS:  I have a long drive.

23          THE COURT:  All right.  Let's get through

24  with this witness, then.

25      Q.   (By Mr. Phelps)  Okay.  So the bottom line is

1    that your timeline of significant stuff on her computer

2    based on what you're supposed to do, doesn't reflect

3    that she accessed the recycle bin?

4         A.    Yes, sir.

5         Q.    Okay.  And -- and there is no question that

6    that's pretty important?  Do you agree with that?

7         A.    Recycle bin is important.

8         Q.    Okay.

9                    THE COURT:  How much again --

10                   MR. PHELPS:  I've probably got 5 or 10

11   minutes top.

12                   MR. JAMES:  Probably 15 minutes, Judge,

13   10 or 15 minutes.

14                   THE COURT:  So we're going to need

15   another --

16                   MR. PHELPS:  20 or 30 minutes?

17                   THE COURT:  Another 30 minutes to

18   complete the hearing?

19                   MR. JAMES:  Of this witness and then

20   we've got more.

21                   THE COURT:  How much more do you got?

22                   MR. JAMES:  I'm going to call Mr. Odem

23   back.

24                   THE COURT:  Just roughly.  I won't hold

25   you to it.

1          MR. JAMES:  30 more minutes, 30 to 45

2    more minutes, Judge.  I've got to put my client on.

3               (Discussion held off the record.)

4          THE COURT:  All right, sir.  We'll shut

5    it down now and come back at 2:30 Friday.

6               (End of proceedings for day.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  THE STATE OF TEXAS          )
2  BRAZOS COUNTY, TEXAS        )

3          I, Susan R. Rainwater, Visiting Court Reporter
4  in and for the 272nd Judicial District Court of Brazos
   County, State of Texas, do hereby certify that the above
5  and foregoing contains a true and correct transcription
   of all requested excerpted portions of evidence and
6  other proceedings as requested to be included in this
   volume of the Reporter's Record, in the above-styled and
7  numbered cause, all of which occurred in open court or
   in chambers and were reported by me.

8

9          I further certify that this Reporter's
   Record of the proceedings truly and correctly reflects
10 the exhibits, if any, admitted by the respective
   parties.

11

12         I further certify that the total cost for
   the preparation of this **expedited** copy of the Reporter's
13 Record is $518.50 and was/will be paid by Mr. Richard
   Wetzel.

14         MY OFFICIAL HAND this the 3rd day of
   December, 2010.
15

16

17

18  *Susan R. Rainwater*
    Susan R. Rainwater, Texas CSR #6561
19  Expiration Date:  December 31, 2010
    3708 East 29th Street, PMB 137
20  Bryan, Texas  77802-3901
    (979) 209-4201

21

22

23

24

25