```
1                   REPORTER'S RECORD
                 VOLUME 3 OF 7 VOLUMES
2
              TRIAL COURT CAUSE NO. 09-02492-CRF
3         APPELLATE COURT CASE NO. 10-10-00297-CRF-272

4   THE STATE OF TEXAS          §  IN THE DISTRICT COURT OF
                                 §
5                                §
    v.                           §  BRAZOS COUNTY, TEXAS
6                                §
                                 §
7   GREGG CARL BAIRD            §  272ND JUDICIAL DISTRICT

8

9

10                                          FILED
                                    TENTH COURT OF APPEALS
11
                                       FEB 0 7 2011
12        - - - - - - - - - - - - - - - - - - - - - - - - -
                                    SHARRI ROESSLER, CLERK
13                   MOTION TO SUPPRESS

14      (SECOND DAY OF TWO-DAY SUPPRESSION HEARING)

15        - - - - - - - - - - - - - - - - - - - - - - - - -
```

RECEIVED

SEP 27 2010

COURT OF APPEALS
WACO, TEXAS

```
19      On the 26th day of February, 2010, the following

20  proceedings came to be heard in the above-entitled and

21  -numbered cause before the Honorable Travis B. Bryan

22  III, Judge presiding, held in Bryan, Brazos County,

23  Texas:

24      Proceedings reported by computerized stenotype

25  shorthand.
```

ORIGINAL

```
 1                     A P P E A R A N C E S

 2   Mr. Shane P. Phelps
     Brazos County District Attorney's Office
 3   SBOT No. 15907530
     300 East 26th Street
 4   Suite 310
     Bryan, Texas 77803
 5   (979) 361-4338
     ATTORNEY FOR THE STATE OF TEXAS
 6
     Mr. Jim W. James III
 7   James & Reynolds
     SBOT No. 10554250
 8   PO Box 1146
     Bryan, Texas 77806-1146
 9   (979) 846-1934
     ATTORNEY FOR THE DEFENDANT
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
             I N D E X
              VOLUME 3
         (MOTION TO SUPPRESS)

                              Page   Vol.
FEBRUARY 26, 2010

DEFENDANT'S WITNESSES  DIRECT    CROSS    VOIR DIRE

ROSE MARIE HUBBARD    N/A      10, 5    N/A          3

WILLIAM ODOM          25, 32   18, 41   22, 53       3

GREGG BAIRD           25, 54    3, 58   N/A          3
                      17, 68   23, 68   N/A          3

DEFENDANT RESTS................................70    3

BOTH SIDES CLOSE..............................70    3

CLOSING ARGUMENTS BY MR. JAMES................70    3
CLOSING ARGUMENTS BY MR. PHELPS...............76    3

COURT'S FINDINGS..............................86    3

ADJOURNMENT...................................86    3

COURT REPORTER'S CERTIFICATE..................87    3


          ALPHABETICAL WITNESS INDEX
              VOLUME ___
         (MOTION TO SUPPRESS)

                     Direct   Cross    Voir Dire   Vol.
Hubbard, Rose Marie  N/A      10, 5    N/A          3

Odom, William        25, 32   18, 41   22, 53       3

Baird, Gregg         25, 54    3, 58   N/A          3
                     17, 68   23, 68   N/A          3
```

```
1                          EXHIBIT INDEX
                           VOLUME 3
2                       (MOTION TO SUPPRESS)

3
     STATE'S
4
     NO.  DESCRIPTION                  OFFERED   ADMITTED   VOL.
5     9   REPRESENTATION OF              44        44        3
          RECYCLE BIN FILES
6
     10   CHART                          53        53        3
7

8    DEFENDANT'S

9    NO.  DESCRIPTION                  OFFERED   ADMITTED   VOL.
      1   COMPUTER SCREEN SHOT           38        38        3
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (Open court, defendant present, no jury,
 3    2:14 PM.)
 4                    THE COURT:  All right.  You are still under
 5    oath.  Go right ahead.
 6                    MR. PHELPS:  May I proceed?
 7                    THE COURT:  Yes, sir.
 8                         ROSE MARIE HUBBARD,
 9    having been first duly sworn, testified as follows:
10                    CROSS-EXAMINATION
11    BY MR. PHELPS:
12         Q.   Hi, Rose.  How are you?
13         A.   I'm doing fine.  Thank you.
14         Q.   I'm sorry.  Would you state your name for the
15    court reporter, please?
16         A.   Yes.  My name is Rose Marie Hubbard.
17    H-U-B-B-A-R-D.
18         Q.   Let me start first of all by asking the last
19    time we were talking when you were testifying was a
20    couple of days ago.  You indicated at that time that you
21    had examined the event logs of the computer; is that
22    right?
23         A.   Yes, sir.
24         Q.   And I think we established, and correct me if
25    I'm wrong, that's all you looked at, correct?
```

February 26, 2010

1        A.    No, sir.  I looked at several computer logs.

2        Q.    Okay.  What kind of computer logs did you look

3   at?

4        A.    I looked at the registry file listings.  I

5   looked at the master file index.

6        Q.    We had introduced it at pretrial Exhibit No. 8.

7   State's Pretrial Exhibit No. 8.  That is your basically

8   listing, I guess, of what happened on this computer

9   according to what you looked at?

10       A.    Yes, sir.  Those are just my notations as to

11  the events.

12       Q.    Is this the only report you generated or --

13       A.    No, sir, that's just what I brought with me to

14  recall the dates and times.

15       Q.    What other notes or reports did you generate?

16       A.    I have an event log with the sleep time and

17  wake time screen shot.

18       Q.    Did you do any kind of a report for Mr. James?

19       A.    No, sir.

20       Q.    Did you, I mean, write him a letter or any

21  e-mails indicating the results of your findings?

22       A.    No, sir.

23       Q.    And is this information in State's Exhibit

24  Pretrial Exhibit No. 8 -- is that based on all of those

25  various things you looked at or just the event logs?

1    A.    The sequence, the time lines, that you have

2 here are from event logs and the master file index as

3 well.

4    Q.    Okay.  And just to refresh the judge's memory,

5 you indicate that the, as I recall your testimony, at

6 5:21 the day before, which would have been May 7th,

7 until 9:06 PM on May 8th the computer was asleep?

8    A.    Till -- yes, sir, May 8th at 9:06 PM.

9    Q.    Is when the -- according to your note -- when

10 the computer wakes you?

11    A.    Yes, sir.

12    Q.    Do you need this in front of you?

13    A.    Yes, sir, I do.  I have the --

14    Q.    Do you have a copy of it in front of you?

15    A.    I do not.

16          MR. PHELPS:  May I approach, your Honor?

17          THE COURT:  You may.

18          MR. PHELPS:  I don't know if we have those

19 exhibits with us?

20          THE COURT:  Yes, I think we may.  Look

21 through those and see.  No, it's not here.

22          MR. PHELPS:  May I?

23          THE COURT:  Yeah.

24    Q.    (BY MR. PHELPS)  This indicates at 9:06 the

25 computer wakes up?

February 26, 2013

```
1       A.   Yes, sir.
2       Q.   And your testimony, I believe, yesterday was
3  that basically from 5:21 the day before till 9:06
4  nothing happened on that computer?  It was asleep the
5  entire time?
6       A.   Yes, sir.  There's a sleep mode with wake up
7  noted.
8       Q.   And the wake up mode was 9:06 PM?
9       A.   Yes, sir.
10      Q.   We talked previously about that something
11  happened at 6:06?
12      A.   Yes, sir.
13      Q.   And that was, according to Mr. Odom, at least
14  consistent with there being a CD put in that computer at
15  that time; do you remember that?
16      A.   I remember you asking me about it.
17      Q.   And is it your opinion that that is not
18  consistent with a CD being put in?
19      A.   It is my opinion that is a CAB file which would
20  not be consistent with --
21      Q.   Okay.  Your opinion is that it is a CAB file
22  that would not be consistent with?
23      A.   Someone inserting a CD to wake up the machine.
24      Q.   Why not?
25      A.   To play a machine, you would have to have some
```

1  type of application to open up the computer, an

2  application to run some type of media such as music.

3  Q.   Okay.  Did you indicate yesterday that you

4  believed that would have been more consistent with the

5  computer being asleep and updating itself?

6  A.   Yes, sir.

7  Q.   Now, if you have an updating like that while

8  the computer is asleep, would you also have a

9  commensurate entry in the computer somewhere something

10 called MC update?

11 A.   There could be updates going on in the

12 background.  That is not an area that I looked into.

13 Q.   But, I mean, I guess my question is:  If the

14 computer is asleep and it does in fact -- that's what

15 explains this 6:06 entry -- update itself, would there

16 be some entry in addition to that called MC update, some

17 indication that was accessed or that it generated

18 something on the commuter with respect to MC update?

19 A.   Again, I don't want to speculate to what I did

20 not look into.  I did see some MC updates in the master

21 file index.  I did not go back to reserve to see what

22 the effect was to CAB file to the MC update.  That was

23 not part of my scope.

24 Q.   If you are correct, however, that at 6:06 this

25 was, in fact, an update such that MC update should have

1   been indicated on the computer, would you have seen that

2   if you had looked?

3       A.   I did see that.  I saw entries to that effect.

4   What I cannot tell you is if it was an update of some

5   sort or what have you.  These entries were in the

6   computer.  They could have happened while there could

7   have been some system processes running in the

8   background, or there could have been some updates

9   running in the background while it's asleep.  I cannot

10  tell you what because that was not my assigned task.  I

11  did not look into that.

12      Q.   I understand that that was not your assigned

13  task.  I'm not asking you that right now.  What I'm

14  asking is your expertise.  If, in fact, that entry at

15  6:06, something happened; do you agree with that?

16      A.   Yes, something happened.  A file was accessed.

17      Q.   If, in fact, the explanation is that while the

18  computer was asleep, the commuter was doing some

19  updating as you testified previously?

20      A.   Possibly, yes.

21      Q.   Would it also at the same time generate some

22  indication on the computer of access to that MC update?

23      A.   There could have been.  Again, I don't know.  I

24  did not delve into that as to what file it was coming

25  from as to what updates.  I can tell you there were some

1  updates made.  There was an MC update, I believe, at

2  0:55.

3      Q.   Let me try one more time.  I'm not asking you

4  what you actually did.  I'm not asking you based on what

5  you did on the computer.  What I'm asking you is you

6  have given an explanation that that 6:06 entry rather

7  being some indication of a CD being put in was an update

8  while the computer slept.  Do you agree with that?

9      A.   I'm sorry?

10     Q.   Do you agree that's what you said?

11     A.   It's possible it was done.

12     Q.   Did you not testify previously that you believe

13 it was an update?

14     A.   I believe it's possible, yes.

15     Q.   Okay.  Okay.  Now, I'm asking you just globally

16 in your experience as a forensic computer expert if

17 that, in fact, was the computer updating itself while it

18 was in sleep mode would there be some indication on the

19 computer that you could look at for that time to see if

20 MC update reference?

21     A.   There could possibly be an MC update reference.

22     Q.   So are you saying it could update itself and

23 not have that reference?

24     A.   I would think it would tie back to reference.

25 Again, I'm not an expert in Microsoft updates.

1      Q.   Okay.  Okay.  I want to talk to you just

2  briefly about the times on the computer.  And on your

3  time line, you have given a number of times 9:06 PM,

4  9:15, and so on through 1:41 AM.  And I presume the

5  thrust of this is that nothing happened on this computer

6  before 9:06; is that correct?

