1       REPORTER'S RECORD
        VOLUME 5 OF 7 VOLUMES
2     TRIAL COURT CAUSE NO. 09-02494-CRF
   APPELLATE COURT CAUSE NO. 10-10-00297-CRF-272

3

4  THE STATE OF TEXAS          )  IN THE DISTRICT COURT
                               )
5  vs.                         )  BRAZOS COUNTY, TEXAS
                               )
6  GREGG CARL BAIRD            )  272ND JUDICIAL DISTRICT

7

8

9     _____

10                    SENTENCING PHASE

11    _____

12

13                    ORIGINAL

14                                  RECEIVED

15                                  SEP 27 2010

16                                  COURT OF APPEALS
                                    WACO, TEXAS
17

18

19       On the 28th day of July, 2010, the following

20  proceedings came on to be held in the above-titled

21  and numbered cause before the Honorable Travis B.

22  Bryan, III, Judge Presiding, held in Bryan, Brazos

23  County, Texas.

24       Proceedings reported by computerized stenotype

25  machine.

FILED
TENTH COURT OF APPEALS
FEB 07 2011
SHARRI ROESSLER, CLERK

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

```
 1                       APPEARANCES

 2  MR. SHANE P. PHELPS
    SBOT NO. 15907530
 3  BRAZOS COUNTY DISTRICT ATTORNEY'S OFFICE
    300 East 26th Street
 4  Suite 310
    Bryan, Texas 77803
 5  Telephone:  (979) 361-4338
    Counsel for the State of Texas
 6
    MR. JIM W. JAMES III
 7  SBOT NO. 10554250
    LAW OFFICE OF JIM W. JAMES, III
 8  PO Box 1146
    Bryan, Texas 77806
 9  Telephone:  (979) 846-1934
    Counsel for the Defendant
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                      I N D E X
                       VOLUME 5
2                  (SENTENCING PHASE)

3                                             Page  Vol

4   JULY 28, 2010

5   Opening Statement by Mr. Phelps .............    8    5
    Opening Statement by Mr. James ..............   10    5
6

7   STATE'S WITNESSES
                          Direct  Cross Voir Dire
8   Nathan McCune         12,53    62     51
    Michael Sheets         66      80
9   Kindale Pittman    83

10  Video Exhibit Published ...................    42    5

11  State Rests ..............................    92    5

12  DEFENDANT'S WITNESSES

13                        Direct  Cross Voir Dire
    Nathan McCune          97      93
14  Thomas Rogers          98     104
    James Miller (via telephone) 116   118
15  Phillip Hathaway      124     125
    Larry Miller (via telephone) 126   129
16  John Rogers           135     137
    Kimberly Roese        138     139
17  Gregg Baird        141,198    149
    Karen Baird           204
18  John Baird            211

19  Judicial Notice of Court's 1 and 2 .......   203    5

20  Defendant Rests ..........................   220    5

21  Both Sides Close .........................   220    5

22  Closing Statement by Mr. James ...........   220    5

23  Closing Statement By Mr. Phelps ..........   226    5

24  Adjournment ..............................   240    5

25  Court Reporter's Certificate .............   241    5
```

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

```
 1              ALPHABETICAL INDEX OF WITNESSES
                         VOLUME 5
 2                   (SENTENCING PHASE)

 3                              Direct Cross Voir Dire Vol.

 4  Gregg Baird              141,198  149                    5

 5  John Baird               211                             5

 6  Karen Baird              204                             5

 7  Phillip Hathaway         124      125                    5

 8  Nathan McCune            12,53,97 62,93   51             5

 9  James Miller (via telephone)116   118                   5

10  Larry Miller (via telephone)126   129                   5

11  Kindale Pittman           83                             5

12  Kimberly Roese           138      139                    5

13  John Rogers              135      137                    5

14  Thomas Rogers             98      104                    5

15  Michael Sheets            66       80                    5

16

17                    EXHIBITS INDEX
                         VOLUME 5
18                   (SENTENCING PHASE)

19  STATE'S
    EXHIBIT      DESCRIPTION              OFFERED   ADMITTED
20
    1         Disk with Charged Images       37
21            and Videos

22  2         Disk with Charged Images       37
              Slideshow
23
    3         Summary and Chart of Image     22        23
24            Locations

25
```

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

```
 1              EXHIBITS INDEX  (Continued)

 2   STATE'S
     EXHIBIT        DESCRIPTION          OFFERED   ADMITTED
 3
     4         List of File Names - Maxtor    33       33
 4             One Touch External Hard
               Drive
 5
     5         List of File Names - Western   33       33
 6             Digital 1600 Hard Drive

 7   6         List of File Names - Seagate   33       33
               Barracuda Internal Hard Drive
 8
     7         List of File Names - Dell XPS  33       33
 9             410 Desktop Computer

10   8         List of File Names - Seagate   33       33
               Barracuda Internal Hard Drive
11
     9         Mozilla Bookmarks - Dell XPS   45       45
12             410 Desktop Computer

13   10        Mozilla 3 Bookmarks - Dell     45       45
               XPS 410 Desktop Computer
14
     11        Internet Explorer Bookmarks -  45       45
15             Dell XPS Desktop Computer

16   12        Mozilla Bookmarks - Western    45       45
               Digital Internal Hard Drive
17
     13        Internet Explorer Bookmarks -  45       45
18             Western Digital Internal Hard
               Drive
19
     14        Photos of Defendant            55       55
20
     15        Comparison Photos of Defendant 55       55
21             and Child Pornography Images

22   16        Western Digital WD 400\Program 59       59
               Files\Yahoo Messenger\Profiles
23             \cs_tx_guy \Archive Messages

24   17        Files and images Relating to   57       57
               "Scouts"
25
```

```
1              EXHIBITS INDEX (Continued)

2   STATE'S
    EXHIBIT       DESCRIPTION          OFFERED   ADMITTED
3

4   18    Von Gloeden Book - Taormina      65       66

5   19    Coming of Age Book by McBride     65       66

6   20    Wilhelm Von Gloeden Book by       65       66
          Weiermair
7
    21    Naked Places Book - Premier       65       66
8         Edition

9   22    Naked Places Book - Third         65       66
          Edition
10
    23    Todo Naturismo Magazine           65       66
11
    24    Bondage Boy Toys DVD              65       66
12
    25    Koinos Magazine                   65       66
13
    26    Made in the USA Magazine          65       66
14        (MUSA 6)

15  27    Virtually Nude Living DVD         65       66

16  28    DVD of Venture Scout Trips        57       58

17  29    Sam Houston Area Council          68       68
          Scout Records for Defendant
18
    30    Evading Arrest Indictment         92       92
19
    31    Evading Arrest Judgment           92       92
20
    32    Portable Hard Drive with          26       26
21        all Images and Videos from
          Defendant's Computers and
22        Peripherals

23

24

25
```

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

```
 1              EXHIBITS INDEX (continued)

 2   DEFENDANT'S
     EXHIBIT        DESCRIPTION              OFFERED    ADMITTED
 3

 4   1           Compilation List             95         96

 5   2           Photograph                  206        206

 6   3           Representative Diagnosis    147        147

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (July 28, 2010, Open Court, Defendant
 3                    Present, No Jury)
 4              THE COURT:  All right.  State v. Gregg
 5    Baird, the punishment phase.
 6                    Opening statements?
 7              MR. PHELPS:  Your Honor, just a few
 8    things.
 9              THE COURT:  Just some housekeeping
10    matters?
11              MR. PHELPS:  Yes, housekeeping matters.
12    I don't think that the State's case will take more
13    than a couple of hours.  I think we can probably be
14    done by 11:00 o'clock.
15              THE COURT:  Okay.
16                    OPENING STATEMENT
17              MR. PHELPS:  First of all, all of the
18    evidence that we will be offering, the physical
19    evidence -- computers, hard drives, books and other
20    things -- all of those pieces of evidence are coming
21    from the search that was conducted at the Defendant's
22    house, came from his bedroom; and I think Mr. James
23    wanted to put out there that what we're offering was
24    actually subject to search warrants.
25              MR. JAMES:  Yes, sir.
```

1          THE COURT:  All right.  That will be

2  noted for the record.

3          MR. PHELPS:  So we will have three

4  witnesses for you today, Judge.  I'm going to call

5  Nathan McCune, who is our investigator who does

6  forensic computer examinations to give the Court some

7  sense of the kind of evidence we're talking about.

8          The only thing that I think will be an

9  issue for the Court or an issue for Mr. James is that

10  while we want to give the Court as full a picture as

11  we can of both the child pornography possessed by the

12  Defendant, we also want to give the Court pursuant to

13  what we normally do in the punishment phase as full a

14  picture of the Defendant as we can.

15          There will be a couple of exhibits that

16  will be offered to show the Defendant, photographs

17  that were taken from the Defendant's computer of

18  himself in, I think, what can be charitably described

19  as deviant sexual contact involving bondage,

20  sadomasochism, that sort of thing.

21          I do want to make it clear that we are

22  not offering any evidence for the purpose of trying to

23  bias the Court or any person against this Defendant

24  because he may or may not be gay.  We are only

25  attempting to give the Court a full picture of this

1 Defendant's sexual proclivities, the extent to which

2 he will go to indulge in those sexual proclivities so

3 the Court can make, I think, a just evaluation of

4 basically redeemability, danger to the community and

5 to ultimately provide a just sentence.

6         We are also going to call a

7 representative from the Sam Houston Area Council of

8 the Boy Scouts of America to simply basically advise

9 the Court of the Defendant's involvement over the

10 number of years while he was downloading child

11 pornography with the Boy Scouts High Adventure Crew,

12 which is a Boy Scouts of America program.

13         And then, finally, we've got a police

14 officer from 2004, which is presently a police

15 officer, a deputy sheriff for the Grimes County

16 Sheriff Department who arrested the Defendant back in

17 2004 for evading arrest with a vehicle.  He was put in

18 the Grimes County Jail until time of trial for that.

19 He received probation -- felony probation as well.

20         THE COURT:  Yes, sir.

21             **OPENING STATEMENT**

22         MR. JAMES:  Judge, I appreciate

23 Mr. Phelps wanting to give you a full picture of Gregg

24 Baird.  I suspect it will not be as full and well

25 rounded as you need to hear.  I think you will have to

1   hear from the Defense and a number of witnesses about

2   a kind and warm-hearted Gregg Baird, excellent worker,

3   a man who has never -- despite what they say about the

4   Boy Scouts, has never, never, never had any improper

5   conduct with a child.

6                 And you're going to hear from the Boy

7   Scouts -- former Boy Scouts who will tell you that he

8   has never committed any act that would even make them

9   uncomfortable.

10                And Judge, I think that once you've

11  heard that real well-rounded Gregg Baird, and you hear

12  what happened to Gregg Baird when he was 12 years old,

13  I think, Judge, that will give you a well-rounded

14  picture of Gregg Baird, not the photos that Mr. Phelps

15  intends to offer.

16                THE COURT:  All right.  Call your first

17  witness.

18                MR. PHELPS:  We call Nathan McCune.

19                MR. JAMES:  Judge, may I borrow a pen?

20                THE COURT:  Yes, make sure that one

21  really works.  There's a couple in there that don't.

22                NATHAN MCCUNE,

23  having been first duly sworn, testified as follows:

24                MR. PHELPS:  Judge, may I proceed, Your

25  Honor?

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

```
 1                THE COURT:  You may.

 2                DIRECT EXAMINATION

 3  BY MR. PHELPS:

 4      Q.   Would you state your name for the court

 5  reporter?

 6      A.   Nathan McCune, M-C-C-U-N-E.

 7                MR. JAMES:  Judge, at this time, we'd

 8  ask that the Rule be invoked.

 9                THE COURT:  All right.  The Rule has

10  been invoked.  If we have any witnesses in the

11  courtroom, please rise and identify yourself for the

12  record.

13                Would you identify yourself, please,

14  sir?

15                MR. SHEETS:  I'm sorry, Judge?

16                THE COURT:  Just give us your name.

17                MR. SHEETS:  My name is Michael Sheets.

18                THE COURT:  All right.  Do we have --

19  remain with us just for a second.

20                And your name, ma'am, on my left?

21                MS. DOROTHY BAIRD:  Dorothy Baird.

22                THE COURT:  All right.

23                MS. KAREN BAIRD:  Karen Baird, Gregg's

24  mom.

25                MR. JOHN BAIRD:  I'm his dad, John
```

1  Baird.

2              THE COURT:  All right.  The Rule has

3  been invoked.  That means that all witnesses must

4  remain in the hallway.  The purpose of that is to keep

5  you from finding out what other witnesses are saying

6  in the courtroom until you testify.  Please do not try

7  to talk to anybody about the case or gain any

8  knowledge about what the witnesses are testifying to.

9  You may talk to the lawyers, however.

10             At this time, please retire to the

11 hallway and await your turn to testify.

