1    A.    He was a great problem solver.

2    Q.    Can you give us an example of that?

3    A.    Just lots of examples.  You know, in terms

4 of the logistics of going on the trips; and then once

5 we got on the trips, he was --

6              One of them that comes to mind, we got

7 to Boundary Waters.  There were 16 of us, and we found

8 out when we got up there that we couldn't go together.

9 We had to go in opposite directions.  And Gregg was

10 the one that settled us all down and ended up helping

11 the boys figure out how to go, not us as adults. Gregg

12 figured that out and calmed us all down.

13              Most of us had a good time.  He had a

14 great time.  My group didn't have as good a time as

15 they did, but it was not because of Gregg.

16    Q.    Was he protective with all the boys?

17    A.    He really was.  I could cite an example.

18              At Glacier, there was a boy that was

19 always falling behind; and some of the boys started

20 talking about his sexual preference; and Gregg stepped

21 in; and it happened so fast.  Before it could even

22 happen, Gregg stepped in.  I walked slowly, and Gregg

23 took the other guys up.  One of -- my son was a

24 leader.  We said we didn't want anything to hurt that

25 boy and have him have a good time.  He had a good

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

1   time.  We got through that the sexual preference

2   wasn't any business of theirs.  What we were

3   interested in was the safety of the boys.

4       Q.   Did you ever see anything on Gregg's part or

5   ever hear anything on Gregg's part to indicate that

6   there might be any kind of inappropriate contact with

7   any of the Scouts?

8       A.   Absolutely not.

9       Q.   Okay.  Did he also give financial advice?

10  He had a position with the credit union.  Did he ever

11  give financial advice?

12      A.   I always said and still say Gregg should

13  write a book on financial advice.  It was so simple

14  and practical that I could name dozens of college

15  students and high school students who benefited from

16  his financial advice.

17      Q.   And your son was in this organization, also;

18  is that right?

19      A.   Yes, sir.

20      Q.   And the Venture Crew is what, 14 to 21?

21      A.   About, yes.  I think the cutoff is 21, 22,

22  somewhere in there.

23      Q.   Were you shocked by his arrest?

24      A.   Very much so.  What I thought of Gregg kind

25  of got called into question on the arrest.

1      Q.    Did you abandon him after the arrest?

2      A.    I did not, nor did my family.   We consider

3 him a part of our family.

4      Q.    You're aware that there was actually a

5 church that didn't want -- didn't want him around; is

6 that right?

7      A.    Well, I -- I'm having a real hard time with

8 that.   I took Gregg to my church, and he sat in my

9 church, and some church members said he couldn't.   I

10 don't know the story.   I don't know who said what, but

11 I do know what came back down was that:   Gregg, if you

12 ever walk back into my church, you would be arrested;

13 and I'm having a really hard time with that.

14      Q.    Have you worked with Gregg as far as his

15 spiritual growth since the time of his arrest?

16      A.    Yes.

17      Q.    And have you continued to work and counsel

18 with him in finding repentance?

19      A.    Yes, we have.

20      Q.    Did he tell you about when he was raped as a

21 Scout?

22      A.    He did shortly after it happened -- after he

23 was arrested.

24      Q.    Do you believe God can change a heart?

25      A.    Yeah.   I mean, He gave us burdens.   This

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

1  afternoon, he said:  You know, it real.  And he said:

2  No matter what we've done, if we come to the Maker,

3  He'll -- He'll redeem us.

4      Q.   Do you have any indication that Gregg Baird

5  ever was improper with any touch -- improperly

6  touched, had any improper conduct with any youth?

7      A.   I have never seen it.  I have never heard

8  it.  I was in a position that I would have if it had

9  been in a troop.  In the Venture Crew, I was in a

10 position where I would have heard it.  I was very

11 sensitive to that.  The answer is no.

12     Q.   Was he always -- what's Too Deep Policy?

13     A.   You always want to have at least two adults

14 on anything; and if you have girls, as we did in

15 Venture Crew, then you have to have women two deep as

16 well so there's protection of all of the kids, that

17 you don't have anyone sitting there -- any adult doing

18 anything that's inappropriate.  Partly probably

19 because of the sexual things that have happened in the

20 Boy Scouts, that's the way it is.

21     Q.   So you have a policy that there have to be

22 two adults around kids; is that right?

23     A.   At least two.

24     Q.   At least two?

25     A.   And depending on how big the group is, the

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

1  number gets bigger.

2      Q.   And did Gregg always strictly enforce that?

3      A.   Yes.

4           MR. JAMES:  I'll pass the witness.

5                   CROSS-EXAMINATION

6  BY MR. THOMAS:

7      Q.   Hi, Mr. Rogers.  How are you?

8      A.   Good.

9      Q.   I just have a few questions for you.  If I

10 ask you any questions that don't make sense, please

11 let me know, okay?

12     A.   Uh-huh.

13     Q.   You have known --

14          THE COURT:  Just a second.  You've got

15 a witness on hold on the phone.

16          MR. JAMES:  Okay.  Judge, that will be

17 my next witness.

18          THE COURT:  Just leave him on hold?

19          MR. JAMES:  That's fine.

20          MR. THOMAS:  Judge, I've probably only

21 got five or ten minutes.

22     Q.   (By Mr. Thomas) Okay.  You've known

23 Mr. Baird for ten years?

24     A.   About that long.

25     Q.   Did you know him just in connection with the

1  Boy Scouts?

2      A.    Actually, because of the way it worked out,

3  he almost became part of the family.  In addition to

4  the Boy Scouts, we played a whole lot of disk golf.

5  We've done -- as it turns out, my son -- oldest son

6  would be about the same age and became very close

7  friends.

8      Q.    So your son --

9      A.    And Gregg.

10     Q.    -- and Gregg became close friends?

11     A.    Right.  So because of that, when we did

12  family kind of things, you know, he was there for a

13  lot of things.

14     Q.    Was your primary contact with him through

15  Scouting?

16     A.    I'd say at the end of -- before this

17  happened, it was probably less Scouting and more

18  family because my youngest son had been away at

19  college, and we were doing less Scouting.

20     Q.    Now, your perceptions of the Defendant, you

21  had rendered your opinion; and you thought he was an

22  outstanding example of a Scout leader.  That was based

23  upon what you observed of Mr. Baird before his arrest;

24  is that safe to say?

25     A.    Yes.

Page 106

1    Q.   Certainly, as you sit here today, you would

2  not say somebody downloading child porn while being

3  actively involved with the Boy Scouts was an

4  outstanding example of a Scout leader?

5    A.   I would say, in his personal life, that was

6  a terrible thing to do.

7    Q.   Okay.

8    A.   I don't know if that meant that he did it

9  while he was in Boy Scouts.  I didn't see any evidence

10 of that, but I would agree that was a terrible thing.

11   Q.   Okay.  And well, that's not really my

12 question.

13   A.   Right.

14   Q.   My question is:  Your opinion was based on

15 what you knew about Mr. Baird before he was arrested,

16 correct?

17   A.   Correct.

18   Q.   That he was an outstanding example of a

19 Scout leader; is that right?

20   A.   Yes.

21   Q.   Okay.  Now, would you consider somebody who

22 was actively involved as a leader in Scouts who is

23 actively downloading tens of thousands of images of

24 child pornography as an outstanding example of a Scout

25 leader?

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

1    A.    And I don't want to avoid your question.  I

2  think it's inappropriate behavior.  The only thing I

3  can say is because I didn't see it at the time.  I

4  think it was terribly wrong.

5    Q.    Well, he was, no question, very successful

6  in keeping this from you, right?

7    A.    Absolutely.

8    Q.    Over the course of ten years?

9    A.    Well, at that time might have not been ten

10  years, yeah.

11    Q.    But you just had no clue?

12    A.    I had no clue.

13    Q.    But you don't dispute what I'm telling you

14  about the numbers?

15    A.    No, no.

16    Q.    For about four or five years, we know for

17  sure that he was downloading some pretty significant

18  child pornography.

19    A.    And I will also say, I grant it to you -- if

20  anything, he had been sharing that with anybody or

21  done anything, I would not be wanting to sit here and

22  defend him.  I would totally agree with you.

23    Q.    I mean, are you telling me, Mr. Rogers, that

24  you're okay with the fact that --

25    A.    I'm not.

1      Q.    -- that a Scout leader who was actively

2   involved in Scouts, at the same time, at home

3   downloading these images of young men having sex with

4   older men?

5      A.    I have a real hard time with that to be

6   honest.

7      Q.    Well, I mean, you will agree with me that

8   it's just dead wrong, right?

9      A.    Dead wrong.

10     Q.    It is immoral?

11     A.    Yes.

12     Q.    It is against everything you've learned in

13  church?

14     A.    That's correct.

15     Q.    It is absolutely without question totally

16  inconsistent with the morals and ideals of Scouting?

17     A.    I would agree.

18     Q.    And there is no way, as you sit there,

19  knowing what you know now about Gregg Baird, that you

20  would ever allow him if you were in a position to do

21  so to be involved in Scouting again.

22          Would you agree with that?

23     A.    I -- it's not my -- that's not for me to

24  say.

25     Q.    I'm asking you.

1      A.    You're asking me a hypothetical.

2      Q.    Yes, sir.

3      A.    It's not my position to even say that.

4      Q.    Would you have your son in Scouts with Gregg

5  Baird as a leader knowing what you know about the

6  Defendant now?

7      A.    Well, let me put it this -- I'm avoiding a

8  little bit.  He's welcome to take care of grandkids

9  and be with me with my family on a camping trip, but I

10 don't know if he will ever be allowed in Boy Scouts

11 because of their own rules.

12     Q.    But I'm asking you if you were in a position

13 to put one of your children in a Venture Crew with

14 this Defendant as a leader.

15     A.    If I would?

16     Q.    Yes, given what you know now about him?

17     A.    What I know now about him, I would put him

18 with my grandson, my great grandson; and I'd say as

19 long as he had somebody there with him.

20     Q.    As long as he had somebody there with him?

21     A.    Absolutely.

22     Q.    Why would you do that?

23     A.    Because I think Gregg is -- I'm talking to

24 you about Gregg almost like feeling like he's a

25 brother; and as a brother, he's part of my family.

1    I'm not going to abandon him.

2         Q.    And I understand.  And even believing the

3    way you do, you still would not have him around your

4    grandchildren or children without somebody else

5    around?

6         A.    I'd be there.  They'd be there.

7         Q.    I'm sorry?

8         A.    I mean, he's around my grandson right now,

9    so --

10        Q.    But you would have somebody with him?

11        A.    Sure, for his protection, you know.

12        Q.    Whose protection?

13        A.    For everybody's protection, just like we

14   have Two Deep in Scouts.

15        Q.    Okay.

16        A.    I just -- I would enforce Two Deep.

17        Q.    With this particular Defendant?

18        A.    With everybody, with myself, too.

19        Q.    With your own children?  Come on, sir.  With

20   your grandchildren?

21        A.    I don't watch my friends' kids.  That's what

22   I'm saying.  You asked a hypothetical.  I gave you a

23   hypothetical.

24        Q.    I'm trying to figure out -- I appreciate the

25   longstanding relationship you have with Mr. Baird and

1  that you had no clue what was going on when you

2  weren't with him, okay?  I appreciate that.

3              What I'm trying to find out is how

4  would that be affected knowing what you know now about

5  this Defendant?

6              MR. JAMES:  Asked and answered.

7              MR. THOMAS:  Judge, it has not been

8  answered.

9              THE COURT:  No, you go ahead and answer

10  the question, Mr. Rogers.  Answer his question.

11      A.   Would you restate it?

12      Q.   (By Mr. Thomas) I'm trying to figure out if

13  your feelings now about whether you would allow this

14  Defendant around your children, your grandchildren or

15  even a Scout troop are different now that you know

16  what you know about Mr. Baird?

17      A.   My opinion, if I was a Scout leader and I

18  knew the facts that had happened in this case, I would

19  have a hard time having Gregg be there.  I don't think

20  he would be there by Scout rules.

21              If you're asking me hypothetically with

22  my family:  Would I have Gregg Baird around, and could

23  he take care of my grandchild alone?  Yes.

