1              And I told her, I said:  I don't want

2   to have anything to do with dealing with tender foots,

3   the little kids.  I just -- they're kind of annoying

4   at times from dealing with them at camp.

5              And she said:  Venture Crew, this one

6   is going to be geared toward high adventure and kind

7   of the areas that I think you would really enjoy.

8              So that's the only reason I became

9   active again.

10      Q.    And did you always protect the -- you heard

11  Tom Rogers talking about you protecting vulnerable

12  Scouts.  Did you always protect vulnerable Scouts?

13      A.    Absolutely.  I'm sure at every event -- my

14  goal there as the adult leader was:  We never -- you

15  know, we provided the transportation and ensured the

16  safety protocols were in place.  Everything was

17  handled in a safe manner.  Pretty much from there, we

18  let the young women and men of the crew take care of

19  the details.

20      Q.    Did you ever want to hurt anybody, Gregg?

21      A.    No.

22      Q.    I told you if you got on the stand, you've

23  got to tell the truth; is that right?

24      A.    Absolutely.  One day I'll stand in front of

25  God; and if He were to use this testimony, there will

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

1  be no issues at all.  I will have absolutely no

2  problems standing in front of God supporting this

3  testimony.

4      Q.   Do you still feel an attraction to underaged

5  boys?

6      A.   At times.  It can still occur.  You know, I

7  kind of feel like a chain smoker who quit cold turkey.

8  You know, that's probably the best way to describe it.

9      Q.   If Judge Bryan does see fit to put you on

10  probation, will you continue -- or even if he doesn't,

11  when you get out, will you continue to work those

12  issues through and ask God's help?

13      A.   Everyday I do; and absolutely, I will.

14              MR. JAMES:  Pass the witness.

15              MR. PHELPS:  I have no further

16  questions.

17              THE COURT:  You can step down, sir.

18              Call your next.

19              MR. JAMES:  Judge, there's some issues.

20  I need to ask that this be marked as Court's 1 and 2.

21  This is the warrant.  Couldn't find it.  Well, I

22  remember -- I recall very well Mr. Phelps offered the

23  warrant to justify the search; but just out of an

24  abundance of caution --

25              THE COURT:  Okay.

```
 1                    MR. JAMES:  -- I'd like to have it
 2    marked.
 3                    Judge, we have for the record, this is
 4    Defendant's -- or Court's 1 and 2.  These are to --
 5    because I don't know which number was called or what
 6    file it ended up in, but these are provided by the
 7    State.  I think they're copies of the warrant and the
 8    affidavit that -- for the basis of this case from the
 9    suppression hearing.
10                    THE COURT:  All right.  So the Court is
11    just basically taking judicial notice of what's
12    already before the Court?
13                    MR. JAMES:  I think that's right.  One
14    is the warrant, and two is --
15                    THE COURT:  Two is the warrant.
16                    MR. JAMES:  Yeah, no, one is the
17    affidavit; and two is the actual search warrant.
18                    MR. THOMAS:  I think there were two
19    search warrants, one for the house and one for the
20    credit union.  We only entered the house.
21                    MR. JAMES:  That's fine.
22                    THE COURT:  Those will be considered.
23    Is there any particular part of that that you want me
24    to note in connection with this?
25                    MR. JAMES:  No, Judge, we want to make
```

```
 1  sure that the record is complete.
 2                  THE COURT:  All right.
 3                  MR. JAMES:  It wasn't in there.  It was
 4  entered into evidence.  We had some trouble getting
 5  that evidence.
 6                  THE COURT:  Okay.
 7                  MR. JAMES:  We call Mrs. Baird, Your
 8  Honor.
 9                  THE COURT:  All right.
10                      KAREN BAIRD,
11  having been first duly sworn, testified as follows:
12                  THE COURT:  Have a seat.
13                  Go right ahead.
14                  DIRECT EXAMINATION
15  BY MR. JAMES:
16      Q.   Would you state your name, please?
17      A.   Karen Baird.
18      Q.   And Mrs. Baird, where do you live?
19      A.   I live in Spring, Texas.
20      Q.   And what's your husband's name?
21      A.   John.
22      Q.   And is he out in the hall?
23      A.   Yes, sir.
24      Q.   And y'all are the parents of Gregg Baird?
25      A.   Yes, sir.
```