7      A.   What I'm referring to is just user activity.

8      Q.   Okay.

9      A.   A lot of activity occurred prior to that but

10 not -- my point is from user activity when was that

11 machine powered up and what happened after that.

12     Q.   Well, I guess what I want to try and see if we

13 can clear up is we've had a lot of conversations about

14 times.  Is it possible for a computer -- computers have

15 an internal clock, right?

16     A.   Yes, sir.

17     Q.   And the time that it shows and the time it

18 registered stuff on like the event log, such is

19 dependent on how that computer internal clock is set; is

20 that correct?

21     A.   Yes, sir.

22     Q.   I can go into a commuter, and I can set that

23 for Central Time.  I can set it to Pacific Standard

24 Time.  I can set it for Hong Kong time if I wanted to,

25 right?

```
 1        A.   Yes, sir.
 2        Q.   And then that computer when you look at the
 3   event logs would be recording that time, not the time
 4   where the commuter physically is?
 5        A.   The event log is going to register the machine
 6   time.  Is that what you're asking me?
 7        Q.   Yes.
 8        A.   Yes.
 9        Q.   And that machine time is dependent on whatever
10   you set it at?
11        A.   Yes, whatever the machine is set at.
12        Q.   I can go into my computer, my PC, go to the
13   internal clock, set it for California time?
14        A.   Yes, sir.
15        Q.   Then anything I do on it, the event log is
16   going to register that happened according to California
17   time?
18        A.   Yes, sir.
19        Q.   Did you look to see what particular -- how this
20   clock, particular computer was set?
21        A.   Yes, sir.
22        Q.   And how was it set?
23        A.   It was set for Central Time, Central Standard
24   Time.
25        Q.   How did you check that off?
```

1       A.   Through the registry.

2       Q.   Did you ever look to see what the internal

3   clock said and compared it to the actual time then?

4       A.   The data registry just tells you which time

5   that it is, and I can go by what I see at that time.

6       Q.   Okay.

7       A.   It also shows in the event log the consistency

8   with the MFT, the master file index, and so on.  That's

9   how I determined the machine time.

10      Q.   Is it possible that the times here on your time

11  line -- the one that says 9:06 PM -- it actually could

12  have been 8:06 PM?

13      A.   Yes, sir.

14      Q.   Is that the fact you found?

15      A.   No, sir.

16      Q.   I mean, would it surprise you that both

17  Investigator McCune --

18              MR. JAMES:  Objection.  That's stating

19  facts not in evidence.

20              THE COURT:  Sustained.

21              MR. PHELPS:  Rules of evidence do not

22  apply.  And I can give her facts and ask her to give her

23  opinion based upon those facts.  Also even if --

24              THE COURT:  You asked her hypothetical

25  question.

1          MR. PHELPS:  Even if the rules of evidence

2    did apply, I think I am certainly entitled to ask a

3    question that is conditionally relevant upon the

4    testimony of people who come up and testify.

5          MR. JAMES:  Judge, I don't have a problem

6    him asking her a hypothetical; but to say if they say

7    this when there's no evidence of that, that's what I'm

8    objecting to.  He can ask her hypothetical.

9          THE COURT:  I will sustain that objection.

10   Q.   (BY MR. PHELPS)  But it's possible that these

11   times here could be an hour ahead?

12   A.   Yes, sir, it's possible that times could be

13   off.

14   Q.   And we're also looking at times on that chat

15   log, right?

16   A.   Yes, sir.

17   Q.   And do you know where that chat log was housed

18   at that particular Web site?

19   A.   No, sir.

20          MR. PHELPS:  May I approach, your Honor?

21          THE COURT:  Yes, sir.

22   Q.   (BY MR. PHELPS)  You're familiar you can look

23   up on the Internet, find IP addresses for Web sites?

24   A.   Yes, sir.

25   Q.   Then you can find out where that IP address is

February 26, 2010

1    actually then housed or headquartered; are you familiar
2    with that?
3          A.    Basically somewhat, yes.
4          Q.    You have done that before, have you not?
5          A.    I have got gone in and looked at Web sites but
6    not necessarily going into IP addresses.
7          Q.    Just looking at this document, this Web site
8    mpwh.net gives an IP address, does it not?
9          A.    Yes, sir, it does.
10         Q.    That IP address, that same one, is for where?
11         A.    It says New York.
12         Q.    And New York is an hour ahead of us, right?
13         A.    Yes, sir, it is.
14         Q.    So just so we are clear, at least it looks like
15   the times that are listed on this chat log are probably
16   an hour ahead of our time?
17         A.    That could -- yes, that could possibly be.
18         Q.    And the computer itself could be an hour ahead
19   of our time?
20         A.    Yes, sir, there's a lot of variables.
21         Q.    And oftentimes when you see times on computers,
22   computers can be off two or three minutes.  One can say
23   8:53, and another can show 8:50.  That doesn't mean
24   they're inconsistent, does it, necessarily?
25         A.    That's correct.  It can be off an hour or an

1  hour and two minutes.  There's variables.

2      Q.  One thing, however, we did determine is that

3  the chat that you reviewed, right?

4      A.  I just perused it.  Again, that fell outside my

5  assigned task.

6      Q.  According to your time line, the video itself

7  was accessed at 9:15 PM?

8      A.  Yes, sir.

9      Q.  And the chat entry regarding that video by

10  Ms. Killian where it says, "Okay, I opened one video.

11  It confirms child porn," was at 9:14 PM, right?

12      A.  Yes, sir.

13      Q.  So at least it looks as though the times that

14  are on -- at least with respect to that particular

15  transaction --

16      A.  I'm sorry?

17      Q.  At least with respect to that particular

18  transaction, the time that she posted it, her comment,

19  is the same time that she actually accessed that video?

20      A.  No, sir.  I'd have to disagree with you.

21      Q.  How so?

22      A.  Because, like I stated on Tuesday, I cannot

23  testify to the times from those servers.  I can only

24  testify to machine time.

25      Q.  Okay.  Well, I have just shown you that the

```
 1   server is located Albany, New York, which is an hour

 2   ahead?

 3        A.   Yes, sir.

 4        Q.   But put that aside for a second.  If the chat

 5   says 9:14 --

 6        A.   Yes, sir.

 7        Q.   -- and your own examination on the computer

 8   shows that she looked at that video at 9:15 --

 9        A.   Yes, sir.

10        Q.   -- that's pretty consistent, isn't it?

11        A.   If you're going to separate the server times,

12   the server times probably remain consistent; but if you

13   look at the computer's time, what time did that entry

14   come into that computer, that computer will note the

15   date and the time.  So you don't depend on one.  You

16   depend on both to make that determination, which is what

17   I did.  I did not rely on one time.

18        Q.   Which time?

19        A.   Because there are so many variables.  As you

20   said, there could be.  Could come from New York.  That's

21   an hour ahead.  We're Texas.  We're Central.  An hour

22   behind.  The server could have been off two or

23   three minutes.  The machine could have been off two or

24   three minutes.

25                  So I don't look at one log.  I look at
```

1  several.  And I see at what time this entry, the chat

2  log that you refer to, comes into the machine.  The

3  machine notes that time.  That's the time that I go

4  with.

5       Q.   Okay.  But --

6       A.   Does that make sense?

7       Q.   According to the machine, she accessed that one

8  video at 9:15?

9       A.   Yes, sir.

10      Q.   According to the chat, she says, "I opened one

11 video.  It showed confirmed child porn."  That happened

12 at 9:14.

13      A.   Yes, sir, I understand.

14      Q.   Does that indicate we have got some consistency

15 between these in terms of time?

16      A.   Again, I have to answer it, if you're looking

17 at the server time versus the machine time, the machine

18 time when this entry that you refer to, this chat log,

19 when it comes in it is noted on the machine.  That

20 machine time is noted on that little sheet that you

21 have.

22      Q.   Okay.  So I mean the thrust of what you're

23 telling me is there are so many variables you can't tell

24 me?

25      A.   No, sir.  I can tell you -- I can tell you

February 26, 2010

```
 1   definitively what time that entry came into that
 2   machine.
 3        Q.   Well, no, you can't.  Did you just testify that
 4   that entry about her opening that video -- does it not
 5   say on this 9:15, right?
 6        A.   Yes, sir, it was opened on that machine at
 7   9:15.
 8        Q.   So what you're saying is that the computer
 9   reflects 9:15?  You're not saying that's the exact --
10   that's the time, in fact, that that occurred?  Do you
11   understand what I'm asking?
12        A.   I believe so.  If you're asking me what time
13   that file, that ABI file, was opened, 9:15 PM, if you're
14   asking me what time the chat log was introduced into
15   that computer -- the server over here in New York may
16   say 8:42.  His, when it comes across onto his machine,
17   it's going to register.  The computer is going to put a
18   time on there.  It's going to state 9:42.  It's the same
19   file.  But New York has it at 8:42.  His machine has it
20   at 9:42.  That is the log I go by.  I don't care about
21   New York, Singapore, Australia.  I care what comes in on
22   that machine at that time.
23        Q.   But, again, that's not my question.
24        A.   Okay.  I'm sorry.
25        Q.   A moment ago you said you could definitively
```

February 26, 2010

1   state that it happened at 9:15 when this entry is.

2   That's when the machine says this happened, right?

3       A.   That video file was opened up.

4       Q.   There is a difference between what the machine

5   says in some circumstances and what actually is the

6   case; would you agree with me?

7       A.   No, I would not.  If the log says that an entry

8   was made at that time, that entry was made.  I am there

9   to read that --

10      Q.   Okay.  If I am on this computer --

11      A.   Yes.

12      Q.   -- I access this video according to the

13  machine.

14      A.   Yes.

15      Q.   And machine's clock at 9:15.  That's what the

16  machine says.

17      A.   Yes.

18      Q.   Is it possible that I could look at my clock,

19  my watch --

20      A.   Yes.

21      Q.   -- and it say 8:15 Texas time?

22      A.   That is possible.

23      Q.   Okay.  So it is not -- you cannot say

24  definitely.  That's kind of the point of my question.

25  You cannot say definitively the times that these things

February 26, 2010

1   happen?  Only the time that the computer says they

2   happened?

3       A.   That is correct, at the time that the computer

4   says it happened.  And then we also look at the master

5   file index to see the sequence of events, and the

6   sequence of events are consistent with those times,

7   those date and times.  So one could not have happened

8   before the other.

9       Q.   I understand that.  Relative to the machine's

10  internal clock?

11      A.   Plus the sequence of events.  The natural order

12  reflects the sequence of events that occurred from 9:06

13  PM until that chat log was put on that -- till it came

14  in or was introduced into that computer.

15      Q.   Is there --  and, again, that's not the

16  question I'm asking.  But just so that we're clear, I

17  understand that you're saying that the computer's

18  internal clock is going to be consistent with respect to

19  its own clock, right?

20      A.   Yes.

21      Q.   That doesn't mean it's necessarily consistent

22  with the actual time on my wrist, right?