12             (Witnesses comply)

13             MR. PHELPS:  There's Mr. Russ.

14             THE COURT:  Mr. Russ, are you a

15 witness?

16             MR. RUSS:  I was; but apparently, I'm

17 not now.

18             THE COURT:  Okay.

19    Q.    (By Mr. Phelps) Okay.  Can you state your

20 name for the record?

21    A.    Nathan, N-A-T-H-A-N, McCune, M-C-C-U-N-E.

22    Q.    How are you employed?

23    A.    As an investigator and advisor for the

24 Brazos County District Attorney's office.

25    Q.    And the Judge may already be familiar with

1   your duties; but just so the record is clear, could

2   you just give the Judge just a brief rundown of your

3   law enforcement career?

4       A.   Yes, sir, I went to work for the College

5   Station Police Department in August of 1998 where I

6   stayed employed both as a patrol officer and then as a

7   detective until October 200- --

8               MR. JAMES:  We'll stipulate to that,

9   Judge.

10              MR. PHELPS:  Okay.

11      Q.   (By Mr. Phelps) So that it is on the record,

12  have you received training in computer forensic

13  examination?

14      A.   Yes, sir, beginning in February 2005, I

15  completed about 165 hours of training in that field

16  including conducting about 82 solo examinations of

17  computers and have observed many others.

18      Q.   Okay.  Have you been involved in the

19  investigation of child pornography -- possession of

20  child pornography cases?

21      A.   Yes, sir, I have on several occasions.

22      Q.   Okay.  Did you do computer forensic

23  examination work on computers and hard drives and

24  other peripheral devices that were taken from the home

25  of Gregg Baird pursuant to the search warrants?

```
 1        A.    Yes, sir, I did.

 2        Q.    Let's start, first of all, if you would by

 3   telling the Court exactly what it was that you

 4   examined.  I'm not talking about what you found in the

 5   computer, but what did you examine?

 6        A.    In -- on May the 27th, 2009, I had

 7   approximately 17 devices delivered -- computer

 8   devices, electronic storage devices, delivered to me

 9   here at the courthouse by University Police

10   Department.

11              And do you want me to go through what

12   each one of them was?

13        Q.    Yeah, just -- just --

14              MR. JAMES:  Just -- Judge, just for the

15   record, I'm always a little scared of waiving

16   something.  We again renew our objections on the

17   grounds previously stated concerning the search

18   warrants of this case the Court previously ruled on.

19              THE COURT:  It will be overruled.  I'll

20   give you a running objection to all fruits of the

21   search.

22              MR. JAMES:  Thank you.

23        Q.    (By Mr. Phelps) Yeah, if you could, just

24   tell the Judge what devices you look through; and then

25   we'll talk about that.
```

1     A.   Go through them one by one?

2     Q.   Yes, sir.

3     A.   The first device I examined was the Fuji

4 Film XD Picture Card, which is -- in simple terms,

5 it's a card that you put in -- you can either put it

6 into a camera or a computer that stores any kind of

7 electronic media whether it be songs, pictures,

8 anything like that.

9     Q.   Okay.  And the second device?

10     A.   Sony Memory Stick Pro, also a card that you

11 can put in a computer or other device, camera or

12 anything like that, that would store any kind of

13 media.

14     Q.   And the next device?

15     A.   And a SanDisk Memory Stick Pro, similar to

16 the Sony, just capable of holding electronic media.

17     Q.   And the next one?

18     A.   It's a Sony Memory Stick Pro.  Again, same

19 circumstances, capable of containing electronic media.

20     Q.   And the next one?

21     A.   Sony Memory Stick, same situation, a card

22 capable of containing electronic media.

23     Q.   Okay.  And the next one?

24     A.   A Lexar SD card, also a card capable of

25 containing electronic media.

1    Q.   And the next device?

2    A.   Another Sony Memory Stick Pro, a device

3 capable of containing electronic media.

4    Q.   And then the next device?

5    A.   Super Flash USB 2.0 Drive.  This is more

6 like you've got a flash drive or a USB drive, thumb

7 drive.  It's capable of containing electronic media as

8 well.

9    Q.   And the next device, is that also the same

10 exact type of device?

11    A.   Same exact type drive, yes, sir.

12    Q.   And the next device?

13    A.   The next device was a Maxtor One Touch

14 External Hard Drive.

15    Q.   What's an external hard drive?

16    A.    It's essentially the same thing as I've

17 already talked about except it -- rather than being in

18 a card that goes in a camera or something like that,

19 it's just a large hard drive that you can store any

20 kind of media from a computer.

21    Q.   Okay.  And the next device?

22    A.   The next device was actually a computer, a

23 Dell XPS 410 Desktop Computer.

24    Q.   Is that the desktop computer that was

25 recovered from Mr. Baird's bedroom?

```
 1       A.    I don't have it in the report; but yes, sir,
 2  I do believe that was.
 3       Q.    Okay.  And any other devices?
 4       A.    Yes, sir, the next device was a Dell
 5  Optiplex GX 520.  This was the computer that Mr. Baird
 6  used at his work at the credit unit.
 7       Q.    Okay.  Was it a laptop or a desktop?
 8       A.    It was a desktop.
 9       Q.    Okay.  And then the next device?
10       A.    The next one was a Western Digital Internal
11  Hard Drive.  It was a hard drive built to go inside of
12  a computer, but this was just separate, you know.
13       Q.    Did it appear it had been removed from a
14  hard drive -- from the computer?
15       A.    Yes, sir, it looked like at one point it had
16  served as the main hard drive for his computer.
17       Q.    Okay.  And the next device?
18       A.    Western Digital External Hard Drive, similar
19  as the other external hard drive.  It's a large
20  storage space for electronic media.
21       Q.    And was the next device also another Western
22  Digital External Hard Drive?
23       A.    Yes, sir, it was.
24       Q.    And the next device?
25       A.    Seagate Barracuda Internal Hard Drive, again
```

1 another hard drive that was designed to go inside a

2 computer or inside the shell of an external hard

3 drive; but yes, it looks like an internal hard drive.

4     Q.   Okay.  And finally, the last device you

5 looked at?

6     A.   Device Number 17 was a Sony Vaio Notebook

7 Computer.

8     Q.   Okay.  Now, I just want you to go through,

9 if you would, and explain to the Judge what was the

10 purpose of examining these devices.

11     A.   At the time the devices were turned over to

12 me, it was believed that they were -- they were

13 believed to contain child pornography.

14     Q.   Okay.  And when you go about doing

15 examinations for child pornography on computers and

16 these peripheral devices, the hard drives and that

17 sort of thing, how do you do it?

18     A.   We use a commercially-available software.

19 It's called Encase.

20     Q.   Uh-huh.

21     A.   It's generally the industry standard in law

22 enforcement, or one of the two industry standards in

23 law enforcement.  It's a program that we use to make

24 an exact bit by bit copy of whatever media we're

25 examining and then examine that media without altering

1    the original device.

2         Q.    Okay.  So did you, in fact, conduct this

3    examination of all these devices that you've told the

4    Judge about looking for potential child pornography?

5         A.    Yes, sir.  The software --

6         Q.    Go ahead.

7         A.    The software also allows you to connect it

8    to the computer that I use to look at it without

9    changing anything on the device and actually preview

10   it rather than copying everything you view.  So the

11   devices you look at that don't have any evidence on

12   them, per se, you don't have to copy those.  There's

13   no need.  It's unnecessary.

14        Q.    Okay.  Now, over the course of your

15   investigation -- well, first of all, how long a period

16   of time did you conduct this examination?

17        A.    I received -- like I said, I received these

18   devices on May 27th of '09.  Obviously, I have other

19   duties as well; but probably over the course of six to

20   eight months, I worked on this periodically.

21        Q.    Okay.  How many man-hours do you think you

22   put into looking into this information?

23        A.    A rough estimate, about 120.

24        Q.    And of those 17 devices listed for the

25   Judge, did you find child pornography, which is

1    suspected child pornography, on any of those devices?

2         A.   On five of the devices, yes, sir.

3         Q.   Well, I'd like to go through kind of each

4    one.  Let's start with the first device that you found

5    there.  Would you suspect child pornography?

6         A.   The first one that had the child porn on it?

7         Q.   Yes, sir.  Well, we can just start with --

8    let's start with the computer -- the Dell computer

9    that you talked about.

10        A.   Okay.  The Dell XPS 410 computer?  Yes, sir,

11   that did contain files that I believe to be child

12   pornography.

13        Q.   And do you know how many?

14        A.   I've got a chart here.  Let me refer to

15   that.

16        Q.   Tell you what.  Let me do this:  You said

17   that you found what you suspect to be child

18   pornography on how many devices?

19        A.   Five devices.

20        Q.   And did you reduce your findings to a

21   summary chart for the Court?

22        A.   Yes, sir, I did.

23        Q.   And also some kind of a, I guess,

24   diagramming effort, give a diagram to show me --

25        A.   Yes, sir.

```
 1                    MR. PHELPS:  May I approach, Your
 2    Honor?
 3                    THE COURT:  Yes, sir.
 4        Q.   (By Mr. Phelps) -- from which the images
 5    came?
 6        A.   Yes, sir.
 7        Q.   And is that State's Exhibit Number 3?
 8        A.   Yes, sir, it is.
 9                    MR. PHELPS:  Okay.  At this time, we'll
10    offer State's Exhibit Number 3.
11                    (State's Exhibit Number 3 offered.)
12                    MR. JAMES:  Judge, other than the
13    objections previously lodged, which we are still
14    maintaining, obviously, that we urged earlier in the
15    pretrial hearing, we would have an objection as it
16    relates to the mention of adult male bondage and
17    homosexual conduct that is not prohibited; and we
18    would mention that in there.
19                    We'll have further objections, too, if
20    the State decides to post those images and introduce
21    them.  Even the mention of those, Judge, we would
22    object to under the Lawrence v. Texas and the Due
23    Process clause.
24                    THE COURT:  Response?
25                    MR. PHELPS:  Your Honor, first of all,
```

1  it's not the rule that it has to be prohibited conduct

2  for it to be relevant to a punishment hearing.  Again,

3  the State is offering this evidence to give the Court

4  a complete and full picture of this Defendant's sexual

5  propensities.

6              THE COURT:  Overrule the objection.

7              MR. JAMES:  May I have a running

8  objection, Judge?

9              THE COURT:  Yes, you may.

10     Q.   (By Mr. Phelps) So the chart that's just

11  been admitted --

12             THE COURT:  State's 3 is admitted.

13         (State's Exhibit Number 3 admitted.)

14             MR. PHELPS:  Sir?

15             THE COURT:  State's 3 is admitted.

16             MR. PHELPS:  Oh, thank you, Judge.  I

17  apologize.

18     Q.   (By Mr. Phelps) -- will you explain that to

19  the Court?  What exactly is this chart?

20     A.   Yes, sir.  If you'll look at the chart on

21  the left side, the device's name shows which device

22  contained the suspected child pornography.  The next

23  column contains the size of the storage space taken up

24  on the disk -- on the device; and then the next column

25  is the number of image files on each device and the

1  number of video files on each device.  And I should

2  note, the adult bondage of which Mr. James spoke of is

3  not included in these.

4       Q.   Okay.

5       A.   This is just the child pornography.

6       Q.   Okay.  Now, as you examined all of these

7  five devices containing this suspected child

8  pornography, did you actually go through and flip

9  through the images, the thumbnails of these images?

10       A.   Yes, sir.

11       Q.   Can you tell the Court whether the images

12  that are represented on State's Exhibit Number 3

13  represent child pornography?

14       A.   The image file column that --

15       Q.   Yes.

16       A.   Yes, sir, they do.

17       Q.   Well, what the Court is looking at is the

18  total number of some 62,000 images.

19       A.   The file number on this -- on this chart is

20  the suspected child pornography, yes, sir.

21       Q.   Okay.  And you've got actual experience in

22  looking at these?

23       A.   Yes, sir.

24       Q.   Because of your work with child pornography?

25       A.   Yes, sir.

1      Q.    And what you have tendered to the Court in
2   State's Exhibit Number 3, is that representative of
3   the child pornography that you found over the course
4   of the examination of these five devices?
5      A.    Yes, sir.
6      Q.    Now, with respect to the entirety of the
7   images, did you download those onto a portable hard
8   drive?
9      A.    Yes, I put all the evidence files onto one
10  hard drive.
11     Q.    And is that State's Exhibit Number 32?
12     A.    Yes, sir, it is.
13     Q.    And what is State's Exhibit Number 32?
14     A.    State's Exhibit Number 32 is -- is an
15  external hard drive like we talked about earlier.
16  It's one that was in the DA's possession.  It was
17  brand new, and I opened it, and I copied everything in
18  there.
19     Q.    Okay.  And what is contained on State's
20  Exhibit Number 32?
21     A.    It is all of these files that are listed in
22  the chart as well as any file list or any exports that
23  I did as part of my work to kind of categorize
24  everything.
25     Q.    And in terms of gigs, how many gigs of child

1  pornography is on State's Exhibit Number 32?