24      Q.   Okay.  You mentioned that you were involved

25  in the Venture Crew with Mr. Baird, and it was a High

```
 1   Adventure unit.  How many of those trips did you go on
 2   with Mr. Baird?
 3        A.   Well, we did lots of preparatory.  If you
 4   count those, probably six, seven; and then the big
 5   ones that I went on were two primarily.
 6        Q.   Would that be Glacier National Park?
 7        A.   Yeah, and Boundary Waters.
 8        Q.   I'm sorry?
 9        A.   Boundary Waters.
10        Q.   Were there other type of trips he went on
11   with the Venture Crew that you did not go?
12        A.   He went to Key West.  They went to Utah.
13   There were others that I wasn't able to go on, yes.
14        Q.   You mentioned that he was one who kind of
15   took the initiative to -- I guess, to kind of prepare
16   these trips and to make sure everybody watched the sex
17   abuse tapes.
18             What did you mean by that?
19        A.   Well, there is a series of safety
20   boundaries.  I mean, kind of things that you're
21   supposed to do as good practice.  If somebody does
22   this, you don't do that.  They always made sure.
23             I remember sitting in there with adults
24   that were going.  We all had to watch the rules of Boy
25   Scouting because Venture Crew would regard it as
```

```
 1   appropriate behavior; and Gregg was the one out there
 2   with the tapes, brought them there, made sure we
 3   watched the videos, made sure everybody signed up,
 4   that we did everything we had to do before we went in.
 5        Q.   So he was familiar, no question, with all of
 6   those policies and the things like that --
 7        A.   Yes.
 8        Q.   -- on these sex abuse tapes?
 9        A.   Yes.
10        Q.   Now, on these trips, the High Adventure
11   trips, how many boys would be going along?
12        A.    It really depended.  Some of them we had --
13   it was usually eight to twelve.
14        Q.   And eighth --
15        A.   From 14 to 21.
16        Q.   Okay.
17        A.   And a couple of them we had -- usually, we
18   had one girl, two girls; a couple of them went along.
19        Q.   And you had mentioned that -- when Mr. James
20   had asked you about the Defendant telling you
21   something about being raped as a Scout, what details
22   did he relate?
23        A.   I can't tell you all the details.  The only
24   thing I can tell you is he did admit it.  He said that
25   he wanted to come clean on it at that time.  He wanted
```

1   to get some things that were dark and hidden on the

2   table.

3        Q.    That wasn't until after he was arrested; is

4   that correct?

5        A.    That's correct.

6        Q.    And you had never heard anything about that

7   ever until he was -- after he was arrested, right?

8        A.    Correct.

9        Q.    And never saw any indication of any

10  manifestation of that and the effects that might have

11  had on him one way or the other before that, did you?

12       A.    That's correct.

13       Q.    And you guys viewed those sex abuse tapes

14  and things likes that.  I guess, Boy Scouts

15  currently -- well, when I was in Scouts, they were

16  sensitive to making sure there aren't any warning

17  signs and those kinds of things; is that correct?

18       A.    That's correct.

19       Q.    And you didn't see it?

20       A.    I saw none of it.

21       Q.    Did the Defendant talk to you about what he

22  was charged with?

23       A.    I can't say that I know all of the details;

24  and I really haven't -- you know, I respect the Court.

25  I respect whatever the Court does, so I can't say I

1 know all the charges here.

2     Q.   Okay.  But well, did the Defendant tell you

3 what he had done?

4     A.   He told me that -- the only thing that came

5 from Gregg's lips to my ears was that he had been

6 downloading child pornography.

7     Q.   Did he tell you how much?

8     A.   No.

9     Q.   And how long a period of time?

10     A.   No.

11     Q.   Just one final question:  Do you think it is

12 responsible for a person who obviously has an interest

13 in having sex with young boys and downloading child

14 pornography to actively involve himself in Boy Scouts?

15     A.   That's a hypothetical.

16     Q.   No, it's not.  Do you think it's

17 responsible?

18     A.   I mean, for me to answer that, I would have

19 to get into some psychology and what was going on.

20 What I now know, I have a theory on that; but I don't

21 think it was a good thing to be doing.  I'll say that.

22     Q.   Okay.

23         MR. THOMAS:  I'll pass the witness.

24         MR. JAMES:  I'll pass the witness,

25 Judge.

```
 1                 THE COURT:  Okay.  Step down.
 2                 Call your next.
 3                 MR. JAMES:  Judge, I believe James
 4  Miller is probably on the phone.
 5                 THE COURT:  All right.
 6                 MR. JAMES:  We might do better to --
 7                 THE COURT:  Y'all want to come up here
 8  and --
 9                 Mr. Miller, hold on one second.
10                 All right.  Mr. Miller, I'm Judge
11  Bryan.  We have the lawyers here, and you're now on
12  the record.
13                 Raise your right hand, please, sir.
14                 THE WITNESS:  Yes, sir.
15                      JAMES MILLER,
16  having been first duly sworn, testified as follows:
17                 THE COURT:  Go ahead.
18                 DIRECT EXAMINATION
19  BY MR. JAMES:
20      Q.   Okay.  Would you state your name, please?
21      A.   James Christopher Miller.
22      Q.   Okay.  And Mr. Miller, where are you
23  currently?
24      A.   I'm currently at Los Alamos National
25  Laboratory in Los Alamos, New Mexico.
```

```
 1        Q.    Okay.  And were you formerly with the
 2   Venture program in Scouting in Bryan?
 3        A.    Every once in a while, I would help out with
 4   them when they did some sails and things and the Aggie
 5   football games and things like that.
 6        Q.    Did you know Gregg Baird?
 7        A.    I have known Gregg Baird for the last 13 or
 8   14 years.
 9        Q.    Have you -- can you tell us about your
10   knowledge of Gregg?  Has he always been a responsible
11   person?
12        A.    Absolutely.  I first met Gregg in 1996.  It
13   was in May.  We were both working at Camp Shenandoah,
14   which is the Boy Scout camp in Stanton, Virginia --
15   outside Stanton, Virginia.  Slope is the official town
16   or whatever.
17              And Gregg was the program manager.  I
18   was 13 at the time, youngest member of the staff; and
19   I was -- officially, my title was counselor in
20   training; and I worked -- Gregg oversaw all the
21   program stuff; and I, you know, delegated where the
22   counselors in training went to work and things like
23   that.
24              And except for contact with him that
25   entire summer, our families have maintained very close
```

1  ties since then.  And then I finished undergraduate

2  and came to graduate school at Texas A&M and rekindled

3  my relationship with Gregg; and we have spent time

4  riding bikes, working together, working out, going to

5  Aggie football games, working with the Venture Crew

6  selling drinks before the Aggie games.  And he's

7  always been an upstanding individual in my interaction

8  with him.

9       Q.   In all of your time with him, did he ever do

10  anything inappropriate with you or make you feel

11  uncomfortable?

12       A.   No, not in any way.

13            MR. JAMES:  I'll pass the witness.

14                    CROSS-EXAMINATION

15  BY MR. PHELPS:

16       Q.   Mr. Miller, my name is Shane Phelps.  Can

17  you hear me okay?

18       A.   Yes, sir.

19       Q.   I just have a couple of quick questions for

20  you.

21            First of all, how old are you, sir?

22       A.   I'm 27 right now.  I just turned 27

23  yesterday, actually.

24       Q.   And you've known Mr. Baird for, I think you

25  said, 13 or 14 years?

1        A.    Yes, sir.

2        Q.    What was the nature of the relationship?

3   Were you guys just kind of associated through

4   Scouting?

5        A.    Through Scouting, friends.  I first met him

6   through Scouting while I was working at Camp

7   Shenandoah, and then I have since -- my family has

8   gone and visited his family in Texas.  A couple of

9   winters ago, my parents came down to College Station

10  for Christmas; and we actually spent Christmas with

11  Gregg and his family at their home in Houston.

12             So I've known Gregg in multiple

13  capacities through work, through Boy Scouts, through

14  all kinds of things.  He's also been my banker and

15  financial advisor for a long time as well.

16       Q.    So you are very close friends with the

17  Defendant?

18       A.    I know him very well.

19       Q.    Okay.  Are you familiar with what he has

20  pled guilty to?

21       A.    I am.

22       Q.    Are you familiar with the extent of the

23  information about his downloading and possession of

24  child pornography?

25       A.    Well, many of the things that have been

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

1  available over the course online.

2      Q.   Were you aware that we're talking about a

3  period of a minimum of five or six years and close to

4  65,000 images of child pornography?

5      A.   I was not made aware of those specific

6  details.  I know I was completely in shock, and this

7  is something I never would have expected from Gregg,

8  and he's never shown any behavior that would lead me

9  to believe that he was capable of that sort of

10  behavior.

11      Q.   Okay.  So if he was actively downloading

12  child pornography for four or five or six years while

13  he knew you, then he would have -- he was successful

14  in completely keeping that from you; is that a safe

15  statement?

16      A.   I had no inkling of anything like that going

17  on.

18      Q.   And you had mentioned -- I think Mr. James

19  had asked you about whether he was a responsible

20  person.  Do you believe that it is responsible to be

21  actively involved in Boy Scouts coming into contact

22  with young men while at the same time downloading

23  literally thousands and thousands of images of child

24  pornography?

25      A.   I'm not aware of what exactly Gregg's exact

1  involvement was in Boy Scouts.  I know he was using --
2  I know he was managing the older Boy Scouts at the
3  time when I was in College Station; and like I said, I
4  was a 13-year-old young man around him.  And there
5  were several times which, you know, it just was the
6  two of us going off and working on some project.  And
7  I never once felt uncomfortable at all.
8      Q.    Okay.  But I guess what I'm asking you is:
9  Somebody who is actively involved in the Boy Scouts
10 and being around young men and mentoring them in
11 leadership positions, but at the same time,
12 downloading tens of thousands of images of child
13 pornography of young boys in sex acts with older
14 men --
15     A.    Right.
16     Q.    -- do you think that's responsible?  Should
17 that person have been involved in Boy Scouts?
18     A.    I would not personally want my son involved,
19 if I had a son, to be involved in that organization.
20 In fact, I've been in troops where the Scout Master
21 has been formally charged with things before, of
22 actual acts; and I know that all the other parents
23 have and the other individuals have worked very
24 tirelessly to safeguard all those boys; and you know,
25 I personally would not want to be involved in that

1  organization.  But I'm not saying -- one to say

2  whether it is or not.  I'm not the moral authority.

3      Q.   Well, Boy Scouts do everything they can

4  to -- at least from your knowledge, to protect their

5  young men and boys from people who would join Boy

6  Scouts for the wrong reasons.

7           Would you agree with that?

8      A.   Which I do not believe Gregg joined Boy

9  Scouts for the wrong reasons.

10     Q.   Well, would you agree that people who are

11 involved in downloading child pornography, people who

12 are interested in having sex with young boys would be

13 attracted to an organization like Boy Scouts?

14     A.   I'm not sure that you can say looking at an

15 image is saying that he's actively interested in

16 performing that act, so I'm not sure that I see the

17 logical action between them.  I'm not aware of any

18 action --

19     Q.   How about -- how about --

20     A.   -- Gregg has taken towards any young man

21 that would be inappropriate.

22     Q.   How about 65,000 images of young boys being

23 forced to have sex with much older men?

24     A.   That surely is a very large number, and that

25 is an unfortunate thing that boys were required to do

1   that or forced to do that; however, I'm -- I have no

2   knowledge of anything that Gregg has ever done

3   actively to do that.  So --

4        Q.   Well, that's not my question.  My question

5   is:  Would you -- let me just put it to you

6   straightforward:  If you had son -- do you have a son?

7        A.   I do not have a son.

8        Q.   If you had a son, would you put him in a Boy

9   Scout troop where somebody is downloading child porn

10  and actively looking at it?

11       A.   No.

12              MR. PHELPS:  All right.  Pass the

13  witness.

14              MR. JAMES:  Nothing further.

15              THE COURT:  All right.  Thank you, sir.

16  Mr. Miller, you're excused.

17              THE WITNESS:  Thank you.

18              THE COURT:  All right.  We got

19  Mr. Larry Miller on hold.

20              MR. JAMES:  Judge, I'd like to take one

21  other witness.  I think it would be short.  Let me

22  check on it.

23              THE COURT:  All right.  We'll keep him

24  on hold.

25              MR. JAMES:  We'd call Phillip Hathaway,

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

1  Your Honor.

2                THE COURT:  All right.

3                BAILIFF:  Raise your right hand.

4                PHILLIP HATHAWAY,

5  having been first duly sworn, testified as follows:

6                THE COURT:  Have a seat.

7                Go right ahead.

8                DIRECT EXAMINATION

9  BY MR. JAMES:

10      Q.    Would you state your name, please?

11      A.    Phillip Hathaway.

12      Q.    And how do you know Gregg Baird?

13      A.    Both of us were members of Aggieland Rotary

14  Club in Bryan.

15      Q.    Okay.  And how long did you know -- have you

16  known him?