1    Q.   Okay.  Can you tell me what was your
2  husband's profession when -- when Gregg was young?
3    A.   He was in the United States Army.
4    Q.   Okay.  And where all were you assigned?
5    A.   Well, when we moved to Houston, it was the
6  24th move; so we've been around the bend a bit.
7           We lived in Texas several times.  Gregg
8  happened to be born in Bryan when John was back at
9  A&M.  We lived in Oklahoma.  Went to Germany, lived
10 there three, four years.  Lived in Fort Benning,
11 Georgia for a number of years.  Went to Washington DC.
12 Then to Fort Leavenworth to command school.  Back to
13 Washington.
14   Q.   Okay.  And what -- what kind of young boy
15 was Gregg?
16   A.   Gregg was a great kid.  I have two boys.
17 Gregg has an older brother.  There were never any
18 issues or concerns.  He did well in school.  He did
19 what he was supposed to.
20           Does that answer your question?
21   Q.   Yes.
22           Did he get involved in Cub Scouts when
23 he was about eight?
24   A.   Yes, sir.
25   Q.   And did he eventually enter into Boy Scouts?

```
 1       A.    Yes.

 2       Q.    Okay.  Let me show you a photograph,

 3  Defendant's Exhibit 2.

 4       A.    Okay.

 5       Q.    Is that Gregg when he went from Cub Scouts

 6  to Boy Scouts?

 7       A.    Yes.

 8             MR. JAMES:  Offer Defendant's

 9  Exhibit 2.

10             (Defendant's Exhibit Number 2 offered.)

11             MR. THOMAS:  No objection.

12             THE COURT:  Defendant's 2 admitted.

13             (Defendant's Exhibit Number 2 admitted.)

14       Q.    (By Mr. James) Did Gregg obtain a rank of

15  Eagle Scout?

16       A.    Yes.

17       Q.    And he went to college, correct?

18       A.    Yes, he went to Longwood University right

19  out of high school.  He graduated in four years.

20       Q.    Okay.  And after he has grown up, become an

21  adult --

22       A.    Uh-huh.

23       Q.    -- what kind of a son -- how old a lady are

24  you?

25       A.    I'm sorry?
```

```
 1        Q.    How old a lady are you?

 2        A.    How old am I?

 3        Q.    Yes, ma'am.

 4        A.    I'm 68.

 5        Q.    What -- does John help with -- does John

 6   help you and your husband with things around the

 7   house, that sort of thing?

 8        A.    Does Gregg help?

 9        Q.    Does Gregg help?  Whatever I said.  Excuse

10   me.

11        A.    John helps, too; but Gregg does.

12        Q.    Okay.

13        A.    Yes, he does.  My other son lives in

14   Virginia, which is where we lived prior to moving to

15   Houston; and so Gregg is kind of a go-to guy.  The

16   Gregg I know comes to Spring and fixes my sound

17   system, installs a ceiling fan, buys me a computer and

18   installs it and shows me how to use it.  He's just,

19   you know, our go-to guy.  Helps us with finances.

20        Q.    Okay.  Helps around; and of course, he works

21   with the credit union and helps to give you financial

22   advice; is that correct?

23        A.    Correct.

24        Q.    Has he -- if somebody needed a place to stay

25   for the holidays, was he willing to bring them in?
```

1    A.    Yes, and he's willing to share his home and

2   our home as well.  We've entertained people.  We've

3   had people, friends of his of all ages, stay with us,

4   meet with us.  I think that's one of his strengths,

5   being able to be really caring and empathetic with

6   people.

7        Q.    He also has always participated in the

8   Multiple Sclerosis Association; is that right?

9        A.    Yes, he is a biker, loves to do that

10  activity; and so the MS has a 150 Ride they call it

11  every year from Houston to Austin.  And he's

12  participated in that and, you know, got other people

13  to participate in it.  And frequently, if someone

14  asked him what he wanted for his birthday, he'd say:

15  Well, make a contribution in his name to the MS 150.

16       Q.    How is he with animals?  Have you seen him

17  interact with animals?  Does he take good care of

18  animals?

19       A.    Gregg has a dog whom he really, really

20  loves; and when he goes on vacations, he hires a dog

21  sitter in order to care for his animal rather than put

22  him in a shelter of some sort.  He really, really

23  loves his dog.

24       Q.    He got his dog out of the pound?

25       A.    Yes.

1      Q.   And has he gone to see his grandmother,

2  taken care of her on South Padre?

3      A.   Yes, when my mother-in-law was alive, Gregg

4  would stop by because he and his friends went to the

5  Island to do a little surfing.  He'd stop by and take

6  her to dinner.  It's a real treat when a young man

7  does that for his grandparent.

8      Q.   You know, Judge Bryan has a lot of

9  discretion here.  He can put Gregg on probation.  He

10 can put him in the penitentiary.  Are you asking him

11 to consider letting Gregg remain in the free world?

12     A.   The Gregg I know is a good man, a really

13 good man.  We've been very involved in his life since

14 last year, and we have heard stories from people about

15 what he has done for them.  That has warmed my

16 heart -- our hearts actually.  I mean, he's a better

17 man than I even knew he was.

18     Q.   You understand what he's been convicted of,

19 child pornography?

20     A.   Yes, sir.

21     Q.   We've talked about that?

22     A.   Yes, sir.

23     Q.   Do you think Gregg is wanting to work to

24 better himself as far as getting help, getting better

25 and working out his issues and seeking redemption?

1    A.   Absolutely.  We have prayed over this.  We

2  have cried over this, and we believe he is prepared to

3  move on and do the things that you have mentioned.

4              MR. JAMES:  I'll pass the witness.

5              MR. PHELPS:  I have no questions, Your

6  Honor.

7              THE COURT:  You can step down, ma'am.

8              Call your next.

9              MR. JAMES:  One moment, Your Honor.

10             THE COURT:  Yes, sir.

11             MR. JAMES:  We call John Baird.  He's

12  very hard of hearing, Your Honor.

13             Mr. Phelps, I'd asked both attorneys to

14  be able to get close to him because he has a hard time

15  hearing.

16             THE COURT:  That will be fine.

17             MR. JAMES:  If I may, Judge.

18             THE COURT:  Yes.

19             BAILIFF:  Raise your right hand for the

20  Judge.

21             JOHN BAIRD,

22  having been first duly sworn, testified as follows:

23             THE COURT:  Have a seat.

24             Go right ahead.

25

DIRECT EXAMINATION

BY MR. JAMES:

    Q.   Would you tell the Judge your name?

    A.   I'm John Baird.

    Q.   Mr. Baird, where do you live?

    A.   I live in Spring, Texas with my wife.

    Q.   And how long have you been retired,
Mr. Baird?

    A.   Since -- I retired from the US Army in 1984.

    Q.   Okay.  And when did you enter the Army?

    A.   In 1962.

    Q.   Okay.  What was your background before you
entered the Army?

    A.   I worked primarily for my father in a small
mechanical welding shop he had in Harlingen, Texas.  I
finished high school.  Went to A&M, flunked out.  Went
home, worked for a year.  Went back to A&M, flunked
out again, and then enlisted in the service.