23      A.   That is correct.

24      Q.   Okay.  And in this case did you, in fact, find

25  that the internal clock of this computer was one hour

February 26, 2010

```
 1   ahead of the time that it actually -- that it actually
 2   was?
 3        A.   No, I did not.
 4        Q.   Did you check?
 5        A.   No, I did not.
 6        Q.   All right.  With respect to the things that
 7   Dawn Killian said she did on the computer, we know she
 8   accessed one video; is that correct?
 9        A.   One video.  That's correct.
10        Q.   No evidence she accessed any other videos?
11        A.   No.
12        Q.   Because no evidence that she accessed any other
13   files other than the recent document file and maybe she
14   went in the recycle bin?
15        A.   That's correct.
16        Q.   She's not deep in the computer fishing around
17   Mr. Baird's stuff, is she?
18        A.   Not that I could see, no.
19        Q.   In fact, in order to get to the recent
20   documents on a computer -- what operating system was
21   this?
22        A.   This is going to be Vista Home Premium.
23        Q.   On Vista Home Premium to get to the recent
24   documents folder, you click on the start button on the
25   lower left-hand corner, right?
```

 1      A.   Yes, sir.

 2      Q.   And then you move up to recent documents.  As

 3  you mouse up and the mouse arrow hits that, it actually

 4  springs out what's in there, right?

 5      A.   Yes, sir, it creates a little pop-up window.

 6      Q.   You don't even have to click again?

 7      A.   No.

 8      Q.   So one click, mouse up, and there's the file?

 9      A.   Yes, sir.

10      Q.   And that's pretty superficial; would you agree

11  with that?

12      A.   That's average, yes.  Nothing -- no other steps

13  are needed to be taken, if that's what you're asking me.

14      Q.   No evidence that you found, and this would be

15  definitive, that Dawn Killian ever went into my

16  computer, explored Mr. Baird's files, opened any file

17  folders, right?

18      A.   The only -- that's correct.  The only file that

19  was accessed was the one --

20      Q.   Was the one video?

21      A.   Yes.

22      Q.   And you don't find any evidence that she went

23  into the recycle bin, but that doesn't mean she didn't;

24  do you agree with that?

25      A.   Yes.

February 26, 2010

1     Q.    In fact, to get to the recycle bin on Windows
2   Vista, all you have to do is click the trash can?
3     A.    Yes, you click.
4     Q.    When you click that trash can, it's going to
5   give you recycle of the trash on the hard drive, the
6   resident hard drive of the computer, but also any
7   external it's hooked up to?
8     A.    That's correct.
9     Q.    So when Dawn Killian goes into recycle bin, all
10  she has to do is one click?
11    A.    Correct.
12    Q.    She could see what's in the recycle bin?
13    A.    Well, she can do one double click to open or
14  one right click to open technically.  But, yes, in
15  general one click.
16    Q.    They're very easy to get into?
17    A.    Very easy.
18    Q.    Not hidden in any way from a user?
19    A.    No, sir.
20    Q.    In fact, it's intended to be as simple as
21  possible for somebody just looking at the desktop?
22    A.    Yes, sir.
23    Q.    Now, you have indicated according to your time
24  line that there was no Internet activity that began at
25  -- before 9:54 PM; is that right?

February 26, 2010

```
 1        A.   Yes, sir.  Again, you have the time line.

 2        Q.   Now, we do know that there is a rather

 3   extensive chat, correct?

 4        A.   Yes, sir.

 5        Q.   And in order to do those chats, you have to get

 6   on the computer, right?

 7        A.   You can use a computer.  You can use a cell

 8   phone.  There's various ways of getting onto.

 9        Q.   Can I use one of those?

10        A.   You could.

11        Q.   My iPhone?

12        A.   Yes, sir.

13        Q.   I could get on this iPhone right now.  Access

14   mpwh.net, if I was a member.  Start a chat thread.

15   Enter a post.

16        A.   Yes, sir.

17        Q.   And then monitor those posts.  Respond to other

18   posts.  Would you agree with that?

19        A.   Yes, sir.

20        Q.   So prior to 9:54 if there was no Internet

21   activity on that computer, Mr. Baird's computer, that

22   doesn't mean that Dawn Killian wasn't on her iPhone?

23        A.   I cannot say one way or another if she was on

24   her iPhone or not.

25        Q.   We know she was on some computer, don't we?
```

1       A.   Yes, sir.

2       Q.   Because there is no Internet activity before

3   that access of that video, right?

4       A.   Before that, no.

5       Q.   And at least according to the chat, quite a bit

6   of stuff happened before she got on and said, "I opened

7   one video and confirmed child porn."

8       A.   Yes, sir.

9       Q.   And the chat, obviously, was started before

10  that?

11      A.   The chat was started before what?  Because it

12  was not started before the video was played, not onto

13  that computer.

14      Q.   Aha.  Not on that computer?

15      A.   That's correct.

16      Q.   But it was started before that happened?

17  Before that entry?

18      A.   No, sir.

19           MR. PHELPS:  May I approach, your Honor?

20           THE COURT:  Yes, sir.

21      Q.   (BY MR. PHELPS)  I want you to explain to me

22  then how she could be on at this point in the chat and

23  not be on a computer before when she starts the computer

24  or starts the thread.

25      A.   For example, this could have been on -- this

February 26, 2010

1    thread could have started on the computer.  This thread

2    whichever page it was -- I apologize.

3         Q.   This is all one thread.

4         A.   It could have been on the iPhone.

5         Q.   Okay.

6         A.   Or whatever device.

7         Q.   But your statement a moment ago -- I think

8    we're just missing each other here.  Your statement a

9    moment ago is that thread could not have started before

10   she accessed that video?

11        A.   I'm saying --

12        Q.   That is what you said a minute ago?

13        A.   Okay.

14        Q.   Let me just make the statement, and you agree

15   with this.  I think what you intended to say, or I

16   misunderstood you, was she could not have started that

17   thread on that computer before she accessed that video.

18   Is that what you're saying?

19        A.   I can testify to any of the -- the files that

20   came in on this computer according to the master file

21   index is registered.  I can state with certainty that

22   that particular file that came in on that computer

23   occurred at a certain time.  It happens to match the log

24   that he has presented to the court.  The same verbiage.

25        Q.   Okay.  Again, I apologize if I'm not making

1   myself clear.  All I want to establish, the only

2   concession I want from you, is that there was a chat

3   thread, right?

4       A.   There was.

5       Q.   At some point in that chat thread she says, "I

6   opened one video.  It confirms child porn."  Right?

7       A.   Yes, sir.

8       Q.   Would you agree with me that all of the entries

9   on that chat thread before that had to have occurred

10  before she posted that?

11      A.   Before she -- that's where I'm losing you.

12  Before she posted what?

13      Q.   "I opened one video."

14      A.   Oh, if you're asking my opinion if this event

15  occurred before she posted that, yes, it could have

16  occurred at that time.

17      Q.   All of the previous postings in that thread

18  happened before?

19      A.   I disagree with you on the time that those

20  threads were posted or came -- were introduced into this

21  computer.

22      Q.   Okay.  Again, that's not my question.

23      A.   Okay.

24      Q.   Just looking at the thread itself, if she makes

25  a post mid-thread, that means the post before it

1    happened before.  Yes or no?

2        A.   It could have.  Again --

3        Q.   How could it be generated before and she could

4    go into the middle of a chat thread and there's nothing

5    there and she responds to other threads?  All I'm asking

6    is if you have a chat thread and you have something in

7    the middle of it, then that means the stuff that

8    happened before in that chat thread in time happened

9    before she posted?

10                MR. JAMES:  Judge I just want to make sure.

11   I think they're doing like this.  Are you asking,

12   Mr. Phelps, that the earlier thread, the earlier chat,

13   occurred before what is in the middle of the --

14                MR. PHELPS:  Yes.

15                MR. JAMES:  Okay.  I think they're having

16   one of these, Judge.  Do you understand the question?

17                THE WITNESS:  Yes.  And I can't answer if

18   it occurred in the middle of it or not.

19                MR. JAMES:  It occurred.  He's talking

20   about the thread.  The earlier posts occurred before the

21   middle post.

22                THE WITNESS:  Yes.  Okay.

23                MR. JAMES:  That's it.

24       Q.   (BY MR. PHELPS)  And all I would kind of like

25   us to agree on is that just because there doesn't appear

 1     anything in your opinion on that computer before 9:54

 2     doesn't mean that Dawn Killian started that thread

 3     prior?

 4          A.   She may have.

 5          Q.   In fact, she has to have, right?

 6          A.   No, sir.  Again, because of the time variations

 7     that we discussed previously.

 8          Q.   And the time variation being that she posted

 9     this at 8:42 PM Albany time, which is an hour ahead, and

10     the computer internal clock was an hour ahead of our

11     time.  Are those the variations you're talking about?

12          A.   If you put those conditions in place, that

13     could be possible.

14          Q.   All right.  But you don't have any argument at

15     all that Dawn Killian could have gotten on iPhone or

16     different phone?  In fact, she must have to start this

17     thread because it did start on that computer?

18          A.   I can't testify to anything she did with the

19     iPhone or any other device with that log.

20          Q.   You don't have any argument -- and I'm going to

21     make this as simple as I can --

22               MR. JAMES:  Objection.  Sidebar.

23               MR. PHELPS:  I'm trying to make this as

24     quick and concise as I can, your Honor.

25               THE COURT:  Go ahead.

February 26, 2010

```
1          MR. PHELPS:  I think I have right to do
2  that.
3      Q.  (BY MR. PHELPS)  I can start a chat on one
4  computer and continue it later on another.  Do you
5  agree?  Yes or no?
6      A.  Yes, I agree.
7      Q.  Thank you.  Thank you.  And, again, you saw no
8  evidence at all on this computer that would suggest from
9  the computer that Dawn Killian did not have consent to
10 be on that computer?
11     A.  I have no way of knowing if she had consent or
12 not to get on computer.
13     Q.  Well, you do know there were no passwords?
14     A.  That is correct.
15     Q.  You do know there was no inscription?
16     A.  That's correct.
17          MR. PHELPS:  All right.  I pass the
18 witness, your Honor.
19          MR. JAMES:  Call Bill Odom.
20          THE COURT:  You may step down.
21          Mr. Odom is still under oath; is that
22 right?
23              WILLIAM ODOM,
24 having been first duly sworn, testified as follows:
25              DIRECT EXAMINATION
```

February 26, 2013

```
 1   BY MR. JAMES:
 2        Q.   Mr. Odom, you and I visited the other day?
 3        A.   Yes, sir.
 4        Q.   And I made a mistake, I guess.  I asked you
 5   when you click that -- what do you call it?  It's not
 6   the recent folder.  What is it?  It's what you have
 7   gotten through with.  You have deleted items.
 8        A.   The recycle bin.
 9        Q.   The recycle bin?
10        A.   Yes, sir.
11        Q.   I asked you, I said, "Well, that wouldn't show
12   pop-ups.  That would show words."  You remember me
13   asking you that?
14        A.   I do recall that.
15        Q.   You said, "No, not necessarily."  Do you
16   remember saying that?
17        A.   Yes, sir.
18        Q.   That depends on the view which way it is set,
19   correct?
20        A.   That's correct.  Yes, sir.
21        Q.   That's correct?
22        A.   Yes, sir.
23        Q.   And you read -- we've talked a lot about the
24   chat here, haven't we?
25        A.   Yes, we have.
```

February 26, 2010

1      Q.   And you read through that, didn't you?

2      A.   I did.

3      Q.   It's at a different place.  These are -- is

4  this the same thing?  Just so we're clear, this is the

5  same thing?  It's just in a different format?