2      A.   Well, as reflected in the chart, 211.5

3  gigabytes of child pornography and then probably an

4  additional -- there's additional files that are

5  contained in my work --

6      Q.   Okay.

7      A.   -- product of my work.

8              MR. PHELPS:  All right.  At this time,

9  State will offer State's Exhibit 32.

10             (State's Exhibit Number 32 offered.)

11             MR. JAMES:  Same objection.

12             THE COURT:  Overruled, and 32 is

13  admitted.

14             (State's Exhibit Number 32 admitted.)

15             MR. JAMES:  If it contains adult sexual

16  conduct, our objection would also be the Fourteenth

17  Amendment, Due Process objection and under -- as well

18  as the search issue.

19             THE COURT:  Thank you.  And that will

20  be overruled.

21      Q.   (By Mr. Phelps) Investigator McCune, you've

22  testified briefly that you have been involved in a

23  number of child pornography investigations while at

24  the District Attorney's Office as well as the College

25  Station Police Department.

1          Have you ever seen this number of

2  images?

3      A.    That number, no, sir.

4      Q.    In terms of your examination of all these

5  images to the extent that you were able to look

6  through these thumbnails, have you ever seen any child

7  pornography more graphic than what's represented on

8  State's Exhibit Number 32?

9      A.    No, sir, I have not.

10     Q.    At my request, did you compile summary lists

11 of the file names of all of these images?

12     A.    Yes, sir.

13     Q.    Let's start with State's Exhibit Number 34.

14 Will you tell the Court what this is?

15     A.    This is a list of file names.  Basically,

16 what I did was create an Excel spreadsheet with all

17 the file names of the child pornography files.  This

18 is a list of just stuff on the Maxtor One Touch

19 External Hard Drive.

20     Q.    And the file names that are listed in this

21 exhibit and several others we'll look at, explain to

22 the Court, if you will, how those file names are

23 attached to these, affixed to the files.

24     A.    Can you explain?

25     Q.    Well, I mean, are they -- each one of these

1 things labeled by, for instance, the Defendant in this

2 case or downloaded in those files, do the names come

3 with them?

4     A.   Generally, the file name came with them. I

5 didn't see any evidence that all these files were

6 being individually named.

7     Q.   Okay. And from your examination in terms of

8 how these files were downloaded, let me ask you just a

9 couple of questions. First of all, is there any

10 evidence that these files, some 62,000 that you

11 testified to, were accidentally downloaded onto the

12 Defendant's computer?

13     A.   No, sir.

14     Q.   Or on any of his hard drives or peripherals?

15     A.   No, sir.

16     Q.   Were any -- what does it take to download

17 one of these images or a number of these images?

18     A.   Well, it takes an intentional action on the

19 part of the user of the computer to go to a site, a

20 website of whatever type, a sharing location to

21 actively go out and point and say: Yeah, I want to

22 take this file.

23     Q.   Okay. And active downloading, actually a

24 conscious, intentional act of getting something from

25 the Internet, I guess, getting it onto the hard drive

1   of your computer?

2       A.   Correct.   The fact that this stuff was on

3   the device was just neither accidental nor incidental.

4   I mean, it was an independent action taken by the user

5   of the computer.

6       Q.   Okay.   And from your examination of all of

7   these devices, did it appear that these were

8   downloaded one at a time, or is it possible to

9   download these in batches?

10      A.   They're generally batched download.   The

11  user is able to download what's called an RAR or a ZIP

12  file, and those files contain -- can contain two or

13  three files to hundreds of pictures in one file.   It's

14  basically container files is what it is.

15      Q.   Okay.   Were the files that we're talking

16  about where they downloaded, at least from your

17  examination, in batches or in --

18      A.   Yes, sir.

19      Q.   -- multiple --

20      A.   What I found looked like they had been in

21  batches.

22      Q.   And you mentioned file-sharing sites.   Will

23  you explain that to the Judge?

24      A.   Yes, sir.   File-sharing sites are online

25  websites that people can go to.   There are legitimate

1   sites.  Even some of the sites that were visited are

2   legitimate sites.  Basically, they're places where

3   people can post their media, their pictures for others

4   to go and view.

5              But the issue with those sites are also

6   people can post, you know, illegal contact and for

7   others to go download as well.

8        Q.    Okay.  Is it common?

9        A.    It's kind of common, yes, sir.

10       Q.    And did you, from your examination,

11  determine as to whether the files on the Defendant's

12  computer -- at least some of them -- were downloaded

13  from those kind of file-sharing sites?

14       A.    Yes, sir, the vast majority, I would say

15  were.

16       Q.    And on those file-sharing sites, can

17  certain -- are certain of those files password

18  protected?

19       A.    Yes, sir, in my research for this case in

20  going to some of the exact sites that were visited

21  with his computer, I was able to go to the websites

22  and found that there are these -- these libraries with

23  some of them being password protected --

24       Q.    Okay.

25       A.    -- where there are containers of folders.

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

1    Q.   Are there libraries of these kind of images

2  that are not password protected?

3    A.   There are, yes, sir.

4    Q.   So getting back to State's Exhibit Number 4,

5  which is a large -- probably about ten-inch deep file,

6  explain to the Court on each one of these pages about

7  how many file names are we seeing?

8    A.   They may be different on each set, but

9  there's roughly 20 to 25 file names on each page.

10    Q.   Okay.

11    A.   And then it takes up that many pages.

12    Q.   Okay.  And this is State's Exhibit Number 4.

13  There's a date on these pages.  What does that date

14  indicate?

15    A.   I believe in the majority of those, the

16  dates show the date last accessed by the computer,

17  which could be -- unfortunately, that date is not

18  extremely useful because it could be the date the

19  last, you know, security scan was run.  I mean, and

20  they'll all show the same date, basically.

21    Q.   And that State's Exhibit Number 4, those

22  file names come from what device?

23    A.   Those come from the Maxtor One Touch

24  External Hard Drive.

25    Q.   This is State's Exhibit Number 5.  Is this

1  the same kind of information that was contained in

2  State's Exhibit Number 4?

3        A.    Same sort of information, yes, sir.

4        Q.    In the same format?

5        A.    Yes, sir.

6        Q.    And where does that come from?

7        A.    That comes from the Western Digital 1600

8  External Hard Drive.

9        Q.    And then looking at State's Exhibit

10 Number 6, this is a much smaller file.

11                  What is this?

12       A.    That's from the Western Digital Internal

13 Hard Drive.

14       Q.    Also containing file names?

15       A.    Yes, sir.

16       Q.    And State's Exhibit Number 7, same

17 questions?

18       A.    Yes, sir, that's the Dell XPS 410 Desktop

19 Computer.

20       Q.    Also containing file names?

21       A.    Yes, sir.

22       Q.    And all of these are about 20 to 25 per

23 page?

24       A.    Roughly.

25       Q.    And then, finally, State's Exhibit Number 8?

1        A.    That's the Seagate Barracuda Internal Hard

2    Drive.

3                    MR. PHELPS:  At this time, Your Honor,

4    the State would offer State's 4, 5, 6, 7 and 8.

5              (State's Exhibit Numbers 4 through 8

6                    offered.)

7                    MR. JAMES:  Same objection as

8    previously lodged.

9                    THE COURT:  Overruled.

10                   That would be 6 through -- what was it?

11                   MR. PHELPS:  It's 4, 5, 6, 7 and 8.

12                   THE COURT:  All right.  Exhibits 4

13   through 8 admitted into evidence.

14             (State's Exhibit Numbers 4 through 8

15                   admitted.)

16                   THE WITNESS:  I just want to add, this

17   is not the list of all the files on the computer.

18   This is just the child pornography file names.

19                   MR. PHELPS:  Okay.  Yeah, 20 to 25 per

20   page.

21                   I'll put these up here.

22                   THE COURT:  All right.  Yes, sir.  You

23   want me to look at them now?

24                   MR. PHELPS:  I don't think it's

25   necessary.

1    Q.    (By Mr. Phelps) Some of the file names, are

2  they just numbers?

3    A.    Yes, sir, they're just random names on a lot

4  of the files.

5    Q.    Are some of the file names pretty

6  descriptive?

7    A.    Yes, sir, some of them can be.

8    Q.    With respect to some of the file names, are

9  they descriptive such that somebody looking at the

10  file name could determine that they were, in fact,

11  files containing child pornography?

12    A.    Yes, sir, they should know that they would

13  be -- contain children.  They list ages and things.

14    Q.    So some of the file names, they list ages?

15  Do they list sex acts?

16    A.    Yes, sir.

17    Q.    In the images that -- the 62,000 or so that

18  you testified to, are we talking about just pictures

19  of children just naked?

20            Are we talking about pictures of

21  children who are involved in sex acts?

22    A.    Pictures of children involved in sex acts

23  with other children, pictures of children naked and

24  pictures of children involved in sex acts with adults,

25  also.

1      Q.    Were you able to determine in your

2  examination about the time frame of how long these --

3  the earliest date of, at least from what you looked

4  at, where this sort of material was downloaded in the

5  Defendant's computer?

6      A.    Yes, sir, the earliest date that I found any

7  of the child pornography on any of these drives was

8  March 2004.

9      Q.    And what was the latest date?

10     A.    May 6, '09.

11     Q.    May 6th of 2009?

12     A.    Yes, sir.

13     Q.    Now, with respect to all of these images --

14  well, let me ask this first:  Can you give the Judge

15  some sense of the organization, if any, of the file on

16  the Defendant's computer and these other peripheral

17  devices?

18     A.    Most of -- like I explained earlier, a lot

19  of these files that you download, they come in

20  container-type folders; and you just download the

21  folder.  You open up the folder, and you've got

22  hundreds of pictures within it.  Most of the -- and

23  then in most of those container folders that were

24  downloaded, had been opened up; and the internal

25  contents had been organized throughout the different

1  drives.

2      Q.    And did you observe or see any evidence of

3  attempts to kind of hide some of this material?

4      A.    Yes, sir, there was some of these folders

5  that had been created in the vast majority of the

6  pornography hidden, were in places that you wouldn't

7  normally store media on a hard drive.  They were

8  within -- either within program files or within --

9  under -- within folders that pertained to system files

10 and not just where users would store media.

11     Q.    Yes.  Is there any question in your mind

12 that the intent of that was to hide these files?

13     A.    No, sir, that seems to be what it looks

14 like.

15     Q.    Okay.  And you're aware that the Defendant

16 was originally charged with 100 counts of child

17 pornography?

18     A.    I am.

19     Q.    And that, ultimately, he pled guilty to ten

20 of them and then admitted guilt in the other 90?

21     A.    Yes, sir, I believe that's right.

22     Q.    Okay.  I want to show you State's

23 Exhibit Number 1 and State's Exhibit Number 2.  What

24 does State's Exhibit Number 1 contain?

25     A.    That is going to be the 100 counts he was

1   originally charged with.

2       Q.    The 100 counts.  Now, does that contain the

3   entirety of the video images as well as the still

4   images?

5       A.    Yes, sir, it does.

6       Q.    And State's Exhibit Number 2, can you tell

7   the Court what that is?

8       A.    That is going to be a presentation that I

9   can put together that contains all the charged images

10  and the portions -- small portions of the child

11  videos.

12      Q.    And does that contain all 100 of those

13  charged images?

14      A.    Yes, sir, it does.

15      Q.    And are the images that are contained, the

16  video images and the still images in State's

17  Exhibit Number 2 and State's Exhibit Number 1,

18  representative of the kinds of child pornography

19  contained throughout the Defendant's computer and

20  other peripherals?

21      A.    Yes, they are.

22              MR. PHELPS:  Your Honor, at this time,

23  we'll offer State's Exhibits 1 and 2.

24          (State's Exhibit Numbers 1 and 2 offered.)