17      A.    About 15 years.

18      Q.    Okay.  Did you find him to be a person that

19  was reliable?

20      A.    Definitely.  He was instrumental in various

21  fundraisers and book drives, medical drives with the

22  Rotary Club.

23      Q.    What kind role did he play in those events?

24      A.    He was the driving force, the organizer.  I

25  believe he was an officer, president at the time.

```
 1        Q.    What kind of charitable -- what kind of
 2   charitable works did he engage in?
 3        A.    It was a book drive for school-aged children
 4   and medical supplies for Mexico; and we did a
 5   ambulance -- provided an ambulance for Duagua
 6   (phonetic) down in Mexico.  He was involved in several
 7   of those as well.
 8                  MR. JAMES:  Pass the witness.
 9                  CROSS-EXAMINATION
10   BY MR. PHELPS:
11        Q.    Hi, Mr. Hathaway.  How are you?
12        A.    Fine.
13        Q.    You just know Mr. Baird through the --
14   through the Rotary Club?
15        A.    Yes, I also -- he's also helped my son in
16   Boy Scouts earn a merit badge in personal finance.
17        Q.    Are you familiar with what he's charged
18   with, what he pled guilty to?
19        A.    Yes, sir.
20        Q.    You don't condone that?
21        A.    No, sir.
22        Q.    You don't condone anyone who is involved in
23   child porn to be involved in the Boy Scouts, do you?
24        A.    No, sir.
25        Q.    You wouldn't want your son around somebody
```

```
 1   you knew to actively be downloading and viewing child

 2   pornography?

 3        A.    No, sir.

 4                   MR. PHELPS:  That's all I have.

 5                   MR. JAMES:  Pass the witness.  Nothing

 6   further.

 7                   THE COURT:  You're excused, sir.

 8                   Call your next.

 9                   MR. JAMES:  Judge, we will take James

10   Miller.

11                   THE COURT:  All right.

12                   MR. JAMES:  I mean, Larry Miller.

13                   THE COURT:  Just one second, sir.

14                   THE WITNESS:  Thank you.

15                   THE COURT:  All right.  This is Judge

16   Bryan.  You're on the record here in the 272nd Court.

17                   Raise your right hand, please, sir.

18                        LARRY MILLER,

19   having been first duly sworn, testified as follows:

20                   THE COURT:  Go right ahead, Mr. James.

21                   MR. JAMES:  Thank you.

22                   DIRECT EXAMINATION

23   BY MR. JAMES:

24        Q.    Would you state your name, please?

25        A.    My name is Larry Miller.
```

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

1      Q.    And Mr. Miller, what's your profession?

2      A.    I'm an attorney.

3      Q.    Okay.  And where do you practice?

4      A.    I practice in Virginia, but I'm also

5  admitted in Iowa, and I'm admitted in four different

6  Federal courts.

7      Q.    And we heard earlier from James Miller.

8  That's your son; is that correct?

9      A.    That's my son, that's correct.

10      Q.    Okay.  Mr. Miller, how long have you known

11  Gregg Baird?

12      A.    Since 1996.

13      Q.    Have you ever -- did you ever observe

14  anything to make you think that Gregg had in any way

15  engaged in any kind of improper contact with any

16  underaged people?

17      A.    No, sir, I did not.

18      Q.    Okay.  And how -- tell us a little bit about

19  your relationship with Gregg and what kind of person

20  you found him to be since 1996.

21      A.    I met Gregg when our family was in the

22  process of moving to Virginia; and I was, at that

23  point in time, seeking reciprocity from Iowa to

24  Virginia.  I took a position with the Stonewall

25  Jackson Area Council of Boy Scouts of America.  I was

```
 1   a district executive, and I was the camp director for
 2   Camp Shenandoah.
 3             When I was hired to do that job, Gregg
 4   Baird had been hired as the program director.  He had
 5   been on staff for quite some time.  I met Gregg on one
 6   of my trips before we moved to Virginia; and we
 7   discussed our philosophies regarding camp, what we
 8   needed to do there, including the Two Deep Leadership,
 9   which is where two adults are -- need to be present
10   whenever there's any minors that are there that are
11   under the age of 18.
12        Q.   Was Gregg in favor and supportive --
13        A.   Was real strict about that.  There was --
14   there was no --
15        Q.   I'm sorry.  I -- we talked over each other.
16   I apologize.
17        A.   Okay.
18        Q.   When I asked you about that, what did you
19   say about his position on the Two Deep Leadership?
20        A.   Oh, he was very strong on that.
21        Q.   Okay.
22        A.   I mean, that -- that's just the way it is.
23   And we made sure -- and as the program director, he
24   was in charge of the junior staff, and that meant any
25   Scouts that worked on the camp staff that were under
```

1  the age of 18 as well as any of the adults.  And he

2  was my direct subordinate.

3      Q.   Okay.

4      A.   And he followed that to the letter.

5      Q.   Okay.  And did you find him to be reliable?

6  If he said he was going to do something, did he do it?

7      A.   Oh, without a doubt, he was reliable.

8  Everything was done.  It was probably the best year

9  Camp Shenandoah has ever had with program, with number

10 of Scouts that attended.  Staff morale was high.  In

11 fact, as a result of Gregg, the staff morale was so

12 high that I had a retention next year when Gregg was

13 not the program director of almost 80 percent; and

14 that's just unheard of.

15     Q.   Okay.

16              MR. JAMES:  I'll pass the witness.

17                   CROSS-EXAMINATION

18 BY MR. PHELPS:

19     Q.   Mr. Miller?

20     A.   Yes.

21     Q.   My name is Shane Phelps.  I'm the prosecutor

22 in the case.  I just have a few questions for you.

23     A.   I can hardly hear you.

24     Q.   All right.  I'll step closer.

25     A.   That's better.

1    Q.    Is that better?

2    A.    That's better.

3    Q.    Okay.  My name is Shane Phelps, and I'm one

4    of the prosecutors in the case.  I just have a few

5    questions for you.

6              First of all, what kind of law do you

7    practice?

8    A.    I'm involved in a general practice.  I have

9    probably about 30 to 40 percent is real estate,

10   probably 25 to 35 percent is bankruptcy.  Then I also

11   am involved with wills, small businesses; and I do try

12   criminal cases.

13   Q.    Okay.  You've known the Defendant for looks

14   like about 14 years?

15   A.    Yes.

16   Q.    And I presume you -- that relationship

17   started kind of as a result of being involved with

18   Scouts?

19   A.    That's correct.

20   Q.    You mentioned that you were a district

21   executive for Scouts?

22   A.    Yes.

23   Q.    And I presumed you're pretty familiar with

24   Scout policy and the reason why the Boy Scouts of

25   America have the policies that they do?

1    A.    I am.   I'm also an Eagle Scout, too.

2    Q.    Okay.   I only made it to Star Scout, so I

3  respect that.

4          You mentioned the Two Deep policy?

5    A.    Yes.

6    Q.    Why does the Boy Scouts of America have

7  that?

8    A.    Because there was an issue regarding child

9  abuse or inappropriate contact with minor children,

10  and Boy Scouts have had that in place for quite some

11  time.   In fact, that's how I became a Scout Master in

12  Iowa before we moved to Virginia.   The Scout Master

13  there was accused of having inappropriate contact with

14  several of the Scouts, and the troop was going to fold

15  unless someone stepped up to be the Scout Master, and

16  that's what I did.

17    Q.    Okay.   So the Boy Scouts of America has

18  instituted this Two Deep policy because of the problem

19  with, I guess, folks who are leaders in Boy Scouts or

20  becoming involved in Boy Scouts engaging in

21  inappropriate contact with Scouts?

22    A.    Correct.

23    Q.    It's obviously also intended to protect the

24  leaders as well; is that correct?

25    A.    That's correct.

1      Q.    And I'm going to guess that while you were a

2  member of the Scouts, that in any troop you were ever

3  associated with, you probably had a pretty

4  zero-tolerance policy for anybody who had any problems

5  at all with the potential for inappropriate conduct?

6      A.    I did.

7      Q.    And if you were aware of anybody in your

8  troop or under your leadership in terms of adult

9  leaders who were downloading child porn, that would be

10  the end of it for them as far as it went with Boy

11  Scouts; would you agree with that?

12      A.    It would be; and in fact, I had to deal with

13  some as a professional Scouter.  There were some

14  accusations made against some of the leaders here, and

15  I had to deal with it as a district executive.

16      Q.    Are you familiar with what Mr. Baird is

17  charged with?

18      A.    Not in a lot of detail.

19      Q.    Okay.  Do you know that he has actually pled

20  guilty to ten counts of possession of child

21  pornography and admitted guilt in 90 other counts?

22      A.    I didn't know it was that many or that's

23  what the status of the case was, no.

24      Q.    Well, actually --

25      A.    I knew there was a guilty plea, but I didn't

1  know the number of counts.

2       Q.   Yes, sir.  The state of the evidence is some

3  65,000 images.  Would you consider that serious?

4       A.   I think so, yes.

5       Q.   And that is somebody that is precisely the

6  kind of person that the Two Deep program is intended

7  to protect Scouts from; would you agree?

8       A.   I would agree that's one of the individuals.

9  The other individual would be somebody who actually

10  has contact with minors.

11       Q.   Okay.  At Camp Shenandoah, how many Scouts

12  were there?

13       A.   For the year or per week?

14       Q.   Well, the period that Mr. Baird was there.

15       A.   During 1996, I think we approached almost

16  1200 Scouts.

17       Q.   And those would have ranged --

18       A.   In six weeks -- over a six-week period, we

19  averaged between 190 to 220 campers, and that didn't

20  include staff.

21       Q.   And how many -- and how long was Mr. Baird

22  involved in that program?

23       A.   I knew he was -- had been on camp staff for

24  at least two years prior to that, so that would have

25  been his third year.  And I think he had also served

1  on staff when he was under the age of 18.  I think he
2  served as junior staff, also.
3      Q.   And did we have -- during that period of
4  time, was there, I guess -- did you involve Cub Scouts
5  as well, or is this just Boy Scouts?
6      A.   I think it was also Webelos week.
7      Q.   Okay.
8      A.   So it would be actually seven weeks of camp.
9  And Webelos is not attended as well as the Boy Scouts
10 camp because it requires parents to be there.  Each
11 child has to have a parent there, so it's a little bit
12 different.
13     Q.   Now, when we're talking Webelos, we're
14 talking about just below Boy Scouts?
15     A.   Yes.
16     Q.   And we're talking about --
17     A.   The -- probably ten.  Ten years of age.
18 They'd be in their second year of Webelos.
19     Q.   And then Boy Scouts from 11 to about 18, 19,
20 20 years old?
21     A.   Eighteen.
22     Q.   Okay.  I guess that's it, Mr. Miller.  I
23 appreciate your time.
24           MR. PHELPS:  I'll pass the witness,
25 Your Honor.

```
 1                    THE WITNESS:  Thank you.
 2                    MR. JAMES:  Nothing further.
 3                    THE COURT:  All right.  Thank you,
 4   Mr. Miller.  You're excused now.
 5                    THE WITNESS:  Thank you, Your Honor.
 6                    THE COURT:  Goodbye.
 7                    MR. JAMES:  Judge, we're going to
 8   finish before 5:00 o'clock.  Just wanted to see if you
 9   wanted to take a ten-minute break.
10                    THE COURT:  A ten-minute break?  Okay.
11   Ten-minute break.
12              (Recess taken)
13                    THE COURT:  Let's proceed.
14                    MR. JAMES:  Call John Rogers, Your
15   Honor.  I'll get him.
16                    THE COURT:  All right.
17                    JOHN ROGERS,
18   having been first duly sworn, testified as follows:
19                    THE COURT:  Have a seat.
20                    Go right ahead.
21                    DIRECT EXAMINATION
22   BY MR. JAMES:
23        Q.   State your name, please.
24        A.   John Rogers.
25        Q.   And is Tom Rogers your father who testified
```

```
 1  earlier?

 2       A.    Yes, sir.

 3       Q.    And how old are you?

 4       A.    I am 22 years old.

 5       Q.    Okay.  Where do you reside?

 6       A.    In Dallas, Texas.

 7       Q.    What do you do there?

 8       A.    I work for Mustang Technology.  I'm an

 9  engineer.

10       Q.    Where did you go to school?

11       A.    University of Oklahoma.

12       Q.    And let me ask you:  Do you know Gregg

13  Baird?

14       A.    Yes, sir.

15       Q.    How do you know Gregg?

16       A.    He was my Venture Crew advisor for

17  three years.

18       Q.    Okay.  And what kind of things did the

19  Venture Crew do?

20       A.    We took trips all over the United States.

21  We went to Boundary Waters, Minnesota; Key West,

22  Florida sailing; went to Glacier National Park.

23  Mainly did hiking -- hiking, backpacking, sailing as

24  well as other trips around the State of Texas.

25       Q.    Was Greg always reliable?
```