    Q.   Okay.  And what -- where did you serve?

    A.   I took basic training at Fort Leonard Wood
in Missouri, and then I went to advanced individual
training at the fort in -- I'll think of it in a
minute.

    Q.   Okay.

    A.   But then I was accepted to go to an officer

DENISE C. MACKAY, CSR, RPR<br>(979) 361-4219

1  candidate school, was awarded a commission out of

2  officer candidate school.  Went to Germany as a second

3  lieutenant.

4             Do you want to know specific locations?

5       Q.   No, that's okay.  Went to Germany.  You can

6  just kind of give us the --

7       A.   We medivac'd out of Germany in 1965, back to

8  the hospital in San Antone.  Put out on 30-day

9  convalescent leave, got married on convalescent leave.

10            My wife and I were subsequently

11  assigned to Fort Bliss, Texas.  Then we were assigned

12  back to Fort Sill, went through the career course.

13  Went to Vietnam the first time.

14            Came home, went to the -- back to the

15  artillery school in Lawton, Oklahoma as an instructor;

16  and then I was selected by the Army to return to A&M

17  and finish my college degree, which I did.

18       Q.   Third time's a charm?

19       A.   Yes, sir.  Aggie persistence.

20            Upon graduation, I went back to Vietnam

21  on -- as an advisor to an armor unit.  Came back from

22  there to an inner-theater transfer to Germany, and I

23  was battalion exec in Geising.  And then after, I

24  think, almost 20 months, I was moved to Darmstadt on

25  corps staff of the fire support elements.

1        Fire support elements moved from
2  Darmstadt to Frankfurt; and we extended in Frankfurt,
3  Germany to get back into the summer rotation cycle.
4        Came back from Germany, went to Fort
5  Benning, Georgia.  I was on the Combat Arms Training
6  Board.  From there, I went to the US Army Nuclear and
7  Chemical Agency located in Fort Belvoir in Virginia.
8  From there, I was selected to go to command the staff
9  of Fort Leavenworth in Kansas.
10        From there, I went back to -- not to
11  the Army Nuclear and Chemical Agency, but to the
12  Defense Nuclear Agency in Washington DC; and I retired
13  out of that post.
14     Q.   Okay.  And then you returned to Spring; is
15  that right, to retire?
16     A.   No, sir, not immediately.
17     Q.   Okay.
18     A.   I worked as a -- at several civilian jobs,
19  primarily involved with sales and marketing of clients
20  who were located not only in the United States but in
21  Europe who manufactured defense equipment that they
22  wanted to sell to our Department of Defense.
23        During my final assignment, I was
24  program manager for what we call the TAP Program,
25  which was the forerunner to the automated computerized

1  nuclear fire mission capability that the artillery has

2  today.  I was head of that program for almost

3  three years.

4            I was recommended and personally

5  selected by two consecutive Secretaries of Defense for

6  that position, and we reported directly on that on one

7  occasion to the Joint Chiefs of Staff.

8      Q.   Okay.  And while you were back here in Bryan

9  and College Station, you had a son Gregg; is that

10 right?

11     A.   Yes, sir, we -- Gregg was born here in Bryan

12 in 1971 when I was back finishing my degree.

13     Q.   Okay.  And you know Gregg has pled guilty

14 and is being sentenced now for child pornography.

15            Do you understand that?

16     A.   Yes, sir.

17     Q.   Okay.  Has Gregg been an important part of

18 your life since your retirement?  Can you tell us the

19 person that you know as Gregg Baird?  What kind of

20 person he is?

21     A.   Gregg is the youngest of our two sons.  He

22 and his brother are our whole life; and our older son

23 has a -- is married, lives in Woodridge, Virginia; and

24 we have one grandson.  But they're really the only

25 reason that his mother and I really -- I mean, him and

1  my son's family, they're really the only ones that
2  really have made a difference in our life, that we
3  really earnestly care for.
4      Q.   Does Gregg have a generous heart?
5      A.   Yes, sir.  I can give numerous examples.
6           Gregg has always been active in the
7  Multiple Sclerosis 150 Mile Annual Bike Ride from
8  Houston to Austin, and he's participated in that for
9  ten years.  The last three years he was what they call
10 a ride marshal.
11          But we very quickly developed a modus
12 operandi, you know, that I was very well connected
13 with and informed of.  Gregg would come to our home
14 two days before the ride started; and he would bring,
15 as I recall, his own bicycle; and I believe the most
16 bicycles he ever brought for friends in addition to
17 his was two others.  But there was always at least
18 two.
19          We would load them in my truck.  Keep
20 my truck in the garage overnight.  The next day he
21 and -- would take his automobile to Austin, and he
22 would park it in the vicinity of wherever the finish
23 line was, ride the bus back the following morning to
24 the hotel there in South Houston that the ride started
25 from; and we would meet him.  I think on one

1  occasion -- on all occasions my wife went with me; and

2  one occasion, she didn't; and a neighbor of mine went

3  with me and give them their bicycles and then wish

4  them the best and go back home.

5      Q.   Okay.  Has Gregg always told you how much he

6  loves you and his mother?

7      A.   Yes, sir.

8      Q.   Are you the type to stand by somebody?  Are

9  you standing by Gregg through this?