6      A.   May I see that?

7      Q.   Sure.

8      A.   From what I see here, it appears to be the

9  same.

10      Q.   Now, where are we?  This has the times on it?

11      A.   Yes, sir.

12      Q.   9:03.  Where would 9:03 be on that one?

13      A.   It would be -- there's an entry for 9:03.

14           MR. PHELPS:  May I see what you're looking

15  at?

16           MR. JAMES:  Yeah.

17           MR. PHELPS:  You're just talking about --

18           MR. JAMES:  Yeah.

19      Q.   (BY MR. JAMES)  So it can either show pop-ups,

20  or it can show words or descriptions depending on how

21  the view is set, correct?

22      A.   I would agree with that, yes.

23      Q.   And you read everything Ms. Killian said,

24  right?

25      A.   I did read through that, yes.

February 26, 2010

1   Q.   And there was something very important in
2  there.  And you didn't mention this in our discussion
3  earlier.  She says, "I am not sure what the legal
4  descriptions are for child porn.  But I did open the
5  folder and flip it to the thumbnail view."
6   A.   Yes, sir.
7   Q.   So, apparently, while Mr. Phelps has been
8  talking about, well, it's just showed up automatically.
9  It showed up after she knew to go to view and change the
10 computer setting from descriptive words to the
11 thumbnail, correct?
12  A.   I'm sorry.  Can you repeat that just to make
13 sure I'm clear?
14  Q.   Okay.  Mr. Phelps made a while ago, well, it's
15 just real easy.  Just click, click.  There you are.
16 Doesn't take any real knowledge.  She only was able to
17 see those thumbnails after she changed the view setting
18 on the computer from words to images, pop-ups?
19  A.   Well, certainly would have to have -- the
20 settings would have to be set for thumbnail view
21 settings.
22  Q.   Well, that's what she says she did.
23  A.   I understand.
24  Q.   "I'm not sure what the legal descriptions are
25 for child porn, but I did open the folder and flip it to

February 26, 2010

36

```
 1   the thumbnail view."  She changed the settings on the
 2   computer so she could see those images, didn't she?
 3       A.   I can't speak to what she did or didn't do.
 4       Q.   That's what she says she did?
 5       A.   I agree with that, yes.
 6       Q.   Did you know that before I just pointed that
 7   out?
 8       A.   I had read through that.
 9       Q.   You didn't mention it in your testimony that
10   she flipped the thumbnail view.  You didn't mention that
11   the other day?
12       A.   No, sir, I wasn't asked that.  I didn't mention
13   it.
14       Q.   You knew it was important.  You knew it was
15   important, didn't you?
16       A.   Is that a question?
17       Q.   Yes.
18       A.   I think it's consistent with usage.
19       Q.   Did you know it was important?
20       A.   Important in what sense?
21       Q.   Mr. Phelps talked a lot about the server.  The
22   server isn't necessarily hosted in the locale where the
23   Web site is, is it?
24       A.   Which server are we speaking about?
25       Q.   Any server, Mr. Odom.  Any server.  Whether
```

February 26, 2010

1   it's this chat room, another chat room.  If a company is

2   located in one place, you don't know where the server is

3   located, do you?

4       A.   Well, the server and the company can be located

5   in two different places.  That's true.

6       Q.   And on this server you don't know -- excuse me.

7   The server on this chat room you don't know where it's

8   located, do you?

9       A.   Yes, I believe it's located in Albany, New

10  York.

11      Q.   You know the server is located there?

12      A.   Yes, sir, I believe that.

13      Q.   Do you believe it -- did you check to see where

14  the server -- we are not talking about where the company

15  is located.

16      A.   Yes, sir, I understand the question.  Based on

17  the information that Mr. Phelps actually presented

18  earlier with the IP lookup, that is, in fact, where the

19  server should be located.

20      Q.   You know all of this we talked about -- you

21  told us under oath the other day that that video was

22  accessed at 9:15, didn't you?

23      A.   Yes, sir.

24      Q.   Mr. Phelps has made a major deal about what

25  time that video was accessed.  Is it still your

February 26, 2010

1   testimony that that video was accessed at 9:15?

2       A.   9:15 based on the computer's internal clock.

3       Q.   Tell us about the -- I mean, all of this --

4   well, I'll get there.  Show you what's been marked as

5   Defendant's Exhibit 1.  Can you tell us what that is,

6   please?

7       A.   This looks to be a screen shot or some

8   graphical representation of what would appear to be an

9   event that occurred at -- on -- or sorry -- May 8th,

10  2009, at 9:06 PM.

11      Q.   And does it indicate that the machine had gone

12  -- was asleep?  And this is UTC time up here, right?

13      A.   Correct.

14      Q.   This would be machine time, right?

15      A.   I would agree with that, yes.

16      Q.   And this shows that the first time that the

17  machine was awakened was on May the 8th at 9:06 and

18  43 seconds, correct?

19      A.   Correct.

20          MR. JAMES:  We offer Defendant's Exhibit 1,

21  your Honor.

22          THE COURT:  Defendant's Exhibit 1 is

23  admitted.

24      Q.   (BY MR. JAMES)  Did you ever check the system

25  event log to see when the computer was opened or when it

February 26, 2010

```
 1   was awakened and when it went to sleep?
 2       A.  Yes, sir.
 3       Q.  What did you find -- that was the system event
 4   log, correct?
 5       A.  Well, that appears to be the one that I looked
 6   at as well, yes, or similar.
 7       Q.  And does it indicate it went to sleep at what
 8   would be on May the 7th and was awakened at 9:06?
 9       A.  On May the 8th.
10       Q.  Yes.
11       A.  Yes, I would agree that was the entry in the
12   log.
13       Q.  You knew that yesterday?
14       A.  Yes, sir.
15       Q.  And you didn't volunteer that information
16   either yesterday, did you?  I said yesterday.  I'm
17   talking about the last time we had a hearing.
18       A.  I understand.  I'm not sure that --
19       Q.  You weren't asked?
20       A.  No, sir.
21       Q.  Did you think it was important?  You knew it
22   was important, didn't you?
23       A.  Again, I would ask how you define what's
24   important?  Important in what respect?
25       Q.  Let me ask you something.  You answered under
```

1   oath -- and you know all this really is smoke and

2   mirrors.  But what is really important, you were asked

3   under oath if there was any indication that music was in

4   any way dragged onto that computer.  And you said no.

5   Is that still your testimony?

6        A.   Yes, sir.

7        Q.   That is really what all this is about.  Was

8   there music put onto that computer?  Your answer is no.

9   Was there music deleted off of that computer that night?

10       A.   Which night?

11       Q.   May 8th.

12       A.   There's no indication that I was able to find

13  of that.

14       Q.   So all this other stuff that we've been talking

15  about -- if Dawn Killian said that she dragged music

16  onto that computer, that's just not correct.  There's no

17  evidence of that, is there, at all?

18       A.   That she dragged music onto that computer?

19       Q.   Yes, sir.

20       A.   I have not been able to find evidence of that.

21  That's correct.

22       Q.   You knew that was important when Mr. Phelps was

23  asking you that the other day and you didn't volunteer

24  that information either, did you, Mr. Odom?

25       A.   Again, which question are we speaking to

 1  specifically?

 2      Q.   Did you ever volunteer when Mr. Phelps in the

 3  pursuit of justice was asking you questions?  Did you --

 4           MR. PHELPS:  Your Honor, I'm going to

 5  object to obvious sidebar and --

 6           MR. JAMES:  Your Honor, he's been

 7  "sidebarring" this whole hearing.

 8           MR. PHELPS:  This is argumentive.  He's

 9  asking him questions that, I think, are improper with

10  given his scope.

11           THE COURT:  Overruled.

12      Q.   (BY MR. JAMES)  Did you ever volunteer that

13  information during Mr. Phelps' direct exam?

14      A.   No, sir.

15           MR. JAMES:  One moment, sir.

16           THE COURT:  Yes, sir.

17           MR. JAMES:  Pass the witness.

18                 CROSS-EXAMINATION

19  BY MR. PHELPS:

20      Q.   Mr. Odom, did you check Mr. Baird's computer to

21  find out whether the internal clock was consistent with

22  the actual time?

23      A.   Yes, I did.

24      Q.   And what's the result?

25      A.   That the clock is actually an hour off from

1   actual time.   It's an hour ahead.

2      Q.   So if the internal clock says 9:15, the actual

3   Texas time that it occurred would have been 8:15?

4      A.   That's correct.

5      Q.   And in your opinion based on the IP address

6   location, the IP address for this Web site mpwh.net is

7   Albany?

8      A.   That's my opinion.

9      Q.   If you know, are they an hour ahead of us?

10      A.   I understand Albany is an hour ahead, yes.

11      Q.   So there's some correlation between the times

12   on this chat and the time on the computer clock?

13      A.   The internal computer clock, yes, they're

14   consistent.

15      Q.   And both those are an hour ahead?

16      A.   That would be correct.

17      Q.   And with respect to what Mr. James was talking

18   to you about the gallery view, I want to make sure that

19   --

20            MR. PHELPS:   May I approach the board, your

21   Honor?

22            THE COURT:   Yes, sir.

23      Q.   (BY MR. PHELPS)   Just a couple of things I want

24   to establish.   First of all, if I am looking at that

25   recycle bin, am I just looking at a screen?   And correct

1   me if I'm wrong, but are there usually little buttons up

2   here that are like -- be like lines.  Then something

3   else be will be -- so if you push this button, it's

4   text.  If you push this button, it's what they call

5   gallery view so you see the thumbnails.

6       A.   Yes.  It's similar to that.  It's actually one

7   button that allows you to click, and it changes the type

8   of view.

9       Q.   Okay.  So it just toggles?

10      A.   Effectively, yes.

11      Q.   So if I get rid of this, does it take one click

12  to get into the recycle bin?

13      A.   Yes, sir.

14      Q.   That's the trash can on the --

15      A.   Trash can icon that would be on the desktop.

16      Q.   And then depending on how that toggle is set,

17  when I go in there, I can see lines of text; is that

18  right?

19      A.   That's one option, yes.

20      Q.   And if the computer is toggled to that, that's

21  what you are going to see, right?

22      A.   That's correct.

23      Q.   When I asked you about this initially, did you

24  or somebody in our office generate if it had been text

25  mode what the spreadsheet of those documents?

1       A.   I'm sorry.  Can you repeat that question?

2       Q.   Terrible question.  I'm sorry.  Do you

3    recognize that?

4       A.   Yes, this is a representation of the files that

5    were in the -- that are in the recycle bin.

6       Q.   So if you were to click on this button for text

7    or the recycle bin and it was set that way, you would

8    see these files in that form roughly?

9       A.   Roughly, yes.  Not exactly.  But close.

10      Q.   But you could read the file names?

11      A.   Correct.

12              MR. PHELPS:  Your Honor, I'll offer State's

13   Exhibit 9.

14              MR. JAMES:  No objection.

15              THE COURT:  Nine is admitted.

16      Q.   (BY MR. PHELPS)  Now, there are a number of

17   files here.  File names are on the left.  So if you were

18   to just pop this up and it was in this mode, would you

19   be able to read "10-year-old boy with 17-year-old

20   boyfriend"?

21      A.   Yes, you would.

22      Q.   Would you be able to read "Boy Scout David part

23   three"?