25              MR. JAMES:  Same objection previously

```
 1   lodged, Judge.

 2                   THE COURT:  All right.

 3                   MR. JAMES:  If that's overruled, I

 4   do --

 5                   THE COURT:  Overruled.

 6                   MR. JAMES:  Okay.

 7                   THE COURT:  You looked like you wanted

 8   to say something.

 9                   MR. JAMES:  I do.  I do.  I just want

10   to make sure -- is there a way to identify the ten

11   images that are the subject of the --

12                   MR. PHELPS:  Yes.

13                   MR. JAMES:  -- pleas versus the 90 that

14   he's culpable for?

15                   MR. PHELPS:  The 12.45s, yes.  There

16   are before each image -- for the Court's edification,

17   for each image, there is a kind of a title page --

18   black title page that has the State's

19   Exhibit whatever, and then -- or some information

20   about where it comes from and the cause number and the

21   count.

22                   MR. JAMES:  Okay.  Will it

23   identify this is the -- let me --

24                   MR. PHELPS:  It will not say:  This is

25   one of them he pled guilty --
```

```
 1                 MR. JAMES:  Okay.  I think we need -- I
 2   think we need to be able -- I mean, I'm just
 3   scrambling here looking at the counts.
 4                 MR. PHELPS:  Well, yeah --
 5                 THE COURT:  Just give me the counts,
 6   and I'll know --
 7                 MR. JAMES:  Yeah, let's look.  Let's
 8   just look at -- just for the record, if we can.
 9                 MR. PHELPS:  Sure, that's fine.  I
10   mean, obviously, they're all admissible for purposes
11   of punishment.
12                 MR. JAMES:  I'm not doubting the
13   admissibility.
14                 THE COURT:  Just for clarity of what
15   specifically --
16                 MR. JAMES:  Yes, if we can -- if we go
17   back and review because I don't know the counts.
18                 MR. PHELPS:  I don't either.
19                 Why don't I go ahead and publish it?
20   May I go ahead and proceed?
21                 THE COURT:  Yes, sir.
22                 My eyes aren't too good, so bring it up
23   close.  Bring it up close.
24                 MR. PHELPS:  I brought it --
25                 THE COURT:  Thank you.
```

1                    MR. JAMES:  Okay.  These are the 12.45

2    counts.  Do you have -- these are 12 -- these are the

3    ones that are 12.45s?

4                    THE COURT:  I have no idea.  It's

5    probably in another folder.

6                    MR. JAMES:  Okay.  If I could get the

7    12.45s.

8                    THE COURT:  Is that something that we

9    can do during the course of the day?

10                   MR. JAMES:  I think so.  I may have to

11   call him back.

12                   THE COURT:  Make sure I have it, if I

13   have any questions.

14                   MR. JAMES:  I may have to call him back

15   for some questions.

16                   THE COURT:  Okay.

17                   MR. JAMES:  I just want to make sure

18   the record is very clear.  This is the 12.45 counts.

19                   MR. PHELPS:  Yeah, we can put together

20   a list of which one of the counts, and we'll look at

21   it.

22                   MR. JAMES:  Okay.

23                   MR. PHELPS:  I can probably do that

24   over lunch.

25                   MR. JAMES:  Yeah.

```
 1                    MR. PHELPS:  And then we can just agree
 2    to it and stipulate to it.
 3                    MR. JAMES:  I will probably need to ask
 4    him a couple of questions after lunch, if I may.
 5                    THE COURT:  That would be fine.
 6                    Do you need this anymore?
 7                    MR. JAMES:  No, Judge.  With that
 8    understanding, it doesn't go to the admissibility.
 9                    THE COURT:  I understand.
10                    Yeah, I can see it.
11                    MR. PHELPS:  Tell us where you want it.
12                    THE COURT:  Bring it up as close as you
13    can.
14                    That's good.
15                    MR. PHELPS:  Permission to post it to
16    the Court.
17                    THE COURT:  Yes, sir.  Any objection?
18                    MR. JAMES:  Yes, same objection.  If I
19    should slip at some point and say "no" or something
20    like that, we are always reiterating our objection to
21    these --
22                    THE COURT:  All right.
23                    MR. JAMES:  -- under the search issue.
24                    THE COURT:  All right.  I understand.
25    That will be overruled.
```

```
 1              (Video exhibit published.)
 2      Q.    (By Mr. Phelps) Investigator McCune, during
 3  your investigation, were you able to determine whether
 4  the Defendant had bookmarked or marked as favorites
 5  any particular files?
 6      A.    Websites, yes, sir.  He had bookmarked
 7  websites.
 8      Q.    Would you explain to the Court what it means
 9  to bookmark or place in your favorites folder a
10  particular website?
11      A.    Sure.  Whichever Internet browser you choose
12  to use -- here at the County, for instance, we use
13  Mozilla Firefox as our Internet browser.  You have the
14  ability to bookmark your favorite sites that you go to
15  daily, which is news sites or whatever so that you can
16  return to them quickly by just clicking in your
17  bookmarks folder.  And you're also able to do that
18  with Internet Explorer and other Internet browsers as
19  well.
20      Q.    And were you able to determine whether the
21  Defendant had bookmarked a number of sites related to
22  child pornography?
23      A.    Yes, sir, he had.
24      Q.    And did you compile a listing of those
25  bookmarked files?
```

A. The bookmarks --

Q. Each of those bookmarks?

A. -- for each Internet browser type for two devices that actually contained those.

Q. Let me show you State's Exhibit Number 9.

What is that?

A. This is a list of the Mozilla bookmarks for the Dell XPS 410 Desktop Computer.

Q. Now, for each bookmark, if -- let's say I wanted to bookmark a site for camera equipment.

A. Yes, sir.

Q. How would I go about doing it? Would that depend on the computer or the browsers?

A. It would probably depend on the browser type; but, generally, you just go up to, like, the Tools menu once you're in the Internet window, and you click on the option to bookmark this page.

Q. Okay. So is it an actual conscious, intentional act to bookmark a particular page?

A. Yes, sir. You do have the ability a lot of times to transfer -- when you get a new computer to transfer your old bookmarks into a new Internet browser type. But, yes, sir, at one point, they would have had to have been intentionally marked.

Q. Okay. And as distinguishing -- or

```
 1  distinguished between bookmarks and simply Internet
 2  history, is this just an Internet history; or is this
 3  actually --
 4       A.   This is just bookmarks.  This does not show
 5  the -- it just shows where his favorites sites were.
 6       Q.   Okay.  And State's Exhibit Number 10?
 7       A.   The Dell XPS 410 Mozilla 3 bookmarks.
 8       Q.   And what is Mozilla 3 versus Mozilla?
 9       A.   In each case of, I guess, different Internet
10  browsers, it may just be a separate install, either an
11  earlier or later install of the Mozilla.
12       Q.   Okay.  And State's Exhibit Number 11?
13       A.   That's the Dell XPS 410 Internet Explorer
14  bookmarks.
15       Q.   And then -- so these are all -- again,
16  State's Exhibits 9, 10 and 11, are they all from the
17  actual desktop computer that was found in the
18  Defendant's bedroom?
19       A.   Yes, sir.
20       Q.   State's Exhibit Number 12?
21       A.   That's the Western Digital Internal Hard
22  Drive Mozilla bookmarks.
23       Q.   Okay.
24       A.   And that Western Digital Hard Drive, as I
25  testified earlier, was an internal hard drive that
```

```
 1   looked like it had been used in a computer from an
 2   earlier time.
 3        Q.   Okay.  And then State's Exhibit 13?
 4        A.   Western Digital Internal Hard Drive Internet
 5   Explorer bookmarks.
 6        Q.   Okay.  So 12 is the Western Digital Internal
 7   Hard Drive for Mozilla bookmarks, and 13 is the
 8   Western Digital Internal Hard Drive --
 9        A.   Yes, sir.
10        Q.   -- for the Internet Explorer?
11        A.   Yes, sir.
12             MR. PHELPS:  All right.  At this time,
13   we'd offer State's Exhibits 9, 10, 11, 12 and 13.
14             (State's Exhibit Numbers 9 through 13
15             offered.)
16             MR. JAMES:  Same objections previously
17   lodged, Your Honor.
18             THE COURT:  Overruled.  Those will be
19   admitted, 9 through 13.
20             (State's Exhibit Numbers 9 through 13
21             admitted.)
22        Q.   (By Mr. Phelps) And in each of these, is it
23   a spreadsheet?
24        A.   Yes, sir.  Through Encase, you're able to
25   create exports into different formats; and in this
```

1  one, I did an Excel spreadsheet.

2      Q.   And just so the Court knows when the Court

3  looks at these, it has a file for names?

4      A.   Right, that name is the name of the actual

5  file contained in the computer.  It is not necessarily

6  the name that was entered by the user.  No matter what

7  website -- most Internet browsers, if you bookmark a

8  site, you're able to manually name the bookmark to

9  whatever you want so you recognize it.  This name on

10  here that is found on the spreadsheets is what the

11  computer shows.

12      Q.   Okay.

13      A.   That's not what was typed.

14      Q.   Okay.  And that's why it bookmarks html or

15  bskpf?

16      A.   That's how the computer retrieved it.

17      Q.   And there's a column for "Created"?

18      A.   Right, the date that the bookmark was

19  created.

20      Q.   And then profile name, what is the profile

21  name?

22      A.   Most Windows-based computer systems allow

23  different -- allow more than one user on a computer.

24  Such as if a couple is living together, one can have a

25  profile.  The other can have a profile.  And so when

1  you go into your profile with all your favorites, all

2  your settings and everything else; and the other

3  person goes into theirs, they have all their settings

4  preset.

5           The profile name on here is which

6  profile is the person, you know, that did that

7  bookmark file.

8       Q.   Now, was there another profile on this

9  computer for the Defendant's roommate?

10      A.   No, sir, I don't believe there was.

11      Q.   Okay.  And this has -- one of the profile

12  names is Gregg.  In some places, it says Gregg Baird.

13      A.   Correct.  And the reason that is on this

14  computer, it appeared that he had backed up an old

15  copy of the Windows and maybe -- it appears his

16  previous user profile name on that older copy of

17  Windows was Gregg Baird; and then on the newer one, he

18  was just Gregg.

19      Q.   Okay.  And then the url name, is that the

20  actual name of the site bookmarked?

21      A.   Right.  That's the -- if you click on the

22  bookmark, that's where it would take you.

23      Q.   And then the browser type is just whether it

24  is Mozilla or Internet Explorer?

25      A.   Yes, sir, sure.

1      Q.    Just had a few questions.  Did you excerpt
2  some of those bookmark sites on to your report?
3      A.    Yes, sir, I just wanted to give a sample of
4  the different type of bookmarks he had.
5      Q.    So what is here is already in what was just
6  admitted into evidence?
7      A.    Yes, sir.
8      Q.    Okay.  I just had a couple of questions for
9  you about a couple of these.  Do a number of these --
10 at least the ones that you listed -- mention boys?
11     A.    Yes, sir.
12     Q.    There's one that's like boyslink.url,
13 puppyboys.co.uk.url?
14     A.    Uh-huh.
15     Q.    Is that UK -- is that -- does that indicate
16 that it's a site located outside of the country?
17     A.    Yes, sir.  I believe that's in the United
18 Kingdom.
19     Q.    There is -- there are a number related to
20 bondage and that sort of thing?
21     A.    Yes.
22     Q.    There's one that's schoolboysonly,
23 slayedlads; and then there's a -- one that says
24 imgsrc.ru.
25     A.    Yes, sir.

```
 1        Q.    Is that preventscout?

 2        A.    Yes, sir.

 3        Q.    And searchboy?

 4        A.    Yes, sir.

 5        Q.    What is that?  What is that imgsrc?

 6        A.    Imgsrc, in doing the research for that -- in

 7   researching these specific links, I went to that site;

 8   and it is a file-sharing site, like we spoke of

 9   earlier, where you can post libraries of photos and

10   other media.

11        Q.    One of the sites that he bookmarked was

12   perverted-justice.com?

13        A.    Yes, sir.

14        Q.    It says:  Exposing wannabe perverts on the

15   net.url?

16        A.    Yes, sir.

17        Q.    What is perverted-justice.com?

18        A.    I'll have to admit, I did not go to that

19   one.  I have a general understanding of what it is,

20   but I didn't research that site.

21        Q.    Okay.  You understand perverted-justice to

22   be an organization that is exposing -- basically, it

23   puts people online to try to entrap --

24              MR. JAMES:  Objection to -- A, to

25   leading, Judge.
```

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

```
 1              THE COURT:  Sustained.
 2              MR. JAMES:  Thank you.
 3    Q.    (By Mr. Phelps) What is your under --
 4              MR. JAMES:  And Judge, his
 5  understanding would come from hearsay.  If he went to
 6  it, I wouldn't have an objection other than those
 7  previously lodged.
 8              MR. PHELPS:  Well, at this point, we
 9  can stipulate as to his qualifications as to the
10  extent that he can claim that he has an understanding
11  of what that website is and what that organization is.
12  It certainly is within the realm of his expertize.
13              MR. JAMES:  Judge --
14              MR. PHELPS:  I don't think I need -- I
15  mean, it's not that I asked whether he visited.  It's
16  what he knows about that website.
17              THE COURT:  Ask him a couple more
18  questions about it.
19    Q.    (By Mr. Phelps) Do you have information in
20  the course of your duties as a computer forensic
21  technician about what perverted-justice.com is?
22    A.    I have a general understanding of what it
23  is.  I can say, in fact, on the link itself that the
24  tagline for it says:  "Exposing wannabe perverts on
25  the Net."  So that's what it says.
```

1       Q.    And this is actually a site that he visited

2   and bookmarked?