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

```
 1        A.    Yes, sir.
 2        Q.    Did he always make sure that things got done
 3   appropriately on the trip?  Did he always make sure
 4   that all the details -- a trip like that is fairly
 5   complex.  Was he always capable of making things work?
 6        A.    Absolutely.
 7        Q.    Let me ask you:  Did he ever do anything
 8   that made you feel or any of the other young men in
 9   the troop feel uncomfortable or inappropriate?
10        A.    Never.
11              MR. JAMES:  I'll pass the witness.
12                     CROSS-EXAMINATION
13   BY MR. PHELPS:
14        Q.    Hi, Mr. Rogers.  I just have one question
15   for you.
16        A.    Okay.
17        Q.    My name is Shane Phelps.  I'm a prosecutor
18   on this case.
19              While you were out on these trips with
20   the Defendant, you didn't know what he was thinking
21   about when he was interacting with you and other young
22   men, do you?
23        A.    As far as what his thoughts were?
24        Q.    Yes, sir.
25        A.    No, sir.
```

1     Q.    Okay.  Thank you, sir.

2                MR. PHELPS:  Pass the witness.

3                MR. JAMES:  Nothing further.

4                THE COURT:  You can step down, sir.

5                MR. JAMES:  Call Kim Roese.

6                Somehow I ended up with State's 16.

7                     KIMBERLY ROESE,

8  having been first duly sworn, testified as follows:

9                THE COURT:  Have a seat.

10                THE WITNESS:  Thank you.

11                THE COURT:  Go right ahead.

12                   **DIRECT EXAMINATION**

13  BY MR. JAMES:

14     Q.    Would you state your name, please?

15     A.    Kimberly Roese.  I'll spell it.  Do you need

16  me to spell it?

17     Q.    Please.

18     A.    R-O-E-S-E.

19     Q.    And Ms. Roese, how do you know Gregg Baird?

20     A.    Gregg was involved with the -- as a leader

21  with the Venture Crew that my older son was involved

22  in.

23     Q.    Okay.  And did you go on at least one trip

24  with Venture Crew?

25     A.    Oh, I went on several, yes, sir.

1    Q.   Okay.  And can you tell me what Gregg was

2  like on those trips?  Was he competent, as far as

3  making things work?

4    A.   Oh, yes.  Yes, sir.

5    Q.   I know -- I think you or Tom had told me

6  that there was a trip to Boundary Waters.  There was a

7  group of people there and that you and Tom and -- or

8  excuse me -- you and Gregg and two other people who

9  were adults, and that Gregg kind of did most of the

10 work; is that right?

11   A.   Oh, no.  Well, Gregg and I were canoe

12 partners in the Boundary Waters; but there were --

13 there were four adults and four youth on the trip.  I

14 thought everybody pitched in, sir.

15   Q.   Okay.

16   A.   The first night we were out, he was our

17 steak cooker.

18   Q.   Steak cooker.

19        Did you ever see anything involving

20 Gregg that made you uncomfortable or made you feel

21 that he was inappropriate towards any of the boys?

22   A.   No, sir.

23                 **CROSS-EXAMINATION**

24 BY MR. PHELPS:

25   Q.   Ms. Roese, my name is Shane Phelps.  I'm one

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

```
 1   of the prosecutors on this case.

 2        A.    Okay.

 3        Q.    I just have a couple of questions for you.

 4        A.    Yes, sir.

 5        Q.    Would knowing that somebody was along on one

 6   of the trips -- one of the adults leader was actively

 7   downloading and viewing thousands and thousands of

 8   images of child pornography, would that make you

 9   uncomfortable?

10        A.    If I knew that, sir, yes, sir.

11        Q.    Okay.  Would you allow your son to go on one

12   of these trips with someone you knew to be doing that?

13        A.    I rather doubt it, sir.

14        Q.    Okay.  Thank you.

15              MR. PHELPS:  Pass the witness, Your

16   Honor.

17              MR. JAMES:  Nothing further.

18              THE COURT:  You can step down.

19              Call your next.

20              MR. JAMES:  Judge, I'm looking for

21   something.  We're getting close.

22              THE COURT:  Take your time.

23              MR. JAMES:  We'll call Gregg Baird.

24

25
```

1                          GREGG BAIRD,

2    having been first duly sworn, testified as follows:

3                    THE COURT:  Have a seat.

4                    Go right ahead.

5                     DIRECT EXAMINATION

6    BY MR. JAMES:

7         Q.    Will you state your name?

8         A.    Gregg Baird.

9         Q.    And where and when were you born?

10        A.    February 11 of 1971.

11        Q.    And where were you born?

12        A.    Bryan, Texas.

13        Q.    Okay.  And what did your -- what did your

14   folks do?

15        A.    My dad was active Army.

16        Q.    Okay.  And where all were you stationed?

17        A.    Stationed -- first place I remember is

18   Germany.  Several places in Germany, followed by

19   Georgia, Virginia, Kansas and then back to Virginia.

20        Q.    Okay.  Did you have a happy childhood?

21        A.    Absolutely.

22        Q.    What all did you enjoy as a child?

23        A.    Oh, a typical childhood.  I really enjoyed

24   growing up in an Army family.  I found moving around

25   was exciting, played sports as a kid -- soccer,

1  swimming and the outdoors.

2        Q.    Did you join the Cub Scouts when you were

3  eight?

4        A.    I did.

5        Q.    How did you like the Cub Scouts?

6        A.    I thought it was fun, and I was really

7  excited to be a Cub Scout because my older brother was

8  one before me.

9        Q.    And did you transition from Cub Scouts into

10  the Boy Scouts?

11       A.    I did.

12       Q.    Let me show you what has been marked as

13  Defendant's Exhibit 2.  Is this a picture of when you

14  transitioned or got moved from being a Cub Scout to a

15  Boy Scout?

16       A.    It is.

17       Q.    Okay.  How old would you have been then, do

18  you know?

19       A.    I guess 11 years old.

20       Q.    And what happened to you in Scouts when you

21  were about 12?

22       A.    In October, the year I was 12, at camp, I

23  was raped by two older Scouts in my patrol.

24       Q.    You say that just sort of matter of

25  factually.  How did that affect you, Gregg?

1      A.    In just about every way.  It's devastating.

2 I felt horribly ashamed, horribly embarrassed.  I felt

3 I had somehow let my family down.  It affected all

4 areas of my life.  My grades at school dropped

5 considerably for awhile.

6      Q.    Did you tell anybody?

7      A.    No.

8      Q.    Didn't tell your parents?

9      A.    Never.

10      Q.    Did you continue on with Scouting?

11      A.    I did.

12      Q.    Did you eventually reach the level of Eagle

13 Scout?

14      A.    I did.

15      Q.    Where did you go to college?

16      A.    Went to college at Longwood College in

17 Farmville, Virginia.

18      Q.    What did you major in there?

19      A.    Finance.

20      Q.    Tell the Judge a little bit about your work

21 history.

22      A.    After college, I worked for the First Union

23 National Bank in Williamsburg, Virginia -- I'm

24 sorry -- Tyson's Corner, Virginia, working in the

25 marketing department.  I worked there for a few years,

1  then went to attend graduate school.

2      Q.   Where did you attend graduate school?

3      A.   Texas A&M International University.

4      Q.   And after you got out of there -- how old

5  were you when you got out of A&M International?

6      A.   I was 25 when I graduated.

7      Q.   And then what did you do?

8      A.   Then I obtained a job working at Aggieland

9  Credit Union in College Station.

10     Q.   How long did you work at Aggieland Credit?

11     A.   For 13 years, just short of 13 years.

12     Q.   And when you left there, how much were you

13  making?  And you left there after your arrest; is that

14  correct?

15     A.   Correct.  Right around $80,000.  I couldn't

16  tell you the exact amount.

17     Q.   Did you get good work evaluations?

18     A.   I did.

19     Q.   Gregg, have you ever had any sexual contact

20  with an underaged child?

21     A.   No.

22     Q.   You saw those photos.  You've seen those

23  photos.  How do you feel about those photos?

24     A.   Absolutely horrified.

25     Q.   That you downloaded them, Gregg?

```
 1        A.    Indeed.   I feel horrible that the people in
 2   those pictures went through what I went through, even
 3   worse in many cases.   I feel horrible that my
 4   downloading them creates a market for them and
 5   contributes to the problem.
 6        Q.    Why did you continue to be involved in
 7   Scouts as an adult advisor?
 8        A.    I joined the program.   I certainly really
 9   enjoyed the high adventure end of it; and one reason I
10   continued my involvement in Scouts is I wanted to
11   foster an environment -- a safe environment where
12   people could get the benefit of the program without
13   going through the horrible experience I had to endure.
14        Q.    But on the other side, you were downloading
15   the child porn?   How does that make you feel now?
16        A.    Horribly ashamed, very embarrassed.
17        Q.    Have you been in counseling with Tom since
18   the arrest?   Have you discussed it with him?
19        A.    Many, many times.   Tom has been very good in
20   that regard, very helpful.   We've prayed together.
21   We've talked countless occasions since this has
22   happened.   You know, I have -- I think when someone
23   goes through what I went through as a young man, you
24   know, I think -- I believe that certainly -- you're
25   certainly capable of learning from mistakes and
```

1  getting past them; but first, you have to face them,

2  I thought I was strong enough to box it in, keep it to

3  myself.  Obviously, that's obviously not the case.

4            And the redemption process of seeking

5  help and talking about it and praying over it has been

6  very, very beneficial.

7       Q.   Do you believe God can change your heart,

8  Gregg?

9       A.   Absolutely.

10      Q.   Gregg, have you been diagnosed with HIV?

11      A.   I have.

12      Q.   And were you in the hospital in critical

13 condition for a good part of the late summer/early

14 fall of '09?

15      A.   I was hospitalized over two different

16 periods.

17      Q.   Okay.  And did at one point they think you

18 were going to die?

19      A.   Correct.

20      Q.   Did I ask you to bring a representative

21 sample showing the diagnosis?  Did I ask you bring a

22 representative --

23      A.   Yes, you did.

24      Q.   -- sample?

25      A.   Yes, you did.

```
 1              MR. PHELPS:  I have no objection.
 2  What's the number on that one?
 3              MR. JAMES:  Defendant's 3.
 4         (Defendant's Exhibit Number 3 offered.)
 5              THE COURT:  Defendant's 3 is admitted.
 6         (Defendant's Exhibit Number 3 admitted.)
 7     Q.   (By Mr. James) Gregg, did your hospital
 8  stays total something over $200,000 in medical
 9  expenses?
10     A.   They did.
11     Q.   And you're on $1500 a month for the drug
12  treatment for HIV?
13     A.   Correct.
14     Q.   You told me something one time.  How do you
15  feel now about getting caught having all this?  You
16  lost your job.  You've become essentially a target for
17  a lot of well-deserved anger.  How do you feel about
18  getting caught?
19     A.   Initially, I was terrified.  Now, it's
20  probably the best thing that ever happened to me.  I
21  have no regret whatsoever.  Had I not been caught, I
22  would have continued to box this in and tried to hide
23  it away, and that obviously was not working.  The
24  light of day can solve a lot of problems and the help
25  I've seeked [sic] and received, and the prayers I
```

1  received and given.

2              When this first happened, probably my

3  best friend here in town, he told me -- he said -- he

4  told me:  If this experience brings me closer to God,

5  it will be a great thing.  For me, that initially

6  really, really, really, really irritated me; and now,

7  I completely see his point and agree with it entirely.

8      Q.   I know it was hard for Judge Bryan to look

9  at those pictures and videos earlier.  How did you

10  feel?  How did you feel knowing that you're the one

11  that downloaded that, Gregg?

12      A.   Absolutely horrible.

13      Q.   Okay.  I think I asked you this before, but

14  I want to make sure:  Did you ever make inappropriate

15  contact with -- with any -- any underaged people?

16      A.   Absolutely never.

17      Q.   And they had all those chats where you're

18  talking to people, and they went on your computer, and

19  they found it.  They didn't find any evidence of

20  underaged contacts, did they?

21      A.   There is no evidence of that.  It never

22  occurred.