10     A.   I'm sorry, sir.  I'm hard of hearing.

11     Q.   Are you standing by Gregg -- by Gregg's side

12 through this even though a lot of people may have

13 turned their back on him?

14     A.   He's my son.  I love him.  I'll always love

15 him, and I can't imagine how this atrocity happened,

16 but even -- I don't love him any less for it.

17     Q.   Do you know about Gregg's contributions to

18 the Rotary Club and all of their charities?

19     A.   Yes, sir.  His mother and I were very proud

20 when Gregg went to work as vice president for the --

21 well, I'm sorry.  The Rotary Club.

22              First of all, Gregg is a Paul Harris

23 Fellow.  He served three years in a row in an

24 executive position.  First of all, he was the

25 treasurer.  The next year, he was vice president; and

1  last year, he was president.  He initiated a lot of --
2  of fundraising events.

3              He built a Habitat for Humanity concern
4  here somewhere in Bryan.  I don't know.  We were very
5  proud.  He always received exemplary ratings.

6              My wife and I were familiar with a lot
7  of the employees at the credit union or at the Rotary
8  Club.  I even attended lunch one day with him there.
9  But unfortunately -- well, that's pretty much the
10  extent of what he's accomplished at the Rotary Club.

11      Q.   Do you know about his contributions that he
12  gave money and time and effort to their charities?

13      A.   Yes, as I mentioned before, he's -- he's a
14  Paul Harris Fellow in the Rotary Club; and a big
15  portion of his responsibility at the credit union was
16  marketing and community affairs.  He was always active
17  in everything from football tickets for friends to
18  running the concession stand at the football games.  I
19  mean, Gregg -- he's made a lot of contributions to the
20  community.

21      Q.   All right.

22      A.   I might mention that -- one more event on a
23  personal side, illustrating his concern for other
24  people.

25              Hurricane Ike, as you know, left a lot

1   of us down in the Houston area really in sad shape;

2   and my wife and I were really fortunate.  We only had

3   to go 48 hours without electrical -- the electricity

4   was turned off only 48 hours, where other people had

5   to wait.  I know of occasions where they had to wait

6   at least a month.

7           Well, shortly after, we telephoned

8   Gregg and said:  Hey, we got our electricity back on.

9   He called me back I think it was that same afternoon

10  and wanted to know -- the Houston manager of the

11  credit union here in Houston, they lived way out east

12  of Atascocita.  And they had no electricity, and he

13  wanted to know if he could borrow -- I have a

14  generator mounted on a fishing trailer, and I said:

15  Certainly.

16          And he called back later and said:

17  They can't come and pick it up.  I didn't want to take

18  the generator off the trailer because that's an

19  all-day job for a 70-year-old man; but I wanted to

20  take, you know, the trailer -- take the generator with

21  the trailer.

22          Well, he called back.  They didn't have

23  a hitch, and could we deliver the generator over

24  there, the trailer, which we did.  Not only loaned

25  them the trailer, showed them how to operate it, how

```
 1   to maintain it.  And as I recall, they had the
 2   generator operational for a little over three weeks.
 3               That just shows his concern, you know,
 4   for other people.  At the time, the lady had called
 5   him in College Station; and you couldn't buy a
 6   generator south of Dallas, I guess.  I don't know, but
 7   there were none.  None were available.
 8      Q.   Okay.
 9      A.   Just to show how Gregg really felt about and
10   supported his employees.
11      Q.   Okay.
12               MR. JAMES:  Pass the witness.
13               MR. THOMAS:  Pass the witness.  I have
14   no questions.
15               THE COURT:  All right, sir.
16               THE WITNESS:  I'm sorry.  I didn't hear
17   you, sir.
18               THE COURT:  He said he had no
19   questions.
20               THE WITNESS:  Okay.  Thank you.
21               May I be excused?
22               THE COURT:  Did you ever rappel down
23   the side of that high cliff up there at Fort Sill next
24   to the river?
25               THE WITNESS:  I'm sorry, Judge.  What
```

1 now?

2          THE COURT:  Did you ever rappel down

3 the side of that high cliff next to the river at Fort

4 Sill?

5          THE WITNESS:  Yes, sir, but not

6 voluntarily.

7          THE COURT:  You're excused.

8          THE WITNESS:  Thank you.

9          THE COURT:  Call your next.

10          MR. JAMES:  Judge, Defense rests.

11          MR. PHELPS:  We have nothing further,

12 Your Honor.  State closes.

13          THE COURT:  Arguments?

14          MR. PHELPS:  I respectfully waive

15 opening and reserve mine for close.

16          THE COURT:  All right.

17                      **CLOSING STATEMENT**

18          MR. JAMES:  Judge, any time there's

19 child pornography, it's one of those emotional things

20 that hits all of us really hard; and I know that.  But

21 one question is:  Where is going to be the best

22 control for Gregg?

23          If he's on probation, we've got

24 polygraphs.  We've got electronic monitor.  I would

25 remind you he's been on the electronic monitor I know

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

1   for over a year, monitoring his every movement.  There

2   can be checks at the house.  There could be mandatory

3   counseling.  All of those things, Judge, are

4   available; but certainly, there is no evidence, not

5   one wit of evidence, that since this arrest, Gregg

6   Baird has done one misstep.  Nothing.  Nothing in that

7   year.

8            And I would remind the Court that the

9   punishment for indecency with a child is 20 years.

10   Here, it's two to ten; but in any -- in any case like

11   this, the State can charge as many counts as it so

12   desires.