24      A.   Yes.

25      Q.   "Ten-year-old boy."  That's part two of that

February 26, 2010

```
 1   other one.  I'm not going to go through all of them, but

 2   there are a number of obviously suspicious titles, are

 3   there not?

 4        A.   Yes, I would have to agree with that.

 5        Q.   And by obviously suspicious, I mean potentially

 6   child pornography?

 7        A.   Yes, sir.

 8        Q.   So somebody who, if the computer was in this

 9   mode, just clicked on that recycle bin, they would be

10   able to read those files like that?

11        A.   By name, yes.

12        Q.   If they clicked on this button to toggle it,

13   would it turn it into gallery view showing thumbnails?

14        A.   That's also another option.

15        Q.   That's not the same as opening a folder, is it?

16        A.   No, sir.  The folder is already open.

17        Q.   And the folder is the recycle bin?

18        A.   Right.

19        Q.   So to get to here, you click one time.  Well,

20   there's a trash -- it's usually over there, is it not?

21   I don't know what it looks like, but usually a trash bin

22   can icon in the corner.  You click on that.  You go

23   here, right?

24        A.   Yes, sir.

25        Q.   Potentially, depending on how it's toggled, you
```

February 26, 2010

```
 1    can either see this listing of names or you can see some

 2    names, right?

 3        A.   Right.

 4        Q.   Most -- well, if you see the text, all you have

 5    to do is toggle it.  It turns into the thumbnails,

 6    correct?

 7        A.   Correct.  That is one of the option.

 8        Q.   Would you see thumbnails without having to open

 9    up some other file somewhere else?

10        A.   Yes.

11        Q.   So when Dawn Killian -- Mr. James asked you

12    about that -- talked in that chat about opening a

13    folder, she wouldn't have to open a folder other than

14    the recycle bin to look at those thumbnails, would she?

15        A.   That's correct.

16        Q.   And, in fact, there are files here, these

17    images that we've marked, that are -- that she described

18    to the police department and they put in their search

19    warrant affidavit.  Do you recall that?

20        A.   Yes, I do.

21        Q.   And you've looked at those?

22        A.   Yes, I have.

23        Q.   And those are in here, are they not?

24        A.   Yes, they are.

25        Q.   So when we're talking about time lines, if the
```

February 26, 2010

```
 1  computer says 6:06, which is the thing you identified
 2  yesterday as being consistent with a CD put into a
 3  computer, that it would be 5:06?
 4       A.   The actual time would be 5:06.
 5       Q.   Just so that we have kind of a quick time line
 6  of what we know, I think, and it's not disputed, you
 7  indicate that there is something the computer says it's
 8  6:06.  But you said it's an hour ahead.  So let's just
 9  say 5:06.  That's when that whatever it was indicates
10  that possibly a CD was put in?
11       A.   A file being accessed, yes.
12       Q.   And along this time line, the chat post says
13  8:42, right, the initial thread?
14       A.   Yes, sir.
15       Q.   Started at 8:42?
16       A.   Correct.
17       Q.   According to, presumably, Albany time, right?
18       A.   The server in Albany, correct.
19       Q.   So our time would have been 7:42?
20       A.   In actuality, yes.
21       Q.   And could that have been started on another
22  computer?
23       A.   Yes.
24       Q.   And, in fact, is there any evidence that it was
25  started on Mr. Baird's computer?
```

February 26, 2010

```
 1        A.   No, there's none.

 2        Q.   So it was started on another computer?

 3        A.   (Moving head up and down.)

 4             MR. JAMES:  Objection, your Honor.  He says

 5   there's no evidence it was started there.  He says,

 6   well, then it was started somewhere.

 7             MR. PHELPS:  On another computer.

 8             MR. JAMES:  If you are asking him was it,

 9   rather than making a conclusory statement.  Ask him if

10   it was.  That's fine.

11             MR. PHELPS:  I don't think you're

12   listening, but I'll try and --

13             MR. JAMES:  I don't think you're making

14   your questions very good, Mr. Phelps.

15        Q.   (BY MR. PHELPS)  According to the chat thread,

16   this would have been started at 7:42 started this time?

17        A.   That's correct.

18        Q.   From the evidence we have was actually started

19   on another computer; is that right?

20        A.   I would agree with that.

21        Q.   It was not started on Gregg Baird's computer?

22        A.   It was not.

23        Q.   Could you agree with their expert that it could

24   have been done on iPhone?

25        A.   Yes.
```

February 26, 2010

```
 1        Q.    iPhones, do they have access to the web?

 2        A.    Yes.

 3        Q.    The chat indicates at 9:14, which would be 8:14

 4   our time, is when Dawn Killian says, "I open one video.

 5   It confirms child porn."  Does that comport with your

 6   review?

 7        A.    I recall that from the chat.

 8        Q.    Yeah, and it's in evidence.  And then the

 9   computer says our time because it's an our ahead, as you

10   said.  Eight-fifteen is when the video was accessed, the

11   one video that was accessed on this computer.  Do you

12   agree with that?

13        A.    Yes, sir.

14        Q.    Computer says 9:15, but the computer is an hour

15   ahead; is that right?

16        A.    Correct.

17        Q.    And then according to, I think everything we've

18   been talking about, 8:54 -- the computer says 9:54 --

19   but it's an hour ahead -- is when on the defendant's

20   computer Internet is accessed it the first time, right?

21        A.    That's what I recall for the first time, yes.

22        Q.    So is this basically a fairly accurate time

23   line based on what we know?

24        A.    Of the key events that evening, yes.

25        Q.    Based on what you've done and based on you were
```

February 26, 2010

1    here for their expert's testimony?

2        A.   Yes, sir.

3        Q.   Okay.  And we had some discussion, I did, with

4    their expert about her opinion day before yesterday that

5    that 5:06 event on the computer I think she said was an

6    update but could have been an update.  Do you agree with

7    that?

8        A.   That it could have been an update?

9        Q.   Yes, sir.

10       A.   I don't believe that it was.

11       Q.   Why not?

12       A.   Because there was no other activity that is

13   indicative that it was an update.

14       Q.   And how do you judge that?  How do you --

15       A.   For the particular file that the access time

16   was updated on, that file is -- I'm sorry -- I'm getting

17   this by name -- MCE Spotlight by DLL -- or CAB.  Sorry.

18   C-A-B.  It's a container file, a file that contains

19   other files, and the only way that typically is going to

20   be accessed is through some windows or other application

21   accessing that.  If it were in the course of being

22   updated, then it would have to access a program called

23   MC update.

24                And so I reviewed the access times for MC

25   update on Mr. Baird's computer.  And there was no access

February 26, 2010

1   to that file during that time, and, in fact, none at all

2   during that day.

3       Q.   And why is that significant with respect to

4   that particular entry at 5:06?

5       A.   Because that would have to be the file that

6   would be accessed to update this particular file.

7       Q.   So in your opinion was that an update?

8       A.   No.

9       Q.   And there was some discussion, and I just want

10  to clear this up, with Mr. James about Ms. Killian

11  changing the settings on the computer.  When we talk

12  about just clicking that button, the toggle, is that

13  changing the settings on the computer?  Can you explain

14  that to the judge?

15      A.   It's, in fact, changing the settings for the

16  user that's accessing that computer.  So it would, in

17  fact, be a temporary type of view while that folder was

18  being viewed.

19      Q.   So is it making any permanent changes to the

20  computer at all?

21      A.   Through that process, no.

22      Q.   And, correct me if I'm wrong, but is it simply

23  a toggle that changes the way you view what you're

24  looking at?

25      A.   Yes.

February 26, 2010

```
 1       Q.    So pop-up that recycle bin.  Shows up text.  If
 2   you want to look at thumbnails that go along with that,
 3   you just hit that button?
 4       A.    Yes.
 5       Q.    In your experience are there varying levels of
 6   experience and familiarity with computers from person to
 7   person?
 8       A.    Certainly.
 9       Q.    Can some people say something about a computer
10   and it turn out not to be the actual thing that is
11   happening on the computer, like I went into a folder and
12   it's just clicking that toggle?  Does that make sense?
13       A.    I guess so.  Generally speaking, I would have
14   to agree.  Yes.
15              MR. PHELPS:   That's all I have, your Honor.
16   Pass the witness.
17              MR. JAMES:   Judge, could I have five
18   minutes?
19              THE COURT:   Yes, sir.  Take a five-minute
20   break.
21              (Break was had from 3:16 PM to 3:27 PM.)
22              THE COURT:   All right.  We ready to
23   proceed?
24              MR. PHELPS:   Yes, sir.
25              THE COURT:   Go ahead.
```

February 26, 2010

```
 1              MR. PHELPS:  I have just one more question
 2   of Mr. Odom.  May I approach, your Honor?
 3              THE COURT:  Yes, sir.
 4       Q.   (BY MR. PHELPS)  Mr. Odom, we just went through
 5   this time line on the board.  Let me show you what I
 6   marked as State's Pretrial Exhibit No. 10.  Do you
 7   recognize that?
 8       A.   Yes, sir, I do.
 9       Q.   Now, is that basically a chart that I put
10   together and showed you earlier?
11       A.   Yes, to corroborate the times.
12       Q.   And you got a chance to take a look at it.  Is
13   it based upon your examination of the computer, your
14   examination of the chat log, and other information I
15   think that's been introduced in this hearing?
16       A.   Yes, sir.
17              MR. PHELPS:  Your Honor, I'll offer State's
18   Exhibit Pretrial 10.
19              MR. JAMES:  The only thing I would point
20   out -- on voir dire, your Honor?
21              THE COURT:  Yeah.
22                   VOIR DIRE EXAMINATION
23   BY MR. JAMES:
24       Q.   This says, on what he prepared, evidence CD put
25   in.  You said possible CD.  You don't know if the CD was
```

```
 1    put in at that point, do you, at 5:06?
 2        A.   Specifically, no, sir.
 3        Q.   And if it was, there was certainly no evidence,
 4    it was downloaded onto the desktop, is there?
 5        A.   No, sir.
 6        Q.   And there's no evidence that it was ever erased
 7    from the desktop, is there?
 8        A.   No, sir.
 9             MR. JAMES:  Then I have no objection.
10             MR. PHELPS:  I actually wrote in possible
11    CD.
12             MR. JAMES:  Now with that understanding,
13    Judge, I have no objection.
14             THE COURT:  That's ten?
15             MR. PHELPS:  Yes, sir.  I wanted to
16    memorialized what we had there.
17             THE COURT:  Yeah, ten it is.
18             MR. PHELPS:  That's all I have.
19             MR. JAMES:  We have nothing further.
20             THE COURT:  You can step down, sir.
21             MR. JAMES:  Call Gregg Baird.
22             (The witness was duly sworn.)
23                   GREGG BAIRD,
24    having been first duly sworn, testified as follows:
25                   DIRECT EXAMINATION
```

February 26, 2010

```
 1   BY MR. JAMES:
 2       Q.   Would you state your name?
 3       A.   Gregg Baird.
 4       Q.   Mr. Baird, all these discussions I think we can
 5   all -- I think we can all agree and stipulate this all
 6   happened at your house with your computer; is that
 7   correct?
 8       A.   Yes.
 9       Q.   Now, let me ask you, sir, how old a man, are
10   you?
11       A.   Thirty-nine.
12       Q.   And what's your -- where were you working prior
13   to this?
14       A.   Aggieland Credit Union.
15       Q.   What's your educational history?
16       A.   I have a master's in international trade, MBA
17   in international trade, and an undergraduate degree in
18   finance.
19       Q.   Now, in May of last year, were you going to
20   take a trip?
21       A.   Yes.
22       Q.   Where were you going?
23       A.   Panama.
24       Q.   Who were you going with?
25       A.   My family.
```