3       A.    Yes, sir.

4       Q.    Now, during the course of your examination,

5   did you recover a number of photographs of the

6   Defendant in sexual -- for lack of a better term --

7   bondage, sadomasochistic poses?

8                 MR. JAMES:  Judge, may I take him on

9   voir dire very briefly?  I have an objection to lodge.

10                THE COURT:  All right.  Go ahead.

11                **VOIR DIRE EXAMINATION**

12  BY MR. JAMES:

13      Q.    All the photos that you saw that Mr. Phelps

14  has represented, there were no children involved in

15  any of those?

16      A.    In reference to the last question he asked?

17      Q.    Yes.

18      A.    No, sir, no children.

19                MR. JAMES:  Judge, again, we would

20  object to that under the Fourteenth Amendment, under

21  Lawrence v. Texas, that it's Constitutionally

22  protected.  We would object to that.

23                THE COURT:  What has the Lawrence v.

24  Texas case told us?

25                MR. JAMES:  That was -- Judge, I've got

```
 1   a copy of it here.  Essentially, it says that sexual

 2   activity between consenting adults is Constitutionally

 3   protected.

 4               MR. PHELPS:  That's the homosexual --

 5               MR. JAMES:  Yeah, yeah.

 6               MR. PHELPS:  That case is the case that

 7   went up to the Supreme Court out of Texas.  I believe

 8   it just said that our homosexual conduct penal statute

 9   was unconstitutional.

10               MR. JAMES:  It went further than that,

11   Judge; and if the Court would look on Page 5 of 28.

12               THE COURT:  Okay.

13               MR. JAMES:  It says under 26 -- 24.75,

14   Bower's rationale does not withstand careful analysis.

15   In his dissenting opinion in the Bowers -- in Bowers,

16   Judge Stevens concluded that the fact that a State's

17   governing majority has traditionally viewed a

18   particular practice as immoral, is not a sufficient

19   reason for upholding it -- upholding a law prohibiting

20   the practice; and (2), individual decisions concerning

21   the intimacies of physical relationships, even when

22   not intended to produce offspring, are a form of

23   liberty protected by Due Process.

24               Certainly, we're not making any claim

25   that this applied to child pornography or anything
```

1  like that, Judge; but it does apply to things that

2  occurred between consenting adults, even if we do not

3  approve of those things.  Otherwise, we get into a

4  situation where, you know, a woman's abortion may be

5  considered bad conduct -- would be by some people, but

6  could that be admitted into punishment?  Being a

7  nonbeliever even.  Some people would consider all

8  sorts of conduct as being bad conduct.  There's got to

9  be something that governs that, and that's what we

10  object to on some of this Due Process, Your Honor.

11              THE COURT:  All right.  Overruled.

12          **DIRECT EXAMINATION (CONTINUED)**

13  BY MR. PHELPS:

14      Q.    Investigator McCune?

15              MR. JAMES:  May I have a running

16  objection?

17              THE COURT:  A running objection to the

18  adult porn?

19              MR. JAMES:  Yes, sir.

20              THE COURT:  I think so.  Yes, you'll

21  have that.

22              MR. JAMES:  Okay.  Thank you.

23      Q.    (By Mr. Phelps) In your examination, did you

24  discover a number of -- quite of few photographs of

25  the Defendant engaged in sadomasochistic behavior with

1   other adults?

2       A.   Yes, sir.

3       Q.   As well as on his own?  Some don't have

4   other adults in it?

5       A.   Sure, it's just pictures of the Defendant.

6       Q.   Did you also find other child porn on the

7   Defendant's computer that showed children in bondage?

8       A.   Yes, sir.

9       Q.   And in sadomasochistic positions?

10      A.   Yes, sir.

11      Q.   Let me show you State's Exhibit Number 14.

12  Is this exhibit a collection of those photographs that

13  depict the Defendant in those sexual situations?

14      A.   Yes, sir.

15      Q.   And State's Exhibit Number 15, does that

16  show contrasting photographs of the Defendant in

17  sadomasochistic poses with some of the photographs

18  taken off the Defendant's computer of children in

19  similar poses?

20      A.   Yes, sir, there's side-by-side comparisons

21  of the children in bondage situations and then the

22  Defendant in those -- or the Defendant and other

23  individuals in the same situations.

24           MR. PHELPS:  Your Honor, I would offer

25  State's Exhibit Numbers 14 and 15.

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

```
 1                    (State's Exhibit Numbers 14 and 15 offered.)
 2                    MR. JAMES:  Same objection as
 3    previously raised.
 4                    THE COURT:  Overruled.  That's 14 and
 5    15, did you say?
 6                    MR. PHELPS:  Yes, sir.  State's 14 is
 7    the pictures of the Defendant; 15 are the contrasting
 8    photographs.
 9                    THE COURT:  Those are admitted.
10                    (State's Exhibit Numbers 14 and 15
11                    admitted.)
12        Q.    (By Mr. Phelps) With respect to State's
13    Exhibit Number 15, do those -- well, let me ask it
14    this way:  Were there a number of photographs found in
15    the Defendant's computer depicting children in those
16    sadomasochistic poses?
17        A.    Yes, sir.
18        Q.    Are these photographs in State's Exhibit
19    Number 15, does that constitute all of them or just a
20    representative sample.
21        A.    Just a sample.
22        Q.    And did you find on the Defendant's computer
23    any files that appear to be related to Scouting?
24        A.    Yes, sir.
25        Q.    Did we also present those files as State's
```

```
 1  Exhibit Number 17?
 2       A.   Yes, sir, the ones that were pornographic.
 3  There were Scouting pictures related to the actual Boy
 4  Scouts troop, I guess -- actual Boy Scout troop.
 5       Q.   The Defendant's Boy Scout activities?
 6       A.   Right, and then there's the pornographic
 7  scouting.
 8       Q.   Now, did you find any photographs that you
 9  could see in which the Defendant himself had taken any
10  photographs of actual Boy Scouts that he was involved
11  with?
12       A.   He took pictures of Boy Scouts, but not
13  sexual, no.
14       Q.   Okay.  And these photographs that are
15  contained in State's Exhibit Number 17, are these
16  photographs downloaded off the Internet that just had
17  to do with Scouting?
18       A.   Yes, sir.
19       Q.   And are they photographs that depict Scouts
20  or, I guess, young men in camping situations, naked
21  and engaging in some sexual conduct?
22       A.   Right, I'd say they're involved in Scouting
23  because the name itself says "Scouts."  I don't know
24  those to be Scout activities, other than they are
25  camping.
```

```
 1        Q.    Okay.   One is Maxtor One Touch/Program

 2   Files/TEMP/scouts, and the other one is Maxtor One

 3   Touch/Program Files/v/v1/scouts/campleto.

 4        A.    Yes.

 5                   MR. PHELPS:  All right.  At this time,

 6   we would offer State's Exhibit Number 17.

 7             (State's Exhibit Number 17 offered.)

 8                   MR. JAMES:  Same objection as

 9   previously raised.

10                   THE COURT:  Overruled.  Exhibit 17 is

11   admitted.

12             (State's Exhibit Number 17 admitted.)

13                   MR. PHELPS:  At this time, we'll offer

14   State's Exhibit 28.  This was a DVD that was found in

15   the Defendant's bedroom.  I think pursuant to our

16   agreement earlier, this is simply a slide show -- two

17   slide shows of camping trips that he went on with the

18   Venture crew.

19             (State's Exhibit Number 28 offered.)

20                   MR. JAMES:  We have a stipulation

21   there's nothing pornographic reported.

22                   MR. PHELPS:  Nothing pornographic, no.

23                   MR. JAMES:  All right.

24                   THE COURT:  So no objections then,

25   or --
```

```
 1              MR. JAMES:  Same objections previously
 2   raised, Your Honor.  I just want the stipulation
 3   noted.
 4              THE COURT:  It is overruled, and that
 5   will be admitted.
 6              (State's Exhibit Number 28 admitted.)
 7        Q.   (By Mr. Phelps) And then, finally,
 8   Investigator McCune, in your investigation of the
 9   Defendant's computer, did you find evidence of online
10   chats by the Defendant with other people?
11        A.   In the investigation or the examination of
12   the Western Digital Internal Hard Drive.
13        Q.   Okay.  Now, explain to the Court, if you
14   will, how you were able to recover these chat
15   sessions.
16        A.   The chat server recovered were routed
17   through messenger chats.  Generally, if someone uses
18   Yahoo Messenger, they have the option to either log
19   that chat or archive that chat or not to.  And I do
20   believe the actual -- unless it's changed recently,
21   the default setting is to not log that chat.  It just
22   takes up space on your computer.
23              On the -- it was the older internal
24   hard drive we're talking about that had come from a
25   previous computer.  There was chats archived from
```

1   Yahoo Messenger.

2        Q.   Okay.   Now, were there -- let me show you

3   State's Exhibit Number 16.   Does this exhibit contain

4   a number of those chat sessions with other people on

5   the Internet regarding sexual activity and meeting for

6   the purpose of sex?

7        A.   Yes.

8        Q.   Does it discuss graphically the sexual

9   proclivities of the Defendant?

10       A.   Yes, sir.

11            MR. PHELPS:   At this time, we'll offer

12   State's Exhibit 16.

13            (State's Exhibit Number 16 offered.)

14            THE COURT:   Any objection?

15            MR. JAMES:   Let me see it for a second.

16            Same objection previously lodged, Your

17   Honor.

18            THE COURT:   Overruled.

19            Sixteen is admitted.

20            (State's Exhibit Number 16 admitted.)

21       Q.   (By Mr. Phelps) Investigator McCune, in

22   these chat sessions, I mean, are you familiar with, I

23   guess, efforts by some folks to get on the computer

24   and find people to have sex with, that type of thing?

25   It does happen.

1    A.    I'm not familiar with it.

2    Q.    No, no.

3    A.    I know what you mean.  I haven't -- I don't

4  even have Messenger, but I'm familiar with it and how

5  it works.

6    Q.    In these -- each one of these that's stapled

7  together as part of State's Exhibit 16, these

8  represent a separate chat?  These are chats with a

9  separate user name other than the Defendant's?

10    A.    Yes, sir.

11    Q.    Now, is it possible for one person to have

12  multiple user names?

13    A.    Yes, sir.

14    Q.    But in this circumstance, there are separate

15  user names.  For instance, this one is massageinbcs

16  speaking with cs_tx_guy?

17    A.    Yes, sir.

18    Q.    This one is tomfinn100 and so on?

19    A.    Yes.

20    Q.    Did you -- were you able to determine

21  cs_tx_guy was, in fact, the Defendant?

22    A.    Yes, sir, under one of his users on his

23  computer, User Gregg, there was a link to a Yahoo

24  email cs_tx_guy.

25    Q.    Now, as far as you can tell in State's

1  Exhibit Number 16, there is no contact with any

2  children or anything?

3       A.   I didn't -- I didn't see any contact with

4  children.

5       Q.   Also, there are dates listed on those chats

6  on the top of each page?

7       A.   Yes, sir.

8       Q.   Do you recall -- or do you need to look at

9  what is the earliest date?

10      A.   I probably need to look at it.  I haven't

11  read through that stuff in a little bit.

12      Q.   There was a date at the top of this chat

13  dated 1/24/2006?

14      A.   Yes, sir.

15      Q.   Okay.  Is that accurate in terms of when

16  those dates occurred -- those chats occurred?

17      A.   That is the date put on there by Yahoo

18  programs.

19      Q.   Okay.  So March 2006, March 2006, March 2006

20  and so on.  So these dates, the Judge can look at

21  these and see at least with respect to this set of

22  chats, that's when it occurred?

23      A.   Yes, sir.

24      Q.   And in your examination of the Defendant's

25  computer and his peripherals, did you find any

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

1  photographs of the Defendant involved with any sex

2  acts with children?

3        A.    No, sir.

4        Q.    Thank you.

5                  MR. PHELPS:  Your Honor, I pass the

6  witness.

7                  MR. JAMES:  Your Honor, for the record,

8  my Cross-Examination is being necessitated by the

9  Court's ruling.  The Court has not made those rulings

10 on the Due Process grounds as well as the search

11 issue, or I would not have those questions for the

12 witness.

13                 THE COURT:  Okay.

14                 **CROSS-EXAMINATION**

15 BY MR. JAMES:

16      Q.    Couple of clarifications.  One, you -- you

17 prepared an exhibit that showed some bondage of

18 adults.  Sitting next to it was bondage of children.

19 That's on the exhibit.  That wasn't prepared -- that

20 wasn't the way it was on his computer, was it?

21      A.    Correct, it did not come off the computer

22 that way.  And if you look at that exhibit, there are

23 file names beside each photo of the name the way it

24 was on the computer.

25      Q.    Okay.  So, in fact, they were on different

1  computers, different hard drives, weren't they?