23              MR. JAMES:  Pass the witness.

24

25

```
 1                  CROSS-EXAMINATION
 2  BY MR. PHELPS:
 3       Q.   Mr. Baird, my name is Shane Phelps.  I've
 4  got a number of questions.  If I ask you something
 5  that doesn't make sense to you or you don't
 6  understand, will you agree to stop me and make sure
 7  that you understand what I'm asking?
 8       A.   Yes.
 9       Q.   Okay.  I don't want you to -- I am not
10  trying to trip you up on anything.  I am going to try
11  to ask you direct questions, and I want the answer
12  that you give me to be an appropriate answer to what
13  I'm asking.
14                  Does that make sense?
15       A.   Yes.
16       Q.   Okay.  First of all, I guess, let's just
17  kind of get some preliminary details out of the way.
18                  No question at all that you are the
19  person who downloaded all of this child pornography?
20       A.   I have no doubt.
21       Q.   This wasn't Dawn Killian's fault, was it?
22       A.   Absolutely not.
23       Q.   In fact, as I understand your testimony
24  today, in fact, Dawn Killian probably did you a big,
25  huge favor?
```

```
 1        A.    Absolutely.
 2        Q.    Do you know why -- were you involved, by the
 3   way, with a recent Open Records request of the City of
 4   College Station of Dawn Killian by your aunt, I
 5   believe, Dorothy Baird?
 6        A.    I was not involved in it.
 7        Q.    Did you know about it?
 8        A.    She made me aware of it, yes.
 9        Q.    Now, why did she do that?  Why was that
10   done?
11              MR. JAMES:  That has nothing to do with
12   this.  That has to do with a search issue, an Open
13   Records -- an Open Records request.
14              MR. THOMAS:  The motion to suppress is
15   over.  He has pled guilty.  He has just testified how
16   remorseful he is about all of this; and yet, during
17   this period of time, Dawn Killian continues to be
18   harassed about this; and I want to know why.
19              MR. JAMES:  If he's not responsible for
20   it, Judge --
21              MR. PHELPS:  If he knows about --
22              MR. JAMES:  And it is not harassment.
23   She made an Open Records request for governmental
24   records.
25              MR. PHELPS:  For all of her --
```

1          THE COURT:   I'm going to let you

2   inquire whether he was involved in it.

3          Q.   (By Mr. Phelps) Did you know about?

4          A.   She made me aware of it after the fact, yes.

5          Q.   You didn't know about it beforehand?

6          A.   I did not know she was going to make the

7   request.

8          Q.   And do you know what the reason is for that

9   request?

10         A.   I can't answer for my aunt.

11         Q.   Okay.  But no question at all, this is not

12   Dawn Killian's fault?

13         A.   I believe I have already stated that.  It is

14   not Dawn Killian's fault.

15         Q.   Nobody else's fault but yours?

16         A.   It was absolutely my fault.

17         Q.   Okay.  When was the first time you started

18   downloading child pornography?

19         A.   Couldn't give you an exact date.  Probably

20   2003, 2004, at that time.

21         Q.   Okay.  There's no question that you have had

22   computers before the ones that you were involved with?

23         A.   Correct.

24         Q.   Okay.  And on those computers, if we had had

25   them, we would have found child pornography at that

1  time?

2      A.    Computers before my current system?

3      Q.    Yes, sir.

4      A.    I can't remember when I purchased my current

5  system.

6      Q.    Is this something that just surfaced in

7  2003?

8      A.    Right around about that time, yes, sir.

9      Q.    Okay.  What manifestations of the experience

10 that you say you had at 12 occurred before then?

11     A.    I'm afraid I don't understand your question.

12     Q.    Okay.  You said that at the age of 12 you

13 were raped by two Scouts?

14     A.    Correct.

15     Q.    Were these, I would presume, older Scouts?

16     A.    Yes, they were.

17     Q.    How much older?

18     A.    I believe both of them were two years older.

19     Q.    Okay.  What were their names?

20     A.    Brian and Scott.

21     Q.    Brian what?

22     A.    Brian and Scott.

23     Q.    Brian, what's the last name; and Scott,

24 what's the last name?

25     A.    Brian Peterson; and I -- Scott, I believe it

```
 1   was Averil, although I could be wrong -- could be
 2   wrong about that.
 3        Q.   Where did this take place?
 4        A.   It took place on a camp-out.
 5        Q.   Where geographically?
 6        A.   In Quantico Marine Corps Base in Virginia.
 7        Q.   And were there other Scout leaders
 8   present -- not during this episode, but on this
 9   particular Scouting adventure?
10        A.   Yes, sir.
11        Q.   Okay.  And you didn't relate that to
12   anybody?
13        A.   As I said, I've never -- I never spoke a
14   word of it.
15        Q.   Until after --
16        A.   Correct.
17        Q.   Not until after you were arrested?
18        A.   Correct.
19        Q.   Not to a single soul?
20        A.   Not to a single soul.
21        Q.   Now, over the course of the time from when
22   you were 12 until 2003, did that experience ever
23   manifest itself negatively in your life?
24        A.   In many ways.
25        Q.   How?
```

1        A.    Inability to form relationships, horrible
2    anxiety.  Academically, during junior high, horrible
3    grades.  Particularly difficult transition from junior
4    high to high school.  Horrible freshman year in high
5    school; and it's something -- my way of dealing with
6    it was I tried to -- I guess the way you would
7    describe it is put it in a box, put it away and
8    pretend it wasn't there.  And you know, it was --
9        Q.    You're aware that young victims -- young
10   victims of sexual assault will often manifest their --
11   what they call acting out.  Would there have been any
12   outward manifestations of this so that other people
13   could have seen?
14       A.    In what -- what -- which ways?
15       Q.    Well, were you a good student until this
16   happened?
17       A.    I would say I was -- I was a fairly good
18   student; and after this occurred, if anyone were to go
19   back and look at my grades, they would certainly
20   notice a decline.
21       Q.    Okay.  Well, I presume your parents would
22   have looked at your grades and noticed there was a big
23   difference?
24       A.    Right.
25       Q.    Did they ever ask you about it?

1      A.    Yes, they did.

2      Q.    Did you ever tell them about it?

3      A.    I've never told a word to anyone.

4      Q.    Again, you've never told anybody about it

5  until after you were arrested?

6                MR. JAMES:  Objection.  Asked and

7  answered.

8                THE COURT:  Overruled.  Go ahead.

9      A.    I've never -- as I've said before, I've

10 never spoken of this before being arrested.

11     Q.    (By Mr. Phelps) However, you remained in

12 Scouts?

13     A.    Excuse me?

14     Q.    You remained in Scouts --

15     A.    Yes, I did.

16     Q.    -- despite this -- this episode --

17     A.    Correct.

18     Q.    -- right?

19                Did you ever go on an outing with these

20 boys again?

21     A.    I went on one additional outing where those

22 two were present.

23     Q.    Okay.  Were you assaulted again?

24     A.    They attempted.

25     Q.    And what happened when they attempted?

1        A.    They let me know what was going to happen

2   that night, and I stuck my finger down my throat and

3   threw up and went home sick.

4        Q.    And were you injured in either of these

5   episodes?

6        A.    No, not physically.

7        Q.    All right.  You remained at Scouts; and you

8   obviously went on and earned a bunch of merit badges

9   and became an Eagle Scout, right?

10       A.    Yes, I did.

11       Q.    So it obviously didn't affect that, right?

12  I mean --

13       A.    No.

14       Q.    Takes a lot of discipline as I recall --

15       A.    Correct.

16       Q.    -- to become an Eagle Scout, a lot of focus;

17  is that right?

18       A.    Yes.

19       Q.    You went on to college?

20       A.    I did.

21       Q.    You got a bachelor's and a master's degree,

22  right?

23       A.    Yes.

24       Q.    And you are a smart guy, are you not?  I

25  mean, I'm not asking for you to toot your own horn;

1  but you're a pretty intelligent guy?

2      A.    I like to say I was a late bloomer.

3      Q.    You did well in college and graduate school?

4      A.    I did fairly well in college and very well

5  in grad school.

6      Q.    And then you obtained employment and did a

7  pretty good job at that as well, right?

8      A.    Yes.

9      Q.    Now, I want to go back to when you first

10  started downloading.  Were you living here in College

11  Station when you first started downloading child porn?

12      A.    At the time, I believe it was Bryan.

13      Q.    You were in Bryan?

14              And when you first started downloading

15  child porn, did you know when you did it that that's

16  what you were doing, was downloading child

17  pornography?

18      A.    I did.

19      Q.    And it was, I presume, similar kinds of

20  things to what the Judge looked at this morning?

21      A.    I believe so, yes.

22      Q.    And this is pretty extreme stuff.

23              Would you agree with that?

24      A.    Some of it, absolutely.

25      Q.    I mean, there's child porn; and then there's

1   some graphic, extreme, really-out-there-on-the-edge

2   child pornography?

3       A.   I would agree with that.

4       Q.   And the stuff that we're looking at that

5   we're talking about that Gregg Baird downloaded is out

6   there; would you agree with that?

7       A.   I would agree with that.

8       Q.   Now, correct me if I'm wrong, but the child

9   pornography that the Judge has looked at and that is

10  contained in all of these exhibits, we're talking

11  about in some cases kids as young as five and

12  six years old.

13               Would you agree with that?

14      A.   Sure.

15      Q.   Is that true or not?

16      A.   I believe it is.

17      Q.   And we're talking about kids as young as

18  five and six years old being violated by an adult,

19  right?

20      A.   Yes.

21      Q.   Anally?  Orally?  Would you agree with that?

22      A.   Yes.

23      Q.   Including situations of sadomasochism,

24  bondage, discipline and that sort of thing; is that

25  right?

1    A.    Correct.

2    Q.    Now, when you first downloaded child porn,

3 how did you feel about that?

4    A.    I would say I had mixed emotions.

5    Q.    What mixed emotions?

6    A.    Not really sure.  Interest, scared a little

7 bit.

8    Q.    Why were you scared?

9    A.    I knew it was something that I should not be

10 doing.

11    Q.    You knew it was big time illegal, didn't

12 you?

13    A.    Yes.

14    Q.    In fact, you knew it was a felony punishable

15 by prison time?

16    A.    I don't think I knew it was a felony at the

17 time, but I knew it certainly was something I

18 shouldn't be doing.

19    Q.    Well, at some time during the course of the

20 years following -- and I guess we'd be talking about

21 at least six years that you downloaded child

22 pornography -- you found out it was a felony

23 punishable by prison time, didn't you?

24    A.    I never specifically looked into it, but I

25 have no reason to doubt that.

1      Q.   Well, at some point, did you ever become

2  aware of how serious a crime it was?

3      A.   Yes.

4      Q.   Now, when you first downloaded it, did

5  you -- and let me ask you this:  I mean, did you

6  download it for the purpose of sexual gratification?

7      A.   At times, yes.

8      Q.   And did you, to all of this stuff or some of

9  this stuff we're seeing, gratify yourself to these

10  images?

11      A.   At times, yes.

12      Q.   Now, you said that you had mixed emotions

13  and that you were scared the first time you did it,

14  correct?

15      A.   Correct.

16      Q.   But you did it anyway, right?

17      A.   Correct.

18      Q.   Now, did you have any sense at that time

19  that this may have been, at least in your mind, a

20  manifestation of what had occurred to you when you

21  were 12?

22      A.   Can you repeat the question?

23      Q.   Yes, sir.

24           When you first got the urge or whatever

25  to start downloading this child pornography, did you

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

1  have any sense that you were experiencing

2  manifestations of what happened when you were 12?

3      A.   Yes.

4      Q.   Okay.  So was it a warning sign to you?

5      A.   What do you mean by "warning sign"?

6      Q.   Wow, I have this experience when I'm 12, and

7  now I'm downloading child pornography.  I mean, was

8  that a warning sign to you that there was something

9  wrong?

10     A.   Yes, absolutely.

11     Q.   Okay.  No question in your mind?

12 Absolutely?

13     A.   Absolutely.

14     Q.   Okay.  So what did you do to stop yourself

15 from doing that, to seek help?

16     A.   Nothing.

17     Q.   And, in fact, your response was to do it

18 again, right?

19     A.   Yes.

20     Q.   The second time you did it, did you have the

21 same feelings?

22     A.   Yes.

23     Q.   And you did it again, right?

24     A.   Correct.

25     Q.   Seeking no help whatsoever, right?

 1      A.    Correct.

 2      Q.    The third time and the fourth time and the

 3 fifth time and the sixth time and the 61,000th time

 4 you did it, the same thing?  You just continued to do

 5 it, right?

 6      A.    Correct.

 7      Q.    Knowing all along it was a serious crime

 8 here in Texas?