13            There is absolutely no evidence that --

14   that Gregg Baird ever acted -- ever acted on those

15   photos and those feelings.  There is none, Judge.  And

16   if there were, the State would have brought it.  The

17   best evidence I think is the fact there is no

18   pictures, no photos.  The chats all involve adults.

19   There is nothing involving any children and that man.

20            Now, that's not to excuse the crime

21   he's convicted for.  I'm not -- I'm not excusing it.

22   Gregg expressed that remorse.  He said:  I understand

23   what I've done is wrong.  But Judge, there is no --

24   like a lot of other indecency -- a lot of other child

25   pornography, as much as the State undoubtedly checked

1   and tried to find it, there is nothing to indicate any

2   kind of physical contact between Gregg Baird and any

3   child.

4               And Judge, you know, I look at that

5   photo.  Yeah, this photo of this little boy and the

6   Scouts and what happened to Gregg Baird and the effect

7   it had on him; and I think what Gregg testified to,

8   Judge, that kind of duality and what everybody who

9   testified said.  He was a protector of the weak in the

10  Scouts.  He was great.  He was efficient.  The Scouts

11  all loved them.  There was not one hint of any

12  impropriety.

13              He was the protector, but he also

14  because of that sexual contact when he's 12 -- I wish

15  he'd gotten counseling then, Judge; but you know what?

16  He didn't.  That was 20 something years ago.  But I

17  look at that boy, and I think how sad because you've

18  got this duality -- the protector of the Scouts, but

19  yet with the child pornography.

20              And I think about what Tom Rogers said

21  that since this happened, he has met with Gregg.  He

22  has counseled with Gregg.  He has prayed with Gregg.

23  Gregg opened up to him about what had happened to him

24  as a youth; and Gregg is dealing with that now, Judge.

25  He is dealing with it every day.

1          And his testimony on the stand was I
2  believe absolutely true.  It's not:  Oh, I'm cured.  I
3  don't have a problem anymore.  It's an ongoing
4  process.  It's an ongoing process, but just like Tom
5  Rogers said:  God can change a heart.
6          And then we have those bondage
7  pictures.  I think about the self-loathing that Gregg
8  Baird must have felt to put himself into those
9  positions.  And like he said -- and it doesn't matter.
10  The Court can do anything to him it wants to him, but
11  he's been freed on another level, Judge.
12          So what does the Court do with Gregg
13  Baird?  Like I say, we can have better control of him
14  on probation -- mandatory polygraphs, the monitor
15  that's he's been on for a year, check on his houses,
16  counseling.
17          From a purely practical standpoint,
18  Judge, the man has HIV.  I'm not saying that ought to
19  be a get-out-of-jail card, but the health care alone
20  was $300,000 in 2009.  His medication came to over
21  15 -- almost $20,000.  It's better that he maintain
22  insurance and deal with that in the free world.
23          His parents -- you know, you say:  Oh,
24  everybody loves their children; and Judge, you know,
25  that's not necessarily true.  We've seen some people

1    that say:  Yeah, I tried; but boy, I never could do

2    anything with this person.  It's not the case here.

3    He grew up.  His father, John; his mother -- he's a

4    loving son and a caring son.  Judge, that's worth

5    something.  That's worth something.  That's -- I think

6    that is an admirable thing.

7                There are no guarantees.  Mr. Phelps is

8    going to argue to you:  There are no guarantees.  You

9    can't guarantee that he won't go back and look at

10   child pornography.  You can't guarantee that -- there

11   are no guarantees in this life.

12               When Judge Munoz reduced the bond and

13   put him on the monitor, the State was certain he'd

14   never show up.  He'll never show up, Judge.  He'll

15   never show up.  We're certain of it.

16               There are no guarantees in life, Judge;

17   but sometimes -- Judge, sometimes you got to look at

18   all of the facts, the causes, what's gone on; and the

19   fact that the State worked so hard -- all this stuff

20   about the Boy Scouts, Judge?  I mean, think about it

21   for just a minute.  The implication is that:  Well, he

22   must have been touching.  He must have been doing

23   something; but when there was no evidence of that --

24   when there was no evidence of it at all, it becomes:

25   Well, he shouldn't have been -- he was really foolish

1  to be putting himself in that position.  There's no

2  evidence of any contact.  There's no evidence of any

3  Boy Scout who was -- or Venture Crew member who was

4  ever touched or was ever harmed.

5           But that's what has pervaded the

6  State's evidence.  Oh, he was involved with Venture

7  Scouts; but there is no indication that any of those

8  people -- may have been a foolish decision.  He may

9  not should have put himself in that position, but

10 there's no indication that there was any harm that

11 came to anybody because of that.

12           Judge, you know, he's already lost his

13 job.  He's lost his respect in the community.  He's

14 got to register for the rest of his life as a sex

15 offender.  This is a person worth redemption, Judge.

16 Just like, you know, when Tom Rogers said:  I didn't

17 abandon him.  I stood by him.  This is a person worth

18 redemption.

19           I know what's tempting here, Judge.  I

20 would ask you to do the right thing.  The Court will

21 do what the Court thinks is right, and I know the

22 Court will.

23           But this is a reliable, loving son.

24 This is a person that, despite the pressures of having

25 this kind of charge, his friends came in to testify

1   that he's a person with a good heart.  I'd ask you to

2   seriously consider placing him on probation, Judge.

3                       **CLOSING STATEMENT**

4              MR. PHELPS:  Your Honor, it has not

5   been the State who has made a gigantic issue out of

6   this Scouting situation.  We gave the Court

7   information about the Defendant putting himself into a

8   target-rich environment because we believe that is

9   something the Court needs to consider when we're

10  dealing with somebody who has gone to the lengths that

11  this Defendant has gone to amass probably one of the

12  greatest collections of child pornography in Brazos

13  County history.  You heard that from Investigator

14  McCune, 65,000 images, consciously, deliberately

15  downloaded for the purpose of gratification to these

16  awful, horrible, abusive images.