February 26, 2010

```
 1        Q.   Is that your parents that you were --

 2        A.   Yes.

 3        Q.   And did you have a dog?

 4        A.   Yes.

 5        Q.   What's the dog's name?

 6        A.   Copper.

 7        Q.   And what were you going to do with that dog?

 8        A.   I was looking at leaving him at home with a pet

 9   sitter.

10        Q.   Who was going to be the pet sitter?

11        A.   Dawn Killian.

12        Q.   Did she come to your house?

13        A.   Yes, she did.

14        Q.   And did you essentially introduce her to your

15   dog and that sort of thing?

16        A.   Yes.

17        Q.   What did you tell her about your bedroom door?

18        A.   I told her my bedroom door should remain shut.

19        Q.   And where was the computer involved in this

20   case?

21        A.   In my bedroom.

22        Q.   Did you ever take her into your bedroom, show

23   her your bedroom, or anything else?

24        A.   I never took her into my bedroom or my

25   bathroom.
```

February 26, 2010

1    Q.   Did you ever tell her she could have whatever
2  she wanted or use whatever she wanted?
3    A.   No, I did not.
4    Q.   Did you tell her she could have whatever food
5  she wanted?
6    A.   Yes.  In fact, we made arrangements about the
7  type of food she wanted before she arrived.
8    Q.   Did you ever give her any indication she could
9  enter your bedroom?
10   A.   Never.
11   Q.   Did you ever give her any indication she could
12 record any CDs?
13   A.   No.
14   Q.   Did you ever give her any indication she could
15 use your computer?
16   A.   No.
17   Q.   Did you ever give her any indication that she
18 could access any user-generated files such as recently
19 opened or deleted files?
20   A.   No.
21   Q.   Did you ever have an expectation of privacy in
22 that computer located in your bedroom?
23   A.   Yes.
24   Q.   Are you asserting today that privacy and
25 objecting to her actions vis-a-vis your computer?

February 26, 2010

 1      A.   Yes.

 2              MR. JAMES:   Pass the witness.

 3                   CROSS-EXAMINATION

 4  BY MR. PHELPS:

 5      Q.   Mr. Baird, my name is Shane Phelps.  I'm the

 6  prosecutor in the case.  I just have a few questions for

 7  you.

 8              First of all, there's no question you

 9  invited her to stay in your home for the period you were

10  in Panama, correct?

11      A.   Correct.

12      Q.   You also have a roommate, do you not?

13      A.   Yes.

14      Q.   You were in Panama, or were going to be in

15  Panama, correct me if I'm wrong, from May 7th to

16  May 17th?  Is that roughly the dates, or am I wrong?

17      A.   I believe May 8th through the 17th.  But the

18  same, yes.

19      Q.   So on May 7th -- did you leave on May 7th?

20      A.   Left on May 7th.

21      Q.   By leaving on May 7th, did you leave your house

22  or did you actually get on a plane and go to Panama?

23      A.   Left my house on the 7th.

24      Q.   Where did you go from there?

25      A.   To my parents' house.

February 26, 2010

```
 1      Q.   Which is where?

 2      A.   In Spring.

 3      Q.   That's near Houston?

 4      A.   Yes.

 5      Q.   Did your plane leave the next day?

 6      A.   Yes.

 7      Q.   So you actually left on May 8th in terms of

 8  getting on a plane and going to Panama?

 9      A.   Yes.

10      Q.   Your plane came back on the 17th?

11      A.   I believe so.

12      Q.   Did you make any stops on the way?  Did you get

13  out to the airport and come straight home?

14      A.   Once the plane landed, I dropped my parents off

15  at their house and returned home.

16      Q.   So no question you actually invited Dawn

17  Killian to come stay in your home?

18      A.   Yes.

19      Q.   That was the agreement, correct?

20      A.   Yes.

21      Q.   Now, with respect to your bedroom, does your

22  bedroom door have a lock on it?

23      A.   I believe it locks from the inside, yes.  I

24  believe it has that capability.  I'm not certain though.

25      Q.   But you didn't lock your bedroom door?
```

February 26, 2010

```
 1        A.    No.

 2        Q.    Now, you indicated you told her the bedroom

 3   door should remain shut.  You never told her she could

 4   not go into your bedroom.  Is that correct?

 5        A.    Correct.

 6        Q.    The idea of keeping the bedroom door shut

 7   really had to do about keeping the dog out while she was

 8   not there; is that right?

 9        A.    True.

10        Q.    And the dog actually hangs a lot in your

11   bedroom, doesn't it?

12        A.    Not when I'm not at home.

13        Q.    But when you're home?

14        A.    Typically in the room I am.

15        Q.    Dog stay asleep in your bedroom?

16        A.    Most of the nights.

17        Q.    So your dog is pretty comfortable.  It's one of

18   those places in your house he spends a lot of time?

19        A.    Sure.

20        Q.    So no question you never told Dawn, "Do not go

21   into my bedroom"?

22        A.    I never stated -- I told Dawn to keep the

23   bedroom door shut.

24        Q.    And that was in connection with keeping the dog

25   out of there when she wasn't in there?  Yes or no?
```

February 26, 2010

```
 1        A.   Correct.

 2        Q.   Your computer is in your bedroom?

 3        A.   Yes.

 4        Q.   Is it just pretty much out there in plain view?

 5        A.   You can't see it from the main area of the

 6   house.

 7        Q.   Is it enclosed in an armoire or any kind of

 8   cabinet?

 9        A.   No.

10        Q.   So if somebody were walking into your bedroom,

11   they'd be able to find your computer pretty easily?

12        A.   Yes.

13        Q.   You never told Dawn that she could not get on

14   your computer?

15        A.   I never mentioned my computer to Dawn at all.

16        Q.   So you never told her, "Dawn, I really don't

17   want you on my computer"?

18        A.   Never said that.

19        Q.   You never made any limitations whatsoever

20   expressly to Dawn about getting on a computer or doing

21   anything at all on your computer?

22        A.   Again, I never mention the computer to Dawn.

23        Q.   Now, your roommate has access to your computer,

24   does he not?

25        A.   He would.
```

February 26, 2010

```
 1      Q.   So at least with respect to your roommate, he
 2  can come into your room any time and get on your
 3  computer.  Is that accurate?
 4      A.   That's a fair statement.
 5      Q.   In fact, there's a file on Andrew's stuff,
 6  correct?
 7      A.   Correct.  That's a file I generated.  Not
 8  Andrew.
 9      Q.   Okay.  With respect to the statement -- you
10  heard Dawn Killian testify you said something to the
11  effect of help yourself to anything?
12      A.   I never said that.
13      Q.   You heard her say that, right?
14      A.   I did.
15      Q.   What do you remember her saying that she must
16  be referring to?
17      A.   I'm sorry.  I don't understand your question.
18      Q.   Are you saying that no conversation like that
19  took place at all, or are you simply telling the judge
20  that it wasn't in reference to anything in the house?
21  Does that make sense?
22           Let me ask this:  I think you were present
23  in the courtroom when Mr. James asked Dawn Killian when
24  he said, "Help yourself to anything," you were referring
25  to the refrigerator.  Do you recall that?
```

February 26, 2010

```
1       A.    No.

2       Q.    Did she say or did you tell her anything to the

3   effect "Help yourself to anything in the house or help

4   yourself"?

5       A.    I told her -- I was very specific -- I said,

6   "You can help yourself to any food you find."  And, in

7   fact, before her visit to the house, we arranged -- I

8   arranged the type of beer she wanted and asked her if

9   there was any particular food she would like while she

10  was at the house.

11      Q.    You wanted her to feel comfortable in your

12  home?

13      A.    Yes.

14      Q.    So something like "help yourself" at least

15  those two words were said, right, by you?

16      A.    Very specifically I told her -- my quote was,

17  "Please help yourself to any food you find."  At the

18  time I pointed to the refrigerator.

19      Q.    Was it clear to you from being present in the

20  courtroom when Dawn William testified that what she

21  heard, or at least what she says you said was, "Help

22  yourself to anything in the house"?

23      A.    She apparently doesn't remember what happened.

24      Q.    Okay.  Now, you have the ability to turn your

25  computer off, do you not?
```

February 26, 2010

```
1       A.   Correct.

2       Q.   And you did not do that on this occasion?

3       A.   I thought I had.

4       Q.   You thought you had?

5       A.   Yes.

6       Q.   Is it your sworn testimony that you had a

7   conscious decision you had made to turn your computer

8   off?

9       A.   Yes, I thought I had turned my computer off.

10      Q.   But, in fact, it was not turned off.  Do you

11  agree with that?

12      A.   I agree with that.

13      Q.   If any person had wandered in there like Dawn

14  Killian, what she would have seen when she shook the

15  mouse was your computer would come awake?  Do you agree

16  with that?

17      A.   No.  She would have to turn the monitor on as

18  well.

19      Q.   You have a recollection of turning the monitor

20  off?

21      A.   Yes.

22      Q.   Okay.  Did you tour her around the house?  Did

23  you show her around the house?

24      A.   Yes, I did.

25      Q.   I presume showed her the kitchen?
```

February 26, 2010

```
 1        A.   Correct.

 2        Q.   Bathroom?

 3        A.   Correct.

 4        Q.   Guest room?

 5        A.   Correct.

 6        Q.   Showed her where your roommate lived in his

 7   study?

 8        A.   I pointed to it.

 9        Q.   Showed her the living room?

10        A.   Correct.

11        Q.   Any other place?  A garage?  Anything like

12   that?

13        A.   I took her to the garage because that's where

14   the dog food is.

15        Q.   Your testimony is you took her pretty much

16   everywhere or showed her everywhere but you did not take

17   her into your bedroom?

18        A.   Correct.

19        Q.   Was it your intention that your dog not be

20   allowed in that bedroom for that entire ten days?

21        A.   Correct.

22        Q.   Did you tell her that?

23        A.   Yes.

24        Q.   Exactly what words did you use to convey?

25        A.   I told her I didn't want the dog -- Copper had
```

February 26, 2010

```
 1   separation anxiety sometimes.  I didn't want him in my

 2   bedroom.

 3       Q.   Actually, wouldn't him being able to go in your

 4   bedroom help the separation anxiety?

 5       A.   I'm not a dog psychologist.  I couldn't answer

 6   that.

 7       Q.   But your recollection now is that you

 8   specifically told her, "I don't want Copper in my

 9   bedroom"?

10       A.   Correct.

11       Q.   Even though that's a place that Copper spent a

12   lot of time?

13       A.   When I'm home, he does.

14       Q.   You did show her how to use the television?

15       A.   Correct.

16       Q.   Showed her how to use the stereo?

17       A.   Yes.

18       Q.   Your CDs were in plain site?

19       A.   Yes.

20       Q.   You didn't tell her she couldn't use the CDs?

21       A.   No.

22       Q.   In fact, you showed her how to use stereo,

23   right?

24       A.   Correct.

25       Q.   Showed her how to use the remotes?
```