2      A.    No, sir, not necessarily.  They -- they

3  could have been on the same computer, just in

4  different locations.

5      Q.    You don't know where they were?

6      A.    I could find them.  I don't know off the top

7  of my head.

8      Q.    Off the top of your head, but you're not

9  making that representation?

10     A.    That they were together, no, sir.

11     Q.    Okay.  You've been working these kinds of

12  cases for a long time.  It's not uncommon for people

13  who actually engage in these -- they engage in those

14  acts to keep some sort of trophy photographs and that

15  sort of thing; is that right?

16     A.    Which type?

17     Q.    Any kind of -- well, for instance, there are

18  photos of the Defendant, you testified, engaged in

19  bondage and in adult homosexual activity; is that

20  correct?

21     A.    Yes, sir.

22     Q.    Okay.  But you didn't find any photos or

23  anything in the house indicating that he had ever had

24  contact with any children, did you?

25     A.    I only searched the computer; but no, sir, I

1  didn't find anything.

2      Q.   Okay.  And it's certainly not uncommon for

3  people who engage in contact with children to keep

4  some sort of trophy like that?  That's pretty common?

5  I've been told that's the case?

6      A.   Yes, sir.

7      Q.   You were talking about the websites.  There

8  were literally hundreds of websites that were marked.

9  Most of them things like Time and CNN; is that fair?

10     A.   I believe if you look through them, it's

11  probably half and half.  The vast majority are

12  pornographic -- pornography-related, and probably half

13  of legitimate websites.

14     Q.   Okay.  And Detective McCune, we had a little

15  conference earlier.  You would be amenable to going

16  through and getting information so that we can

17  identify exactly which -- give me some information

18  about exactly which photos or videos are the source of

19  the pleas in this case.  You can do that?

20     A.   Sure.  I don't know which they are, but

21  y'all tell me, and I can find them.

22     Q.   We can work that out.  Ray's doing that.

23              MR. JAMES:  I'll pass the witness.

24              MR. PHELPS:  I have nothing further.

25              THE COURT:  You can step down.

```
 1                    THE WITNESS:  Thank you.

 2                    THE COURT:  Let's take a ten-minute

 3  break.

 4            (Recess, 10:33 a.m. to 10:52 a.m.)

 5                    THE COURT:  All right.  We ready to

 6  proceed?

 7                    MR. PHELPS:  Yes, sir.

 8                    THE COURT:  Okay.  Raise your right

 9  hand, please, sir.

10                    MICHAEL SHEETS,

11  having been first duly sworn, testified as follows:

12                    THE COURT:  Have a seat.

13                    MR. PHELPS:  We just have a proffer of

14  evidence, again, pursuant to our agreement that these

15  are items that are taken from the Defendant's bedroom

16  pursuant to the search warrant.  I'll try to do them

17  in order, but probably won't.

18                    State's Exhibit 18, which is a book

19  found in the Defendant's bedroom.

20                    State's Exhibit 19, State's Exhibit 20,

21  State's Exhibit 21, State's Exhibit 22, State's

22  Exhibit 23, State's Exhibit 24, State's Exhibit 25,

23  State's Exhibit 26 and State's Exhibit 27.

24                    I think I've shown them to Mr. --

25                    (State's Exhibit Numbers 18 through 27
```

```
 1                      offered.)
 2                      MR. JAMES:  Yeah.  What's this one?
 3                      Same objection as previously lodged
 4  here.
 5                      THE COURT:  It will be overruled.
 6                      Seventeen -- or excuse me -- 18 through
 7  27 are now admitted into evidence.
 8                 (State's Exhibit Numbers 18 through 27
 9                      admitted.)
10                      THE COURT:  All right.  Go right ahead.
11                      DIRECT EXAMINATION
12  BY MR. THOMAS:
13      Q.    All right.  Mr. Sheets, please state your
14  name for the record.
15      A.    My name is Michael Alan Sheets.
16      Q.    And what did you do, sir?
17      A.    Recently retired from the Sam Houston Area
18  Council of Boy Scouts of America.
19      Q.    And so you were actually an employee of the
20  Boy Scouts of America?
21      A.    Yes, I was.
22      Q.    And how long did you work for them?
23      A.    I worked for them 27 and a half years.
24      Q.    And what all did you do as an employee for
25  the Boy Scouts of America over that 27 years?
```

1      A.    From working in the field, I became Council

2 program director, served in advancement and training

3 issues; and then 18 years ago, I picked up a new

4 responsibility of standards of membership, youth

5 protection, criminal background checks and legal

6 affairs for the Council.

7      Q.    And what do you do now that you're retired?

8      A.    I recently retired.  I haven't done it.  I

9 will teach privately certification courses starting in

10 January.

11      Q.    And this week, you actually were at the

12 100th Anniversary Jamboree?

13      A.    Yes, I'm in from Fort AP Hill, Virginia for

14 the -- for National Scout Jamboree.

15      Q.    And because we contacted that office and

16 asked for somebody to come, you were the nominee to

17 fly back from the Jamboree?

18      A.    I am -- yes, sir, I'm the designee.

19      Q.    Now, back in January of 2010, our office

20 spoke to you and requested some records concerning

21 Gregg Baird, and you did send us some records?

22      A.    That is correct.

23      Q.    Okay.  And you sent us also the business

24 record affidavit?

25      A.    Yes, I did.

1            MR. THOMAS:  Your Honor, at this time,

2    we would offer State's Exhibit 29, which has

3    previously been entered in the Court's file.  It is a

4    business record affidavit signed by Mr. Sheets for the

5    Boy Scouts of America.

6            (State's Exhibit Number 29 offered.)

7            THE WITNESS:  I'm also the record

8    keeper.

9            MR. JAMES:  No objection.

10           THE COURT:  Twenty-nine's admitted.

11           (State's Exhibit Number 29 admitted.)

12       Q.   (By Mr. Thomas) And you have a copy of this

13    record to refer to, don't you?

14       A.   Yes, sir, I do.

15       Q.   Okay.  Now, as a -- in your position in all

16    your time with the Boy Scouts of America, when you

17    pulled up these records and looked at the different

18    affiliations or registrations or training that someone

19    has, you would be familiar with pretty much everything

20    that could be out there?

21       A.   Yes, I am.

22       Q.   And when you looked for records concerning

23    Gregg C. Baird, were you, in fact, able to find some

24    affiliations that he had with the Boy Scouts of

25    America?

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

```
 1       A.    At one point, he had affiliation with the
 2  Boy Scouts of America.
 3       Q.    And the exhibit we tendered to the Judge,
 4  the two pages that shows as an adult for a registered
 5  period of time that Mr. Baird was involved in the Boy
 6  Scouts?
 7       A.    Yes, it shows from -- up until his
 8  registration he did not recharter on that on March the
 9  30th of 2009.  We compute -- changed computerized
10  records, so this picks up with the registration of
11  2000 or actually 19- -- the year 1999, and there may
12  be other records that we would not have.  This is what
13  we would have personally here at the Council office.
14       Q.    And just draw your attention to one thing
15  towards the bottom of the first page, it talks about
16  ranks?
17       A.    Yes.
18       Q.    It says that on February 8th of 1989, the
19  rank of Eagle.  Does that show that Mr. Baird was --
20       A.    It shows that he's an Eagle Scout.
21       Q.    So as a child or a young man, he, obviously,
22  came up through Scouting as well?
23       A.    Yes, sir.
24       Q.    And these records here show that starting in
25  2000 the different affiliations and so forth he had as
```

1  an adult?

2      A.   That -- yeah.  In fact, if I go through the

3  BSA registrations, there's a point there where it

4  says:  Expired, December 31st, 1998; shows that he's a

5  member at large on the district committee and not --

6  in his affiliation with a unit.  This shows expiring

7  January 31st, 2000, as a committee member of Crew 1.

8      Q.   Okay.

9      A.   And so one is with the district

10 registration, and the other is with a unit

11 registration.

12     Q.   Okay.  And I guess, first, we need to talk

13 about when -- this, obviously, is the Boy Scouts of

14 America overall.  It covers the whole country.  When

15 you're talking about a district, for us right here --

16     A.   Yeah.

17     Q.   -- in this area, how -- what does a district

18 mean; and what is our district?

19     A.   Okay.  There's 16 and a half counties in the

20 Sam Houston Area Council.  The district is a

21 geographical area with leadership of Brazos, part of

22 Bryan County.  This will actually go all the way to

23 College Station and Bryan, will go over to

24 Madisonville and up to Hearn as what they call the

25 Arrowmoon District.

1      Q.    Okay.  So when we look at this form, and we

2   see District of Arrowmoon, is that one in the same

3   Arrowmoon District?

4      A.    Yes, it is.

5      Q.    And that's under -- or it's one of the

6   districts under the Sam Houston Area Council?

7      A.    That's correct.

8      Q.    Which goes from Hearn pretty much down to

9   Galveston?

10     A.    Yeah, and it goes from Madisonville to

11  Huntsville, Trinity, Mount Bellview down to -- not

12  Galveston.  Galveston would be a separate council, and

13  it will go down to Friendswood, part of -- half of

14  Friendswood over to Bay City back up to Sealy/Columbus

15  area and Weimar, back to Hempstead, and then makes

16  that -- makes that loop of 16 and a half counties.

17     Q.    Okay.  And then when we get within the

18  district, then we see something like the Venture Crew,

19  the District broken down into smaller entities such as

20  troops, Cub Scout packs and Venture crews?

21     A.    Yeah, right.  The districts will help the

22  programs of the Boy Scouts.  In the Boy Scouts, you

23  have the Cub Scouting Program, which is the packs.

24  The Boy Scouting Program, which is the troops and

25  teams, varsity teams; and then you have the Venturing

1 programs which are crews as far as the traditional
2 Scouting programs.
3      Q.   And as far as Mr. Baird's record, it shows
4 his involvement as an adult leader with a Venture
5 crew?
6      A.   That is correct.
7      Q.   And so the Judge knows, what is -- as
8 opposed to a Boy Scout troop, give a general idea of
9 what a Venture crew is.  Are we talking about --
10     A.   A Venture crew is for young people, boys and
11 girls, from age -- actually, the eighth grade, 14 or
12 the eighth grade -- complete the eighth grade up and
13 to -- through the age of 20 up and to they're 21 from
14 that aspect.  So a crew can be coed or a non-coed up
15 to whatever the Charter organization deems it.
16          All the units within the Scouting
17 program enter into an annual agreement with charter
18 organizations who agree to use the Scouting program as
19 their youth program.  We do not own the units.  The
20 charter organization does.  So when I look at charter
21 organizations, they're the ones that say:  We're going
22 to use Scouting for our youth program.
23     Q.   Okay.  And then the charter organization
24 also keeps track of their leaders and checking up
25 on --

1      A.    Yes, they -- they --

2      Q.    -- and who they are and so forth?

3      A.    The charter organization approves the

4  leadership, and they -- on the application that we

5  sent to Council office; and as of 2008, it was --

6  we'll do the processing and approve the manager and do

7  criminal background checks from that aspect.

8      Q.    And let me ask you this:  When you become

9  any kind of Boy Scout leader, a registered leader, in

10  the records like this, is there training you have to

11  go through?

12      A.    At this time, it is.  When the Defendant was

13  registered, it was recommended, wasn't mandatory.

14  It's mandatory today.

15      Q.    Okay.  And does his record show that he has

16  been through some training?

17      A.    It shows that he has been through training.

18  He's been through the Adult Explorer Leadership

19  Training, which was a predecessor of Venturing

20  program, the old Explorer post; and it shows that he

21  has taken New Leader Essentials, a little bit about

22  the Cub Scouting program and Venturing Basics and then

23  Youth Protection Training and Venturing Leaders

24  specific training, which would include the Youth

25  Protection Program which would include personal safety

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

1  awareness.

2      Q.    Okay.  And Youth Protection Training, that's

3  something that has to be -- you don't just take that

4  once.  You have to take it every so often; isn't that

5  correct?

6      A.    During this time period, you could take it

7  once unless you were going on a national trip.  I can

8  tell you that the rules have changed this year as in

9  every leader must have it, and it must have been done

10 annually.

11     Q.    Must have it.

12     A.    And we recommended it every two years prior

13 to that.

14     Q.    Okay.  Now, go back and look at the first

15 page.  Looking at the different positions Mr. Baird's

16 been in, I guess, as briefly as possible if you could

17 run through for the Judge the different positions and

18 registrations he's been in, what level he's been

19 involved with the Venture Crews and what exactly that

20 position does when he's in that.

21     A.    Okay.  In here, there's been several charter

22 organizations.  At one point, St. Michael Academy was

23 the charter organization.

24              If you look at the dates, there's the

25 corresponding requisition.  The exec officer or the

1    institutional head is the key person who we sign the

2    agreement with.   The charter organization

3    representative interfaces between the committee and

4    the charter organization.