 9      A.    Correct.

10      Q.    And I know I heard you say kind of the buzz

11 words, but I'm going to talk to you about it anyway.

12 The images that you were downloading are real

13 children, right?

14      A.    Yes.

15      Q.    They're human beings.  If what you say is

16 true about what happened to you at 12, if there's a

17 human being on this planet -- or certainty in Brazos

18 County -- who ought to be sensitive to what those kids

19 are going through, it ought to be Gregg Baird, right?

20      A.    I would agree.  I would agree with that.

21      Q.    And yet, did you have a sense as you were

22 downloading it about what these kids have been

23 through?

24      A.    Yes.

25      Q.    You don't for a moment intend to tell this

1   Court or believe yourself that any of these kids who

2   were bound and gagged and were anally sodomized and

3   all of that, have any desire to be involved in any of

4   that, right?

5        A.   Right.

6        Q.   They don't want that, do they?

7        A.   I seriously doubt it.

8        Q.   And it's probably going to be a pretty awful

9   thing for them to have to deal with, right?

10       A.   I know it is.

11       Q.   And some of those kids are going to be -- in

12  order to have done it -- are going to be abused in

13  other ways as well.

14            Would you agree with that?

15       A.   Yes.

16       Q.   All right.  It's a terribly, terribly

17  unhealthy, criminal and awful situation that these

18  children are having to go through, right?

19       A.   Correct.

20       Q.   And that would have become obvious to you

21  the very first time you saw one of those images,

22  right?

23       A.   Yes.

24       Q.   And did you actually actively go out and

25  search for these images?

1     A.    At times, yes.

2     Q.    What about the first time?

3     A.    Yes.

4     Q.    What brought Gregg Baird to:  I want to look

5  at child porn?

6     A.    I can't really specify one trigger.

7     Q.    At that point, when you did it, did you

8  think to yourself:  I should not be doing this?

9     A.    Afterwards, absolutely.

10     Q.    But not before?

11     A.    Correct.

12     Q.    Okay.  So you had regret immediately

13  afterwards?

14     A.    Yes, as I do today.

15     Q.    Well, you said you were -- when the Judge

16  was looking at it, you were horribly ashamed and

17  embarrassed.  Were you horribly ashamed and

18  embarrassed all the times you downloaded it?

19     A.    Yes.

20     Q.    Now, you downloaded it, I guess, in the

21  privacy of your room, right?

22     A.    Correct.

23     Q.    As you testified, you gratified yourself

24  to these images; is that right?

25     A.    Yes.

1      Q.    And yet, not horribly ashamed enough or

2  embarrassed enough or concerned enough about your own

3  psychological welfare to stop.

4                Would you agree with that?

5      A.    Correct.

6      Q.    And certainly not concerned enough about the

7  welfare and well being of the children in these images

8  to stop, correct?

9      A.    Correct.

10      Q.    So you continued to make conscious decisions

11  to -- let me ask you this:  Basically, as you sit

12  there, will you agree with me that you are

13  participating in the abuse of these children that are

14  in these images?

15      A.    Absolutely.

16      Q.    And that didn't stop you from continuing to

17  download these images, correct?

18      A.    Unfortunately not.

19      Q.    You were the one who organized these images?

20      A.    What do you mean by "organized"?

21      Q.    Put them in folders.

22      A.    I downloaded them to a particular folder,

23  yes.

24      Q.    Okay.  Did you ever make any efforts to hide

25  them as you heard Mr. McCune testify?

1      A.    They were just in a folder.  I didn't make

2  attempt or effort to hide them, no.

3      Q.    You didn't want anybody to see it, right?

4      A.    Correct.

5      Q.    Okay.  So as you sit there today, would you

6  say that you have a sexual attraction to young boys?

7      A.    At times, yes.

8      Q.    Well, what do you mean "at times"?  At what

9  times?  As you sit there, generally speaking, do you

10 have a sexual attraction to young boys?

11     A.    Right now, no.  At times in the past,

12 absolutely.

13     Q.    So there were times when you were sexually

14 attracted to young boys and times you were not?

15     A.    I believe so.

16     Q.    So is it your testimony that it just kind of

17 came and went, or is it your testimony that you could

18 turn it off when you wanted to?

19     A.    Came and went.

20     Q.    Okay.  Did you have any control over when it

21 came or went?

22     A.    Not necessarily.

23     Q.    Okay.  So you could be overcome with sexual

24 attraction for a young boy at any given time, right?

25     A.    At times, yes.

1    Q.   Okay.  And that would include times that you

2  were out, say, in Glacier National Park with young

3  boys?

4    A.   I wasn't at Glacier National Park with young

5  boys.

6    Q.   Were you ever on camping trips with young

7  boys?

8    A.   When I was younger, yes.

9    Q.   Younger meaning?

10    A.   When I was in Scouts.

11    Q.   When was the last time you went on a trip

12  with the Venture Crew?

13    A.   Last time was summer of 2008.

14    Q.   Okay.  And how old were the boys on that

15  trip?

16    A.   I believe the youngest person on that trip

17  was 17.

18    Q.   Any sexual thoughts about any of those boys?

19    A.   No.

20    Q.   Ever on that trip?

21    A.   Never.

22    Q.   Was there a risk of you having sexual

23  thoughts about those boys?

24    A.   Not on those trips.

25    Q.   What about -- have you been under -- ever

```
 1   been on other trips where you had boys 13, 14,
 2   15 years old?
 3        A.   Never a 13 year old.  I believe the youngest
 4   who ever went on a Venture Crew trip was 14.
 5        Q.   Okay.  And on all of those trips, is it your
 6   testimony under oath, as you sit there, that you never
 7   had any sexual thoughts about any of those boys you
 8   ever went on these camping trips with?
 9        A.   In that area, I was actually able to keep it
10   separate.
11        Q.   How?
12        A.   Very professional.  I would never put anyone
13   who I personally knew through that.
14        Q.   I understand.  What you're telling the Judge
15   is you made a conscious decision not to actually put
16   your hands on kids?
17        A.   Absolutely.
18        Q.   I was asking you if you ever had thoughts,
19   fantasized about having sex or any kind of sexual
20   contact with these boys?
21             MR. JAMES:  Judge, I'm -- before you
22   answer, but are you through with your question?
23             MR. PHELPS:  Go ahead.
24             MR. JAMES:  Judge, I'm going to object.
25   Thoughts are not crimes or bad acts; and if he wants
```

1  to ask if he ever did something, that's fine.  But if

2  he's asking if he ever had a thought --

3                    MR. PHELPS:  I think that --

4                    MR. JAMES:  Let me finish my objection.

5                    I don't think that comes under 37.07;

6  and Judge, if we are put on trial for our thoughts,

7  that's certainly not what 37.07 says.  It says:  Bad

8  acts, crimes.

9                    MR. PHELPS:  Judge, he put this at

10 issue because he was --

11                    THE COURT:  Overrule the objection.

12                    MR. THOMAS:  Sir?

13                    THE COURT:  Overrule the objection.

14                    MR. JAMES:  Can I have a running

15 objection, Your Honor?

16                    THE COURT:  You can have a running

17 objection to his thoughts.

18      Q.    (By Mr. Phelps) Did you ever have any

19 thoughts of a sexual nature toward any of the boys you

20 ever went on trips with?

21      A.    No.

22      Q.    Or ever came into contact with?

23      A.    In the Venture Crew?

24      Q.    Yes, sir.

25      A.    No.

```
 1       Q.    All right.  I want you to think about that
 2  for a second.  You had 65,000 images of child
 3  pornography from boys including ages six years old all
 4  the way up to 17, 18, 19 years of age.  You gratified
 5  yourself to these -- gratified yourself sexually to
 6  those images, and it is your testimony that you're
 7  able to go on these trips with these young boys and
 8  not have a single thought in that direction?
 9       A.    That's correct.
10       Q.    Wow.
11                 MR. JAMES:  Objection, side bar.
12                 THE COURT:  Sustain the objection.
13       Q.    (By Mr. Phelps) You testified that there
14  was -- that this attraction for young boys kind of
15  comes and goes with you, that you can control that.
16                 Do you recall that testimony?
17       A.    I do.
18       Q.    Okay.  So you could not have known before
19  you went on these trips with these young boys that
20  that would not happen.
21                 Would you agree with that?
22       A.    I'm afraid I don't understand your question.
23       Q.    As you're preparing to go to Glacier
24  National Park or all of these other places you go with
25  these young boys, before you go, you would have no way
```

1  of knowing, because of your testimony that it comes

2  and goes and you don't have any control over it, that

3  it might not come over you while you're on one of

4  these trips with these young boys?

5      A.   As I told you already, I've never had

6  attraction, had feelings toward anyone in the Venture

7  Crew.

8      Q.   My question to you, however, is:  Before you

9  went on these trips, would you have any way of knowing

10  that it would not have happened given what you've

11  testified to that it can come and go and you don't

12  have any control over it when it does?

13      A.   I agree with that.

14      Q.   Okay.  Now, how responsible is it for a

15  Scout leader who's downloading child pornography,

16  gratifying himself to those images, graphic, extreme

17  images to go out and to put himself in that position

18  to go out on these trips with young boys?

19      A.   Not very responsible.

20      Q.   You shouldn't have done it, should you?

21      A.   I've already said no.

22      Q.   In fact, the very last place that Gregg

23  Baird ever should have been was around young boys.

24           Do you agree with that?

25      A.   In the fact that I never took any

1    inappropriate action with any person, it was never a

2    problem.

3         Q.    Okay.  Let me -- do you think you have a

4    problem with an attraction to young boys?  Do you

5    think there's a problem with that, Mr. Baird?

6         A.    There is.

7         Q.    And do you think you, Gregg Baird, have a

8    problem with that?

9         A.    I do at times, yes.

10        Q.    Are you a pedophile?

11        A.    What's your definition of that?

12        Q.    Do you like to have sex with little boys or

13   fantasize about it?  Is that something that if you had

14   the chance to do and you could get away with it, you

15   would do it?

16        A.    I would never do it.

17        Q.    So this is all just fantasy?  All of these

18   images?

19        A.    That's what I believe.

20        Q.    No question, however, you've got a sexual

21   attraction to young boys, right?

22        A.    At times I do, yes.

23        Q.    Okay.  Now, do you believe as you sit there,

24   Gregg Baird, you have a terrible and significant

25   problem?

```
1        A.    At times, yes.

2        Q.    Okay.  Is it really your testimony,

3   Mr. Baird, that sometimes you're just fine and other

4   times you're a raging pedophile?  I mean, is that your

5   testimony that you can actually build a Chinese wall

6   and never the 'twain shall meet?

7        A.    When I was on Venture Crew, I was very

8   professional in my actions.  I followed every rule

9   that Scouts had in place to the letter including Two

10  Deep leadership.  I never put myself in the position

11  where that would happen.  I would never allow that to

12  happen to anyone.  I would never personally do that to

13  another person that happened to me.

14       Q.    So your testimony is that it's okay because

15  when you went out with these young boys that you

16  followed the rules and never put your hands on a kid,

17  that that meant -- so it was okay and that there was

18  no risk?

19       A.    They were completely safe.

20       Q.    And there was no risk for you personally?

21       A.    As I said, I would never do anything to

22  anyone who was on Venture Crew.

23       Q.    Okay.  And so up until the point that you

24  were arrested, did you ever have any concerns that you

25  might do something that you would regret with a young
```

1  boy?

2      A.   I knew I would never be able to make the

3  leap into real life.

4      Q.   Were you ever concerned about that?

5      A.   No.

6      Q.   It just never occurred to you that there

7  might be a circumstance in which you would go from the

8  extreme sexual material involving young boys that

9  we've had to look at here to actually putting hands on

10 kids?  That never concerned you?

11     A.   As I told you before, I would never

12 personally put someone into the position I was placed

13 into.  I can certainly understand the concern you have

14 in that area.  I would never, nor have I ever, nor

15 will I ever do that.

16     Q.   Now, of course, that's just your testimony,

17 correct?

18     A.   That's all I -- well, what else can I offer

19 besides my testimony?

20     Q.   Well, I agree with that.  But you were a

21 12-year-old boy who you didn't outcry until you were

22 30 -- how old?

23     A.   Thirty-eight.

24     Q.   Thirty-eight.  And you're aware that there

25 are a lot of young boys who are abused who don't

1   outcry at all, right?

2        A.    I was one.

3        Q.    Okay.  So just the fact that we've heard

4   from a few people saying that you never did it to them

5   doesn't necessarily mean it never happened, right?