17              Now, does it make sense that the Court

18  hear information that this guy has continued during

19  the entire year's long episode of downloading child

20  porn, that we know of for sure, that he is involving

21  himself in Scouting?  Of course it does.

22              Now, what Mr. James has made the tenor

23  of his defense is:  Hey, he has never put a hand on

24  somebody.  You heard that over and over and over again

25  from him, and that was the tenor of most of the

1   witnesses that were placed on the stand.  But Judge,

2   that's not the issue here.  Would it make it worse?

3   Sure.  But that's not the issue.  Indecency with a

4   child and sexual assault of a child and aggravated

5   sexual assault of a child are separate offenses to

6   child pornography.

7              Child pornography is a crime in and of

8   itself in Texas, and it is an awful crime.  In fact,

9   the Legislature has seen fit to make this one of those

10  crimes where they give courts and juries as much

11  ammunition as they can to help root out this problem

12  from communities.  And make no mistake, Judge, it is a

13  huge, huge problem.

14              Now, the Defendant has basically taken

15  the stand and told you:  I have told the truth.  I can

16  stand before God, and I'll be fine because I have told

17  the truth.  Well, I'm not sure that the Court should

18  buy that; but I can tell you this:  If he is telling

19  the truth, he is in total and complete denial.  He

20  doesn't think he has a problem.  And if he thinks he

21  has a problem, Your Honor, he thinks -- and this is

22  critical -- he's in control.  It's going to be fine.

23  I can control these.  I will never put a hand on a

24  child.

25              Now, again, that's not the issue.  But

1   somebody who comes to you asking for probation who is

2   not willing to acknowledge the disorder that he is

3   dealing with, certainly does not appreciate the

4   magnitude of the disorder he is dealing with, the

5   depravity of the disorder that he is dealing with, the

6   magnitude of all of the evidence that this Court has

7   seen.  And he's just basically telling you with no

8   more of a plan than:  Judge, I'll be okay.  I'm in

9   control.  It's like stopping cigarette smoking cold

10  turkey.  This is not the same thing.

11          And had there been evidence of him

12  putting his hands on children, we'd be trying a

13  different case, Judge.  But we are before the Court on

14  a momentous child pornography case in Brazos County

15  history.  We have 65,000 images of child pornography,

16  Judge.

17          These are just file names; and if the

18  Court looks through some of these, you will find some

19  of the most vile descriptions of abuse of young boys

20  that you could never have conceived of in your worst

21  nightmares.

22          And you know what?  It's not just this

23  stuff, Judge.  This is not a man who just has an

24  occasional interest in boys.  He is looking for nudist

25  camps that he can go to.  He is ordering devices.  He

1  is chatting online.  These books, Judge -- this is

2  sophisticated pedophilia.  This is evidence of

3  somebody who is enamored completely with the thought

4  of boys sexually.

5             There are photographs.  The reason that

6  we offered this is that you've got photographs the

7  Defendant took of the boys he went out on these

8  camping trips with.

9             He's got plenty of photographs in here

10 that show boys in poses, naked, partially clothed.  He

11 just likes looking at boys for sexual reasons.  There

12 is something deeply, profoundly and desperately wrong

13 with that.

14            And this Defendant has not come to

15 terms with that.  He has no plan for you.  There was

16 no psychologist here or psychiatrist here or sex

17 offender counselor here to tell you:  Judge, here's

18 the plan.

19            It was just the Defendant telling you:

20 This is what happened to me when I was 12.  The Court

21 doesn't have the benefit of anything other than the

22 Defendant saying that there is a connection even

23 though over the course of years and years and years,

24 he continues to do well; to get jobs, to be an Eagle

25 Scout -- that's a big deal -- to get his college

1  degree, to get his master's degree.  Those are not the

2  manifestations of somebody so affected by this that

3  they -- that this is an excuse for what he's doing.

4          If you look at any of these books that

5  he has, all of these books that are pictures of little

6  boys in various states of array, places to go in Texas

7  where you can find naked people, books about nature

8  places where you can go, nudist camps where there are

9  children to look at, Bondage Boy Toy DVD.  You're

10  seeing the photographs we showed you, Your Honor,

11  where the Defendant is acting out these fantasies.  It

12  is more than just looking at these things in the

13  privacy of his own home.

14          And Judge, for him to tell you that it

15  comes and goes and that it never, ever, ever occurred

16  to him while he was on one of these trips with these

17  young boys, he is lying to you or in total and

18  complete denial.

19          Now, Judge, you have heard me argue in

20  other cases that this is not just about the Defendant.