February 26, 2010

```
 1        A.    Correct.

 2        Q.    Do you remember anything else about what you

 3   showed her to kind of get her comfortable and orient her

 4   to your home?

 5        A.    I believe that you mentioned the high points,

 6   yes.

 7        Q.    Anything else you remember?

 8        A.    No.

 9        Q.    After you got home, you discovered that a

10   search had been conducted at your home?

11        A.    Correct.

12        Q.    And you left, did you not?

13        A.    Correct.

14        Q.    In fact, you were ultimately arrested in

15   Alpine?

16        A.    Correct.

17        Q.    At some point you communicated with Dawn

18   Killian by e-mail?

19        A.    I believe so.

20        Q.    Did you ask her to take care of your dog

21   Copper?

22        A.    I do not remember.

23        Q.    You don't remember the e-mail you sent?

24        A.    No.

25        Q.    Do you remember writing down, "Get off the road
```

February 26, 2010

```
 1   her parents pay her $5,000"?

 2       A.   I'm not disputing that.  That area, that

 3   24 hours of my life is very fuzzy.

 4       Q.   So you're not saying it didn't happen?

 5       A.   Correct.

 6       Q.   Was it your intention that Dawn Killian adopt

 7   your dog?

 8       A.   If that's what the e-mail said, sure.

 9       Q.   Well, I'm just asking if you recollect that?  I

10   mean --

11       A.   I don't recollect that e-mail exactly.

12       Q.   You did spend some time thinking about what was

13   going to happen to your dog, right?

14       A.   Sure.

15              MR. PHELPS:  That's all I have.  Pass the

16   witness.

17                    REDIRECT EXAMINATION

18   BY MR. JAMES:

19       Q.   Mr. Baird, next with keeping that door closed,

20   you didn't want your dog going in but you didn't want

21   Dawn Killian going in your bedroom either?

22       A.   Correct.

23                    RECROSS-EXAMINATION

24   BY MR. PHELPS:

25       Q.   But you didn't tell her not to go in, did you?
```

February 26, 2010

```
 1        A.   I think a reasonable person -- I've had many
 2   house sitters over the years.  I've never had one who --
 3   I didn't think it was necessary.  If you tell someone to
 4   keep the door shut, then I think that's a pretty clear
 5   message.  Keep the door shut.
 6        Q.   You previously testified under oath not five
 7   minutes ago when you told her to keep the door shut that
 8   was in connection with keeping the dog out of the
 9   bedroom; do you recall that?
10        A.   Sure.
11        Q.   So the question I asked you was not what you
12   thought was reasonable.  My question is did you tell
13   her, "Dawn, I don't want you to go in my bedroom," or
14   anything explicitly indicating you didn't want her in
15   your bedroom?
16        A.   The only statement I recall telling her was to
17   please keep my door shut.
18        Q.   In connection with Copper, right?
19        A.   I don't know if those two statements were made
20   concurrently at the same time.
21        Q.   Let me ask the question one more time.  Did you
22   tell Dawn Killian explicitly, "Don't enter my room"?
23        A.   No.
24        Q.   That would have been a pretty easy thing to
25   say, wouldn't it?
```

February 26, 2010

 1       A.    Sure.

 2       Q.    And if it had been your intention to make sure

 3   she did not go in, you would have made a point of that,

 4   wouldn't you?

 5       A.    I didn't think it was necessary.

 6               MR. PHELPS:   Okay.   That's all I have of

 7   this witness.

 8               MR. JAMES:   Nothing further.

 9               THE COURT:   You can step down, sir.

10               MR. JAMES:   We rest.

11               MR. PHELPS:   We have nothing further.

12               THE COURT:   Arguments?

13               MR. PHELPS:   I believe it's Mr. James's

14   motion.

15               MR. JAMES:   Mr. Phelps, if you'll allow me

16   to give the cases after I give them to him because I'll

17   get them all confused.

18               THE COURT:   I already have a big packet of

19   cases, if these are the ones you are referring to.

20               MR. JAMES:   Those are the bad cases, Judge.

21   I want to give you the good cases.

22               THE COURT:   Looks like your handwriting.

23                  DEFENDANT'S CLOSING ARGUMENT

24   BY MR. JAMES:

25               Judge, the test on 38.23 -- there are a lot

February 26, 2010

```
 1   of old cases on that that go every which way.  The case

 2   -- and I think the State actually provided a number of

 3   cases, and it includes Miles.  But Miles is now the

 4   white horse case.  It's an opinion and by Judge Cochran,

 5   as I recall.  And she talks about the test.  And on page

 6   -- my page 13, she talks about an analysis of other

 7   cases.  And then she talks about none of these cases was

 8   explained on this basis.  But this rule that a private

 9   person can do what a police officer standing in his

10   shoes can legitimately do but cannot do what a police

11   officer cannot do would explain the outcome in each case

12   and is consistent with the purposes of Article 38.23.

13   We conclude that the historical rationale for including

14   unlawful conduct by other person under the Texas

15   Exclusionary Statute is best explained and implemented

16   by this rule.

17                So I would caution the Court not to pay

18   much attention to anything that is prior to that case of

19   Miles v. State.  And I will submit that to the Court.

20                Judge, the key thing is under -- and we

21   talked about the statutes.  Under the relevant statutes

22   33.02 says it is a breach of computer security if a

23   person commits an offense if the person knowingly

24   accesses a computer without the effective consent of the

25   owner.
```

1            There is absolutely nothing to indicate

2    that Ms. Killian had consent to access the computer.

3    All of this about time lines are really kind of smoke

4    and mirrors because the fact is it's going to be who is

5    the most credible witness as to what was said.  Is it --

6    she testified that all of this occurred -- and if you

7    read the search warrant affidavit -- because she

8    downloaded two CDs onto the computer and then wanted to

9    get rid of or go in the recycle bin and get rid of

10   those.

11            Not only our expert Ms. Hubbard but the

12   State's expert Mr. Odom said that if that happened there

13   would be a footprint.  And they both say there was never

14   a footprint that music was ever downloaded onto the

15   computer.  And what's more, there was no evidence that

16   the music was ever taken off the computer.  No evidence.

17   No evidence of that.  And that is the gravamen of the

18   State's argument that she innocently went on the

19   computer and in trying to download music and exit music,

20   well, she did go into his recent folder.  They admit

21   that.

22            Judge, that alone -- that alone is

23   sufficient to cause this evidence to be suppressed.  I

24   asked her specifically.  I said, "Did he ever tell you

25   that you could use the computer?"  She said, "No."

February 26, 2010

```
 1              If the Court reviews her testimony and the
 2   way she said it happened, it's inconsistent with the
 3   State's time line.  I urge the Court to go back and
 4   review her testimony.  She said that she drug two songs
 5   over onto the desktop, that she went into recent
 6   documents to remove it.  She saw questionable titles on
 7   recent documents.  She clicked on there and saw those
 8   images of child pornography.  She goes onto his computer
 9   onto his recent documents.  Then she says she went to
10   remove these, and she clicks on more images.
11              And there is no doubt, Judge, she never
12   drug those songs.  She never tried to erase them.  She
13   was pure and simple snooping.
14              And as Ms. Hubbard showed the Court, the
15   time line shows that at 9:15 she accessed the recent
16   folder.  By her testimony , Judge, she did that prior to
17   any chat.  She did that.  She then went into the recycle
18   bin and accessed not anything else but things that he
19   had after she went to the change the view so that she
20   could see the photos.
21              Judge, and I kept asking her, "Do those
22   thumbnails automatically appear?"  And she kept on
23   saying, "I don't remember.  I don't remember."
24              I would urge the Court to look at her
25   testimony.  I have a copy that court reporter
```

1   Ms. Rainwater got up.  The Court might find it useful,

2   or you can go back and have her read it.  But that's

3   what she testified to, Judge.  And that shows that she

4   was using and accessing his computer files without his

5   permission.

6            Now I acknowledge that there's been no

7   showing that she was an agent of the State.  But she was

8   certainly a private individual who is standing in the

9   shoes of the police.  Could not have accessed that.  Was

10  illegal of law violations as well as the criminal

11  trespass when he told her to keep that door shut.  She

12  entered in there, and she entered onto the computer.

13           What the State would have you buy off is in

14  a light most favorable to the State.  My client has

15  certainly said you can help yourself to the food.  She

16  says you can help yourself to whatever you need.  But

17  does that kind of remark in a light most favorable to

18  the State give somebody the right to utilize your

19  computer to snoop to see what you've been doing?  To

20  read your diary?  Help yourself to anything you need.

21  Well, I decided to look at his diary.  I found some

22  jewelry.  I decided to wear that.

23           Even if you believe what she said, Judge,

24  she doesn't have the authority to go into his computer.

25  But I would suggest, Judge, that since her story is made

1    of whole cloth her word should not be taken.  The word

2    of Gregg Baird should be who said I told her to keep

3    that door closed and help yourself to any food that you

4    need.

5                    Finally, Judge, as far as the affidavit

6    goes, there is absolutely no assertion of reliability of

7    the named informant Dawn Killian.  Nowhere in that

8    affidavit does the officer assert that Dawn Killian is

9    in any way reliable.  There is nothing saying that she's

10   employed or that she's got a good employment history.

11   There is nothing to indicate that she has no criminal

12   record.  There is nothing to indicate that the officer

13   who talked to her even believed her to be credible.

14   There is not one shred of evidence, not one thing in the

15   four corners of that affidavit, your Honor.  There's

16   nothing that indicate that they confirmed that she was,

17   in fact, a dog sitter, that she confirmed -- or that

18   they confirmed where she was staying or who owned the

19   house.  There is absolutely no proof of the credibility

20   of Dawn Killian.

21                   So even if you say, well, there wasn't a

22   legal violation under 38.23, under the Fourth and

23   Fourteenth Amendment Article 1 Section 9 and 10 of the

24   Texas Constitution and 38.23, the evidence would have to

25   be suppressed because the affidavit itself is

February 26, 2010

1   insufficient.

2            So, Judge, those are the areas.  I have got

3   some case on the affidavit.  There's also the *Tonyak*

4   [phonetic] case deals with tainted evidence and

5   reaffirms the *Miles* case.  Submit that to the Court.

6   *United States v. Barth* talks about the expectation of

7   privacy when a person turns his computer over for an

8   examination or for it to be repaired.  I think that case

9   is extremely relevant, your Honor.

10            And then *Davla* [phonetic] and *Eduardo* both

11  deals with there has to be a representation of the

12  credibility of a person on whom they're basing a

13  warrant.  Certainly, there was sufficient detail given

14  to that, the basis of the knowledge, but nothing to

15  indicate the credibility of that individual.

16            For those reasons, Judge, we would ask that

17  the evidence be suppressed.

18            MR. PHELPS:  Your Honor, if it please the

19  Court.

20            THE COURT:  Yes, sir.

21                 STATE'S CLOSING ARGUMENT

22  BY MR. PHELPS:

23            With respect to the issue about the

24  credibility -- the State's credibility and the

25  underlying information or indicia of credibility of the

February 26, 2010

 1  affidavit, Mr. James is asking you to apply a different

 2  standard than is appropriate in this case; that is, he

 3  is asking you to apply the standard of the confidential

 4  informant, someone who is not named.

 5            The Waco Court of Appeals has said this in

 6  an almost identical challenge to the search warrant

 7  where they said exactly the same thing.  Here is what

 8  the Waco court said.  They say a magistrate is entitled

 9  to rely on information applied by a private citizen

10  since unlike many police informants they are much less

11  likely to produce false or untrustworthy information.