5              There was a change for a year.   Aggie

6    Credit -- Aggieland Credit Union was the charter

7    organization, and then currently the charter

8    organization, as of 2005, 2000 -- as of 2000 --

9    starting at the end of 2006, the Kiwanis of -- it's

10   not on here -- the Kiwanis of the -- of College

11   Station, which at the time left that -- that key

12   leadership role within the unit and became a direct

13   contact leader, which is as an associate advisor.

14      Q.   Okay.   So when we look at under Unit

15   Registration, from January 2000 through March 2004,

16   that's when he is more maybe in an administrative

17   role, doing the --

18      A.   Generally speaking, it's more of an

19   administrative role to ensure that the program

20   happens.   Now, different organizations have different

21   degrees of working whether they're working with youth;

22   but generally speaking, it's an administrative role.

23              As you come in here, where it says the

24   Venturing Crew Associate Advisor, that's the direct

25   contact.   That's the person who's working with the

1   youth on a weekly or monthly basis.

2        Q.   Okay.  So from March 2005 on through to the

3   time that he's not reregistered, this shows that he's

4   in one of those direct contact positions with --

5        A.   Yeah, sometime prior to that, in 2004,

6   that's a re -- that's an expiration date.  So the unit

7   expired and directly reregistered in 2005.  So

8   sometime between that 2004 and that early 2005, he

9   started as an associate advisor.

10       Q.   Okay.

11       A.   And then as far as that actual Venture Crew

12  Number 1, the only thing as far as I think that crew

13  is how many kids are involved.  It ranged from roughly

14  10 to 20 over the years.  I think there were about 18

15  people active.

16       Q.   And then as a Crew Associate Advisor for a

17  Venture Crew, did he only associate with those 10 or

18  20 kids, or did he have an opportunity to also

19  associate with other Venture Crew kids or --

20       A.   You have the opportunity to associate with

21  other Venturing Crews and activities, depending on the

22  program of that crew.  It's very common for Venturing

23  Crews in an area to get together to do something and

24  so on.

25       Q.   All right.  And then we have, I know, in

1  evidence here some photographs from the 2005 summer

2  trip.  I believe this is Glacier National Park with a

3  Venture Crew.  That was a nine- or ten-day trip.

4  Would that be a typical type of trip that a Venture

5  Crew would take?

6      A.   If they were using the High Adventure

7  Program, yes, it would.

8      Q.   Okay.

9      A.   Venturing Crews can have different

10 specialties.  For example, one could be around the

11 Indian Dancing area.  One could be strictly high

12 adventure like going to Glacier Park.  One could be

13 working with the youth fellowship of a church.

14 There's a lot of flexibility within Venturing Crew on

15 what they do.

16     Q.   Okay.  In any of these positions that

17 Mr. Baird's held over the years, since each charter

18 organization or crew or troop more or less controls

19 their leaders and who gets in, were any of the

20 positions he had, would he have been in a position of

21 helping to decide other leaders coming in --

22     A.   Yes.

23     Q.   -- and appropriateness or not?

24     A.   Yes.

25     Q.   And which positions would that have been?

```
1        A.    That would be into the charter organization,
2   executive officer institutional head.  Those are --
3   when an adult fills out an application, they must be
4   approved by the charter organization; and his
5   signature should appear on that application as
6   approving them for adult leader.  It goes to the
7   Council office, and then we have a secondary approval
8   process.
9                We listen to the charter organization
10  and approve the leaders unless someone does not meet
11  the complete standards of the Boy Scouts of America.
12       Q.    Then each actual charter organization, then
13  they -- it would be up to them to check somebody's
14  background and do a background check, find out if they
15  have anything in their background that makes them
16  unfit as much as possible for them to do so?
17       A.    Well, yeah, informally, that was done on the
18  application through references; and some may have done
19  that.  The Boy Scouts of America instituted criminal
20  background checks for all Scouting leaders seven years
21  ago.  Three years ago or two years -- three years ago,
22  it -- anybody who was a registered leader was
23  grandfathered in with no criminal background check.
24  As of August the 1st, 2008, all leaders underwent a
25  criminal background check, or they were removed from
```

1  the Scouting program.

2      Q.    Okay.  And if someone had arrests -- felony

3  arrests or felony charges in their -- in the past,

4  would the Boy Scouts be interested in finding out what

5  that is and finding out if they have that, whether

6  it's something that they think would be appropriate or

7  not in being a leader?

8      A.    Absolutely.  That is what I do.  When I

9  referred to standards of membership, that was my key

10 role with the Sam Houston Area Council that we use

11 Lexis Nexis now.  We did Choice Point at the time.  We

12 do a criminal background check based on Social

13 Security number and key points.  I would receive the

14 criminal background check.  I would look at that

15 information.  If it met certain standards, they were

16 not going to be a leader.  If they were marginal, we

17 would talk with the charter organization.  If not,

18 then they were apprized of their leader.

19     Q.    And then part of it also was the applicant

20 applying and saying:  I want to be a Boy Scout Leader.

21 Is a part of that application process also relying on

22 that person to list on their application everything

23 that the Boy Scouts may be interested in knowing that

24 could be a concern or not about their background?

25     A.    That's correct.

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

1         MR. JAMES:  Could we -- it might save a

2    minute if I can go over with Mr. Thomas --

3         Q.   (By Mr. Thomas) What's Mr. Baird's status,

4    if any, with the Boy Scouts?

5         A.   He is not registered with the Boy Scouts of

6    America.  He did not reregister.  At the time that

7    there was charges or indictment, he was put on an

8    ineligible list.  He will not be able to register with

9    the Boy Scouts of America.

10        Q.   And if the Boy Scouts of America or the Sam

11   Houston Area Council or an individual charter

12   organization found out someone was a person who

13   collected or viewed child pornography, would that be

14   concerning to the Boy Scouts?

15        A.   That's what we call a Category 1 offense or

16   charge.  That is one of four that will not allow you

17   to be a member of the Boy Scouts of America at any

18   time.

19        MR. THOMAS:  I pass the witness, Your

20   Honor.

21            CROSS-EXAMINATION

22   BY MR. JAMES:

23        Q.   You said that this indicates that Gregg

24   became an Eagle Scout in 1989; is that right?

25        A.   That's correct.

1        Q.    And that's, as far as the Boy Scouts

2   function, that would be sort of the highest rank or

3   the highest position that you can obtain in the Boy

4   Scouts function; is that right?

5        A.    It's the highest advancement recognition

6   that a youth can earn within the Boy Scouts of

7   America.

8        Q.    And that was 1989.  So it appeared that

9   Gregg grew up in Scouting; is that right?

10        A.    Yes, sir.

11        Q.    He didn't just come along later; is that a

12   fair statement?

13        A.    That is a fair statement.

14        Q.    Okay.  And not just any criminal offense

15   will just disqualify somebody from being a Scout

16   leader.  I understand child pornography certainly

17   would, but not just any criminal offense?

18        A.    Yeah, it -- there's assault, any injury to a

19   disabled or to a child.  Those are things that we're

20   going to weed out.

21        Q.    Right.

22        A.    That's correct.

23        Q.    Okay.  And you said Venture Crew, 14 to 21;

24   is that right?

25        A.    Up and to 21.

1      Q.    Fourteen?

2      A.    Fourteen.  But now, it's complete the eighth

3  grade; so you can conceivably be 13 through the age of

4  21.

5      Q.    And you certainly never got any kind of

6  complaints about Gregg Baird having any kind of

7  improper contact with anybody?

8      A.    No, I did not.

9                MR. JAMES:  Pass the witness.

10               MR. THOMAS:  No further questions for

11 Mr. Sheets.

12               THE COURT:  You can step down, sir.

13               Call your next.

14               MR. THOMAS:  May he be excused, Your

15 Honor?

16               THE COURT:  You're excused.

17               MR. SHEETS:  All right.  Thank you,

18 Your Honor.

19               MR. THOMAS:  We call Deputy Pittman.

20               THE COURT:  Raise your right hand,

21 please, sir.

22                 KINDALE PITTMAN,

23 having been first duly sworn, testified as follows:

24               THE COURT:  Have a seat.

25               Go right ahead.

```
1                    DIRECT EXAMINATION

2   BY MR. THOMAS:

3        Q.    Okay.   Please state your name.

4        A.    Kindale Pittman.

5        Q.    Okay.   And who do you work for now?

6        A.    Grimes County Sheriff's Office.

7        Q.    And what do you do for Grimes?

8        A.    I'm a patrolman.

9        Q.    How long have you been with the Grimes

10  County Sheriff's Department?

11       A.    Approximately two and a half years.

12       Q.    And where did you work before that?

13       A.    Milam County Sheriff's Office.

14       Q.    And what did you do for Milam County?

15       A.    Patrol, and I was assigned as a criminal

16  investigator.

17       Q.    How long did you work for Milam?

18       A.    Approximately three years.

19       Q.    And where did you work before that?

20       A.    Somerville Police Department.

21       Q.    And how long did you work for Somerville?

22       A.    Approximately three years.

23       Q.    And what did you do for them?

24       A.    I was a patrol officer.

25       Q.    And any more law enforcement before that?
```

1       A.   Just jail experience.

2       Q.   As a jailor?

3       A.   Yes, sir.

4       Q.   How long were you a jailor?

5       A.   Altogether, approximately, maybe two years.

6       Q.   Okay.   Total, how long have you been in law

7  enforcement?

8       A.   I'd have to say almost ten years.

9       Q.   And how long have you been a certified Texas

10  peace officer?

11      A.   Since 2001.

12      Q.   Now, I'm going to ask you back when you

13  worked for Somerville Police Department.

14      A.   Okay.

15      Q.   Back when you worked for Somerville Police

16  Department, were you working on May 12th of 2004?

17      A.   Yes, sir.

18      Q.   And do you recall what shift you worked way

19  back then?

20      A.   I believe I worked 6:00 p to 6:00 a, deep

21  night shift.

22      Q.   Did you have to work 12 hours back then?

23      A.   Yes, sir.

24      Q.   And did you work alone or with a partner?

25      A.   I worked alone.

```
 1        Q.    And did you wear a uniform for the
 2   Somerville Police Department?
 3        A.    Yes, sir, I did.
 4        Q.    And did you drive a marked patrol unit with
 5   lights on the roof and "Police" on the side for
 6   Somerville?
 7        A.    Yes, sir, I did.
 8        Q.    Now, the incident that we're talking about
 9   today, May 24th -- May 12th of 2004, did you write a
10   report concerning that incident?
11        A.    Yes, sir.
12        Q.    And have you reviewed that prior to
13   testifying today?
14        A.    I'm sorry?
15        Q.    Have you reviewed that report prior to
16   testifying today?
17        A.    Yes, sir, I have.
18        Q.    Okay.  And back on May 12th of 2004, a
19   little before 11:00 p.m. that night, you -- were you
20   patrolling around the Somerville High School?
21        A.    Yes, sir, I was.
22        Q.    And is that an area you had patrolled
23   before?
24        A.    Yes, sir.
25        Q.    And what -- do you remember what day of the
```

1  week this was?

2      A.   According to my report, it was on a Monday.

3      Q.   Okay.  Now, 11:00 p.m. on a Monday night at

4  Somerville High School, was there very much

5  activity that you would expect at that kind of time?

6      A.   No, sir.

7      Q.   Okay.  Was there something at Somerville

8  High School that night that caught your attention or

9  may have been suspicious?

10      A.   Yes, sir.

11      Q.   What was that?

12      A.   It was a vehicle sitting beside the track

13  area.  Upon my arrival, the vehicle noticed -- upon it

14  noticing me, it sped away.

15      Q.   Okay.  Now, do you remember what kind of

16  vehicle it was?

17      A.   Initially, I didn't notice what type of

18  vehicle it was until after fleeing from me and

19  becoming stuck in a ditch.  It was -- if I'm not

20  mistaken, it was a gray 2000 Chevrolet SUV.

21      Q.   Okay.  And when you -- just, if you could

22  for the Judge, describe when you say the vehicle was

23  near the track area, just briefly how the high school

24  property is laid out and if that was a parking lot or

25  grass or whatever it was where the car was by the

1  track?

2      A.    If I remember correctly, it was still under

3  construction at that time.  They were still doing a

4  lot of work in the area.  You had the gymnasium; and

5  then approximately, I would say, 100 yards in the rear

6  of the gymnasium was the track, and then the tennis

7  court's to the right of the track.  I'd say the tennis

8  court's, approximate -- maybe -- say, maybe 75 yards

9  from the track to the right of the track.

10     Q.    And this area that the vehicle was in, was

11 it a parking lot area or a grass-type area?

12     A.    If I remember -- I can't remember correctly.

13 I believe it may have been grass.

14              MR. JAMES:  Judge, I'm going to object.

15 That's speculative, Judge, if he doesn't remember.  I

16 understand the past recollection is recorded; but if

17 he's not sure today, he doesn't know, then that would

18 be speculation.