6                 MR. JAMES:  I'm going to object.  Your

7   Honor, the 37.07 says you've got to prove something

8   beyond a reasonable doubt.  Mr. -- what Mr. Phelps is

9   doing is asking you to punish him for having sex with

10  young boys even though there is not one shred of

11  evidence; and I'm going to object to that, Judge.

12  Saying -- telling the -- essentially arguing to the

13  Court:  Well, we don't know for sure that he didn't

14  have sex.

15                 You can't disapprove a negative.  All

16  we can do is do what we have done, which is bring in

17  the people that worked with him to show that there was

18  no evidence of it; and they cannot ask the Court to

19  consider what might be out there somewhere even though

20  there's not a shred of evidence.  It's not proper

21  under 37.07.

22                 MR. PHELPS:  Judge, I don't think

23  that's a proper objection.  From the very beginning,

24  this -- the entire tenor of Mr. James' defense has

25  been he never touched a boy.  He never touched a boy.

```
 1   It has been incumbent upon me to explore whether we
 2   have for sure determined that that's the case.  I am
 3   entitled to narrow it down to exactly what the source
 4   of that information is so the Court can make a
 5   judgment about it.  And what it comes down to is his
 6   word.
 7                THE COURT:  Overrule the objection.
 8        Q.   (By Mr. Phelps) Ultimately, when it comes
 9   right down to it, the ultimate fact of whether you
10   ever put a hand on a child comes down to your word; is
11   that right?
12        A.   Correct.
13        Q.   Okay.  Now, you understand you're not
14   charged with putting a hand on a child.
15                Do you understand that?
16        A.   I understand that.
17        Q.   You understand that you're charged and pled
18   guilty to and admitted guilt in 100 counts of
19   possessing child pornography, right?
20        A.   I believe it was ten.
21        Q.   Well, you pled guilty to ten.  You admitted
22   guilt in 90 other cases.
23        A.   Correct.
24        Q.   Do you recall that?
25                So I guess what I'm trying to figure
```

1  out, Mr. Baird, is over the course of the years,

2  having had the experiences that you say you had, that

3  you began to become deeply and profoundly involved in

4  child pornography -- extreme child pornography -- and

5  you did not have concerns about making that jump to

6  actually putting your hands on a kid?

7       A.   I believe my testimony has been on several

8  occasions, all right, that I will -- I have never, nor

9  will I ever, nor did I ever place a hand on a child.

10       Q.   And my question is:  Did you ever have a

11  concern that you would, that you might?

12       A.   No.

13       Q.   Did you really believe that you were going

14  through all of this information that you were

15  gratifying yourself to all of these images that you

16  were in complete control?

17       A.   You can ask the question ten different ways,

18  and the answer is consistently:  I would never

19  personally put anyone through what I went through as a

20  young boy.  Never.

21       Q.   Except on those images of those kids?

22       A.   I would personally never do that to another

23  human being.

24       Q.   As long as it's somebody else doing it, it's

25  okay?

1          A.     It's not okay.

2          Q.     Okay.   And so that it's clear, up until the

3    point you were arrested, given all of this activity

4    over the years, you never sought any kind of help?

5          A.     Correct.

6          Q.     Never saw a psychiatrist, never saw a

7    psychologist, never sought spiritual counseling about

8    this issue?

9          A.     As I said, I never said a word to anyone at

10   any time ever.

11         Q.     Okay.   Now, in addition to your downloading

12   of child pornography, you actually were reaching out

13   on the Internet to find people to have sex with.

14                  Would you agree with that?

15         A.     Yes.

16         Q.     Okay.   And, in fact, on numerous occasions

17   you did find people and meet people to have sex with?

18                  MR. JAMES:   And Judge, I want to renew

19   my objection under the Due Process clause.

20                  THE COURT:   Go.

21                  MR. PHELPS:   Judge, this goes to the

22   fact that he says that he is in complete control and

23   he would never do it; and yet, he was reaching out on

24   the Internet.   He is reaching out through actual

25   meetings with people.   He is engaging in extreme

1   sadomasochistic behavior.

2              Now, the Court is entitled to consider

3   that in determining the credibility of his statement

4   that he was in control and that he would never go that

5   far.

6              THE COURT:  Overrule the objection.

7              MR. JAMES:  Can we have a running

8   objection?

9              THE COURT:  Yes, sir.

10  Q.   (By Mr. Phelps) Now, you were reaching out

11  on the Internet and actually meeting men and having

12  casual sexual encounters, right?

13  A.   Consenting adults.

14  Q.   That's not my question.

15             Were you reaching out on the Internet,

16  meeting people and having casual sexual encounters

17  with them?

18  A.   Two consensual -- consensual adults, yes.

19  Q.   All right.  And you were also engaging in

20  this sadomasochism?  I mean, you'd characterize it

21  that way, wouldn't you?

22  A.   At times, yes.

23  Q.   Well, the times that you were bound and

24  wrapped to that table and --

25  A.   Correct.

1    Q.    -- and all of those?  I mean, that's all
2  pretty extreme behavior.
3                Would you agree with that?
4    A.    Yes.
5    Q.    Okay.  So at least with regard to actually
6  acting out extreme sexual behavior, you were that far
7  along that particular continuum, right?
8    A.    Yes.
9    Q.    I mean, again, this is out there, isn't it?
10   A.    Yes.
11   Q.    And this is actual contact with human
12  beings --
13   A.    Yes.
14   Q.    -- correct?
15                And you did have a number of --
16  downloaded a number of images of young boys in
17  bondage, did you not?
18   A.    I believe so, yes.
19   Q.    And then you went through the exact same
20  thing that they did, right?
21   A.    Correct.
22   Q.    Okay.  Some of the same things the Court has
23  looked at in these pictures of these young boys
24  undergoing sadomasochistic, I guess, well, conduct is
25  the same stuff you were acting out with your friends

1    at whatever place this was; is that right?

2         A.    Correct.

3         Q.    So now, you're not just looking at it.

4    You're actually acting out on some of those fantasies.

5                   Would you agree with that?

6         A.    Not with children.

7         Q.    Not with children, but the stuff that you're

8    looking at with children -- I mean, that bondage stuff

9    we're talking about with these children tied up with

10   paperclips -- or clothes pins on their body parts,

11   being violated anally, tied up, that sort of thing,

12   that's the same kind of stuff you were doing with your

13   friends in this undisclosed location, right?

14        A.    Correct.

15        Q.    And would you say that -- and I'm trying to

16   get a handle on this -- but would you say that your

17   life for at least the last five or six years before

18   you were arrested was pretty much consumed by sexual

19   thoughts?

20        A.    No.

21        Q.    It was just a hobby?

22        A.    What do you mean by "hobby"?

23        Q.    You just did it on the weekends or once in a

24   while, or was this something you were involved with

25   every day?

1      A.    Once in a while.

2      Q.    You weren't involved in getting on chat

3  lines and downloading child pornography and visiting

4  websites and doing things like that on pretty much a

5  daily basis?

6      A.    Not necessarily, not on a daily basis.

7      Q.    Well, not necessarily is just kind of a --

8             MR. JAMES:  Objection to the side bar,

9  Your Honor.

10            THE COURT:  Sustain the objection.

11     Q.    (By Mr. Phelps) Was it every day or not?

12     A.    Not.

13     Q.    Was it several times a week?

14     A.    Yes.

15     Q.    Were there times when you would use some of

16  these bondage devices and actually wear them to work

17  with you?

18     A.    No.

19     Q.    Do you remember chatting with somebody about

20  wearing some kind of chastity device on your penis and

21  going to work?

22     A.    No, I don't.

23     Q.    You don't remember that?

24            This is some of the chats that's

25  actually entered into evidence.  Why don't you read

1  through here and then onto the next page, and then

2  let's talk about that?

3          (Witness complies.)

4      Q.   (By Mr. Phelps) So what were you doing?  You

5  were wearing a chastity device?

6      A.   That's what it says.  I honestly do not

7  remember this chat.

8      Q.   Well, you wrote that, didn't you?

9      A.   I have no doubt.

10     Q.   You are cs_tx_guy, right?

11     A.   Yes.

12     Q.   And you are discussing putting this device

13  on your penis and wearing it to work for like

14  three weeks, right?

15     A.   Again, I don't remember that particular

16  chat.

17     Q.   Well, I'm not asking you whether you

18  remember the particular chat.

19     A.   That's what it says.

20     Q.   I'm asking --

21     A.   That's what it says.  If that's what it

22  says, I don't disagree with it.

23     Q.   I'm asking you whether you remember doing

24  that.

25     A.   No.

1    Q.   If we are to believe your chat, you were

2  going to work with these devices?

3    A.   I actually never did.

4    Q.   So you were lying here?

5    A.   Yes.

6    Q.   Now you do remember the chat?

7    A.   I never did that at work, no.

8    Q.   All right.  Did you ever buy one of these

9  devices and wear it around for some extended period of

10 time?

11         MR. JAMES:  Judge, again, I'm going to

12 have to object.  He's going into what a person does.

13 This is not illegal activity.

14         MR. PHELPS:  We're not going --

15         MR. JAMES:  It's not illegal activity.

16 I know I have a running objection, Judge; but now,

17 we're going from soliciting homosexual conduct,

18 something he does in his complete privacy.  That's a

19 Due Process violation, Judge.

20         How far are we going to get with this

21 thing?  Have you ever had a bad thought?  I mean, I --

22 you know, every Defendant that ever gets on the stand:

23 Have you had a bad thought?  Tell us about your bad

24 thoughts.  That's what they're punishing.  That's what

25 they're punishing him for.  Punish him for the images

1   if you want to punish him, but not for bad thoughts.

2                   MR. PHELPS:  He has just testified,

3   Your Honor, that he can turn it on and off.  It was an

4   occasional thing, and he has --

5                   THE COURT:  Overruled.

6                   MR. PHELPS:  -- chatted about doing

7   this every day.

8        Q.   (By Mr. Phelps) The testimony now is that

9   what's in the chat you now remember is a lie?

10       A.   Correct.

11       Q.   Okay.  You did have these chastity devices

12   though, right?

13       A.   Yes.

14       Q.   You did access these websites?  You did

15   purchase them?

16       A.   Yes.

17       Q.   And you did wear them --

18       A.   Yes.

19       Q.   -- for some extended periods of time?

20       A.   No.

21       Q.   For how long?

22       A.   They're much too uncomfortable to wear for

23   extended periods of time.

24       Q.   Are we talking days?

25       A.   No, hours.

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

```
1       Q.    You also explored a number of opportunities

2  to go around the country and go to -- I think they

3  call it Naturism?  Are those nudist camps?

4       A.    Yes.

5       Q.    You had books.  You actually ordered a DVD

6  about nudist camps around the country, right?

7       A.    Right.

8       Q.    And did you ever go to one of these?

9       A.    No, I didn't.

10      Q.    You knew because the materials that were

11 sent to you included children that there would be

12 children there if you went, right?

13      A.    Correct.

14      Q.    I want to talk to you about this arrest in

15 2004.  You were out there behind Somerville High

16 School to meet somebody, weren't you?

17      A.    Yes.

18      Q.    And --

19                THE COURT:  I didn't hear the question.

20                MR. PHELPS:  You were out there behind

21 Somerville High School to meet someone?

22                THE COURT:  Okay.

23      Q.    (By Mr. Phelps) And the answer was?

24      A.    Correct.

25      Q.    And that was probably a result, or was it
```

1   the result of one of these online chats?

2        A.   Yes.

3        Q.   Okay.  And I presume that that would have

4   been perfectly legal, adults, consenting adults?

5        A.   Correct.

6        Q.   Well, why did you run?

7        A.   We were talking on the phone; and he said he

8   was working out on the track there at the high school,

9   which was lit up.  There was no one there.  I turned

10  around, and I was unaware that the police officer was

11  attempting to pull me over.  It was never a situation

12  in which I'm taking off down the road, and he's

13  following me.

14       Q.   So you were not guilty?

15       A.   Guilty of what?

16       Q.   Of evading arrest in a vehicle.

17       A.   I pled guilty.

18       Q.   So were you guilty?

19       A.   Absolutely.

20       Q.   So my question is:  Why did you run from

21  him?  Why did you take off?

22       A.   I was terrified.  I was scared.

23       Q.   Of what?  If you were out there doing a --

24  just to meet somebody consensually, there's nothing

25  wrong with that.  It's not against the law.  Why did

1  you run?

2       A.    Because I was scared.

3       Q.    And you didn't tell anybody at all about

4  that, right?

5       A.    Correct.

6       Q.    You were able to keep that from your

7  employer, from the Boy Scouts?