21  You are in the position of the jury now.  You are the

22  one who has to make -- and I'm not telling you

23  anything you don't know, Your Honor; and I don't mean

24  to be disrespectful and presumptuous -- but you are

25  the one who has to make an important decision about

1    what to do with this Defendant.  And Judge, based upon
2    what you have heard, there is no reason to put this
3    Defendant on probation.  There is no plan in place.
4    There is no, as Mr. James says, guarantee.
5              You have a PSI from the probation
6    department that says he is an inappropriate candidate
7    for probation due to the extreme nature and graphic
8    nature of these images and the number of these images.
9    This is a huge deal, which leads me to what I think is
10   one of the critical things for the Court to consider.
11             We are doing everything we can in
12   Brazos County, law enforcement and the District
13   Attorney's Office, to create an environment in this
14   community where people who download child pornography
15   are simply not welcome.  We want to put into place as
16   great a disincentive as we possibly can, a deterrent.
17             And I know I've talked to you before.
18   We've talked earlier about deterrents in another
19   context; but Judge, it is according to the Penal
20   Code -- the very first thing they say when they're
21   talking about the objective of the Penal Code:  To
22   ensure the public safety through a deterrent influence
23   of the penalties herein after provided.
24             It talks about rehabilitation, but you
25   don't have a plan for that.  It talks about:  And such

DENISE C. MACKAY, CSR, RPR
(979) 361-4219

```
 1  punishment as may be necessary to prevent likely
 2  recurrence of criminal behavior.
 3          And I think you are faced with that
 4  very, very difficult decision here at this point.  You
 5  know, actually, I don't think it's a difficult
 6  decision.  It's not pleasant; but the fact is, Your
 7  Honor, that in the face of the magnitude of this case
 8  in terms of child pornography and the reasons that we
 9  have this crime, the Defendant told you -- he had
10  volunteered it in Direct Examination.
11          Judge, if you just look at the faces --
12  I know you've seen some of these images before, and I
13  apologize for having to show them to you -- but if you
14  look at the faces of some of these kids, these kids
15  are being damaged for the rest of their lives.  And
16  this Defendant has told you he's in the best position
17  to know the damage that that can cause, and that
18  didn't stop him.  Being arrested and placed on felony
19  deferred in connection with his sexual activities did
20  not stop this Defendant.  It did not shake him out of
21  it.  When he tells you he's in control, he is dead
22  wrong.
23          So what I'm asking the Court to do is
24  to assist in the deterrent efforts.  If you grant
25  probation in this case, if you even give a minimal
```

1  sentence in this case, then you have established the
2  ceiling for these kinds of crimes in Brazos County.
3  You will affect what we are able to do, both law
4  enforcement and the District Attorney's Office, in
5  being able to create a disincentive so that people
6  understand:  If I'm downloading child porn -- if it
7  won't be:  Hey, this is unhealthy for me, or:  Hey,
8  this is really bad for these kids who are being bound
9  and tied and anally sodomized; if that won't stop them
10 downloading this stuff into Brazos County, then the
11 only thing left to us is deterrence.
12            The only thing left to us is creating
13 that disincentive so that somebody somewhere, Judge,
14 will look at the paper tomorrow morning and say:  You
15 know what?  They sent that bank vice president to
16 prison.
17            Your Honor, I don't know what kind of
18 parallel universe Mr. James wants you believe that
19 we're in, but the fact is that we've got a person
20 who's interested in sex with young boys who is
21 gratifying himself sexually to these photographs.
22 They are some of the most extreme images that have
23 ever been presented in a Brazos County court in terms
24 of volume, some of the most we've ever seen.  You have
25 episodes of him acting out fantasies, reaching out on

1  the Internet.  This man is not in control.

2               This case, standing alone, irrespective

3  of whether he ever put a hand on a kid -- and you have

4  to know that there's increased risk when you're

5  looking at the stuff you're looking at.  Putting that

6  aside, standing alone, the maximum sentence for this

7  is ten years per image.  Judge, we could have charged

8  65,000 counts.  That's 650,000 years in prison.  Now,

9  that's silly; but it tells you what the Legislature

10  thinks of this issue.

11              This child pornography stuff is awful.

12  It is a cancer in society.  It is something that

13  cannot be tolerated.  And we have to create as strong

14  and potent a disincentive as we possibly can.  That's

15  what I'm asking you to do today.

16              This Defendant deserves to go to

17  prison.  The probation department has told you he's

18  inappropriate for probation.  He knew each and every

19  time over the course of years and years and years and

20  made a conscious decision to take the risk he's now

21  asking you to disregard today, and that is to pay the

22  consequences for what is a truly awful crime.

23              A person this involved in child

24  pornography over this period of time, involving

25  himself in target-rich environments like the Scouts,

1   that means something, Judge; and this Defendant
2   deserves the maximum sentence.   And we're also asking
3   the Court to stack, to cumulate these sentences
4   because if we do not take this stand, if we give an
5   inch, we are going to lose this battle.   I'm not going
6   to be able to go tell people:   You plead this case for
7   this if all they have to say:   Well, you know what?   I
8   can go to court, and I can get probation.
9               And I know that puts the Court in a
10  difficult position, but it is a legitimate plea for
11  law enforcement.   We are trying to do something very
12  important here, and we need your help.
13              I understand that the Defendant doesn't
14  want to go to prison.   I understand, and I empathize
15  from the bottom of my heart.   His parents don't want
16  to see that.   His friends don't want to see that
17  either, but this isn't just about Gregg Baird.
18              Gregg Baird has not come to terms with
19  what he has done.   He does not understand that he
20  can't control it.   He is, therefore, a threat to this
21  community.   And we have to use this case as we do all
22  of these kind of cases as an example to show that
23  there are serious consequences because serious
24  consequences deter this kind of behavior.
25              And the bottom line for these kind of

1  case is if they stop downloading it, the market dries

2  up; and little boys like this -- even if it's in the

3  Ukraine.  They count, too -- are not going to be

4  victimized and violated by people; and there won't be

5  people gratifying themselves to those kinds of abusive

6  images.

7               So we ask the Court to reject the plea

8  for probation because there is no plan, that he is a

9  risk to this community, and in the effort that we have

10  taken in the District Attorney's Office and law

11  enforcement to make sure that we have created a

12  hostile environment for child pornography to sentence

13  him to the maximum and cumulate these sentences.