12            The Court knows that the law always takes a

13  different view of a private citizen that makes a

14  complaint that is willing to be named.  That is

15  completely different standard than when a confidential

16  informant is not named or somebody calls in a tip and

17  that person doesn't want to be named.  Then there is an

18  obligation to talk about corroboration of an anonymous

19  tip or to bolster the credibility.

20            And what the Waco Court of Appeals says

21  further about that, it says the Court of Criminal

22  Appeals has consistently stated that when a named

23  informant is a private citizen -- and there's no

24  question of that in this case -- whose only contact with

25  the police is the result of having witnessed a criminal

1  act committed by another the credibility and reliability

2  of the information is inherent.  And they say there is

3  no necessity for that.  The fact is they say that a

4  magistrate is entitled when signing a search warrant to

5  rely on that.

6           And in this particular case, that's exactly

7  what was stated in the search warrant affidavit.  It

8  states Dawn Killian, private citizen -- those are not

9  the words exactly, but it gives the circumstances in

10 that she came into contact with this information.  I

11 think that particular issue really is a nonstarter.  It

12 is disposed of, I think, by the Waco Court of Appeals

13 citing.  They say the Court of Criminal Appeals has

14 consistently stated that when a named or informant is a

15 private citizen that they are inherently reliable.  I

16 don't think that goes, your Honor.

17          With respect to the challenge under 38.23,

18 I think it's important to note two things first.  Number

19 one, they have the burden of persuading you that a

20 criminal violation has occurred.  I am presuming that

21 since Mr. James did not argue it -- well, I guess you

22 did say criminal trespass.

23          But, you know, the common thing about

24 burglary and criminal trespass and the breach of

25 computer access as he has indicated 33.02 is effective

 1   consent.  That's really the issue here.  And when we're

 2   talking about effective consent, first of all, the only

 3   definition that would apply under this circumstance is

 4   she exceeded the scope of her consent.  So I presume

 5   what they're arguing is that she had consent but she

 6   exceeded it by either going deep into the computer or as

 7   far as she did or by simply getting on the computer and

 8   that exceeded the scope of her being in the house.

 9           So I think it is very important to consider

10   the totality of the circumstances here and how this

11   whole thing started.  Gregg Baird invited her into his

12   home for ten days to sit with his dog, to live there, to

13   sleep there, to eat there, to listen to or watch his TV,

14   to listen to his CDs, to playing that stereo.  To

15   suggest that under those circumstances, absent any

16   explicit limitations of that consent -- and that's what

17   all the case law says.  If you don't take the effort, it

18   is not good enough simply to say she doesn't have his

19   permission explicitly.  It is not good enough because he

20   doesn't say something about it a reasonable person in

21   her position wouldn't have done this.  None of that

22   matters.

23           What the case law says in all those

24   repairman cases that we've given you -- and we have

25   actually given you some of the same cases or some of

1    them -- they say if somebody does not take steps to

2    limit the access then their access is unfettered.

3    That's exactly the words the courts use.

4              So when the computer repairman cases --

5    when I take my computer in and say, "Would you please

6    fix this," I don't then get to complain that you went

7    into a file I didn't want you to go into.

8              Not to mention that the courts also talk

9    about it, and Mr. James talked about this, about the

10   reasonable expectation of privacy.  How you can say I'm

11   inviting somebody in my home, I'm letting them have

12   access to my home, I'm not telling them not to go in the

13   bedroom -- and we'll talk about the credibility issue in

14   a second -- that somehow you have a reasonable

15   expectation of privacy when you call somebody into your

16   home.

17             One of the cases that we provided to you

18   actually talks about this issue with respect to kind of

19   the same thing.  And here's what they say.  The computer

20   was not password protected so she could access it.

21   That's our situation.  She was able to do that.  The

22   defendant could have protected the computer with a

23   password where she couldn't have accessed that

24   information.  He didn't do that.  This was the only

25   usable computer in the home; and as far as we know,

1    that's it absent the iPhone.  But that's not really a

2    usable computer for the kinds of things you can do on a

3    computer.

4              Nowadays in American society -- and this is

5    important.  Nowadays in American society, a computer is

6    just about as common as a telephone or a refrigerator.

7    So to say even though I didn't tell her she could get

8    the computer, what this Court is telling you it is

9    absolutely ludicrous to suggest that I can invite you

10   into my home and somehow you are going to know you can't

11   get on my computer but you can get in the refrigerator.

12   You can get on my stereo.  You can go out in my garage.

13   You have full run of the house except for I told you not

14   to go in my bedroom.

15              I think if you review these cases, your

16   Honor, you're going to see that it is the absence of

17   doing something to protect that information that, number

18   one, destroys the reasonable expectation of privacy.

19   These cases actually talk about it in that term:

20   destroys.  The *Barth* case that Mr. James gave you, a

21   private party search can destroy an individual's

22   reasonable expectation of privacy if the activity or

23   conduct of the defendant and/or the circumstances of the

24   situation significantly lessen the defendant's

25   reasonable expectation of privacy by creating a risk of

1    intrusion by private parties which was reasonably

2    foreseeable.

3              It is a case that Mr. James gives you --

4    and we have as well because it supports our position --

5    suggests -- actually compels the conclusion if you don't

6    take steps and you invite somebody in your home you

7    cannot then say I have a reasonable expectation of

8    privacy when I don't tell them.

9              And these repairman cases say exactly the

10   same thing.  There's even one repairman case that we

11   gave you in which the defendant takes the computer in

12   and the person who repairs the computer actually goes

13   into a file marked personal.  They say, you know, that's

14   not good enough.  You didn't limit access to that

15   computer.  You brought it in and said fix my computer.

16   Therefore, there is unfettered access.  You shouldn't

17   now say you shouldn't go into that file.

18              I think it is significant to appreciate

19   that what we're talking about and the reason we talked

20   about the computer and the event logs and all that and

21   particularly the information about how this information

22   was accessible is the Court is familiar with the

23   computer.  Both Mr. Odom and their expert told you the

24   same thing.  In order to get to what we're talking about

25   and is perfectly consistent with what Dawn Killian told

1   you, I click start.  I mouse up.  Recent documents

2   pop-up, and I can read them.  That's it, Judge.  That's

3   a click and a mouse up from waking up the computer.

4               So there's no deep explanation.  There's no

5   invasion of privacy.  There's no snooping.  And to say

6   that just clicking on the recycle bin you see those

7   things.  We gave you a spreadsheet of the actual titles

8   if it was in that mode that she would have seen that

9   clearly showed it is riddled with child pornography.

10  All she had to do, if that wasn't already in that mode,

11  was push the toggle and there are the thumbnails, four

12  of which she described to the police from memory

13  graphically, we introduced to you, match perfectly.

14              So for the suggestion to be that somehow

15  she is snooping, somehow she's done something unlawful,

16  that's critically important.  They have the burden to

17  persuade you she committed a crime.  In order to get the

18  point where you suppressed this evidence, you have to

19  believe that Dawn Killian committed a crime.

20              And the reason we went through the time

21  line is because the time line is not inconsistent with

22  what she said.  And I think it's important to consider

23  that.  There may be some discrepancies one way or

24  another, but did that make Dawn Killian a liar and a

25  criminal?  Hardly.  I mean, you heard testimony that

February 26, 2010

1  people have varying experiences with computers and they

2  can say things that don't turn out to be exactly the way

3  things should have been said.  Computers are kind of

4  tricky.  There's a lot to be learned in computers.

5           Ultimately, I think the question before the

6  Court is:  Did she commit a crime?  To say that she did

7  not have effective consent, I would have to -- if I were

8  going to prosecute Dawn Killian, if I was going to ask

9  you to find her guilty of breach of computer access or

10  criminal trespass, I think it is pretty clear because

11  there was no express implication do not go in my

12  bedroom, nothing about don't go on my computer -- and

13  the courts have told you how foreseeable that is -- that

14  we could even come close to a conclusion certainly

15  beyond a reasonable doubt but even by a preponderance

16  that a crime was committed.  She had no ulterior motive.

17           You see the chat where she agonizes over

18  what she ought to do.  The benefits of the doubt she

19  gives this defendant about whether, gosh, she might ruin

20  his life.  I'm concerned about this.  That's all

21  genuine.

22           Ultimately, if you want to talk about who

23  has a motive to get up here and say, "I told her not to

24  go in the bedroom," it's probably the guy in this room

25  who is facing a thousand years for the child pornography

February 26, 2010

1  on his computer.  I would say that's a pretty powerful

2  motivator to get up here and simply just as easily as I

3  can say it, "I told her not to go in the bedroom."

4             You know, it's interesting there's a thing

5  that I use in some speeches I give about courtroom

6  testimony where I recite some interesting courtroom

7  moments.  And one of them is cross-examination of a guy

8  on trial for murder.  And he testifies.  And the

9  prosecutor asked him, sir, do you know the penalty in

10 the State of Texas for aggravated perjury.  And the

11 defendant says, "Yeah, I do, and it's a lot less than

12 murder."

13            And I suggest to you it's nothing for

14 Mr. Baird to get up there and remember this differently

15 in conflict with what Dawn Killian says to create a

16 conflict for you.  And if you explored the agony she

17 went through, the decision making she went through, the

18 fact that there is absolutely no ulterior motive for her

19 to do anything other than take care of the dog, then I

20 submit to you this is an easy call.

21            If it comes down to the credibility between

22 there's two, I don't think it matters.  Here's the

23 important thing, Judge.  I don't think we even get that

24 far.  It doesn't matter how far into the computer she

25 gets.  I don't think what matters what happened here.

February 26, 2010

1   What matters is he invited her into his home.  He gave

2   her the run of the house, and now he says, "But I told

3   her not to go into the bedroom," even though he admitted

4   and kind of backed off that.  "Yes, I don't want my dog

5   in my room."  So there is no evidence before you that he

6   ever told her not to go my bedroom.  There is virtually

7   no evidence from the defendant's mouth that he ever told

8   her not to go the computer.  He simply said, "It was

9   reasonable."  That is not enough.  Certainly not enough

10   to call Dawn Killian a liar and a criminal.

11            And in order to suppress this evidence, you

12   have to say she violated the law.  And I don't believe

13   it's even close.  I strongly encourage you to deny this

14   motion on most of these grounds.

15            THE COURT:  Motion is denied.  Anything

16   else?

17            MR. JAMES:  I was going to make my final

18   argument, Judge, but I'm not going to do a useless

19   thing.

20            THE COURT:  I thought you were through.

21   I'm sorry.  I apologize to you.

22            MR. JAMES:  That's fine, Judge.

23            (Proceedings concluded at 4:09 PM.)

24

25

February 26, 2010

REPORTER'S CERTIFICATE

THE STATE OF TEXAS
COUNTY OF BRAZOS

I, Kaetheryne B. Kyriell, Deputy Court Reporter in and for the 272nd District Court of Brazos County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $392.25 and was paid/will be paid by Defendant's attorney.

WITNESS MY OFFICIAL HAND this the 9th day of June, 2010.

Kaetheryne B. Kyriell, Texas CSR 6083
Expiration Date: 12/31/2011
Deputy Court Reporter
272nd District Court
Brazos County, Texas
Bryan, Texas 77803