19              THE COURT:  Sustained.

20     Q.    (By Mr. Thomas) Is that -- 11:00 o'clock on

21 a Monday night, is that an area where you would expect

22 to see a vehicle?

23     A.    No, sir.

24     Q.    Okay.  And do you recall if the vehicle had

25 his lights on and off?

1     A.    I don't recall.

2     Q.    And like I said, were you ever -- were you

3  able to approach the vehicle; or as you said, did it

4  leave before you could do that?

5     A.    Left before I could do that.

6     Q.    And which direction did it leave in?

7     A.    It turned around and started traveling, I

8  believe, eastbound.

9     Q.    And when you came in, did you have your

10 lights -- not your emergency lights -- but did you

11 have your headlights and taillights and so forth on?

12    A.    Yes, sir, I did.

13    Q.    As a police officer and when you see a

14 vehicle that's in a possibly suspicious position, does

15 it raise your suspicions anyway if it just takes off

16 like that?

17    A.    Yes, sir.

18    Q.    And why is that?

19    A.    What's -- why is it --

20    Q.    Why would you become more suspicious of a

21 vehicle that takes off before you can approach it?

22    A.    Illegal activity possibly.

23    Q.    And did you attempt to go after the vehicle

24 to find it?

25    A.    Yes, sir, I did.

1    Q.   Were you able to see where this vehicle went

2  or was located?

3    A.   Yes, sir, I was able to locate the vehicle.

4    Q.   Okay.  Where did you locate it at?

5    A.   It became stuck behind the gymnasium parking

6  lot.

7    Q.   Okay.  It was stuck -- stuck in a ditch?

8  Stuck in a --

9    A.   Yeah.

10   Q.   And would that be an area where folks should

11 be driving, in a ditch?

12   A.   No.

13   Q.   Okay.  And when you saw the vehicle stuck in

14 that ditch, where were the persons or people that were

15 in the vehicle?

16   A.   He was walking towards me.

17   Q.   Okay.  And do you see that same person in

18 the courtroom today?

19   A.   Yes, sir.

20   Q.   And could you, just for the record purposes,

21 describe where he is seated and what he's wearing?

22   A.   He's seated to the right of me wearing a

23 white shirt and yellow tie.

24   Q.   And were you able to identify who that

25 person was?

1      A.   Gregg Baird.

2      Q.   Were you able to determine if anybody else

3 was with him at that point in time?

4      A.   Yes, sir, there was nobody else with him.

5      Q.   Okay.  And I forgot if I asked you this.

6 When you first -- after -- when you first saw the

7 vehicle and it took off and you began after the

8 vehicle to pursue it, did you turn on your emergency

9 lights or emergency equipment?

10      A.   Yes, sir.

11      Q.   The lights?

12      A.   Yes, sir, overhead lights.

13      Q.   Did you use your siren at all?

14      A.   No, I didn't.

15      Q.   And when you saw Mr. Baird, did he approach

16 you; or did you have to call him over to you; or what

17 happened?

18      A.   He was walking towards me at that time, and

19 I instructed him to get on the ground and took him

20 into custody without incident.

21           THE COURT:  I didn't hear you.  What

22 did you say?

23           THE WITNESS:  I instructed him to

24 position himself on the ground and took him into

25 custody without incident.

1              THE COURT:  Okay.

2      Q.   (By Mr. Thomas)  Did he make any statement

3  to you at all about why he was out there, or what he

4  was doing?

5      A.   He didn't say what he was doing, no.  Just

6  made the statement that he was in a place he shouldn't

7  have been in, and he was stupid for fleeing from me.

8      Q.   He said he was in a place he shouldn't have

9  been in and what, sir?

10      A.   That he was stupid for fleeing from me.

11      Q.   Okay.  What did you arrest Mr. Baird for?

12      A.   Evading detention.

13      Q.   Okay.  I imagine you booked him into the --

14  what is it, the Burlson County Jail there?

15      A.   Yes, Burlson County, yes, sir.

16              MR. THOMAS:  Pass the witness.

17              MR. JAMES:  Pass the witness.

18              THE COURT:  You can step down, sir.

19              MR. THOMAS:  May he be released, Your

20  Honor?

21              THE COURT:  You're released.

22              MR. THOMAS:  Thank you, Your Honor.

23              At this time, we'd offer State's

24  Exhibit Numbers 30 and 31, which are certified copies

25  from the Burlson County District Clerk's Office.


                DENISE C. MACKAY, CSR, RPR
                     (979) 361-4219

```
 1              (State's Exhibit Numbers 30 and 31 offered.)

 2              MR. JAMES:  No objection, Your Honor.

 3              THE COURT:  Exhibits 30 and 31 are

 4  admitted.

 5              (State's Exhibit Numbers 30 and 31

 6              admitted.)

 7              MR. THOMAS:  For the record, 30 is a

 8  copy -- certified copy of a criminal indictment, Cause

 9  Number 12856 in the 21st Judicial District Court of

10  Burlson County, indictment for evading arrest with

11  vehicle; and Number 31 is the corresponding judgment

12  on a plea of guilty waiver of trial in order of

13  deferred adjudication for the same offense concerning

14  this Defendant.

15              With that, Your Honor, we rest.

16              THE COURT:  Do you want to proceed now

17  or after lunch?

18              MR. JAMES:  Judge, with -- if we can

19  approach?

20              THE COURT:  Come on up.

21              MR. JAMES:  Originally, we thought this

22  was going to be a two-day.  I understand that

23  was pared down.  We've prepared for our witnesses to

24  be here at 2:00 o'clock.

25              THE COURT:  All right.  2:00 o'clock.
```

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

```
 1  We'll resume at 2:00 o'clock.
 2                    MR. JAMES:  Thank you.
 3                    (Lunch recess, 11:25 a.m. to 2:01 p.m.)
 4                    THE COURT:  Be seated.  We ready to
 5  proceed?
 6                    MR. JAMES:  Yes, Your Honor.
 7                    THE COURT:  Mr. Thomas?
 8                    MR. THOMAS:  Yes, sir.
 9                    THE COURT:  Okay.  Go right ahead.
10                    MR. JAMES:  We call Nathan McCune up.
11                    THE COURT:  You're under oath already,
12  right?
13                    THE WITNESS:  Yes, sir.
14                    THE COURT:  Okay.
15                    NATHAN MCCUNE,
16  having been previously duly sworn, further testified
17  as follows:
18                    CROSS-EXAMINATION
19  BY MR. JAMES:
20      Q.    Mr. McCune, just a couple of things.
21                    Did you go back and get the images that
22  are the basis of these convictions and locate the
23  computer that they were on as well as the date of
24  download and correspond those counts to the number of
25  the CD that is in evidence?
```

1      A.    Yes, sir.

2      Q.    Okay.

3      A.    Not as far as corresponding them to the

4   number.  It would be Number 8 through 17 on the one.

5      Q.    Right.  Okay.  And then you also did the

6   same with the other counts so that the Court could go

7   back and say:  This photo or this video matches this,

8   and this is the basis of the case?

9      A.    We did not do that for the other 90 in the

10  criminal case.  I was directed to do it for only the

11  counts that are charged here.

12     Q.    So these others are not -- this doesn't

13  correspond to the number on the video?

14     A.    Yes, sir, it does correspond with the number

15  on the video.

16     Q.    Okay.

17     A.    I'm saying I didn't locate which drive they

18  were on for you and all that.

19     Q.    Okay.  That's fine.  The others just show

20  the number that it is on the video; but for the ten

21  counts, we've got the number on the CD and then the

22  location and then the date down below?

23     A.    Yes, sir.

24     Q.    Is that right?

25     A.    Yes, sir.

```
1        Q.   And then I'll show you what's been marked as
2   Defendant's Exhibit 1.  Was that prepared by you, and
3   is that an accurate reflection of the counts, the
4   number on the CD and the date downloaded for the ten
5   counts that are in question here today?
6        A.   It was prepared by ADA Ray Thomas.  I
7   watched him prepare this, so it is accurate.
8                  MR. JAMES:  I'd offer Defendant's
9   Exhibit 1.
10                 (Defendant's Exhibit Number 1  offered.)
11                 MR. THOMAS:  Let me see because I
12  haven't seen it.
13                 MR. JAMES:  Okay.
14                 MR. THOMAS:  Judge, the only
15  stipulation I would make is I think that the best
16  record of -- let me put it this way:  On the exhibit
17  with the hundred that we showed you and the other one
18  in its entirety, they have the cause number on the
19  count number, and I think file numbers; is that right?
20  The file names?
21                 THE WITNESS:  File names, yes, sir.
22                 MR. THOMAS:  And those correspond to
23  what was actually pled to by the Defendant.  That's
24  the best record.  I think that's clear.  I don't have
25  any objection to this coming in.  I don't want this to
```

1    be the substitute for what was --

2              MR. JAMES:  It's a synopsis.  I think

3    it comes in under --

4              MR. THOMAS:  I don't have any objection

5    to it.  I just want to make sure that the record is

6    clear.

7              THE COURT:  All right.  We'll let it

8    in.  It's admitted.  Defendant's 1.

9          (Defendant's Exhibit Number 1  admitted.)

10   Q.    (By Mr. James) And Mr. McCune, I believe you

11   earlier testified that you can download literally

12   hundreds, maybe thousands of images in one stroke; is

13   that right?  I mean, that's -- that's --

14   A.    In a short period, yes, sir.

15   Q.    Yes.  Okay.  And you may not even know the

16   number that you're downloading?

17   A.    I guess that's different with different

18   sites.  I don't know if they tell you how many files

19   that are on the site.

20   Q.    But it may be a large -- a very large

21   number?

22   A.    Could be, yeah.

23   Q.    And you went through -- is it fair to say

24   that you went through all of the e-mails that you

25   found on that computer.  And some of them are quite

1  graphic?

2      A.    The chat session?

3      Q.    The chat session, yes, sir.

4            And you didn't -- you didn't find any

5  indication that there were any children involved, did

6  you?

7      A.    No, sir.

8            MR. JAMES:  Pass the witness.

9                   DIRECT EXAMINATION

10 BY MR. THOMAS:

11     Q.    Investigator McCune, with respect to

12 Mr. James' question about downloading -- I mean, he

13 downloaded all of them, all 65,000 images?

14     A.    Yeah, something like that.  Starting in '04

15 and going through to '09.

16     Q.    Are we taking about a few times that he's

17 downloading stuff, these files?

18     A.    There's a lot of different dates on a lot of

19 the files.

20            MR. THOMAS:  Pass the witness.

21            MR. JAMES:  Nothing further.

22            THE COURT:  You can step down.

23            MR. JAMES:  We call Tom Rogers, Your

24 Honor.

25            THE COURT:  All right.

```
 1              Raise your right hand, please, sir.

 2                   THOMAS ROGERS,

 3   having been first duly sworn, testified as follows:

 4                   THE COURT:  Have a seat.

 5                   Go right ahead.

 6                   DIRECT EXAMINATION

 7   BY MR. JAMES:

 8        Q.    Would you state your name, please?

 9        A.    Thomas Wayne Rogers.

10        Q.    And how are you employed?

11        A.    I do part-time work for the University doing

12   teaching.  I'm also doing consulting.

13        Q.    Okay.  How long have you known Gregg Baird?

14        A.    About ten years.

15        Q.    Okay.  And how did -- did you become

16   acquainted with Gregg through Scouting?

17        A.    Yes.

18        Q.    What kind of person did you know Gregg to

19   be?

20        A.    An outstanding example of a Scout leader.

21        Q.    Did you go on trips with him?

22        A.    Many.

23        Q.    Okay.  Can you tell us some of the places --

24   this was with the Venture group; is this right?

25        A.    Yes, sir.
```

1     Q.    And this was a High Adventure Venture Crew;

2  is that correct?

3     A.    That's correct.

4     Q.    What does that mean?  What kind of things

5  did y'all do?

6     A.    Well, most of the things that -- the boys

7  become Eagle Scouts, and they get past 14.  What

8  they're trying to do is get them out in the wilderness

9  and do things.  With the Venture Crew, you have a

10 number of activities.  We went to Boundary Waters.  We

11 went to Minnesota.  We went to Key West to do sailing.

12 We went to Glacier National Park.  We went all over

13 the United States.

14    Q.    When Gregg was on these trips, what kind of

15 a leader was he?  Was he reliable?

16    A.    Absolutely.

17    Q.    Okay.

18    A.    He -- I mean, Gregg was the one that would

19 always do the pre-organization, make sure we did all

20 the certifications, the training, watch the sexual

21 abuse tapes, watch the -- you know, all the things

22 that we're required to do in Scouts because there's a

23 lot of paperwork.  Gregg always was the one that was,

24 if not doing it, having a boy do it.

25    Q.    And was he a problem solver?