8       A.    My employer, no.

9       Q.    Shouldn't you have told the Boy Scouts about

10 being on a felony deferred adjudication?

11      A.    I'm not aware if that's a problem with the

12 Scouts or not.

13      Q.    You were a Scout leader, right?

14      A.    Yes.

15      Q.    You were in a position in which you were

16 helping to make determinations about who ought to be

17 Scout leaders, right?

18      A.    Not necessarily, no.

19      Q.    You heard the testimony of the gentleman

20 earlier.  Is he just wrong?

21      A.    In which way?  Where --

22      Q.    You were in a position or some leadership

23 position in which you were at least participating in

24 the decision about whether people were qualified to

25 become Scout leaders?

Page 189

 1      A.   The only people -- when I was charter

 2   partner representative for the Venture Crew; is that

 3   what you're referring to?

 4      Q.   Let me just ask it a different way,

 5   Mr. Baird.  Is it actually your testimony that you did

 6   not believe it would be of interest to the Boy Scouts

 7   if you were on felony deferred adjudication and that

 8   that's something you shouldn't have told them or

 9   didn't need to tell them?

10      A.   I told my employer, and that's the only

11   people I told.

12      Q.   No, that's not my question.

13              MR. JAMES:  Objection, side bar.

14              MR. PHELPS:  I'm telling him that's not

15   my question.

16              THE COURT:  All right.  Ask your next

17   question.

18      Q.   (By Mr. Phelps) My question, Mr. Baird, is:

19   Is it your testimony, as you sit there, that you did

20   not believe you had any obligation to tell the Boy

21   Scouts that you are on felony deferred?

22      A.   I probably should have.

23      Q.   The arrest was, I would expect, a fairly

24   traumatic incident for you, wasn't it?

25      A.   It was.

1     Q.    Not fun to be arrested, is it?

2     A.    No.

3     Q.    And you were scared, right?

4     A.    Correct.

5     Q.    And this was one of those circumstances in

6  which you were meeting, rendezvousing with somebody

7  for the purposes of having sex, right?

8     A.    There was a potential, yes.

9     Q.    Okay.  So at that point, given that you had

10 been downloading this child pornography and you were

11 meeting with somebody, now the police are -- have

12 arrested you, did that not shock you enough so that

13 you would stop doing this?

14    A.    It did for a time.

15    Q.    Okay.  For how long?

16    A.    Several months.

17    Q.    Now, you were chatting online while you were

18 on deferred, right?

19    A.    Yes.

20    Q.    Doing exactly the same thing that got you in

21 trouble out in Somerville, right?

22    A.    In which way?

23    Q.    Well --

24    A.    I was chatting online.

25    Q.    Yeah.  You were chatting online.  You were

1    meeting somebody in Somerville.  You got scared when

2    the police arrived and ran.  That ended up in an

3    arrest.  You ended up on felony deferred adjudication;

4    and yet, you continued to chat and continued to engage

5    in that conduct.

6         A.   Continued to chat with people, yes.

7         Q.   Okay.  And to meet with people?

8         A.   On occasions, yes.

9         Q.   Okay.  For the purposes -- the same purposes

10   that you were going to meet with this person --

11        A.   At that point, I tended to see people I knew

12   very well.

13        Q.   Did you know this person very well?

14        A.   No.

15        Q.   So afterwards, you would just meet with

16   people that you tended to know very well?

17        A.   Yes.

18        Q.   But you continued to chat.  I mean, we have

19   the chat record --

20        A.   I believe I already answered that.

21        Q.   -- here as well.

22              Pardon?

23        A.   I believe I already answered that question.

24   Yes.

25        Q.   Well, were you on deferred adjudication in

1   January of 2006?  You actually didn't get off until

2   like April or May of 2006, right?

3        A.    That sounds about right.

4        Q.    And yet, January 24th of 2006, you're

5   chatting with somebody named aggiedude_05; and:  "Josh

6   here.  Good to meet you greg.

7                    Ditto."

8                    I mean, this is somebody involving sex

9   and that sort of thing.  It's the first time you're

10  chatting with him.

11       A.    I don't know if that was the first time or

12  not.

13       Q.    It sounds like it is.  "Good to meet you."

14                    Would you agree with me?

15       A.    I would have to read it.

16       Q.    Okay.  Were you ever involved in Big Brother

17  or anything like that?

18       A.    No.

19       Q.    Just Scouts in terms of young men, young

20  boys?

21       A.    Correct.

22       Q.    Okay.  And how long for the period that you

23  were actively downloading child pornography and

24  actively doing the things that those photographs show

25  that you were doing -- were you that entire time

1   involved in Scouting?

2        A.   With the Venture Crew, yes.

3        Q.   Okay.  And your testimony is over that

4   entire course of that going on, camping trips and

5   doing things like that, that that never concerned you

6   enough that you thought wasn't a healthy environment

7   for you?

8        A.   That's still my testimony.

9        Q.   That's still your testimony.  Okay.  Would

10  you consider that a high-risk situation for you?

11       A.   It could certainly be considered -- for me

12  personally?

13       Q.   Yeah, for Gregg Baird.

14       A.   As I told you many times now, I will never;

15  I have never; I didn't ever take action with anyone in

16  the Venture Crew.

17       Q.   If you are downloading child pornography

18  involving --

19       A.   You can ask that question as many times as

20  you like, I would never --

21       Q.   Mr. Baird, let me ask the question.

22       A.   Sure.

23       Q.   If you are downloading child pornography

24  involving young men, young boys, at least as young as

25  six years of age, doing all sorts of sexual things, is

1  it your testimony that it's just okay for Gregg Baird

2  to be in those situations because nothing's ever going

3  to happen?  Is that your testimony?

4      A.   My testimony is:  I would never personally

5  do anything to another human being.

6      Q.   Okay.  Did it ever occur to you that in

7  order to make sure as a part of that determination for

8  it to never happen to another human not to put

9  yourself in high-risk situations?  Did that ever occur

10  to you?

11      A.   I didn't consider it a high-risk situation

12  because I would never, ever take that step.

13      Q.   Well, are you familiar with pedophilia?

14      A.   Yes.

15      Q.   How are you familiar with it?

16      A.   I've done research.

17      Q.   Okay.  Then you know it's an overwhelming

18  compulsion then, don't you?

19      A.   For some people, absolutely.

20      Q.   If you're a pedophile, the definition of

21  that pretty much is that it's a compulsion you can't

22  handle, right?

23      A.   I'm not a psychologist.

24      Q.   Have you ever seen a psychologist since you

25  were arrested because of this?

1     A.    Yes.

2     Q.    What psychologist did you see?

3           MR. JAMES:  Judge, that's -- well,

4  actually, that's attorney-client privilege.  That was

5  someone hired by me for my information.

6           MR. PHELPS:  I don't think it's

7  actually attorney-client privilege once he puts him on

8  the stand.

9           MR. JAMES:  Yes, it is.  It's a

10 consultant.

11          MR. PHELPS:  The fact that he has seen

12 a psychologist that we're not going to hear from today

13 I think is pretty important.

14          MR. JAMES:  Judge, that's a consultant

15 for me.

16          THE COURT:  Well, that would be --

17 Mr. James, that would be an extension of him of a

18 agent of the -- just like talking to a defense lawyer,

19 based on what he's saying to me.

20          MR. JAMES:  It's at my request, Judge.

21          THE COURT:  Did you retain him, and he

22 was a consultant to you?

23          MR. JAMES:  He was a consultant to me.

24 I don't remember who wrote the check, Judge; but he

25 was a consultant for me.

1            MR. PHELPS:  Judge, that's not -- once

2  he puts him on the stand?  Is he actually saying that

3  I cannot ask him about whether he has sought help from

4  a psychologist?

5            MR. JAMES:  I don't think --

6            THE COURT:  You can't ask him what he

7  said to his lawyer, and that guy is just an extension

8  to his lawyer, so I think that violates the

9  attorney-client privilege.

10           MR. PHELPS:  Except when he puts him on

11  the stand in a punishment hearing in which the Court

12  has to make a determination.

13           THE COURT:  No, sir, I don't think you

14  can ask this man what he said to his lawyer; and I

15  don't think you can ask him what he says to his

16  psychologist, who is an extension of the lawyer hired

17  as a consultant.

18           MR. PHELPS:  Well, first of all, Judge,

19  I did not ask what he said to his psychologist.

20           THE COURT:  I sustain the objection.

21    Q.   (By Mr. Phelps) You have seen a

22  psychologist?

23    A.   Yes.

24    Q.   Okay.  Have you seen a psychiatrist?

25    A.   Yes, I did.

1      Q.    So you know --

2      A.    I'm sorry.  A psychiatrist?

3      Q.    Yes, sir.

4      A.    No.

5      Q.    A psychiatrist has a medical degree.  A

6 psychologist doesn't.

7      A.    Did not see a psychiatrist.

8      Q.    Okay.  So you know that pedophilia can be a

9 significantly compulsive disorder, right?

10     A.    Certainly can.

11     Q.    Okay.  And your testimony is:  But it's just

12 not that way for Gregg Baird?

13     A.    I believe it's different for every person.

14     Q.    And that's based on what?

15     A.    Based on my meetings with the psychologist.

16     Q.    And your testimony is that while you may be

17 a pedophile, you're the pedophile who can control

18 himself and say for certain that this is never going

19 to happen?

20     A.    I'm a person who never would take action

21 against a child.

22     Q.    Do you have any clue with what you are

23 dealing --

24     A.    Absolutely.

25     Q.    -- in this disorder?

1      A.    Absolutely.

2      Q.    And it is your testimony with that

3  understanding that you're in control?

4      A.    With the number of situations I've had in my

5  life, I've certainly had opportunities had I wanted to

6  act on them.  I never have.  I never will.  If I had

7  done that, I'm pretty sure there would be evidence

8  presented to the Court.

9              MR. PHELPS:  Pass the witness.

10             I object to that answer as

11 nonresponsive.

12             THE COURT:  Sustained.

13             **REDIRECT EXAMINATION**

14 BY MR. JAMES:

15     Q.    Mr. Phelps asked you:  Well, we have to take

16 your word.  Did you prepare all those chats that were

17 in evidence?  Did you prepare those to mislead the

18 Government in any way?

19     A.    No.

20     Q.    And none of them -- and we've heard from

21 Mr. McCune -- none of them reflect any try -- I mean,

22 we can -- Judge Bryan sees it all the time.  I'm

23 13 years old.  I want to meet you, that sort of thing.

24 Nothing like that on any of those chats, are there?

25     A.    No.

1      Q.   It's hard to prove a negative; but Gregg,

2  you answered all those --

3           MR. PHELPS:  Judge, I would object to

4  that as leading and argumentative.

5           THE COURT:  Let him ask the question,

6  and then I'll rule.

7      Q.   (By Mr. James) Would you tell the Judge

8  whether or not you ever had any kind of sexual contact

9  with an underaged person?

10     A.   The only time I did was when I was being

11 raped.

12     Q.   And Gregg, since this happened, have you

13 been in -- I don't want to say counseling.  Have you

14 been with Tom Rogers discussing redemption?

15     A.   Many, many, many times.

16     Q.   I believe you told me once or twice a week

17 at least.

18     A.   At minimum.

19          We've cried.  We've prayed.  I admit

20 I'm not capable of making changes myself.  I reached

21 out to God.  I reached out to Tom and others to help

22 me with those changes.

23     Q.   Do you think if Judge Bryan did see fit to

24 put you on probation that you could continue your

25 growth?

1     A.    Absolutely.

2     Q.    You're --

3     A.    Certainly.  I'm certainly not where I need

4  to be.  It's a process.  It's not a -- you know, it's

5  a goal, not a destination.

6     Q.    You never had sex with an underaged person

7  you testified to, but admit those photos are horrific?

8     A.    Absolutely horrible.

9     Q.    And Mr. Phelps talked about you're around

10  youth; but you -- why did you -- you started out in

11  Scouts.  You didn't get in Scouting for the first time

12  as an adult.  You grew up in Scouting; is that right?

13     A.    Correct.

14     Q.    And why did you want to get back involved in

15  Scouts?

16     A.    I didn't necessarily want to.  When I moved

17  here, I didn't want to become active with a Scouts

18  troop.  I just didn't have a lot of interest in that

19  area.  I was -- the reason I really joined Scouts

20  again was the high adventure, that end of it.

21          When I -- a local leader down there,

22  Mary Bryant, she knew me from work.  She knew my

23  background, and she's the one who originally recruited

24  me.  She told me:  There's a new group starting up,

25  the Venture Crew.

DENISE C. MACKAY, CSR, RPR
(979) 361-4219