14               THE COURT:  You're asking for ten

15  ten-year sentences stacked?

16               MR. PHELPS:  Yes, sir, I am.  This case

17  is richly deserving.

18               THE COURT:  How is that --

19  hypothetically speaking, if I were to do that -- even

20  give him two ten-year sentences -- what is your

21  understanding of how that would play out as far as

22  actual service of time?

23               MR. PHELPS:  In terms of?

24               THE COURT:  My understanding he's got

25  to serve the whole ten-year sentence before he can

1   even begin -- or parole out on the first.

2                   MR. PHELPS:  Well, he would have to

3   serve the whole ten-year sentence before he begins --

4                   THE COURT:  Before he begins the

5   second?

6                   MR. PHELPS:  Yes, sir.  He would have

7   to discharge, but he's eligible for parole at each one

8   as he goes through.

9                   THE COURT:  So ten ten-year sentences

10  stacked is effectively giving him a life sentence as I

11  understand it.

12                  MR. PHELPS:  It would be the equivalent

13  of a non-aggravated life sentence.

14                  THE COURT:  Yes, sir.

15                  MR. PHELPS:  And I would point out to

16  the Court that the Legislature has made this a

17  stackable offense for a very good reason.  I mean, we

18  cannot say literally that having 10 or 15 or 100 or

19  1,000 of these images is the same as 65,000.  If there

20  is a maximum scenario case envisioned by the

21  Legislature for the utilization of the maximum

22  sentence and cumulation of sentences, then this is the

23  case.

24                  THE COURT:  Now, is this a 3G Offense?

25                  MR. PHELPS:  No, sir, it's not.


                    DENISE C. MACKAY, CSR, RPR
                         (979) 361-4219

```
 1                   THE COURT:  It's not a 3G.

 2                   Now, I know you said a minute ago --

 3    and this must have gotten past me during the

 4    evidence -- but this contains pictures that he took of

 5    the kids that were camping with him?

 6                   MR. JAMES:  Not new, Judge.  They're

 7    not new.

 8                   MR. PHELPS:  They're not new.

 9                   MR. JAMES:  Just --

10                   MR. PHELPS:  What happens -- what

11    happens is oftentimes you go out on these trips.  You

12    take photographs.  You put them into a slide show, and

13    you distribute them to the Venture Club.

14                   THE COURT:  Okay.  You have a comment?

15                   MR. JAMES:  Those are actually

16    distributed to the families, Judge, okay?  There's

17    absolutely --

18                   THE COURT:  I understand.

19                   MR. JAMES:  -- nothing in that, Judge.

20    And, you know, Judge, he talks about --

21                   MR. PHELPS:  Judge, I think I had the

22    right to close.

23                   MR. JAMES:  Well, I know.

24                   THE COURT:  I'm inviting some comments

25    here from both sides.
```

```
 1                  MR. JAMES:  Retribution?  Judge, he's
 2  lost everything.  If that doesn't deter somebody,
 3  nothing will.  If having to register as a sex offender
 4  the rest of your life, losing your job and having to
 5  wear an ankle monitor doesn't deter somebody, nothing
 6  is going to deter them, Judge.
 7                  THE COURT:  I understand.
 8                  MR. PHELPS:  And what do you do the
 9  next time a kid from the north side of Bryan comes in
10  here who doesn't have a job as a bank vice president
11  to give up and say:  Okay.  I don't have to go to
12  prison.
13                  MR. JAMES:  You know, Judge --
14                  THE COURT:  Well, okay.  I'm not going
15  to say anything.  I'm going to take the evening to go
16  back and look at all this evidence, which I have not
17  looked at, read the material, and come back tomorrow
18  and announce my decision at 4:00 o'clock.
19                  Is that a problem for anybody?
20                  MR. JAMES:  No.
21                  MR. PHELPS:  No.
22                  MR. JAMES:  You're the Judge.
23                  THE COURT:  I just want to know if you
24  have a conflict.  Do you have a conflict with that,
25  Mr. Phelps?
```

```
 1                    MR. PHELPS:  No, sir.  Tomorrow is
 2   Thursday?
 3                    THE COURT:  Tomorrow is Thursday.
 4                    We'll meet again at 4:00 o'clock, and
 5   I'll give you my decision at that time.
 6               (Proceedings concluded)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1  STATE OF TEXAS

2  COUNTY OF BRAZOS

3

4      I, Denise C. MacKay, Deputy Official Court

5  Reporter in and for the 272nd District Court of

6  Brazos County, State of Texas, do hereby certify that

7  the above and foregoing contains a true and correct

8  transcription of all portions of evidence and other

9  proceedings requested in writing by counsel for the

10  parties to be included in this volume of the

11  Reporter's Record in the above-styled and numbered

12  cause, all of which occurred in open court or in

13  chambers and were reported by me.

14      I further certify that this Reporter's Record of

15  the proceedings truly and correctly reflects the

16  exhibits, if any, offered by the respective parties.

17      I further certify that the total cost for the

18  preparation of this Reporter's Record is $1250.00 and

19  was paid/will be paid by Mr. Richard E. Wetzel,

20  Appellate Counsel for Defendant.

21              Denise C. MacKay, CSR 6482
                Expiration:  12/31/2011
22              Deputy Official Court Reporter
                272nd District Court
23              Brazos County, Texas
                300 E. 26th Street, Suite 204
24              Bryan, Texas 77803
                Telephone:  (979) 361-4219
25

DENISE C. MACKAY, CSR, RPR
(979) 361-4219